# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EMERALD OIL, INC., *et al.*,[1] | ) | Case No. 16-10704 (KG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Emerald Oil, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] respectfully submit this motion for the relief set forth herein. In support of this motion, the Debtors respectfully proffer the *Declaration of Matthew J. Hart in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Authorizing the Debtors to Use Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Emerald Oil, Inc. (9000); Emerald DB, LLC (2933); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887). The location of the Debtors' service address is: 200 Columbine Street, Suite 500, Denver, Colorado 80206.

[2]  A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Ryan Smith, Chief Financial Officer of Emerald Oil, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

*Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Hart Declaration"), attached hereto as **Exhibit B**, and the First Day Declaration. In further support of this motion, the Debtors respectfully state the following:

**Preliminary Statement**[3]

1.      This motion requests that the Court approve a $7.5 million secured loan credit facility on an interim basis and $129,928,000 in the aggregate on a final basis (collectively, the "DIP Loan") provided by Wells Fargo Bank, N.A. and a syndicate of financial institutions comprising the Pre-Petition Lenders (collectively, the "Post-Petition Lenders"). If this Motion is approved, the Debtors will use the proceeds of the DIP Loan to, among other things stabilize and fund the Debtors' general and corporate operations during these chapter 11 cases.

2.      For the reasons set forth below, in the Hart Declaration and the First Day Declaration, the Debtors firmly believe that the DIP Facility will maximize the value of all of the Debtors' stakeholders and is an exercise of the Debtors' sound business judgment. Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

**Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2**

3.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order,"[4] and together with the Interim DIP Order, the "DIP Orders"): (i) authorizing the Debtors to obtain secured postpetition financing (the "DIP Facility") as set forth in that certain loan agreement, annexed as **Exhibit 1** to **Exhibit A** attached hereto (the "DIP Agreement" and, together with all

---

[3]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms further below in this motion or in the Interim DIP Order, as applicable.

[4]    The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

agreements, documents, and instruments executed and delivered in connection therewith, as hereafter amended, supplemented, or otherwise modified from time to time in accordance with the DIP Orders, the "DIP Financing Documents") among Emerald Oil Inc. ("Emerald"), Emerald DB, LLC, Emerald NWB, LLC, Emerald WB LLC, and EOX Marketing, LLC (the "Guarantors"), Wells Fargo Bank, N.A., as administrative agent (in such capacity, the "DIP Agent"), and the lenders of the DIP Loans (collectively, in such capacities, the "Post-Petition Lenders"); (ii) granting liens and providing superpriority claims with respect to such postpetition financing; (iii) authorizing the Debtors to use Cash Collateral; (iv) approving the form of adequate protection to be provided to certain prepetition lenders; (v) modifying the automatic stay on a limited basis as set forth herein; (vi) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order; and (vii) granting related relief.

4.      The provisions of the DIP Agreement and the Interim DIP Order were extensively negotiated and are the most favorable terms that the Debtors were able to obtain. Moreover, the Debtors have an urgent need for the DIP Facility. Approval of the DIP Facility will ensure the Debtors are able to maintain their operations, pursue the chapter 11 cases, and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors request that the Court enter the Interim DIP Order and Final DIP Order approving the DIP Facility.

5.      The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.[5]

---

[5]  The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Financing Documents or the Interim DIP Order, as applicable.

| Bankruptcy Code/Local Rule | Summary of Material Terms |
| --- | --- |
| Borrower<br>Bankruptcy Rule 4001(c)(1)(B) | Emerald.<br><br>*See* DIP Agreement Preamble; Interim DIP Order Preamble. |
| Guarantors<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the Debtors (other than Emerald).<br><br>*See* DIP Agreement Preamble; Interim DIP Order ¶ 11. |
| DIP Financing Lenders<br>Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Bank, N.A., and a syndicate of financial institutions comprised of the Pre-Petition Lenders, including SunTrust Bank, The Bank of Nova Scotia, Barclays Bank PLC, and Credit Suisse AG, Cayman Islands Branch.<br><br>*See* DIP Agreement Preamble; Interim DIP Order Preambles. |
| Term<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br>Local 4001-2(a)(ii) | The term of the DIP Facility shall mature on the earliest of (a) September 22, 2016 at 4:00 p.m. Central Time, (b) April 21, 2016 at 4:00 p.m. Central Time unless the Bankruptcy Court shall have entered a final Financing Order, which shall be in form and substance satisfactory to the DIP Agent, (c) the date the Debtors terminate the commitment of the Lenders to make the Postpetition Loans, (d) the date the DIP Agent terminates the commitment of the Lenders to make the Postpetition Loans upon the occurrence and during the continuation of a Postpetition Default, (e) the date of following the occurrence of an Event of Default under and as defined in the Financing Order and the giving of three (3) Business Days' prior written notice to the Debtors, provided that no such notice or any notice of any kind is required if the Termination Date (as defined in the Financing Order) occurs, (f) the effective date of a confirmed plan of reorganization for the Debtors, (g) the date on which any agreement for the sale of substantially all of the Debtors' assets closes, or (h) the date on which the Bankruptcy Court approves the extension of any other credit facilities to the Debtors over the objection of the DIP Agent.<br><br>*See* DIP Agreement § 2(b). |
| Commitment<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The total DIP Facility shall include loans to be advanced and made available to the Borrower in the aggregate maximum principal amount of $7.5 million on an interim basis and $129,928,000 in the aggregate on a final basis.<br><br>*See* DIP Agreement § 2(b); Interim DIP Order Preamble. |
| Conditions of Borrowing Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The obligation of the Post-Petition Lenders to make any Post-Petition Loan (including the initial Post-Petition Loan) shall be subject to the following conditions precedent: (i) the Borrower shall deliver to the DIP Agent an executed Postpetition Notice of Borrowing pursuant to Section 2.11(b) of the DIP Agreement, (ii) no event has occurred and is continuing which constitutes a Postpetition Default or which would constitute a Postpetition Default but for the requirement that notice be given or time elapsed or both; (iii) the Borrower shall deliver to the DIP Agent a certificate of the chief restructuring officer or chief financial officer of the Borrower certifying that (A) all representations and warranties made by each Debtor in the DIP Agreement or in any statement or certificate after the DIP Agreement Effective Date by such Debtor in writing pursuant to any Loan Document are true and correct in all material respects (except to the extent qualified by materiality, in which case, true and correct in all respects), (B) the Debtors are in compliance with the Budget, subject to the Permitted Variances, and attached thereto is a schedule demonstrating such compliance in reasonable detail, (C) the Debtors do not have sufficient DIP Cash Collateral available to pay the Budgeted Expenses requested to be paid with the proceeds of the Post-Petition Loan, and (D) the Debtors shall apply the proceeds of the Post-Petition Loan only to Budgeted Expenses; (iv) with respect to the initial Postpetition Loan, the DIP Agent shall have received such other approvals or documents as the Lenders may reasonably request; (v) no Bankruptcy Court order has |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | been entered authorizing the Debtors to obtain financing or credit pursuant to Section 364 of the Bankruptcy Code from any Person other than the Post-Petition Lenders secured by a security interest or having the priority of an administrative claim unless otherwise consented to by the DIP Agent in writing; (vi) the Financing Order shall be in full force and effect and shall not have been vacated, reversed, modified, or amended and, in the event that such order is the subject of any pending appeal, no performance of any obligation of any party under the Financing Order shall have been stayed pending appeal; (vii) the DIP Agent shall have received payment for all reasonable professional fees incurred by the DIP Agent and the Post-Petition Lenders to the extent then due and payable in accordance with the Financing Order; and (viii) after giving effect to the requested Borrowing, the total Post-Petition Loans shall not exceed the Postpetition Aggregate Commitment.  In no event shall the Post-Petition Lenders be requested to advance any funds or extend any credit other than for Budgeted Expenses actually incurred and payable either at the time of such advance or within one week thereafter.<br><br>*See* DIP Agreement § 2(c). |
| Interest Rates<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Debtors shall pay interest on the unpaid principal amount of each Post-Petition Loan from the date made until the principal amount thereof shall have been paid in full at a rate per annum equal at all times to (i) in the case of a Eurodollar Borrowing, the LIBO Rate for the Interest Period in effect for such Eurodollar Borrowing plus 9.00% and (ii) in the case of an ABR Borrowing, the Alternate Base Rate in effect from time to time plus 8.00%, in each case, payable monthly in arrears on the last Business Day of each month and on the Postpetition Termination Date and, in the case of a Eurodollar Borrowing, upon the expiration of each Interest Period.<br><br>In addition, principal outstanding on account of Post-Petition Loans after the occurrence of a Postpetition Default shall bear interest, from the date of such Postpetition Default until the date on which such amount is paid in full or such Postpetition Default is waived or cured, payable on demand, at the applicable rate set forth in clause (i) or (ii) above plus 2.00% per annum; *provided* further that no rate of interest payable pursuant to the terms of Section 2(c) of the DIP Agreement shall exceed the Highest Lawful Rate.  For the avoidance of doubt, the Debtors shall pay interest on the unpaid principal amount of any Rollup Amount in accordance with Section 3.02 of the Credit Agreement,<br><br>*See* DIP Agreement § 2(c). |
| Use of DIP Financing Facility and Cash Collateral<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br>Local Rule 4001-2(a)(ii)<br><br>Repayment Features<br>Local Rule 4001-2(a)(i)(E) | The DIP Facility shall be used (i) in accordance with and subject to the Budget, subject to Permitted Variances, for general corporate purposes of the debtors (including payment of fees and expenses in connection with the transactions contemplated hereby, any adequate protection payments included herein, and working capital) and (ii) such prepetition obligations as the Court shall approve, in each case in a manner consistent with the terms and conditions contained in the DIP Agreement.<br><br>*See* DIP Agreement § 2(d). |
| Entities with Interests in Cash Collateral<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The lenders party to the Amended and Restated Credit Agreement dated May 1, 2014.<br><br>*See* Interim DIP Order ¶¶ 14-15, 43–44. |
| Fees<br>Bankruptcy Rule | DIP Agency Fee: The DIP Agent shall receive, for its own account, a monthly administration fee of $15,000, due and payable on the first Business Day of each month |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | commencing on the first such date to occur after the DIP Agreement Effective Date. *See* DIP Agreement § 2(c). Commitment Fee: Each Post-Petition Lender will receive a commitment fee of 1.00 % per annum on the average daily amount of the unused amount of the DIP Commitment of such Post-Petition Lender during the period from and including the DIP Agreement Effective Date to but excluding the Postpetition Termination Date, payable monthly in arrears on the last Business Day of each month and on the Postpetition Termination Date, commencing on the first such date to occur after the Petition Date. *See* DIP Agreement § 2(c). Facility Fee:  Each Post-Petition Lender will receive a facility fee equal to 2.00% of the amount of each Post-Petition Lender's commitment (exclusive of any Rollup Amount). *See* DIP Agreement § 3(i). |
| Budget Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(ii) | The use of cash and proceeds from the DIP Financing Loans is subject to a customary budget, attached to the Interim DIP Order as **Exhibit 2**. *See* DIP Agreement § 2(c); Interim DIP Order ¶¶ 26, 42. |
| Reporting Information Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | The DIP Agreement requires compliance with certain reporting covenants that are usual and customary for DIP financings, including, without limitation, delivery of schedules, assignments, financial statements, insurance policies, and endorsements, weekly reports of receipts and budgeted cash usage, copies of all reports filed with the Office of the United States Trustee within two days after such filing; and such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of any of the Debtors' estates. Additionally, the Debtors are required pursuant to the Interim DIP Order to promptly deliver to the DIP Agent any and all material documentation that in any way relates to a solicitation, offer, or proposed sale or disposition of a material amount of property of any of the Debtors' estates. *See* DIP Agreement § 2(d); Interim DIP Order ¶¶ 59–63. |
| Variance Covenant Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | The Debtors are authorized to use the Cash Collateral (including, without limitation, the advances under the DIP Facility) strictly in accordance with the 13-week Budget, subject to a permitted negative variance (i) of 10% per week above the projected Total Operating Disbursements set forth in the Budget, (ii) 10% per week, on a by-line-item basis, above the projected amounts set forth in the Budget for the line-items in the Budget labeled "Accounts Payable - Critical," "Salaries & Benefits," "Rent & Utilities," "Professional Fees" (provided that, for the avoidance of doubt, "Professional Fees" will not include any fees attributable to the Administrative Agent's or Lenders' professionals) and "Other," and (iii) of 10% per four-week period, then ending, on the actual production volume of crude oil set forth in the Budget. *See* DIP Agreement § 2(d); Interim DIP Order ¶ 39 |

| Bankruptcy Code/Local Rule | Summary of Material Terms | |
|---|---|---|
| Sale Milestones Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | **30 days after the Petition Date** | The Debtors shall obtain entry of an order authorizing the retention of the Sales Agent. |
| | **March 28, 2016** | The Debtors shall deliver to the DIP Agent a list of Target Parties, a form NDA to the Target Parties, and a marketing document for distribution to the Target Parties. |
| | **April 1, 2016** | The Debtors and shall have opened and populated a virtual data room with documents and other information for the sale process. |
| | **April 15, 2016** | The Sales Agent shall have solicited from the Target Parties non-binding indications of interest for the sale transaction. |
| | **April 29, 2016** | The Debtors' management shall conduct presentations regarding the Debtors' business and assets to interested parties. |
| | **May 13, 2016** | The Debtors shall have solicited final bid letters and proposed asset purchase agreements and any requisite financial commitment materials from the most promising bidders. |
| | **May 20, 2016** | The Debtors shall have filed a motion to approve sale and bid procedures. |
| | **June 10, 2016** | The Debtors shall have obtained entry of an order by the Court approving the bid procedures motion. |
| | **July 11, 2016** | The Sales Agent shall conduct an auction of substantially all of the Debtors' assets. |
| | **July 15, 2016** | The Debtors shall have obtained entry of an order by the Court approving the sale transaction. |
| | **July 22, 2016** | The Debtors shall have closed and consummated the sale transaction and distributed proceeds as set forth in the DIP Order. |
| | *See* Interim DIP Order § 80. | |
| Liens and Priorities Bankruptcy Rule 4001(c)(l)(B)(i) Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | The DIP Loan shall be secured by the following liens: | |
| | (i) upon entry of the Interim DIP Order, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority claims with priority over all other administrative claims against the Debtors' estates and all other benefits and protections allowable under sections 507(b) and 503(b)(1) of the Bankruptcy Code, senior in right to all other administrative claims against the Debtors' estates, except for the Carve Out; and | |
| | (ii) pursuant to sections 364(d)(i), (c)(2) and (c)(3) of the Bankruptcy Code, first priority claims, liens and security interests on any property not subject to a lien, junior liens on property subject to a Prior Lien, and priming liens and security in any and all assets and properties of the Debtors and the Debtors' bankruptcy estates, wherever located, including property subject to avoided liens, now owned or after acquired, real and personal, tangible and intangible, and all proceeds, substitutions, products, rents, or profits thereof (which shall include any and all assets of the Debtors of the types described in the Pre-Petition Claim Documents, but not be limited to the Pre-Petition Collateral, it being the intent of the Debtors, the Pre-Petition Agent, the Pre-Petition Lenders, the Post-Petition Agent, and the Post-Petition Lenders that the DIP Collateral shall encumber all assets of the Debtors' estates, including, without limitation: (1) the following presently-owned and after-acquired personal property: (a) accounts, (b) accessions, (c) chattel paper (both tangible and electronic), (d) commercial tort claims, (e) commodity accounts, (f) commodity contracts, (g) deposit accounts, (h) documents, (i) equipment, (j) financial assets, (k) fixtures, (l) general intangibles, (m) goods, (n) intellectual property, (o) instruments, (p) inventory, (q) investment property, (r) letters of credit, (s) letters of credit rights, (t) payment intangibles, (u) permits, (v) timber, (w) as-extracted collateral, (x) notes, (y) | |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | promissory notes, (z) securities (certificated and uncertificated), (aa) securities accounts, (ab) securities entitlements, (ac) software, (ad) supporting obligations, (ae) collateral records, (af) insurance, (ag) causes of action, (ah) proceeds from any causes of action under the Bankruptcy Code including, without limitation, § 544, 547, and 548 ("Avoidance Claims") (but not, for the avoidance of doubt, Avoidance Claims themselves), and (ai) money (as each such term may be defined in the New York Uniform Commercial Code as of the date hereof (the "UCC")), (2) all presently owned or after acquired real property and improvements thereon and leases of real property, and (3) all presently owned or after acquired interests in Oil and Gas Properties, as defined in the Credit Agreement, wherever located and irrespective to whether such Oil and Gas Properties are part of the Lenders' Pre-Petition Collateral), subject only to the Prior Liens (if any) and the Carve Out.<br><br>*See* DIP Agreement § 2(c); Interim DIP Order ¶ 32. |
| Carve Out<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(f) | The sum of:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Bankruptcy Court, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").<br><br>The Carve Out amounts for the fees and expenses of the Professional Persons shall be invoiced to the Debtors monthly and promptly deposited into a segregated account of the applicable Debtor with the Post-Petition Agent and held in trust to pay Allowed Professional Fees of Professional Persons benefitting from the Carve Out, with such funds being subject to the respective interests of the Post-Petition Lenders and Pre-Petition Lenders such that any residual amount (the "Residual Amount") will be paid as provided in the Carve Out Reserve Account Priority (as defined below), but only after payment of all Allowed Professional Fees of Professional Persons benefitting from the Carve Out (the "Carve Out Reserve Account").  Allowed Professional Fees of Professional Persons benefitting from the Carve Out shall be paid from the Carve Out Reserve Account.  The "Carve Out Reserve Account Priority" is the following payment priority from the Carve Out Reserve Account to the extent of the Residual Amount: first, to pay the Post-Petition Agent for the benefit of the Post-Petition Lenders and, until and unless the DIP Facility has been indefeasibly paid in full in cash and all DIP Facility commitments have been terminated, second, to the Pre-Petition Agent for the benefit of the Pre-Petition Lenders, and third, any remaining amount shall be retained by the bankruptcy estate(s).<br><br>On the day on which a Carve Out Trigger Notice is given by the Post-Petition Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), notwithstanding anything in the DIP Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Agreement) or Event of |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Default, the failure of the Debtors to satisfy any or all of the conditions precedent for borrowings under the DIP Facility, any termination of the commitments under the DIP Facility following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Agreement), the Carve Out Trigger Notice shall be deemed a draw request and notice of borrowing by the Debtors, as applicable, per the terms of the DIP Facility, in an amount equal to the accrued and unpaid Professional Fees that have not yet been deposited in to the Carve Out Reserve Account plus the Post-Carve Out Trigger Notice Cap.

Notwithstanding anything to the contrary in the terms of the DIP Facility, following delivery of a Carve Out Trigger Notice, the Post-Petition Agent and the Pre-Petition Agent shall not sweep or foreclose on cash (including, without limitation, cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserve Account has been fully funded.  Further, notwithstanding anything to the contrary in this Financing Order, (i) while amounts deposited into the Carve Out Reserve Account shall constitute Loans (as defined in the DIP Agreement), disbursements by the Debtors from the Carve Out Reserve Account shall not constitute Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserve Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Facility, or in any facility under the Pre-Petition Claim Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the prepetition secured obligations.

The Post-Petition Agent, the Post-Petition Lenders, the Pre-Petition Agent, and the Pre-Petition Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Financing Order or otherwise shall be construed to obligate the Post-Petition Agent, the Post-Petition Lenders, the Pre-Petition Agent, and/or the Pre-Petition Lenders in any way, to pay compensation to, or to reimburse expenses of, any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement, and any such obligation to make payments to any Professional Person shall be an obligation of the applicable bankruptcy estate.

Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Post-Carve Out Trigger Notice Cap.

Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Financing Order, the DIP Documents, the Bankruptcy Code, and applicable law.

Other than the Carve Out set forth above, none of the Post-Petition Agent, the Post-Petition Lenders, the Pre-Petition Agent and the Pre-Petition Lenders consents to any carve out from their Collateral for payment of any fees and expenses of the Professional Persons.  The amounts payable on account of Professional Fees are subject to final approval and allowance by the Bankruptcy Court, and to the extent the amounts funded in the Carve Out Reserve Account exceed the amount so allowed, any excess shall be |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | distributed per the Carve Out Reserve Account Priority.<br><br>*See* Interim DIP Order ¶¶ 65–74. |
| 506(c) Waiver<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br>Local Rule 4001-2(a)(i)(C) | Subject to entry of the Final DIP Order, no costs or expenses of administration which have or may at any time be incurred in the chapter 11 cases (or in any successor chapter 7 case) shall be charged against the DIP Agent or the Lenders, their claims or the Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Agent and the Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.<br><br>*See* DIP Agreement § 2(c); Interim DIP Order ¶ 75. |
| Section 552(b)<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(i)(h) | The Debtors stipulate that the "equities of the case" exception of Bankruptcy Code section 552(b) shall not apply.<br><br>*See* Interim DIP Order ¶ 20. |
| Stipulations to Prepetition Liens and Claims<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br>Local Rule 4001-2(a)(i)(B)<br><br>Challenge Period<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(i)(B) | Pursuant to paragraphs 10 and 18 of the Interim DIP Order, the Debtors make certain customary admissions and stipulations with respect to the aggregate amount of the prepetition debt and the extent, validity, enforceability, and priority of the liens and security interests securing the Pre-Petition Collateral.<br><br>*See* Interim DIP Order ¶¶ 10, 18. |
| Adequate Protection<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Taking into account all factors in the chapter 11 cases, as adequate protection of the Pre-Petition Agent's and Pre-Petition Lenders' interest in the Collateral and for the Debtors' use of Cash Collateral, and subject only to Prior Liens, if any, the Carve Out, and the Post-Petition Agent and the Post-Petition Lenders' liens and security interests securing the DIP Facility:<br><br>   i.   The Pre-Petition Agent and Pre-Petition Lenders are granted pursuant to the Interim DIP Order, effective as of the Petition Date, valid and automatically perfected first priority replacement liens and security interests in and upon the Collateral.<br><br>   ii.   To the extent any adequate protection is insufficient to adequately protect the Pre-Petition Agent and the Pre-Petition Lenders' interest in the Collateral, the Pre-Petition Agent and the Pre-Petition Lenders are granted pursuant to the Interim DIP Order, superpriority administrative claims and all of the other benefits and protections allowable under Bankruptcy Code § 507(b), junior only in right to any superpriority administrative claims granted to the Post-Petition Agent and the Post-Petition Lenders on account of the DIP Facility and the Carve Out.<br><br>*See* Interim DIP Order ¶¶ 4344. |
| Events of Default<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Financing Agreement contains the following events of default: (a) any default, event of default, violation, or breach by any of the Debtors of any of the terms of the DIP Orders or any default, event of default, or Event of Default (as such term is defined in the |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(ii) | DIP Facility Documents) under the DIP Facility Documents; (b) the occurrence of the Expiration Date (as defined below), maturity, termination, expiration, or non-renewal of this Financing Order or the DIP Facility as provided for herein or in any of the DIP Facility Documents; (c) the Debtors shall fail to pay any principal of the DIP Facility when the same becomes due and payable; (d) the Debtors shall fail to pay any interest on the DIP Facility or any fee or other amount due with respect to the DIP Facility after such interest, fee, or other amount becomes due and payable; (e) the Debtors shall fail to obtain, on or before 30 days after the Petition Date, an order by the Court approving the Motion on a final basis in form and substance satisfactory to the Agent, for itself and for and on behalf of the Lenders, in its sole and absolute discretion; (f) any representation or warranty made by the Debtors in any DIP Facility Document or in any statement or certificate given after the effective date of the DIP Amendment by any of the Debtors in writing pursuant to any DIP Facility Document or in connection with any DIP Facility Document shall be false in any material respect on the date as of which made; (g) any of the Debtors' Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (h) the appointment of a trustee or examiner with expanded powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) under 1106(b) of the Bankruptcy Code in any of the Debtors' Cases; (i) any security interest, lien, or encumbrance, excluding any Prior Liens, shall be granted in any of the Collateral which is pari passu with or senior to the liens, security interests, or claims of the DIP Agent or the Lenders, including, without limitation, any surcharge of the Collateral pursuant to Bankruptcy Code §506(c); (j) the entry of an order granting relief from the Automatic Stay to the holder or holders of any other security interest or lien (other than the DIP Agent or the Lenders) in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Collateral, in each case involving assets with a value in excess of $250,000; (k) any provision of the DIP Facility Documents shall cease to be valid and binding on the Debtors, or the Debtors shall so assert in any pleading filed with any court; (l) the Debtors shall attempt to vacate or modify the DIP Orders over the objection of the DIP Agent, for itself and for and on behalf of the Lenders; (m) the entry of an order pursuant to Bankruptcy Code § 363 approving the sale of a material portion of any of the Debtors' assets; (n) the failure to meet any of the Sale Milestones (as defined below); (o) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending the DIP Orders; (p) the filing by the Debtors or confirmation of a plan of reorganization that (1) does not provide for indefeasible payment in full in cash of all obligations owing under the DIP Facility or (2) is not acceptable to the DIP Agent in the treatment of the Lenders' Pre-Petition Claim or the DIP Facility; (q) any challenge to the extent, validity, priority, or unavoidability of the DIP Agent's or the Lenders' liens securing the Lenders' Pre-Petition Claim and/or the DIP Facility is commenced by the Debtors or an order is entered sustaining any such challenge commenced by any party other than the Debtors; or (r) the occurrence of any default under any DIP Facility Document. *See* DIP Agreement § 2(b); Interim DIP Order ¶ 76. |
| Waiver/Modification of the Automatic Stay Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362(a) of the Bankruptcy Code is modified pursuant to the Interim DIP Order to permit: (a) the Debtors, the DIP Agent, and the Lenders to commit all acts and take all actions necessary to implement the DIP Facility and the DIP Orders; (b) all acts, actions, and transfers contemplated in the DIP Orders, including, without limitation, transfers of Cash Collateral and other funds to the DIP Agent, for itself and for and on behalf of the Lenders, by the Debtors as provided in the DIP Orders; and (c) consistent with the terms of the DIP Order, to permit the DIP Agent and/or the Lenders, at their option, to pursue their rights and remedies as to the Collateral in accordance with the Pre-Petition Claim Documents, the DIP Facility Documents, and |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | applicable law. |
| | *See* Interim DIP Order Preamble, ¶ 54. |
| | Upon the occurrence of an Event of Default that continues to exist after the Default Notice Period, then without further act or action by the DIP Agent, or any further notice, hearing or order of this Court, the Automatic Stay shall be immediately modified and the DIP Agent shall be and are hereby is authorized, in its sole and absolute discretion, to take any and all actions and remedies that the DIP Agent may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of any of the estates of the Debtors, including, without limitation, (i) any right or remedy set forth in the DIP Facility Documents, (ii) any right or remedy that the DIP Agent may deem appropriate to proceed against, take possession of, foreclose upon, sell (in whole or in part), protect, and realize upon the Collateral and any other property of any of the Debtors' estates upon which the DIP Agent and the Lenders have been or may hereafter be granted liens and security interests to obtain repayment of the DIP Facility and the Lenders' Pre-Petition Claim, (iii) the commencement of actions for specific performance and for the foreclosure upon any Collateral, (iv) the sale of the Collateral, or any portion thereof, either as a whole or in part, at private or public auction, and the DIP Agent, for itself and for and on behalf of the Lenders shall have the right to purchase the Collateral at same by credit bidding all or a part of their debt or otherwise, (v) taking possession of the Collateral, and the exercise, without interference, and, if necessary, as the attorney-in-fact for the Debtors, of any rights of the Debtors in the management, possession, operation, protection or preservation of the Collateral, (vi) the receipt of proceeds from the sale of any Collateral, (vii) the direction of the payment for any purchase of the Collateral directly to the DIP Agent, for itself and for and on behalf of the Lenders, as applicable, and (viii) the right of setoff and recoupment as to any funds of the Debtors' estates held by the DIP Agent, for itself and for and on behalf of the Lenders; provided that the DIP Agent and the Lenders shall not be obligated to take title to any of the Collateral in the pursuit of any of the DIP Agent's or the Lenders' rights and remedies and the Debtors shall cooperate with the DIP Agent and the Lenders in conjunction with the exercise of any right and the pursuit of any remedy by the DIP Agent or the Lenders without limitation. |
| | *See* DIP Agreement § 7.02(a); Interim DIP Order ¶¶ 54, 78. |
| Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim DIP Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of the DIP Agent's and the Lenders' security interests in and liens on the DIP Collateral granted and created hereunder, and such security interests and liens shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities granted under the Interim DIP Order, effective as of the Petition Date, without the necessity of creating, filing, recording, or serving any financing statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to the DIP Agent, for itself and on behalf of any of the Lenders, by the Interim DIP Order. |
| | *See* Interim DIP Order ¶ 45 |
| Indemnification Bankruptcy Rule 4001(c)(1)(B)(ix) | Subject to entry of the Final DIP Order, the Debtors shall jointly and severally indemnify the DIP Agent, the Lenders, the Secured Swap Provider, and their respective representatives, directors, officers, employees, independent contractors, attorneys and agents, and their successors and assigns (each, an "Indemnified Person," and together, the "Indemnified Persons") and hold each of them harmless from and against all claims, liabilities, losses, damages, causes of action, suits, judgments, costs, and expenses, including, without limitation, reasonable attorneys' fees, arising out of or from or related to any of the Pre-Petition Claim Documents and DIP Facility Documents. If any action, |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | suit, or proceeding is brought against any of the Indemnified Persons, Debtors shall, at the DIP Agent's or Lenders' request, defend the same at their sole cost and expense, such cost and expense to be a joint and several liability of the Debtors, by counsel, selected by the Lenders.<br><br>*See* DIP Agreement § 8; Interim DIP Order ¶ 103. |
| Liens on Avoidance Actions<br>Local Rule 4001-2(a)(i)(D) | To the extent approved by and subject to the Final DIP Order, the DIP Collateral includes the proceeds of any causes of action under sections 544, 547, and 548 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>") (but not, for the avoidance of doubt, Avoidance Actions themselves).<br><br>*See* Interim DIP Order ¶ 33. |

### Jurisdiction and Venue

6.      The United States Bankruptcy Court for the District of Delaware (the "Court")
has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the
*Amended Standing Order of Reference from the United States District Court for the District of
Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of
28 U.S.C. § 157(b)(2). The Debtors confirm their consent pursuant to Rule 9013-1(f) of the
Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the
District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection
with this motion to the extent that it is later determined that the Court, absent consent of the
parties, cannot enter final orders or judgments in connection herewith consistent with Article III
of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503,
and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"),
Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

**Relief Requested**

9.    The Debtors request that the Court, on an interim basis pending entry of the Final

DIP Order:

> a.    authorize the Debtors to obtain the DIP Financing consisting of $7.5 million of secured financing on an interim basis and $129,928,000 in aggregate on a final basis subject to and pursuant to the terms and conditions set forth in the Interim DIP Order and the DIP Agreement;
>
> b.    authorize the Debtors to execute and deliver the DIP Agreement and the other DIP Financing Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;
>
> c.    authorize the Debtors to (a) grant the Post-Petition Lenders superpriority administrative claims and all other benefits and protections allowable under sections 507(b) and 503(b)(1) of the Bankruptcy Code, senior in right to all other administrative claims against the Debtors' estates, except for the Carve Out and (b) pursuant to sections 364(d)(i), (c)(2) and (c)(3) of the Bankruptcy Code, perfected first priority claims, priming liens, and security interests in the DIP Collateral and Pre-Petition Collateral, subject only to the Prior Liens (if any) and the Carve Out.
>
> d.    authorize the Debtors to (a) use Cash Collateral (as defined in the Interim DIP Order) to the extent required herein, and (b) provide adequate protection, solely to the extent provided herein, to the Pre-Petition Lenders under: (i) that certain Amended and Restated Credit Agreement, dated as of May 1, 2014, by and among Emerald, as borrower, the Guarantors party thereto, Wells Fargo Bank, N.A., as administrative agent (the "Pre-Petition Agent," and together with the DIP Agent, collectively, the "Agent"), and the lenders from time to time party thereto (in such capacity, the "Pre-Petition Lenders") on account of the Debtors' use of Cash Collateral and any other Pre-Petition Collateral;
>
> e.    authorize the Agent to exercise remedies under the DIP Financing Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Agreement);
>
> f.    subject to entry of the Final DIP Order, authorize the Debtors to grant liens to the Post-Petition Lenders on the proceeds of the Avoidance Actions (as defined herein) (but not, for the avoidance of doubt, on the Avoidance Actions themselves);

g.      subject to entry of the Final DIP Order, waive the Debtors' right to surcharge against the DIP Financing Collateral (as defined in the Interim DIP Order) or, solely to the extent set forth herein, the Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code;

h.      schedule the Final Hearing for a date that is before the 25th day after the Petition Date to consider entry of the Final DIP Order authorizing the borrowings under, and the Debtors' entry into, the DIP Agreement on a final basis and approval of notice procedures with respect thereto; and

i.      lift the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders.

## Background

10.     The Debtors are an onshore oil and gas exploration and production company with headquarters in Denver, Colorado and operations primarily located in North Dakota. The Debtors operate, or have royalty or working interests in, approximately 100 oil and gas production sites.

11.     On March 22, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## I.      The Debtors' Prepetition Capital Structure.

12.     As of December 31, 2015, the Debtors reported approximately $291 million in total assets (with $28 million in current assets) and approximately $337 million in total liabilities. As described in greater detail below, as of the Petition Date, the principal amount of

15

the Debtors' consolidated funded debt obligations (the "<u>Prepetition Debt Obligations</u>") totaled approximately $260.5 million, comprising: (a) approximately $111 million of obligations under the Prepetition Credit Facility (as defined herein); and (b) approximately $148.5 million of obligations under the Convertible Notes (as defined herein).

**A.    Credit Facility.**

13.    Emerald is the borrower under that certain Amended and Restated Credit Agreement, dated as of May 1, 2014 (as amended from time to time, the "<u>Prepetition Credit Agreement</u>"), with Wells Fargo Bank, N.A., as administrative agent, and the lenders from time to time party thereto.[6]  The Prepetition Credit Agreement provides for a senior secured reserve-based revolving credit facility with a maximum commitment of $400 million (the "<u>Prepetition Credit Facility</u>").  The obligations owing in respect of the Prepetition Credit Agreement are guaranteed by each of the other Debtors except for Emerald Oil, Inc.

14.    The Debtor' Pre-Petition Lenders assert they have first priority lien on all of the Debtors' existing producing reserves.  On April 30, 2015, in connection with the scheduled semiannual borrowing base redetermination, Emerald and the Lenders entered into an amendment to the Prepetition Credit Facility.  The amendment to the Prepetition Credit Facility reduced the borrowing base from $250 million to $200 million.  On October 6, 2015, the Agent notified Emerald that the borrowing base was further decreased to $120 million, as described more fully below.

15.    The Prepetition Credit Agreement permits the Debtors to hedge (typically in the form of a swap agreement) up to 60 percent of proved reserves for the first 24 months of the term of the particular swap agreement and 80 percent of projected production from proved developed

---

[6]    The Credit Agreement amended and restated that certain Credit Agreement, dated as of November 20, 2012, among Emerald, as borrower, the Agent and the Lenders.

producing reserves from the 24th month up to the 60th month of the swap agreement, subject to certain restrictions. As of September 30, 2015, Emerald had hedges covering 70 percent of its projected production through 2016.

16.     On February 3, 2016, The Bank of Nova Scotia notified Emerald that Emerald's existing hedges had been terminated for approximately $17.5 million with all proceeds going towards pay down of the existing base deficiency.   Concurrently, the borrowing base was reduced from $120 million to $113 million.  Thus, as of the Petition Date, all of the Debtors' swap agreements had terminated, and the Debtors therefore no longer had hedges in place.

**B.      Convertible Notes.**

17.     Emerald has issued those certain 2.0 percent Convertible Senior Notes due 2019 (the "Convertible Notes") pursuant to an Indenture dated March 24, 2014 between Emerald and U.S. Bank, National Association, as indenture trustee (the "Indenture Trustee"). The Convertible Notes, issued in the aggregate principal amount of $172,500,000 (netting approximately $167 million in proceeds), mature on April 1, 2019.  Interest on the Convertible Notes is payable semi-annually on October 1 and April 1 of each year. The Convertible Notes are not guaranteed by the other Debtors.  On October 22, 2015, the Debtors entered into an agreement with a holder of the Convertible Notes pursuant to which the Debtors and the noteholder agreed to exchange approximately $3 million principal value of Convertible Notes for a number of shares of common stock, thereby achieving a limited deleveraging.

**II.     The Debtors Have an Immediate Need for Cash.**

18.     The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest.  As of the Petition Date, the Debtors' total cash balance is

approximately $3.5 million, which is insufficient to operate their enterprise and continue paying their debts as they come due. Without prompt postpetition financing and access to cash collateral, the Debtors will be unable to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. *See* Hart Decl. ¶¶ 6, 10.

**III.    Alternative Sources of Financing Are Not Readily Available.**

19.    The Debtors do not believe it would prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. However, the Debtors do not have a variety of sources of financing readily available. The Debtors' Pre-Petition Lenders assert that all of the Debtors' existing producing reserves are encumbered under their existing capital structure, which, along with the Debtors' long-term liquidity needs, projected cash losses, and the current state of the oil and gas commodity markets and its impact on cash flows and asset values, restricts the availability of, and options for, postpetition financing. *See* Hart Decl. ¶¶ 8. As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably obtainable.

20.    Starting in the fall of 2015, the Debtors' management and advisors, including Intrepid Partners, LLC ("Intrepid"), initiated discussions with the Pre-Petition Lenders regarding a potential chapter 11 process as well as a variety of out-of-court restructuring options. During this process, the Pre-Petition Lenders made it clear that they would not consent to a "priming" DIP financing provided by a third party. *See* Hart Decl. ¶ 13.

21.    In the course of exploring and negotiating restructuring and financing alternatives, the Pre-Petition Lenders again expressed an unwillingness to have their loans primed by a third party postpetition financing. *See* Hart Decl. ¶ 20. Additionally, the Debtors could not provide

strong enough evidence of a sufficient equity cushion to allow for debtor-in-possession financing

that would prime existing lenders' liens over their objections.  For the same reasons regarding

the likelihood of providing sufficient evidence of an equity cushion, few if any lenders would be

willing to provide debtor-in-possession financing junior to the Debtors' existing lenders.  *See*

Hart Decl. ¶¶ 20–21.  These indicators did not portend the development of a feasible third-party

financing option.

22.    Additionally, with any third-party proposal, the Debtors would incur the

execution risk associated with a new lender transaction, including material timing and due

diligence constraints, necessarily involving the payment of additional professional fees.   In

contrast, the proposed DIP Facility offered by the Post-Petition Lenders allows the Debtors to

avoid the need to engage in a costly and time-consuming priming fight at the outset of these

chapter 11 cases.

### Basis for Relief

**I.    The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Financing Documents.**

**A.    Entry into the DIP Financing Documents Is an Exercise of the Debtors' Sound Business Judgment.**

23.    The Court should authorize the Debtors, as an exercise of their sound business

judgment, to enter into the DIP Financing Documents, obtain access to the DIP Facility, and

continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to

obtain secured or superpriority financing under certain circumstances discussed in detail below.

Courts grant a debtor-in-possession considerable deference in acting in accordance with its

business judgment in obtaining postpetition secured credit, so long as the agreement to obtain

such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy

Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994)

(approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

24.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

25.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a

proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy

court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

26.    The Debtors' determination to move forward with the DIP Facility is an exercise

of their sound business judgment following an arms'-length process and careful evaluation of

alternatives.  Specifically, and in the face of insufficient cash on hand, the Debtors and their

advisors determined that the Debtors would require significant postpetition financing to support

their operational and chapter 11 activities.  Further, while the Debtors' vendors historically have

allowed the Debtors to purchase goods on credit, the Debtors' ability to continue this practice is

dependent upon their having access to sufficient liquidity to assure business counterparties that

the Debtors are not a credit risk.  The Debtors negotiated the DIP Agreement and other DIP

Financing Documents with the Post-Petition Lenders in good faith, at arms' length, and with the

assistance of their respective advisors, and the Debtors believe that they have obtained the best

financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP

Financing Documents, as it is a reasonable exercise of the Debtors' business judgment.

B.    **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

27.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Financing Documents pursuant to section 364(c) of the Bankruptcy Code; specifically, the Debtors propose to provide to the Post-Petition Lenders perfected first priority claims, priming liens, and security interests in the DIP Collateral and Pre-Petition Collateral.

28.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

29.    As described above and as set forth in the Hart Declaration, the Debtors are in need of an immediate capital infusion, yet current market conditions are challenging and the

Debtors' existing producing reserves are asserted to be encumbered under their existing capital structure. *See* Hart Decl. ¶¶ 8, 10. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders. *See* Hart Decl. ¶¶ 20–21. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, or cover the projected costs of these chapter 11 cases. *See* Hart Decl. ¶¶ 10, 20. Absent the DIP Facility, which will allow the Debtors to meet their working capital needs during these chapter 11 cases and consummate the proposed sale transaction, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Agreement, are fair, reasonable, and adequate, all as more fully set forth below. For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

30.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the Post-Petition Lenders is reasonable and appropriate.

31.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of

the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Pre-Petition Lenders have consented or (b) Pre-Petition Lenders' interests in collateral are adequately protected.

32.    Here, the Pre-Petition Lenders have consented to the DIP Facility.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.    No Comparable Alternative to the DIP Facility Is Reasonably Available.**

33.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores,*

115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

34.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure. The Debtors' Pre-Petition Lenders assert that all of the Debtors' existing producing reserves are encumbered under their existing capital structure. *See* Hart Decl. ¶¶ 8, 13.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases. *See* Hart Decl. ¶¶ 15, 17.  Therefore, in addition to evidence to be introduced at the hearing on the Interim DIP Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.     The Repayment Feature of the DIP Facility Under the Final DIP Order Is Appropriate.**

35.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

36.    Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.    Courts in this jurisdiction have approved similar DIP features, including on the first day of the case. *See, e.g.*, *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP that included roll-up of approximately $48.6 million prepetition debt pursuant to interim order); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order).[7]

37.    The repayment of $109,928,000 of obligations under the Prepetition Credit Facility in cash from DIP Financing Loan proceeds upon entry of the Final DIP Order is a sound exercise of the Debtors' business judgment.    Under the proposed DIP Facility, $109,928,000 of obligations under the Prepetition Credit Facility will be repaid on the effective date of the DIP Agreement such that $109,928,000 will be "rolled-up" into the DIP Facility.    The repayment of the Prepetition Credit Facility is a material component of the structure of the DIP Facility and was required by the Post-Petition Lenders as a condition to their commitment to provide postpetition financing.

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

38.     Where, as here, a prepetition secured creditor is likely oversecured, repaying such creditor that stands to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.  In contrast, absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  The DIP Facility's proposed repayment feature merely affects the timing, not the amount, of the Pre-Petition Lenders' recovery.  Given these circumstances, repayment of the Prepetition Credit Facility is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

## II.     The Debtors Should Be Authorized to Use the Cash Collateral.

39.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Pre-Petition Lenders consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

40.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993)

(explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

41.    As described more fully above, and as set forth in the Interim DIP Order, the Debtors propose to provide the Pre-Petition Lenders with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

    a.    Valid and automatically perfected first priority replacement liens and security interests in and upon the Pre-Petition Collateral and the DIP Collateral;

    b.    superpriority administrative claims and all of the other benefits and protections allowed under section 507(b) of the Bankruptcy Code, junior only in right to any superpriority administrative claims granted to the DIP Agent and the Post-Petition Lenders on account of the DIP Facility and the Carve Out;

    c.    attorneys' fees and expenses and financial advisors' fees and expenses.

42.    Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Pre-Petition Lenders from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Pre-Petition Lenders agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Pre-Petition Lenders are appropriate.[8]  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to

---

[8]    Pursuant to the DIP Orders, the Pre-Petition Lenders are permitted to seek additional adequate protection in accordance with the terms thereof.

continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the Post-Petition Lenders Under the DIP Financing Documents.**

43.    Under the DIP Financing Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the Post-Petition Lenders.  In particular, as noted above, the Debtors have agreed to pay:

a.    a monthly agency fee of $15,000, due and payable on the first Business Day of each month commencing on the first such date to occur after the DIP Agreement's Effective Date;

b.    for the account of each of the Post-Petition Lenders, a commitment fee equal to 1.00% percent per annum of the average daily amount of the unused amount of the DIP Loan of such Lender during the period from and including the DIP Agreement Effective Date to, but excluding, the Postpetition Termination Date, payable monthly in arrears on the first Business Day of each month and on the Postpetition Termination Date, commencing on the first such date to occur after the Petition Date; and

c.    a facility fee equal to 2.00% of the amount of each Post-Petition Lender's commitment (exclusive of any Rollup Amount).

44.    It is understood and agreed by all parties, including the Debtors, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the DIP Agent and the Post-Petition Lenders as consideration for the extension of postpetition financing. *See* Hart Decl. ¶¶ 18–19.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Financing Documents in connection with entering into those agreements.

**IV.    The Post-Petition Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

45.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

46.    As explained herein, in the Hart Declaration, and in the First Day Declaration, the DIP Financing Documents are the result of:    (a) the Debtors' reasonable and informed determination that the Post-Petition Lenders offered the most favorable terms on which to obtain vital postpetition financing and (b) extended arms'-length, good-faith negotiations between the Debtors and the DIP Agent and Post-Petition Lenders.  The Debtors submit that the terms and conditions of the DIP Financing Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Financing Documents other than as described herein.  Accordingly, the Court should find that the Post-Petition Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.    The Automatic Stay Should Be Modified on a Limited Basis.

47.    The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Post-Petition Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim DIP Order.  The proposed Interim DIP Order further provides that the automatic stay

is modified as necessary to permit the Debtors to grant the DIP Financing Liens to the Post-Petition Lenders and to incur all liabilities and obligations set forth in the Interim DIP Order. Finally, the proposed Interim DIP Order provides that, following the occurrence of an Event of Default (as defined in the DIP Agreement), the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Financing Documents, or applicable law.

48.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

49.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

50.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final DIP Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  *See* Hart Decl. ¶ 22.

### Request for Final Hearing

51.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 31 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

52.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

53.    The Debtors will provide notice of this motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition credit facility; (d) counsel to the administrative agent under the Debtors' prepetition credit facility; (e) the indenture trustee for the Debtors' 2.00% convertible senior notes due 2019;

(f) the agent under the Debtors' proposed debtor-in-possession credit facility; (g) counsel to the agent under the Debtors' proposed debtor-in-possession credit facility; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) the Environmental Protection Agency; (k) the office of the attorneys general for the states in which the Debtors operate; (l) the Securities and Exchange Commission; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

54.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders,
granting the relief requested herein and such other relief as the Court deems appropriate under
the circumstances.

Wilmington, Delaware
Dated:  March 23, 2016

/s/ Laura Davis Jones

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              crobinson@pszjlaw.com
              jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (*pro hac vice* admission pending)
Travis M. Bayer (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              ryan.bennett@kirkland.com
              travis.bayer@kirkland.com

*Proposed Counsel to the Debtors*