**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EMERALD OIL, INC., *et al.*,[1] | ) | Case No. 16-10704 (KG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF WADE STUBBLEFIELD,
CHIEF RESTRUCTURING OFFICER OF EMERALD OIL, INC.,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Wade Stubblefield, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Emerald Oil, Inc. ("Emerald"), a publicly-traded corporation organized under the laws of the state of Delaware and a debtor and debtor in possession in the above-captioned cases of Emerald and its subsidiaries as debtors and debtors in possession (collectively, the "Debtors").

2.      I have served Emerald as a financial advisor since September 25, 2015 and as Chief Restructuring Officer ("CRO") since March 22, 2016.  I have also been a Managing Director of Opportune LLP ("Opportune") since January 2014.  In September 2015, the Debtors retained Opportune.  As a result of my work with Opportune and as CRO of Emerald, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

3.      I submit this declaration (the "Declaration") to assist this Court and parties in interest in understanding the circumstances that compelled the commencement of these

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Emerald Oil, Inc. (9000); Emerald DB, LLC (2933); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887).  The location of the Debtors' service address is:  200 Columbine Street, Suite 500, Denver, Colorado 80206.

chapter 11 cases and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on March 22, 2016, (the "Petition Date"); and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").

4.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and prior restructuring initiatives, and/or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

5.    To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized into six primary sections. The first section provides a brief introduction to the Debtors.  The second section provides detailed information on the oil and natural gas production industry in which the Debtors operate. The third section provides an overview of the Debtors' organizational and capital structure. The fourth section provides detailed information on the Debtors' corporate history and business operations.  The fifth section describes the circumstances leading to the commencement of these chapter 11 cases.  The final section lists the First Day Motions and explains the importance of the relief requested therein.

6.    As described more fully in the final section, the Debtors have requested a variety of relief in their First Day Motions to minimize the adverse effects of the commencement of

KE 40524962

these chapter 11 cases.  I have reviewed and am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  I further believe the relief requested in the First Day Motions will aid in the implementation of timely and efficient chapter 11 cases for all of the Debtors that will preserve and maximize the value of their respective estates, and I respectfully submit that, for the reasons discussed herein, each of the First Day Motions should be approved.

### Preliminary Statement

7.      Emerald, together with its Debtor subsidiaries, is an exploration and production company that is focused on acquiring acreage and developing wells in the Williston Basin of North Dakota.  The Debtors' oil and gas products are marketed and sold to third party purchasers with access to pipeline facilities, trucking operations, or refineries near the Debtors' production area.  As described in more detail herein, although the Debtors' operations generally remain strong, the Debtors have fallen victim to the same macroeconomic forces afflicting the rest of the oil and natural gas industry, namely historically low commodity prices coupled with the global decline in oil demand growth projections.

8.      Crude oil prices have dropped to their lowest levels since 2003, with prices at around or even below $40 per barrel, and the near-term outlook for crude oil prices remains weak due to the record levels of worldwide inventories, resilient international production (including anticipated increases in Iranian production), seasonal realities, and decelerating global economic growth.  The total number of drilling rigs in operation in North Dakota targeting the Debtors' primary focus area today is approximately 25 percent of the number of rigs that were in operation in North Dakota just one year ago.  In addition, United States natural gas production hit a record high in August 2015, despite the continued slump in natural gas prices and a fall in

3

the number of drilling rigs targeting natural gas formations.  Lower demand for natural gas has put significant pressure on prices, leading to a current price below \$1.90/MMBtu.[2]

9.    As a result of these substantial declines in oil and gas prices, the Debtors' liquidity profile, including its working capital balance and EBITDA, has become dramatically impaired.  Simply put, the commodity price decline has severely reduced the revenues that were generated from the sale of the Debtors' oil and gas production volumes.  Further, the sustained price decline has caused the Debtors' proved developed reserve value to significantly drop while the Debtors' proved undeveloped reserves have lost all current value.  The loss in aggregate value of the Debtors' proved reserve base has significantly impaired the Debtors' ability to access both the debt and equity capital markets.

10.    These macroeconomic factors, coupled with the Debtors' substantial debt obligations and hydrocarbon gathering, transportation, and processing costs, strained their ability to sustain the weight of their capital structure and devote the capital necessary to maintain and grow their businesses.  As a result, the Debtors retained Opportune in September, 2015, and in October, 2015, engaged Intrepid Financial Partners LLC, each to advise management and Emerald's board of directors regarding potential strategic alternatives to enhance the Debtors' liquidity and address their current capital structure.  In January, 2016, the Debtors also engaged Kirkland & Ellis LLP as legal counsel in connection with a potential restructuring.

11.    Given certain covenant defaults under their secured credit facility and an inability to make installment payments with respect to a borrowing base deficiency, the Debtors entered into a forbearance agreement in November, 2015, with certain of their lenders.  The Debtors and their advisors subsequently engaged in negotiations with their key parties in interest and pursued

---

[2]    "MMBtu" is a unit of measurement meaning one million British thermal units.

all available options to stabilize their businesses and forestall a bankruptcy filing. Although the parties tried to reach a global, consensual resolution, these attempts failed and the forbearance agreement expired according to its terms on January 29, 2016. Out of liquidity runway, the Debtors filed these chapter 11 cases rather than remaining under the constant threat of impending creditor remedies while hoping for an immediate turnaround in both the global commodities and capital markets.

12.    Importantly, the Debtors, with the assistance of their advisors, have successfully obtained an agreement on the provision of debtor-in-possession financing after a thorough analysis of potential third party financing services. After vigorous, arm's-length negotiations between the Debtors, the Debtors' advisors, and the lending parties and their advisors, the Debtors seek to obtain a financing package to address their liquidity needs, enable them to operate their businesses in a manner that will permit the Debtors to preserve and maximize the value of their estates, and avoid immediate and irreparable harm to their estates and stakeholders.

13.    In addition, on March 17, 2016, the Debtors entered into a non-binding term sheet (the "Sale Term Sheet") with The Latium Group ("Latium") to facilitate discussions regarding the terms of a fully-documented agreement whereby Latium proposes to serve as a stalking horse in connection with a court-approved auction of substantially all of the assets of the Debtors. In consultation with Latium and in accordance with the terms of the Sale Term Sheet and the requested order approving debtor in possession financing, the Debtors will work to develop appropriate bidding procedures for a value-maximizing auction. The Debtors plan to file a motion seeking approval of bidding procedures as soon as reasonably practicable after the Petition Date, followed by a liquidating chapter 11 plan. In addition, the Debtors will file a motion for an order authorizing the Debtors to (a) designate and retain me as the CRO and (b)

utilize additional personnel from Opportune to assist me. I believe that my experience with the

Debtors, industry experience and experience with complex chapter 11 cases will allow me to

serve the Debtors well as CRO.

## I.    Introduction.

14.    Emerald is a Denver-based independent exploration and production company that

is focused on acquiring acreage and developing wells in the Williston Basin of North Dakota.

The Debtors have leasehold interests that provide them the right to drill and maintain wells in

specific geographic areas.   The Debtors design and drill oil and natural gas wells on acreage

where they hold a controlling working interest and then operate those wells with the expectation

of producing hydrocarbons.  In general, the Debtors' lease agreements are for three to five year

primary terms.  Once a well is drilled and production established, the unit is considered held by

production, meaning the lease continues as long as hydrocarbons are being commercially

produced.  Other locations within the drilling unit created for a well may also be drilled at any

time as long as the lease is held by production.

15.    As of March 15, 2016, the Debtors leased approximately 76,000 net acres

(approximately 128,000 gross acres) in the Williston Basin, located in McKenzie, Dunn,

Billings, and Stark Counties in North Dakota.  The Debtors' primary geologic targets are the

Middle Bakken and Three Forks formations along with the Pronghorn sand.  The Debtors'

transport the majority of produced hydrocarbons and water out of the basin via pipeline and sell

to various end users.  Upon receipt of proceeds representing the gross amount of hydrocarbons

produced, the Debtors then distribute the allocated production to the appropriate working interest

parties, leaseholders, and governmental entities.

KE 40524962

16.    The Debtors' average cycle time from spudding[3] an individual well to realizing revenues is approximately 60 days.  Emerald markets its own produced crude oil to end users via its wholly owned subsidiary, EOX Marketing, LLC ("EOX").    Collectively, as of December 31, 2015, the Debtors estimate that their holdings included proved developed oil reserves of approximately 14,000 MBbls,[4] all of which were located in the Williston Basin, and proved developed natural gas reserves of approximately 11,000 MMcf.[5]

## II.    Exploration and Production Process Overview.

17.    In order to understand the Debtors' capital requirements and challenges, it is important to first understand at a high level the process by which oil and gas exploration and production companies like the Debtors ("E&P Companies") produce oil and natural gas. As explained more fully below, the process generally consists of exploration, appraisal, production, and transportation stages.

### A.    Exploration.

18.    The first stage of the process consists of locating oil or natural gas deposits by examining the surface and sub-surface structure of a particular geographic area. E&P Companies seek to identify geographic characteristics that indicate oil or natural gas may be present in a certain area.  E&P Companies use several techniques to identify these deposits. For instance, data from offset well locations drilled by other operators is gathered and analyzed to identify specific geologic zones.    These geologic zones are then mapped over an E&P Company's leasehold position to establish areas that are proven to hold commercial

---

[3]    The "spudding" process is further described herein.

[4]    "MBbl" is a unit of measurement equaling 1,000 stock tank barrels of oil or other liquid hydrocarbons, or 42,000 U.S. gallons.

[5]    "MMcf" is a unit of measurement equaling one million cubic feet, a common measure of gas volume in the gas industry.

7

amounts of recoverable hydrocarbons.  The geologic mapping process is not perfect, as there are multiple variables that must be analyzed.  As a result, the assumptions used when mapping the geologic properties of an area can have a significant impact on the resulting map.

**B.    Appraisal.**

19.    Once a set of targets has been identified by geologic mapping or otherwise, the next step is to assess the likelihood of discovering an active hydrocarbon system at each target. This step is accomplished through drilling or "spudding" an exploration well.  The purpose of an exploration well is to accumulate additional information regarding the targeted rock formation.

20.    Wells usually are drilled by rotary drilling.  Rotary drilling uses a hollow pipe with a drill bit on the end.  To facilitate the drilling process, a mixture of chemicals, referred to as "mud," is pumped down the middle of the drill pipe.  Mud then exits through the drill bit and circulates back up to the surface between the drill pipe and the walls of the well.  The purpose of mud is to carry away cuttings from the drill bit, provide lubrication to prevent the drill pipe from getting stuck in the well bore, provide hydraulic pressure to prevent oil from "blowing out" of the well, and deposit a thin, impermeable layer of mud over reservoir zones to prevent further invasion and/or damage of the reservoir by drilling fluids.

21.    Wells generally are drilled in stages.  When the bottom of each stage is reached, the freshly drilled hole, known as an "open-hole," is cased off with steel pipe, converting the "open-hole" to a "cased-hole."  Casing is used to prevent the hole from collapsing on top of the drill pipe.  The graphic below illustrates the various components of a well.



22.    Simply drilling a hole into the ground rarely conclusively reveals whether the well has intersected an oil or gas reservoir.  This unfortunate fact is especially true with respect to shale or tight oil or gas wells, which often require additional operations, including fracking, to start the flow of oil and gas.  As a result, once the exploration well is drilled, the E&P Company begins a set of operations designed to acquire additional information regarding the presence, quantity, and location of hydrocarbons in the surrounding area.

23.    Such information can be acquired through a combination of mud analysis, coring, and wirelogging.  Mud analysis consists of geologists analyzing the returned mud cuttings to identify what type of rock formation has been drilled through.  However, mud analysis does not shed any light on the depth of each type of rock as cuttings do not necessarily rise to the surface in a uniform manner.  Coring involves bringing physical samples from the well to the surface for analysis.  Although coring is a more accurate way to assess the formation

being drilled through, it is also more expensive and often requires working with multiple third party consultants.

24.     Wirelogging involves lowering an electrode on the end of a long cable to the bottom of a well and continuously recording the voltage difference between the electrode and the surface while slowly pulling the electrode up to the surface.  This process capitalizes on the fact that reservoirs bearing water or hydrocarbons react differently to the drilling mud, producing different voltage responses as the wire-line log moves through the well.  Because wirelogging requires access to the well, no drilling may take place while wirelogging is ongoing.

25.     The only way to definitively determine whether oil or gas exists in economic quantities is a well test.  A well test involves setting up equipment so oil and gas can flow to the surface in a controlled manner.  Measurement of flow rates, properties of the fluids or gas produced, and fluid surface pressures will provide an E&P Company with definitive information about the permeability, content, and potential flow rate of a reservoir.

### C.     Production.

26.     Upon completion of the appraisal stage, E&P Companies begin extracting the hydrocarbons.  Extracted oil is gathered by a network of pipes into a central treatment plan where any associated gas or water is removed.  The crude oil is then either piped or trucked to a refinery or export terminal.  The water or gas removed from the oil will either be reinjected into the field from which it came or be sent to the local gas market.  Gas is piped back to a central processing station, where any water, sulphur, or other impurities are removed.  If gas is destined for local market distribution, it is usually treated before being sent to the market.  If there is not a sufficient local market for the gas, the gas may be transmitted to a plant for treatment and potentially cooled for export as a liquid.  Crude oil has historically constituted approximately 98 percent of the Debtors' revenue stream.

### D.     Transportation.

27.     Crude oil and natural gas is transported to the end user through an extensive network of pipelines.  Pipelines efficiently gather and transport crude oil and natural gas from its origin to end markets.  New pipelines also are constructed continually in high growth regions, increasing access to the growing number of extraction sites.  The construction of these pipelines is time-consuming and capital intensive, but is integral to crude oil and natural gas production as hydrocarbons are more difficult and expensive to transport by vehicle.  As a result, the availability of adequate pipeline infrastructure and the cost to transport such crude oil and natural gas directly impacts the profitability and environmental compliance of any given crude oil and natural gas property.  E&P Companies, including the Debtors, are dependent on seamless interaction with hydrocarbon gatherers, transporters, and processors in order to maintain both profitable and environmentally compliant operations.

## III.    The Debtors' Organizational and Capital Structure.

### A.     The Debtors' Prepetition Organizational Structure.

28.     Emerald is the direct parent of each of the four other Debtors.  Emerald is not the direct or indirect parent of any other entity.   A chart depicting the Debtors' prepetition organizational structure appears below:



**B.      The Debtors' Prepetition Capital Structure.**

29.      As of December 31, 2015, the Debtors estimated approximately $291 million in total assets (with $28 million in current assets) and approximately $337 million in total liabilities.  As described in greater detail below, as of the Petition Date, the principal amount of the Debtors' consolidated funded debt obligations totaled approximately $260.5 million, comprising approximately $111 million of obligations under the Credit Facility (as defined herein) and approximately $148.5 million of obligations under the Convertible Notes (as defined herein).

**1.      The Credit Facility.**

30.      Emerald is the borrower under that certain Amended and Restated Credit Agreement, dated as of April 30, 2014 (as amended from time to time, the "Credit Agreement"), with Wells Fargo Bank, N.A., as administrative agent (in such capacity, the "Agent"), and the lenders from time to time party thereto (the "Lenders").[6]  The Credit Agreement provides for a senior secured reserve-based revolving credit facility with a maximum commitment of $400 million (the "Credit Facility").  The obligations owing in respect of the Credit Agreement are guaranteed by each of the other Debtors (the "Guarantors").

31.      The Agent and the Lenders have a first priority lien on substantially all of the assets of Emerald and the Guarantors, including a pledge of Emerald's interests in the Guarantors.  On April 30, 2015, in connection with the scheduled semiannual borrowing base redetermination, Emerald and the Lenders entered into an amendment to the Credit Facility. The amendment to the Credit Facility reduced the borrowing base from $250 million to $200 million.  On October 6, 2015, the Agent notified Emerald that the borrowing base was

---

[6]      The Credit Agreement amended and restated that certain Credit Agreement, dated as of November 20, 2012, among Emerald, as borrower, the Agent and the Lenders.

KE 40524962

further decreased to $120 million, as described more fully below. On February 3, 2016, The Bank of Nova Scotia ("BNS") notified Emerald that Emerald's existing hedges had been terminated for approximately $17.5 million with all proceeds going towards pay down of the existing base deficiency. Concurrently, the borrowing base was reduced from $120 million to $113 million.

32.     The Credit Agreement permits the Debtors to hedge (typically in the form of a swap agreement) up to 60 percent of proved reserves for the first 24 months of the term of the particular swap agreement and 80 percent of projected production from proved developed producing reserves from the 24th month up to the 60th month of the swap agreement, subject to certain restrictions. As of September 30, 2015, Emerald had hedges covering 70 percent of its projected production through 2016. However, as of the Petition Date, all of the Debtors' swap agreements had terminated, and the Debtors therefore no longer have hedges in place.

### 2.      The Convertible Notes.

33.     Emerald has issued those certain 2.0 percent Convertible Senior Notes due 2019 (the "Convertible Notes") pursuant to an Indenture dated March 24, 2014 between Emerald and U.S. Bank, National Association, as indenture trustee (the "Indenture Trustee"). The Convertible Notes, issued in the aggregate principal amount of $172,500,000 (netting approximately $167 million in proceeds), mature on April 1, 2019. Interest on the Convertible Notes is payable semi-annually on October 1 and April 1 of each year. The Convertible Notes are not guaranteed by the other Debtors. On October 22, 2015, the Debtors entered into an agreement with a holder of the Convertible Notes pursuant to which the Debtors and the noteholder agreed to exchange approximately $3 million principal value of Convertible Notes for a number of shares of common stock, thereby achieving a limited deleveraging.

### 3. Common and Preferred Stock.

34.     As of December 31, 2015, Emerald had 9,582,970 shares of common stock outstanding and 255,732 shares of Series B Voting Preferred Stock issued and outstanding. On February 11, 2015, Emerald completed a public offering of 1,357,955 shares of common stock at a price of $22.40 per share for total net proceeds of approximately $29.4 million.

35.     Then, on May 20, 2015, a majority of Emerald's stockholders approved a 1-for-20 reverse stock split pursuant to which all stockholders of record received one share of common stock for each twenty shares of common stock owned (subject to minor adjustments as a result of fractional shares).  During April and May 2015, Emerald issued shares of common stock through its "at the market" or "ATM" program totaling 2,460,045 at an average price of $6.87 per share for total net proceeds of approximately $16.4 million, and during September 2015, issued another 848,961 shares at an average price of $2.79 per share for total net proceeds of approximately $2.3 million.

### C. Asset Retirement Obligations.

36.     As of December 31, 2015, the Debtors have asset retirement obligations associated with the future plugging and abandonment of its proved oil and natural gas properties and related facilities in the discounted amount of $4.7 million.  Such obligations may be mandated by federal regulations that impose a comprehensive set of requirements for plugging wells with the goal of protecting workers and the environment.

## IV. The Debtors' History and Business Operations.

### A. Incorporation and Recapitalization.

37.     Emerald was originally incorporated in Delaware on July 28, 2004, and then recapitalized on April 16, 2010, when it began oil and natural gas exploration and development activities.  Emerald subsequently reincorporated in Montana on May 31, 2011.  On June 11,

2014, Emerald's stockholders approved a measure to change Emerald's state of incorporation from Montana to Delaware.  On June 11, 2014, Emerald consummated a merger with its wholly owned subsidiary and, as a result, reincorporated as a Delaware corporation.

### B.    Acreage Holdings.

38.    As of February, 2016, the Debtors held approximately 76,000 net acres in the Williston Basin.  The Debtors operated approximately 100 percent of this total net acreage. More specifically, the Debtors' acreage holdings are comprised in the operating areas below (all figures are approximate):

- 54,000 net acres in the Low Rider area of McKenzie County, North Dakota;

- 20,000 net acres in the Lewis & Clark area of McKenzie County, North Dakota (south of the Low Rider area); and

- 2,000 net acres in the Pronghorn Sand formation in Stark and Billings Counties, North Dakota, in the core of the Pronghorn field.

### C.    Strategic Focus

39.    The Debtors' goal has long been to grow production, cash flows, estimated proved reserves, and their leasehold position to generate attractive rates of return on capital. Key elements of this business strategy include:

- ***Focusing on Developing Williston Basin Leasehold Position***. Due to the results from operated producing wells to date and commodity prices, the Debtors concentrated substantially all 2015 capital expenditures to the Williston Basin.

- ***Retaining Operational Control***. In their principal development targets, the Debtors seek to maintain operational control of development and drilling activities. As operator of close to 100 percent of their net acreage, the Debtors retain more control over the timing, selection, and process of drilling prospects and completion design, which enhances the Debtors' ability to maximize return on invested capital and gives greater control over the timing, allocation, and amounts of capital expenditures.  Retaining operational control also gives the Debtors the ability to control the financing, construction, and operation of infrastructure related to production operations.

- ***Adopting and Employing Leading Drilling and Completion Techniques***. The Debtors' management team focuses on enhancing drilling and completion techniques to maximize overall well economics. The Debtors have continuously evaluated their internal drilling and completion results and monitored the results of other operators to improve operating practices.

### D.    Sales and Hedging.

40.    As previously discussed, the Debtors' principal products are oil and natural gas. These products are marketed and sold primarily to purchasers that have access to nearby pipeline facilities, trucking operations, refineries, or other markets.   Most of the Debtors' core Williston Basin area is served by third party oil and gas gathering systems.  Moving oil and gas through pipelines eliminates trucking costs and associated surface disturbance, mitigates weather related production interruptions, and minimizes environmental and safety risks.  A significant portion of the oil currently produced in the Williston Basin is transported to refineries through the utilization of railroad facilities.  In other cases, pipelines deliver the oil from the wellhead to the rail facilities; however in some situations trucking of the oil is still utilized and may prove more economical depending upon the pricing terms and volume requirements between the producer and the gatherer.

41.    Typically, both oil and natural gas are sold at the wellhead under contracts at negotiated prices based upon factors normally considered in the industry, such as distance from well to pipeline, pressure, and quality.  The Debtors rely on Emerald's wholly-owned subsidiary, EOX, to sell all of the Debtors' operated production, and currently have no long-term fixed-price physical delivery contracts in place.  The Debtors currently sell materially all their oil production to Northern Tier Energy to be refined at their St. Paul, Minnesota facility.

42.    The Debtors have historically used financial hedges to limit their overall exposure to fluctuations in oil prices.  Such hedges are intended to mitigate the risk of a reduction in cash flows that may affect the Debtors' ability to meet their obligations and capital expenditure

budget while at the same time ensuring an acceptable rate of return on investments. Without hedges in place, the Debtors may be affected by changes in the price received locally versus prices at quoted market centers, including the West Texas Intermediate ("WTI") prices. This differential can vary widely because of changes in supply and demand locally and at the market centers as well as the utilization of transportation capacity between these points. The Debtors are not currently able to hedge the entire differential using financial instruments, which reduces the effectiveness of their hedges that are based on WTI prices. As noted above, the swap agreements the Debtors previously used for hedging purposes terminated prior to the Petition Date.

### E.    Industry Challenges.

43.    The oil and natural gas industry is intensely competitive, particularly with respect to the acquisition of prospective oil and natural gas properties and oil and natural gas reserves. The Debtors compete against a substantial number of major and independent oil and natural gas companies that have larger technical staffs and greater financial and operational resources than the Debtors.  Many of these companies not only engage in the acquisition, exploration, development, and production of oil and natural gas reserves, but also have refining operations, market refined products, and generate electricity.

44.    In addition, winter weather conditions and lease stipulations can limit or temporarily halt the Debtors' drilling and producing activities and other oil and natural gas operations.  These constraints and the resulting shortages or high costs can delay or temporarily halt operations and materially increase operating and capital costs.  Such seasonal anomalies can also pose challenges for meeting well drilling objectives and may increase competition for equipment, supplies, and personnel during the spring and summer months, which can lead to shortages and increase costs or delay or temporarily halt operations.

17

45.     The Debtors are also subject to extensive rules and regulations promulgated by federal, state, tribal, and local authorities and agencies. For example, North Dakota requires permits for drilling operations, posting of drilling bonds, and reports concerning operations and imposes stringent limits on the amount of excess natural gas that the Debtors can "flare," *i.e.* burn up, thereby imposing significant additional costs to remain environmentally compliant. The Debtors' operations are subject to other extensive and changing federal, state, and local laws and regulations relating to environmental protection, including the generation, storage, handling, emission, transportation, and discharge of materials into the environment, and similar laws and regulations relating to safety and health. The recent trend in environmental legislation and regulation generally is toward stricter standards, and the Debtors anticipate that this trend will likely continue.[7]

### F.      Employees.

46.     The Debtors employ approximately 27 individuals on a full-time basis. Approximately four employees are paid on an hourly basis and approximately 23 employees receive a salary.  The Debtors do not employ any individuals on a part-time basis.  None of the employees receive a commission, and none are represented by a union or collective bargaining unit.   In addition to the employees, the Debtors also retain from time to time specialized individuals as independent contractors to complete discrete projects.   The Debtors currently retain approximately ten independent contractors in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time.

---

[7]     Existing laws pertaining to the Debtors may include, among others, the Comprehensive Environmental, Response, Compensation, and Liability Act, the Federal Safe Drinking Water Act, the Underground Injection Control program, the federal Clean Water Act and analogous state laws, the federal Clean Air Act and comparable state laws, and the Endangered Species Act.

### G.    Production and Proved Reserves.

47.    As described above, in recent years the Debtors have primarily focused their operations on exploration, development, and production in the Williston Basin.  The Debtors' aggressive focus on the Williston Basin resulted in substantial increases in both production and proved reserves from 2010–2014, although proved reserves dropped off dramatically in 2015 as the Debtors' undeveloped reserves became effectively currently worthless due to drops in commodity prices:[8]



---

[8]    Figures for 2015 in the graphics below are the Debtors' preliminary estimates and are subject to material change.

KE 40524962

48.     The significant increase in proved reserves through the 2014 fiscal year (a 99 percent year-over-year increase) was driven primarily through increased drilling activity in the Debtors' operated well program, which continued through 2015.   The Debtors initially believed their production profile would continue to grow in 2016, with a focus on the operated drilling program to convert Emerald's substantial undeveloped operated leasehold position to production; however, as described further herein, continued commodity price pressure has stalled these plans.

## V.      Circumstances Leading to These Chapter 11 Cases.

### A.      Adverse Market Conditions.

49.     In the fall of 2014, oil prices plummeted due to a worldwide oversupply, and these prices have remained depressed.  Simultaneously, the natural gas market saw the impact of continued growth in natural gas production in the United States, which, coupled with generally mild weather, has caused a sustained drop in natural gas prices for the foreseeable future. The graphics below illustrate the drop in commodity prices over the last two years:[9]



---

[9]     *See   Commodity   Futures   Price   Quotes   for   Crude   Oil*,   NASDAQ, http://www.nasdaq.com/markets/crude-oil.aspx?timeframe=2y  (last  visited  March  22,  2016); *Commodity   Futures   Price   Quotes   for   Natural   Gas*,   NASDAQ, http://www.nasdaq.com/markets/natural-gas.aspx?timeframe=2y (last visited March 22, 2016).

KE 40524962

50.    The Debtors are not alone in their difficult position.  A number of other independent E&P Companies, including Magnum Hunter Resources Corporation, Swift Energy Company, American Eagle Energy Corporation, Quicksilver Resources Inc., Saratoga Resources Inc., Sabine Oil & Gas Corporation, Energy and Exploration Partners, LLC, and Samson Resources Corporation filed for bankruptcy protection in 2015 and 2016.  A growing number of other similarly situated companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.  Most small- and mid-cap oil and gas companies are under financial distress due to the continued decline in commodity prices.

**B.**    **Proactive and Disciplined Approach to Addressing Liquidity Constraints.**

**1.**    **Operational Changes.**

51.    As oil and gas prices continued to decline starting in late 2014 and through 2015, and as the Debtors understood the potential for future prices to remain at such low levels for an extended period of time, the Debtors considered numerous proactive actions to stabilize their financial position, including:  (a) actively managing their debt capital structure; (b) selling assets; (c) minimizing capital expenditures; (d) obtaining waivers or amendments from the Lenders; (e) effectively managing working capital;    (f) improving cash flows from operations; and (g) accessing the equity capital markets.

52.    The Debtors also initiated numerous measures aimed at continuing to improve efficiency and cutting costs at both the operational and corporate level.  For example, in December 2014, the Debtors reduced the 2015 development program due to the fallen commodity price environment.  The Debtors therefore released two of their three contracted rigs at the beginning of 2015 and halted the majority of their previously planned drilling program for 2015.  With their remaining rig, the Debtors realized an approximate 30 percent reduction in

drilling and completion costs, driven primarily by commodity price depression and the subsequent effect on the Debtors' field service providers combined with operational efficiencies achieved by the Debtors.

53.     Unfortunately, the Debtors also have had to discharge approximately 40 percent of their employees since the beginning of 2015.  The Debtors were also not to pay all of their vendors on a current basis in the months leading up to the Petition Date.  Beginning in November, 2015, the Debtors extended certain trade terms with their vendors in order to carefully manage their precarious liquidity situation.

**2.     Koch and Angelus Transactions.**

54.     On July 31, 2015, certain of the Debtors entered into a purchase and sale agreement with Koch Exploration Company, LLC ("Koch Exploration"), a wholly owned subsidiary of Koch Industries Inc., pursuant to which Koch Exploration acquired a 30 percent working interest in approximately 25,000 undeveloped net acres held by the Debtors in McKenzie County, North Dakota and approximately 4,400 undeveloped net acres held by the Debtors in Richland County, Montana, for approximately $17.4 million.  Koch Exploration also reimbursed the Debtors approximately $5.4 million for its proportionate share of recently drilled and uncompleted wells in southern McKenzie County.  Total proceeds received by the Debtors upon closing the transaction on October 1, 2015 were approximately $20 million and were used to pay down outstanding borrowings under the Credit Facility.  Approximately $2.7 million was held in escrow subject to customary closing diligence items, of which approximately $1.8 million has subsequently been paid over to the Debtors (with approximately $674,000 of this $1.8 million then applied to repayment of the Credit Facility).

55.     On December 18, 2015, the Debtors entered into a purchase and sale agreement with Angelus Private Equity Group with respect to the sale of certain of the Debtors' oil and gas

leases totaling approximately 9,750 net acres with associated daily production of approximately 375 barrels of oil equivalent for an aggregate $9.75 million. The sale closed on January 11, 2016, and all of the proceeds were used to pay down outstanding borrowings under the Credit Facility.

      **C.**      **Other Attempts to Address Liquidity.**

56.     The Debtors entered into exclusive negotiations with an unrelated third party on June 11, 2015 regarding a $75 million senior secured second lien term loan facility. The proceeds from the proposed transaction were intended to pay down outstanding borrowings under the Credit Facility which would result in additional borrowing capacity for the Debtors. On October 12, 2015, the Debtors and the counter party determined they were unable to consummate a transaction and terminated the exclusivity arrangement. The primary negating factor in the failure to close the proposed transaction was the inability of the counter party to agree to terms under a required intercreditor agreement.

57.     The Debtors also entered into exclusive negotiations with an unrelated third party on October 20, 2015 regarding a $175 million refinancing (consisting of a $50 million revolving credit facility and a $125 million term loan). The proceeds from the proposed transaction were intended to pay off the Lenders in full and allow some additional funds for working capital purposes. In December 2015, however, the Debtors and the counter party determined that they were unable to consummate a transaction and terminated the exclusivity arrangement. The primary negating factor in the failure to close the proposed transaction was the continued effect on the Debtors' reserve base caused by the sustained commodity price downturn.

58.     On November 18, 2015, the Debtors executed a term sheet with another unrelated party to provide the Debtors $30 million in a private offering of convertible notes. The offering was contingent on the Debtors successfully closing on either a senior secured loan or a second

lien term loan and successfully reducing the outstanding loan on the Credit Facility to a level acceptable to the counter party.  Unfortunately, the Debtors were unable to successfully close such a loan or reduce their outstanding loan on the Credit Facility to an acceptable level, and therefore the potential offering failed.

59.    In addition, on March 16, 2015, the Lenders executed a term sheet with an unrelated third party proposing to assign the Credit Facility from the Lenders to the third party.  The assignment was contingent on certain conditions precedent being executed, including the satisfactory performance of due diligence, and would have resulted in an immediate liquidity injection from the third party.  The transaction was never consummated.

### D.    Events of Default and Temporary Forbearance.

60.    Given the myriad issues facing its industry, Emerald was unable to maintain the minimum ratios required by certain of its financial covenants under the Credit Agreement for the quarters ended June 30 and September 30, 2015.  As noted above, on October 6, 2015, the Agent delivered a "New Borrowing Base Notice" as permitted under the Credit Agreement, notifying Emerald that, as of that date, the borrowing base was decreased from $200 million to $120 million.  At the time, the principal amount of approximately $140 million was outstanding under the Credit Facility, resulting in a deficiency of approximately $20 million. Under the terms of the Credit Agreement, Emerald was obligated to repay the deficiency in three monthly installments beginning on November 5, 2015.

61.    Given the financial covenant defaults and Emerald's inability to make the first installment payment with respect to the deficiency, on November 5, 2015, the Debtors, certain Lenders, and the Agent entered into a forbearance agreement (the "Forbearance Agreement") pursuant to which such Lenders and the Agent agreed to forbear from exercising their rights and remedies under the Credit Agreement until December 18, 2015 with respect to

certain events of default (including the financial covenant breaches). The parties to the Forbearance Agreement subsequently extended its term until January 29, 2016. During the forbearance period provided by the Forbearance Agreement, the Debtors and their advisors engaged in numerous discussions with their key constituents—namely, the Agent, the Lenders, and certain holders of the Convertible Notes—regarding possible restructuring alternatives. Although the parties tried to reach a global, consensual resolution, these attempts failed and the Forbearance Agreement expired according to its terms on January 29, 2016.

62.    As result of the events of default under the Credit Agreement, BNS notified the Debtors that it had designated February 3, 2016 as the early termination date of the ISDA Master Agreement (together with all schedules and confirmations and amendments thereto, the "ISDA Agreement") dated as of June 20, 2014. Thereafter, on February 3, 2016, BNS terminated the ISDA Agreement and applied $17.5 million of proceeds from the termination to amounts owing by the Debtors to BNS under the Credit Agreement. As a result of this payment of the ISDA Agreement termination proceeds to the Credit Agreement, as well as the proceeds from other transactions consummated by the Debtors, the Debtors cured the borrowing base deficiency under the Credit Facility.

63.    However, notwithstanding the cure of the borrowing base deficiency, the Debtors remained in default under the Credit Facility based on the continuing covenant defaults, and there was no further credit available under the Credit Facility. In addition, the possibility of an acceleration of the obligations under the Credit Facility posed the threat of a potential cross-default under the documents governing the Convertible Notes and the related possibility of holders of the Convertible Notes accelerating their maturity. On February 26, the Debtors

provided written notice to the Indenture Trustee of certain defaults under the indenture governing the Convertible Notes, as well as the expiration of the Forbearance Agreement.

**E.    Sale Term Sheet.**

64.    The Debtors also negotiated with various parties in the months leading up to the Petition Date concerning a potential sale of a material portion or substantially all of the Debtors' assets. These sustained good faith efforts on the part of the Debtors and their advisors ultimately led to the Debtors' entry into the non-binding Sale Term Sheet with Latium, as noted above. The Debtors and Latium will use the terms of the Sale Term Sheet to attempt to develop appropriate bidding procedures for the marketing and sale of the Debtors' assets, with Latium serving as a potential stalking horse bidder. As soon as reasonably practicable, the Debtors will file a motion to approve bidding procedures and other relief, which may include certain customary protections for Latium or another third party purchaser acting in the role as stalking horse. The Debtors intend to conduct a robust auction process that will maximize the value of their estates for all parties in interest according to the timelines outlined in the motion to approve their postpetition financing facility (as described more fully below).

**F.    Proposed DIP Financing.**

65.    Prior to the Petition Date, the Debtors also successfully negotiated and finalized the terms of a debtor in possession financing facility with certain of their prepetition lenders (the "Proposed DIP Financing") as well as the consensual use of cash collateral during these chapter 11 cases. The Proposed DIP Financing calls for a new senior secured credit facility in the amount of $20 million, in addition to the paydown of a portion of the prepetition indebtedness under the Credit Agreement. The terms of the Proposed DIP Financing are described in further detail in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of*

26

*the Bankruptcy Code, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Authorizing the Debtors to Use Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP and Cash Collateral Motion") [Dkt. No. 17] filed contemporaneously herewith and which is incorporated herein.

66.    The Proposed DIP Financing also contemplates a timeline with the following material milestones (among others) for the Debtors to conduct a comprehensive marketing and sale process of their assets and businesses:

- on or prior to June 10, 2016, the Debtors shall have obtained the entry of an order by the Court approving acceptable bid procedures with respect to consummation of a sale;

- on or prior to July 11, 2016, the Debtors and their sales agent shall conduct an auction of substantially all of the Debtors' assets;

- on or prior to July 15, 2016, the Debtor shall have obtained entry of an order by the Court approving the sale; and

- on or prior to July 22, 2016, the Debtors shall have closed and consummated the sale.

67.    The provisions of the Proposed DIP Financing were extensively negotiated, and I believe they are the most favorable terms that the Debtors were able to obtain.  Moreover, the Debtors have an urgent need for the Proposed DIP Financing, which will ensure the Debtors are able to maintain their operations while pursuing a value-maximizing sale.  Without prompt postpetition financing and access to cash collateral, the Debtors will be unable to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  The Debtors' need for the Proposed DIP Financing, as well as details regarding the terms of the Proposed DIP Financing, are outlined in further detail in the Declaration of Matthew J. Hart in support of the DIP and Cash Collateral Motion.

KE 40524962

**VI.    First Day Motions.**

68.    The Debtors have filed a number of First Day Motions in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions include:

- the DIP and Cash Collateral Motion;

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Dkt. No. 2];

- *Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Approving the Appointment and Retention of Donlin, Recano & Company, Inc. as the Claims and Noticing Agent to the Debtors, Effective* Nunc Pro Tunc *to the Petition Date* [Dkt. No. 15];

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and (III) Granting Related Relief* [Dkt. No. 3];

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Dkt. No. 11];

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Dkt. No. 9];

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Working Interest Expenses, (B) Joint Interest Billings, (C) Marketing Expenses, and (D) 503(b)(9) Claims, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Dkt. No. 10];

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Mineral Payments and (B) Working Interest Disbursements and (II) Granting Related Relief* [Dkt. No. 8];

- *Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreement and Pay Premiums Thereunder, (IV) Enter into New Premium Financing Agreements in the Ordinary Course of Business, and (V) Granting Related Relief* [Dkt. No. 7];

- *Debtors' Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [Dkt. No. 5];

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Dkt. No. 14]; and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Dkt. No. 13].

69. The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing on an interim basis, honor employee-related wages and benefits obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to giving the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

70. Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those

circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

71.    I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully implementing the Debtors' chapter 11 strategy.

*[Remainder of page intentionally left blank]*

KE 40524962

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 23, 2016                    */s/ Wade Stubblefield*
                                        Wade Stubblefield
                                        Chief Restructuring Officer
                                        Emerald Oil, Inc.