### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EMERALD OIL, INC., *et al.*,[1] | Case No. 16-10704 (KG) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: TBD** |
| | **Objection Deadline: TBD** |

### DEBTORS' MOTION FOR ENTRY OF
### (I) AN ORDER (A) APPROVING BIDDING PROCEDURES
### AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF
### SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING
### THE FORM AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN
### AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR THE
### ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (E) GRANTING
### RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE ASSET PURCHASE
### AGREEMENT BETWEEN THE DEBTORS AND THE PURCHASER, AND
### (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
### ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
### INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
### CONTRACTS, AND (D) GRANTING RELATED RELIEF

Emerald Oil, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] respectfully state the following in support of this motion:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Emerald Oil, Inc. (9000); Emerald DB, LLC (2933); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887).  The location of the Debtors' service address is: 200 Columbine Street, Suite 500, Denver, Colorado 80206.

[2]   A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Wade Stubblefield, Chief Restructuring Officer of Emerald Oil, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 25] (the "First Day Declaration").

**Jurisdiction and Venue**

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9006-1.

**Background**

4.     The Debtors are an onshore oil and gas exploration and production company with headquarters in Denver, Colorado and operations primarily located in North Dakota. The Debtors operate, or have royalty or working interests in, approximately 100 oil and gas production sites.

5.     On March 22, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a)

2

and 1108 of the Bankruptcy Code.  On March 24, 2016, the Court entered an order authorizing procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 36].  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On April 6, 2016, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in these chapter 11 cases [Docket No. 125] (the "Committee").

### Preliminary Statement

6.    Before the Petition Date, the Debtors explored several strategic alternatives to address balance sheet issues and the financial pressures exacerbated by unpredictable commodity prices, including:  (a) actively managing their debt capital structure, (b) selling assets; (c) minimizing capital expenditures; (d) obtaining waivers or amendments from the Lenders; (e) effectively managing working capital; (f) improving cash flows from operations; and (g) accessing the equity capital markets.  More specifically, the Debtors engaged in negotiations with four separate parties to refinance their debt capital structure.  Separately, the Debtors negotiated with other parties to pursue a potential sale of a material portion or substantially all of their assets.  Ultimately, in no part due to a lack of effort, the Debtors prepetition efforts were unsuccessful.  Although the Debtors' operations were and continue to be generally strong, the prevailing macroeconomic forces—most notably the unprecedented drop in the price of oil and natural gas—strained the Debtors' ability to maintain the weight of their capital structure, and ultimately led to the filing of these chapter 11 cases.

7.    Having explored other alternatives with the assistance of their advisors, the Debtors determined that a sale of substantially all of their assets would maximize the value of their estates for all stakeholders.  To that end, the Debtors negotiated a $20 million postpetition

KE 39610918

financing facility with Wells Fargo Bank, N.A., as agent (the "Agent"), on behalf of a syndicate of financial institutions comprised of certain prepetition lenders (the "Lenders"), to provide them with sufficient runway to execute on a value-maximizing sale process. Pursuant to the *Final Agreed Order Authorizing Limited Use of Cash Collateral, Obtaining Post-Petition Credit Secured by Senior Liens, Granting Adequate Protection to Existing Lienholders, and Granting Related Relief* [Docket No. 287] (the "DIP Order"), the Debtors are required to expeditiously move toward a number of sale milestones. The sale milestones are structured to allow for the Debtors' sale of substantially all of their assets to be closed within approximately four months of the start of these cases.

8.    In order to fully and adequately market their assets, the Debtors engaged Intrepid Partners, LLC ("Intrepid") to serve as their investment bankers.[3] Intrepid employed a comprehensive marketing process to identify potential bidders for the Debtors' assets. Specifically, Intrepid contacted 100 potential bidders, representing both financial and strategic potential buyers. Of these contacted potential bidders, all either reviewed a teaser document or participated in high-level discussions about the transaction. 37 bidders ultimately negotiated confidentiality agreements and were provided access to a virtual data room containing detailed information about the Debtors' assets. Interested parties were asked to participate in initial discussions with Intrepid to hear about the opportunity and ask questions about the Debtors' assets. Parties that demonstrated sufficient interest in the transaction were then given access to further due diligence information via the virtual data room. Between April 15, 2016 and April 28, 2016, 14 parties provided verbal or written indications of interest and 9 of the highest bidders

---

[3]    *See Order (I) Authorizing the Employment and Retention of Intrepid Partners, LLC as Financial Advisor for the Debtors and Debtors in Possession, Effective Nunc Pro Tunc to the Petition Date and Waiving Certain Information Requirements Imposed by Local Rule 2016-2 and (II) Granting Related Relief* [Docket No. 235].

KE 39610918

were invited to more detailed diligence discussions and presentations with management. Subsequent to these discussions and presentations, these 9 parties were asked to provide second round bids for the Debtors' Board of Directors to consider. By May 13, 2016, Intrepid had received 4 final bid letters.

9.    The Debtors' marketing efforts have paid off. With Intrepid at the helm of the sale process, and following the completion of considerable investigation and diligence by the Debtors and their advisors, the Debtors identified a party to serve as their stalking horse bidder. Specifically, the Debtors and New Emerald Holdings, LLC (the "Stalking Horse Bidder") have entered into an Asset Purchase Agreement, dated as of May 25, 2016 (including all exhibits and schedules related thereto, the "Stalking Horse Purchase Agreement"), whereby the Stalking Horse Bidder proposes to purchase substantially all of the Debtors' assets for cash consideration of approximately $73 million (the "Purchase Price"), which will serve as a competitive baseline of recovery for the Debtors' stakeholders. The proposed transaction, if approved, will generate significant value for the Debtors' estates, and among other things, satisfy a significant portion of the prepetition claims against the Debtors and pave the way for confirmation of a chapter 11 plan.

10.    The Debtors now seek authority to market test the transactions contemplated by the Stalking Horse Purchase Agreement (collectively, the "Stalking Horse Bid") to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for the Debtors' assets. If approved, the proposed bidding procedures (the "Bidding Procedures") will enable the Debtors to move expeditiously towards confirmation of a chapter 11 plan. As set forth in further detail below, the sale, the Stalking Horse Purchase Agreement, the Bidding Procedures, and the

related relief requested in this Motion are in the best interests of the Debtors' estates and their

stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this Motion.

## Relief Requested

11.     The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Bidding Procedures Order"):

(a)     authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1** and approving the Bid Protections (as defined below) in connection with the sale of substantially all of the Debtors' assets (the "Assets");

(b)     approving the form and manner of notice of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "Sale"), attached as **Exhibit 2** to the Bidding Procedures Order (the "Sale Notice");

(c)     scheduling the Auction and Sale Hearing;

(d)     approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Contracts"); and

(e)     granting related relief.

12.     In addition, the Debtors will seek entry of an order at the conclusion of the

Sale Hearing, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"):

(a)     authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid;

(b)     authorizing and approving the Sale of all or substantially all of the Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid;

(c)     authorizing the assumption and assignment of the Contracts; and

(d)     granting any related relief.

13.     The Debtors reserve the right to file and serve any supplemental pleading or

declaration that the Debtors deem appropriate or necessary in their reasonable business

judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.

**The Proposed Sale**

**I.    The Proposed Stalking Horse Purchase Agreement and Contemplated Section 363 Sale.**

14.    The Debtors entered into arm's-length negotiations with the Stalking Horse Bidder to finalize mutual and agreeable terms of the Stalking Horse Bid for the sale of the Assets.  The Debtors believe a prompt Sale of the Assets represents the best alternative available for all stakeholders in these chapter 11 cases.  Moreover, it is critical for the Debtors to execute on their proposed Sale transaction within the timeframe contemplated by the Stalking Horse Purchase Agreement and DIP Order.  Under the DIP Order, the Debtors are required to hold a sale hearing by July 15, 2016, and a sale transaction is to be consummated by July 22, 2015; otherwise, the Debtors will trigger an event of default under the DIP Order.

15.    The Debtors respectfully request that the Court approve the following general timeline:

- *Contract Cure Objection Deadline*: 4:00 p.m. (prevailing Eastern Time) seven calendar days from service of the Contract Notice (as defined herein), as the deadline to object to the cure amounts listed in the Contract Notice;

- *Bid Deadline*:  11:59 p.m. (prevailing Eastern Time), on or before July 6, 2016, as the deadline by which bids for the Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders (as defined in the Bidding Procedures)) must be actually received (the "Bid Deadline");

- *Auction*:  July 11, 2016 at 10:00 a.m. (prevailing Eastern Time)], as the date and time the Auction, if needed, will be held at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022;

7

- *Sale Objection Deadline*:  4:00 p.m. (prevailing Eastern Time), on or before seven calendar days after the Bid Deadline, as the deadline to object to the Sale;

- *Sale Hearing*:  on or before July 14, 2016, at 10:00 a.m. (prevailing Eastern Time), as the date and time for the Sale Hearing.

16.     The Debtors believe that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing these chapter 11 estates.  To further ensure that the Debtors' proposed Auction and Sale process maximizes value to the benefit of the Debtors' estates, the Debtors will use the time following entry of the Bidding Procedures Order to actively market the Assets in an attempt to solicit higher or otherwise better bids.  The Debtors believe the relief requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

## II.     Material Terms of the Stalking Horse Purchase Agreement.

17.     The following chart summarizes the terms and conditions of the Stalking Horse Purchase Agreement (attached hereto as **Exhibit C**) and discloses certain information required pursuant to Local Rule 6004-1:[4]

| Stalking Horse Purchase Agreement Provision | Summary Description |
|---|---|
| **Stalking Horse Purchase Agreement Parties** <br> **(Recitals)** | <u>Sellers</u>:  Emerald Oil, Inc., Emerald WB LLC, Emerald NWB, LLC, Emerald DB, LLC, and EOX Marketing, LLC <br><br> <u>Purchaser</u>:  New Emerald Holdings, LLC <br><br> <u>Guarantors</u>:  CL Energy Opportunity Fund,  L.P. & SSC Emerald LP |
| **Purchase Price, Including Credit Bid** <br> **Local Bankr. R. 6004-1(b)(iv)(N)** | <u>Purchase Price</u>:  (a) cash in an amount equal to $73,000,000 less the aggregate amount of all Cure Costs, if any, for Leases or Contracts (i) to which EOX is a party, (ii) DMS is a counterparty, (iii) set forth in section 1.1(b)(xiii) of the Stalking Horse Purchase Agreement, or (iv) Assigned Leases and Interests; and (b) the assumption of the Assumed Liabilities (collectively, the "<u>Base Purchase Price</u>"). |

---

[4]   This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall govern in all respects.  Capitalized terms used in the following summary shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.  All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse Purchase Agreement.

8

| | |
|---|---|
| **Stalking Horse Bid Protections**<br>**Local Bankr. R. 6004-1(c)(i)(C)** | Breakup Fee:  A breakup fee of no more than three percent of the Base Purchase Price (the "Breakup Fee"), payable as set forth in Section 10.2 of the Stalking Horse Purchase Agreement in the event that the Stalking Horse Purchase Agreement is terminated.<br><br>Minimum Bid:  The aggregate consideration proposed by each Bid must equal or exceed the sum of (i) the Bid Value set forth in the Stalking Horse Bid, (ii) the Breakup Fee, and (iii) $500,000 (the "Minimum Overbid" and together with the Breakup Fee the "Bid Protections"). |
| **Acquired Assets**<br>**(Recitals)** | All or substantially all Assets of the Seller. |
| **Assumed Liabilities** | The Assumed Liabilities listed in Section 1.3 of the Stalking Horse Purchase Agreement. |
| **Assumed Contracts** | The Assumed Contracts listed on **Exhibit C** of the Disclosure Schedule |
| **Excluded Assets** | The Excluded Assets listed on **Exhibit C** of the Disclosure Schedule. |
| **Excluded Liabilities** | The Excluded Liabilities listed in Section 1.4 of the Stalking Horse Purchase Agreement. |
| **Representations and Warranties**<br>**(Art. IV, V, & XI)** | Customary representations and warranties by Purchaser, the Company, and Seller. |
| **Agreements with Management**<br>**Local Bankr. R. 6004-1(b)(iv)(B)** | The Debtors' management and the Stalking Horse Bidder have discussed in broad general terms the possibility that some or all of the current management team may be retained by the Stalking Horse Bidder post-Closing, but no agreements have been discussed or entered into, nor have any specific personnel been identified. |
| **Releases**<br>**Local Bankr. R. 6004-1(b)(iv)(C)** | None. |
| **Private Sale/No Competitive Bidding**<br>**Local Bankr. R. 6004-1(b)(iv)(D)** | No.  The Debtors have proposed an open Auction and Sale process. |
| **Closing and Other Deadlines**<br>**Local Bankr. R. 6004-1(b)(iv)(E)** | Entry of the Bidding Procedures Order:  June 10, 2016.<br>Bid Deadline:  on or before July 6, 2016 at 11:59 p.m. (prevailing Eastern Time).<br>Auction:  July 11, 2016 at 10:00 a.m. (prevailing Eastern Time).<br>Sale Hearing: July 14, 2016 at 10:00 a.m. (prevailing Eastern Time)<br>Closing: on or before July 22, 2016. |
| **Good Faith Deposit**<br>**Local Bankr. R. 6004-(b)(iv)(F)** | Deposit: $3,650,000 |
| **Interim Arrangements with Proposed Buyer**<br>**Local Bankr. R. 6004-(b)(iv)(G)** | Prior to closing, the Debtors and Stalking Horse Bidder shall perform and satisfy all conditions to each of their respective obligations to consummate the transactions contemplated by the Stalking Horse Purchase Agreement that are to be performed or satisfied by such party under the Stalking Horse Purchase Agreement and to cause the Closing to occur as promptly as possible. |

9

| | |
|---|---|
| **Use of Proceeds**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(H)** | The Base Purchase Price will provide for a payment of the DIP Loan Amount (as defined in the DIP Order) to the Agent for the benefit of the Lenders. |
| **Tax Exemption**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(I)** | None. |
| **Records Retention**<br>**Local Bankr. R. 6004-**<br>**(b)(iv)(J)** | Post-Closing books and records will be maintained as set forth in Section 7.7 of the Stalking Horse Purchase Agreement. |
| **Sale of Avoidance Actions**<br>**Local Bankr. R. 6004-**<br>**(b)(iv)(K)** | The Stalking Horse Purchase Agreement contemplates that all Avoidance Actions are Excluded Assets and will be retained by the estates. |
| **Requested Findings as to Successor Liability**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(L)** | All of the Assets shall be sold free and clear of all liens, interests, and other encumbrances (other than the Assumed Liabilities and Permitted Encumbrances). |
| **Executory Contracts and Unexpired Leases**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(M)** | The Stalking Horse Purchase Agreement requires the Debtors to transfer the Assets to the Stalking Horse Bidder free and clear of all liens, interests, and other encumbrances (except for the Assumed Liabilities and Permitted Encumbrances). |
| **Credit Bid**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(N)** | Any Qualified Bidder, including the Stalking Horse Bidder, who has a valid, perfected, and unavoidable lien on any assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code. |
| **Relief from Bankruptcy Rule 6004(h)**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(O)** | To maximize the value received for the Assets, the Debtors are seeking to close the transactions contemplated by the Successful Bidder's Purchase Agreement as soon as possible after the Sale Hearing. The Debtors, therefore, have requested a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). |

## The Bidding Procedures Order

## I.    The Bidding Procedures.

18.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as **Exhibit 1** to the Bidding Procedures Order.  The following describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[5]

---

[5]    This summary is qualified in its entirety by the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

(a)     **Bid Requirements (Local Bankr. R. 6004-1(c)(i)(A), (B))**.  Any bid by an Acceptable Bidder must be submitted in writing and determined by the Debtors, in their reasonable business judgment, to have satisfied the following requirements:

(i)     *Assets and Purchase Price*:  Each Bid must be a bulk bid to purchase all or substantially all of the Assets, and must clearly state which liabilities of the Debtors the Acceptable Bidder is agreeing to assume.  Each Bid must clearly set forth the Purchase Price to be paid, including and identifying separately any cash and non-cash components.

(ii)    *Deposit*:  Each Bid, including the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 5 percent of the aggregate cash purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

(iii)   *Minimum Bid*:  The aggregate cash consideration proposed by each Bid must equal to, or exceed, the sum of (i) the Bid Value set forth in the Stalking Horse Bid, including any Breakup Fee; plus (ii) the Overbid Increment.

(iv)    *The Same or Better Terms*:  Except as otherwise provided herein, each Bid must, in the Debtors' business judgment and in consultation with the Agent and the Committee Representatives, be on terms the same as or better than the terms of the Stalking Horse Purchase Agreement.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include a schedule of Assumed Contracts (pursuant to the Stalking Horse Purchase Agreement) to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Acceptable Bidder (including those related to the Purchase Price and Assets to be acquired by such Acceptable Bidder), as well as all other material documents integral to such Bid.

(v)     *Sources of Financing*:  The Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies.  The Bid should include a detailed sources and uses schedule.

(vi)    *Structure*:  The Bid must identify the structure proposed for undertaking the Sale, including the specific Assets of the Debtors, the proposed steps to accomplish such acquisition, and any

11

financial, legal, or tax considerations upon which the Bid's proposed structure replies.

(vii) **_Tax Structure_**: The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if any incremental tax liabilities will be incurred by the Debtors under the Bid.

(viii) **_Assumption_**: The Bid must specify which, if any, of the obligations of the Debtors the Bidder proposes to assume.

(b) **Bid Deadline.** Each bid must be transmitted via email (in .pdf or similar format) or other means so as to be **_actually received_** by the Debtors, counsel to the Debtors, the Debtors' financial advisor, co-counsel to the Debtors, the Stalking Horse Bidder, and counsel to the Stalking Horse Bidder on or before **July 6, 2016 at 11:59 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

(c) **Right to Credit Bid.** The Agent shall be deemed to be a Qualified Bidder and is not required to make any Deposit. The Agent may credit bid at any time, in its sole and absolute discretion, any portion and up to the entire amount of the Agent's and the Lenders' respective claims, including, without limitation, both the Lenders' prepetition claims and all obligations under the DIP Order, at any time on any individual Asset, portion of the Assets, or all Assets constituting their respective Collateral (as defined in the DIP Order) in conjunction with any sale of the Debtors' assets (the "Credit Bid Right"). Upon exercise of the Credit Bid Right, the Agent shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, and the Agent shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid Right. Except for the holders of any Prior Liens (as defined in the DIP Order), no other person may credit bid unless the entire amount of the Lenders' claims (including all prepetition and debtor in possession financing claims) will be indefeasibly paid in full in cash on the closing of the proposed sale. In the event the Agent exercises the Credit Bid Right, and the amount of the credit bid of the Agent exceeds the total amount of the highest bids for the Assets subject to the Credit Bid Right, such credit bid will be deemed the highest and best bid and such credit bid will be accepted by the Debtors and be presented for approval to the Bankruptcy Court.

KE 39610918

Subject to the prior paragraph: (i) at the Auction, any Qualified Bidder, including the Stalking Horse Bidder, who has a valid, perfected, and unavoidable lien on any assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; *provided, further,* that for purposes of such Secured Creditor's Qualified Bid, the Secured Creditor's claim shall be deemed to have the value it possesses on the date of the Auction, and (ii) the Stalking Horse Bidder shall have the right (including as part of any Overbid) to credit bid all or a portion of the value of the secured portion of its claims for the Assets pursuant to section 363(k) of the Bankruptcy Code

(d)     **The Auction.**  If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtors, in consultation with the Agent and the Committee Representatives, will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid unless the Agent indicates that it intends to exercise its Credit Bid Right as set forth above.

(e)     **Bidding Increments (Local Bankr. R. 6004-1(c)(i)(C)).**  Any Overbid following the initial Minimum Overbid or following any subsequent Prevailing Highest Bid shall be in increments of $500,000.

(f)     **Backup Bidder (Local Bankr. R. 6004-1(c)(i)(E)).**  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors (the "Backup Bid").  The Agent will not be a Backup Bidder unless the Agent consents in writing otherwise.

(g)     **Highest or Otherwise Best Bid.**  When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Agent and the Committee Representatives, may consider the following factors in addition to any other factors that the Debtors, the Agent, and the Committee Representatives deem appropriate:  (i) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a

13

transaction and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; and (v) the tax consequences of such Qualified Bid; *provided* that in each case, that the fact the Stalking Horse Bid comprises a credit bid shall not be a factor considered by the Debtors in their determination of the highest or otherwise best Qualified Bid.

(h) **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D)).** The Debtors reserve their rights to modify the Bidding Procedures (after consultation with the Agent and the Committee) in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets.

19.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

## II.     Form and Manner of Sale Notice.

20.     On or within three business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice to be served on the following parties or their respective counsel, if known:   (a) the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) co-counsel to the Committee; (c) counsel to the Stalking Horse Bidder; (d) counterparties to the Contracts (the "Contract Counterparties"); (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtors' other creditors; (j) the United States Bureau of Land Management; (k) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (l) all parties that have requested or that are required

to receive notice pursuant to Bankruptcy Rule 2002.  In addition, the Debtors will also publish an abbreviated version of the Sale Notice in the *The USA Today (National Edition), The Denver Post,* and *The DailyDAC*, at least ten days prior to the Auction.

21.     The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; (f) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any).[6]

22.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that

---

[6]   Pursuant to the Bidding Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bidding Procedures Order as **Exhibit 3** (the "Contract Notice") and **Exhibit 4** (the "Assumption Notice") to be sent to the applicable Contract Counterparties.

no other or further notice of the Sale shall be required.  Accordingly, the Debtors request that this

Court approve the form and manner of the Sale Notice.

## III.     Summary of the Assumption Procedures.

23.     The Debtors are also seeking approval of certain procedures to facilitate the fair

and orderly assumption and assignment of the Contracts in connection with the Sale

(the "Assumption Procedures").     Because the Bidding Procedures Order sets forth the

Assumption Procedures in detail, they are not restated herein.     Generally, however, the

Assumption Procedures:  (a) outline the process by which the Debtors will serve notice to all

Contract Counterparties regarding the proposed assumption and assignment and related cure

amounts, if any, informing such parties of their right and the procedures to object thereto; and

(b) establish objection and other relevant deadlines and the manner for resolving disputes

relating to the assumption and assignment of the Contracts to the extent necessary.

## Basis for Relief

## I.     The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.

24.     Courts have made clear that a debtor's business judgment is entitled to substantial

deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re*

*Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can

sell property of the estate . . . if he has an 'articulated business justification'" (internal citations

omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *In re*

*Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re*

*Integrated Resources, Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding

procedures that have been negotiated by a trustee are to be reviewed according to the deferential

16

"business judgment" standard, under which such procedures and arrangements are "presumptively valid").

25.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

26.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

27.     The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially

capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction. Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

28.     At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Entering into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

29.     The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this District. *See In re Quicksilver Res., Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015); *In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014); *In re Palm Harbor Homes, Inc.*, No. 10-13850 (Bankr. D. Del. Jan. 6, 2011); *In re Ultimate Escapes Holdings, LLC*, No. 10-12915 (Bankr. D. Del. Oct. 8, 2010); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009); *In re VeraSun Energy Corp.*, No. 08-12606 (Bankr. D. Del. Feb. 19, 2009).[7]

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.

KE 39610918

**II.      The Bid Protections Have a Sound Business Purpose and Should Be Approved.**

30.      The Debtors are also seeking authority to offer customary bid protections. The Debtors have agreed to pay the Breakup Fee to the Stalking Horse Bidder as an allowed administrative expense priority claim.  The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."  *Id.* (internal citations omitted).  Thus, the use of bidding protections has become an established practice in chapter 11 cases.

31.      Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code:  "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . .  In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value."  *Integrated Res.*, 147 B.R. at 659–60 (emphasis added).  Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking."  *995 Fifth Ave.*, 96 B.R. at 28

---

Copies of these orders are available upon request of the Debtors' proposed counsel.

19

(quotations omitted); *see also Integrated Resources*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

32.    As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Debtors believe that the allowance of the Bidding Protections is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

33.    Here, the Bid Protections were, and remain, a critical component of the Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested Breakup Fee in good faith and at arm's length with significant give-and-take with respect to proposed Bid Protections. As a result, by agreeing to the Bid Protections, the Debtors ensured that their estates would have the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

34. If the Court does not approve the Bid Protections, the Stalking Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Debtors' estates. Further, if the Bid Protections were to be paid, it will likely be because the Debtors have received higher or otherwise superior offers for the Assets. In short, the proposed Bid Protections are fair and reasonable under the circumstances because it constitutes a "fair and reasonable percentage of the proposed purchase price" and is "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662 (*quoting 995 Fifth Ave.*, 96 B.R. at 28). Accordingly, the Bid Protections should be approved.

## III. The Form and Manner of the Sale Notice Should Be Approved.

35. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

36. As noted above, within three business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice upon the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) the Committee; (c) the Stalking Horse Bidder; (d) the Contract Counterparties; (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtors' other creditors; (j) the United States Bureau of Land Management; (k) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors shall also

publish an abbreviated version of the Sale Notice in the *The USA Today (National Edition), The Denver Post,* and *The DailyDAC* at least ten days prior to the Auction.

37.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**IV.     The Assumption Procedures Are Appropriate and Should Be Approved.**

38.     As set forth above, the Sale contemplates the assumption and assignment of the Contracts to the Stalking Horse Bidder or Successful Bidder arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish a process by which:  (a) the Debtors and Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure amounts (the "Assumption Procedures").

39.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Contract Notice.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

KE 39610918

40.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.   Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

## V.     The Sale Should Be Approved as an Exercise of Sound Business Judgment.

41.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

42.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company."  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-*

*Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### A.   A Sound Business Purpose Exists for the Sale.

43.     As set forth above, the Debtors have a sound business justification for selling the Assets.  ***First***, the Debtors believe the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone basis.  Moreover, because the Stalking Horse Purchase Agreement contemplates the assumption of certain of the Debtors' estates' Contracts, it will result in payment in full for a number of the Debtors' estates' creditors.

44.     ***Second***, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative.  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

45.     Thus, the Debtors submit that the Successful Bidder's Purchase Agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into the Successful Bidder's Purchase Agreement will be a valid and sound exercise of the

24

Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

      **B.**     **Adequate and Reasonable Notice of the Sale Will Be Provided.**

46.     As described above, the Sale Notice:  (a) will be served in a manner that provides at least 21 days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

      **C.**     **The Sale and Purchase Price Reflects a Fair Value Transaction.**

47.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

48.     Moreover, as noted above, even as the Debtors move forward with the Sale, Intrepid will continue to market the Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information,

considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse Purchase Agreement's purchase price will, conclusively, be fair value.

**D.    The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Is a "Good-Faith Purchaser."**

49.    The Debtors request that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

50.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

51.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g.,* *In re Abbotts Dairies of Pa., Inc.* ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale

26

involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

52.     The Debtors submit that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Purchase Agreement, or any marked versions thereof, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[8]  *First*, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Stalking Horse Purchase Agreement is substantial, fair, and reasonable.  *Second*, the parties entered into the Stalking Horse Purchase Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.  And, with respect to

---

[8]     The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction.  Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

KE 39610918

potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. ***Finally***, the Stalking Horse Bidder's offer was evaluated and approved by the Debtors in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a successful bid will have been evaluated in a similar fashion. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse Purchase Agreement (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

**E.     The Sale Should be Approved "Free and Clear" Under Section 363(f).**

53.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

54.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable Purchase Agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

55.     The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and

that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

F.   **Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

56.    A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

57.    In this district, absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  *See In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014) (order approving bid procedures which authorized parties with secured claims to credit bid); *In re Fisker Auto.*

*Holdings, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (order authorizing secured creditors to exercise right under Bankruptcy Code section 363(k) to make a credit bid); *In re PTC Alliance Corp.,* No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Intl, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing any interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, No. 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citation omitted).

58.    In the event that the Agent, for itself and for and on behalf of the Lenders, elects, it is entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code.   For the avoidance of doubt, the Stalking Horse Purchase Agreement contemplates that the Agent is entitled to credit bid up to the face value of any of its secured claims in order to effectuate the transactions under the Stalking Horse Purchase Agreement.

## VI.    The Assumption and Assignment of the Contracts Should Be Approved.

### A.    The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment.

59.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign or transfer the Contracts to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, to the extent required by such bidders.

60.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign his executory contracts and unexpired leases, subject to the approval of the court, provided that

30

the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

61.    Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment: *First*, the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets.  *Second*, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction.  *Third*, the Stalking Horse Purchase Agreement provides that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, the Sale.  *Finally*, the Assumed Contracts will be assumed and

KE 39610918

assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

62. Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

**B.    Defaults Under the Assumed Contracts Will Be Cured Through the Sale.**

63. Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

64. The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse Purchase Agreement requires that the Stalking Horse Bidder cure all defaults associated with, or that are required to properly assume, the Assumed Contracts. *See* Stalking Horse Purchase Agreement § [1.5]. Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults

exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### C.    Non-Debtor Parties Will Be Adequately Assured of Future Performance.

65.    Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.    "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

66.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assumed Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assumed Contracts

assigned to the Stalking Horse Bidder or any Successful Bidder arising from the Auction. Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assumed Contracts or proposed cure amounts. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assumed Contracts as set forth in the Stalking Horse Purchase Agreement.

## VII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

67.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."   The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

68.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006).   Furthermore, if an objection is filed

and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

69.     To maximize the value received for the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.   Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

70.     The Debtors will provide notice of this motion to:  (a) the Office of the United States   Trustee   for   the   District   of   Delaware;   (b) co-counsel   for   the   Committee; (c) the administrative agent under the Debtors' prepetition credit facility; (d) counsel to the administrative agent under the Debtors' prepetition credit facility; (e) the indenture trustee for the Debtors' 2.00% convertible senior notes due 2019; (f) the agent under the Debtors' debtor-in-possession credit facility; (g) counsel to the agent under the Debtors' debtor-in-possession credit facility; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue  Service;  (j) the  Environmental  Protection  Agency;  (k) the  office  of  the  attorneys general for the states in which the Debtors operate; (l) the Securities and Exchange Commission; (m) the United States Bureau of Land Management; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

71.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Wilmington, Delaware
Dated:  May 25, 2016

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:          ljones@pszjlaw.com
                   crobinson@pszjlaw.com
                   jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          james.sprayregen@kirkland.com
                   ryan.bennett@kirkland.com
                   travis.bayer@kirkland.com

*Counsel to the Debtors*