# EXHIBIT 1

EXECUTION VERSION

**PURCHASE AND SALE AGREEMENT**

**BY AND BETWEEN**

**KOCH EXPLORATION COMPANY, LLC**

**(Koch)**

**AND**

**EMERALD OIL, INC.**

**EMERALD WB LLC**

**EMERALD NWB, LLC**

**(Emerald)**

**Dated July 31, 2015**

**EXHIBIT**

**1**

TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND REFERENCES ................................................................... 1

    1.1    Certain Defined Terms ........................................................................ 1
    1.2    References and Construction ............................................................... 8

ARTICLE 2 PURCHASE AND SALE ..................................................................................... 8

    2.1    Purchase and Sale ............................................................................... 8
    2.2    Consideration ...................................................................................... 8
    2.3    Purchase and Sale of Purchased Assets ............................................. 9

ARTICLE 3 DUE DILIGENCE REVIEW ............................................................................... 9

    3.1    Due Diligence Review ......................................................................... 9
    3.2    Access to Emerald Records .................................................................. 9
    3.3    Access to Emerald Assets. ................................................................... 9

ARTICLE 4 TITLE MATTERS ............................................................................................. 10

    4.1    Emerald's Title .................................................................................... 10
    4.2    Purchase Price Adjustment Procedures. ............................................. 12
    4.3    Title Dispute Resolution ..................................................................... 16
    4.4    Preferential Purchase Rights ............................................................... 16

ARTICLE 5 ENVIRONMENTAL MATTERS ........................................................................ 17

    5.1    Environmental Defect Notice .............................................................. 17
    5.2    Remedies for Environmental Defects .................................................. 17
    5.3    Environmental Threshold; Deductible ................................................ 17
    5.4    Environmental Dispute Resolution ..................................................... 18

ARTICLE 6 KOCH'S REPRESENTATIONS AND WARRANTIES ....................................... 18

    6.1    Organization and Standing .................................................................. 19
    6.2    Power ................................................................................................... 19
    6.3    Authorization and Enforceability ........................................................ 19
    6.4    Liability for Brokers' Fees ................................................................... 19
    6.5    Litigation ............................................................................................. 19
    6.6    Judgements .......................................................................................... 19
    6.7    No Other Representations or Warranties; Disclosed Materials ........... 19
    6.8    Koch's Evaluation ............................................................................... 20

TABLE OF CONTENTS
(continued)

Page

ARTICLE 7 EMERALD'S REPRESENTATIONS AND WARRANTIES ................................ 20

    7.1    Organization and Standing ................................ 20
    7.2    Power ................................ 20
    7.3    Authorization and Enforceability ................................ 20
    7.4    Liability for Brokers' Fees ................................ 21
    7.5    Litigation ................................ 21
    7.6    Material Agreements ................................ 21
    7.7    Preferential Purchase Rights ................................ 21
    7.8    Taxes ................................ 21
    7.9    Judgments ................................ 22
    7.10    Compliance with Law And Government Authorizations ................................ 22
    7.11    Environmental Matters ................................ 22
    7.12    Lease Status/Rentals/Royalties ................................ 22
    7.13    Well Status ................................ 23
    7.14    Condition of Emerald Wells ................................ 23
    7.15    No Other Representations or Warranties; Disclosed Materials ................................ 23
    7.16    Disclaimer ................................ 23
    7.17    Emerald's Evaluation ................................ 24

ARTICLE 8 COVENANTS AND AGREEMENTS ................................ 24

    8.1    Covenants and Agreements of Emerald ................................ 24
    8.2    Covenants and Agreements of the Parties. ................................ 25

ARTICLE 9 TAX MATTERS ................................ 26

    9.1    Tax Reports and Returns ................................ 26
    9.2    Tax Cooperation ................................ 27
    9.3    Transfer Taxes ................................ 27
    9.4    Allocation of Emerald Purchase Price ................................ 27

ARTICLE 10 CONDITIONS PRECEDENT TO CLOSING ................................ 27

    10.1    Koch's Conditions ................................ 27
    10.2    Emerald's Conditions ................................ 29

ARTICLE 11 RIGHT OF TERMINATION ................................ 29

    11.1    Termination ................................ 29
    11.2    Liabilities Upon Termination ................................ 29

TABLE OF CONTENTS
(continued)

                                                                                          Page

ARTICLE 12 CLOSING ................................................................................................ 30

    12.1    Date of Closing ................................................................................... 30
    12.2    Place of Closing ................................................................................. 30
    12.3    Closing Obligations ........................................................................... 30

ARTICLE 13 INDEMNIFICATION ............................................................................. 31

    13.1    Retained Liabilities ............................................................................ 31
    13.2    Indemnification .................................................................................. 32
    13.3    Procedure ........................................................................................... 33
    13.4    Survival of Warranties, Representations and Covenants ..................... 34
    13.5    Reservation as to Non-Parties ............................................................ 34
    13.6    Reductions in Losses.......................................................................... 34
    13.7    Waiver ............................................................................................... 35

ARTICLE 14 MISCELLANEOUS ............................................................................... 35

    14.1    Exhibits and Schedules ...................................................................... 35
    14.2    Expenses ............................................................................................ 35
    14.3    Notices ............................................................................................... 35
    14.4    Amendments ...................................................................................... 36
    14.5    Assignment ........................................................................................ 36
    14.6    Headings ............................................................................................ 36
    14.7    Counterparts/Fax Signatures............................................................... 36
    14.8    Governing Law and Jurisdiction......................................................... 36
    14.9    Entire Agreement ............................................................................... 37
    14.10  Binding Effect.................................................................................... 37
    14.11  No Third-Party Beneficiaries.............................................................. 37
    14.12  No Vicarious Liability ....................................................................... 37
    14.13  Publicity ............................................................................................ 37
    14.14  Severability ........................................................................................ 37

List of Exhibits

Exhibit A-1.................Emerald Leases
Exhibit B-1.................Emerald Wells
Exhibit C-1.................Intentionally Omitted
Exhibit D-1.................Emerald Material Agreements
Exhibit E-1 .................Form of Assignment and Conveyance of Purchased Assets
Exhibit F.....................Affidavit of Non-Foreign Status
Exhibit G....................AMI Agreement
Exhibit H....................Drilling Agreement
Exhibit I .....................JOA

List of Schedules

Schedule 1.1(a) ..........Emerald's Knowledge Representatives
Schedule 1.1(b) ..........Koch's Knowledge Representatives
Schedule 1.1(c) .........Emerald Excluded Assets
Schedule 4.2...............Defect Leases
Schedule 7.5...............Emerald Pending or Threatened Litigation
Schedule 7.7...............Preferential Purchase Rights
Schedule 7.8...............Emerald Assets Owned by a Partnership
Schedule 7.11.............Environmental Matters
Schedule 7.13.............Emerald Well Status
Schedule 9.4...............Allocation Schedule

**Draft-For Discussion Purposes Only**

PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "*Agreement*"), dated as of this 31st day of July, 2015, is entered into by and between Koch Exploration Company, LLC, a Delaware limited liability company ("*Koch*"), and Emerald Oil, Inc., a Delaware corporation ("*Emerald Oil*"), Emerald WB LLC, a Colorado limited liability company ("*Emerald WB*"), and Emerald NWB, LLC, a Colorado limited liability company ("Emerald NWB" and together with Emerald Oil and Emerald WB, "*Emerald*").  The foregoing entities are collectively referred to as the "*Parties*" and individually as a "*Party*".

RECITALS

WHEREAS, Emerald desires to sell and Koch desires to purchase a certain percentage of Emerald's interest in the Emerald Assets (as defined below) upon the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

AGREEMENTS

ARTICLE 1
DEFINITIONS AND REFERENCES

1.1     Certain Defined Terms.  In addition to the terms defined elsewhere herein, the following terms will have the respective meanings assigned to them in this Section 1.1 when used in this Agreement with initial capital letters:

"*Additional Escrow Amount*" means the sum of (i) the aggregate Title Escrow Amounts, if any, and (ii) the aggregate Environmental Escrow Amounts, if any.

"*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.  For purposes of the immediately preceding sentence, the term "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"*Assets*" means Emerald Assets, as applicable.

"*Business Day*" means a day other than a Saturday, Sunday or a day on which commercial banks in Denver, Colorado, or New York, New York, are authorized or required by applicable Law to be closed for business.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Condition***" means any circumstance, omission, status or defect that requires Remediation to comply with Environmental Laws.

"***Deposit Payment***" means the deposit payment to be paid by Koch to escrow pursuant to the terms herein.  The amount of the Deposit Payment shall be ten percent (10%) of the number calculated by subtracting the Value of the Defect Leases from the Emerald Purchase Price.

"***Dispute***" means any dispute, claim or controversy of any kind or nature related to, arising under, or connected with this Agreement (including disputes as to the creation, validity, interpretation, breach or termination of this Agreement).

"***Effective Time***" means July 1, 2015, at 7:00 a.m. Mountain Time.

"***Emerald***" means, collectively, Emerald WB, Emerald NWB, and Emerald Oil.

"***Emerald Assets***" means all of Emerald's right, title, and interest, whether present, contingent, or reversionary, in and to the Emerald Leases and Emerald Wells.

"***Emerald Indemnified Parties***" means Emerald, its affiliates, and its and their Representatives.

"***Emerald Leases***" means the Hydrocarbons leases listed on **Exhibit A-1**, including all royalty, overriding royalty, net profits, and other interests therein as well as all rights with respect to any pooled, unitized, or communitized acreage by virtue of any Emerald Lease being a part thereof.

"***Emerald Purchase Price***" has the meaning set forth in Section 2.2 of this Agreement.

"***Emerald Records***" means the Emerald owned records as they relate to the Emerald Leases and Emerald Wells.

"***Emerald Wells***" means the wells listed on **Exhibit B-1** as well as any facilities and appurtenances associated therewith, including pipelines.  "Emerald Wells" shall not include any oil or natural gas wells and any facilities and appurtenances associated therewith, including pipelines, located on the Emerald Leases prior to the Wells Effective Time unless specifically enumerated or referenced within **Exhibit B-1**.

"***Environmental Claim***" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by any Governmental Entity or legal proceeding or notice of violation by any Person alleging liability or potential liability arising out of, based on or resulting from: (a) the presence, release of, or exposure to, any Hazardous Materials; or (b) any non-

compliance with, violation of or alleged non-compliance with or violation of any Environmental Law or term or condition of any Environmental Permit.

"*Environmental Defect*" means any material non-compliance with Environmental Law or any condition in, on, under or relating to the air, land, soil, surface and subsurface strata, surface water, groundwater, or sediments of, or at, a particular Emerald Asset, including, without limitation, the presence of Hazardous Materials, but excluding any Plugging and Abandonment Obligations (which shall not constitute an Environmental Defect).

"*Environmental Laws*" means all federal, tribal, state, local or foreign law (including common law), statute, rule, regulation, requirement, ordinance and any writ, decree, bond, authorization, approval, license, permit, registration, binding criteria, standard, consent decree, settlement agreement, judgment, order, directive or binding policy issued by or entered into with a Governmental Entity pertaining or relating to:  (a) pollution or pollution control, including, without limitation, storm water regulation; (b)  protection of human health and the environment, including, without limitation, the air, land, soil, surface and subsurface strata, surface water, groundwater, sediments, natural resources and species from the Release of Hazardous Materials; and/or (c)  the management, presence, use, generation, processing, extraction, treatment, recycling, refining, reclamation, labeling, transport, storage, collection, distribution, or Release or threat of Release of Hazardous Materials.  "*Environmental Laws*" shall include, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*; the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 *et seq.*; the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*; the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*; the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*; the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*; the National Historic Preservation Act, 16 U.S.C. §470 *et seq.*; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq., the National Environmental Policy Act, 42 U.S.C. § 4321 et. seq. and the regulations and orders respectively promulgated thereunder, each as amended, or any equivalent or analogous state or local statutes, laws or ordinances, any regulation promulgated thereunder and any amendments or reauthorizations thereof or thereto.

"*Environmental Notice*" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim.

"*Environmental Permit*" means any permits, licenses, variances, exemptions, franchises, approvals, authorizations and consents required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"*Excluded Assets*" means, with respect to either Koch or Emerald, (a) (i) all corporate, financial, income, Tax and legal records of such Party that relate to such Party's business generally (whether or not relating to the Assets) and (ii) all books, records and files that relate to the Excluded Assets or this Agreement and the transactions contemplated hereby; (b) (i) equipment, inventory, machinery, fixtures and other tangible personal property and improvements that are leased by such Party or located at or used in connection with any field

office or yard of such Party that are not used solely in connection with the Assets, (ii) any computers and related peripheral equipment that are not located on the Assets, and (iii) communications equipment that is not located on the Assets and not used solely in connection with the Assets; (c) all rights to any refunds for Taxes or other costs or expenses borne by such Party or such Party's predecessors in interest and title attributable to periods prior to the Effective Time in accordance with the principles of <u>Section 9.1</u>; (d) such Party's area-wide bonds, permits and licenses or other permits, licenses or authorizations used in the conduct of such Party's business generally and not relating to the Assets; (e) all geophysical and other seismic and related technical data and information that is not transferrable without the payment of a fee or other penalty or is otherwise not transferrable pursuant to a third party agreement or applicable Law; (f) all data that cannot be disclosed by a Party to the other Party as a result of confidentiality arrangements under agreements with third parties; (g) all trade credits, account receivables, note receivables, take or pay amounts receivable, and other receivables attributable to the Assets with respect to any period of time prior to the Effective Time; (h) any refunds due to either Party by a third party for any overpayment of rentals, royalties, excess royalty interests or production payments attributable to the Assets with respect to any period of time prior to the Effective Time; (i) any causes of action, claims, rights, indemnities or defenses with respect to the Assets, whether arising before or after the Effective Time, that relate to any indemnification obligation of either Party hereunder as more fully described in <u>Article 15</u> below; (j) all rights and interests of either Party (i) under any policy or agreement of insurance or indemnity agreement, (ii) under any bond and (iii) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omission or events, or damage to or destruction of property prior to the Effective Time; (k)  any oil or natural gas wells and any facilities or appurtenances associated therewith, including pipelines, located on the Emerald Leases prior to the Wells Effective Time unless specifically enumerated or referenced within **Exhibit B-1**; and (l) the assets listed on **Schedule 1.1(c)**.

"***Force Majeure***" means acts of terrorism, fire, explosion, earthquake, storm, flood, freezing of wells or pipelines, delays in obtaining rights-of-way, shutting-in facilities for repair or maintenance, strike, lock out, activities of a combination of workmen or other labor difficulties, wars, insurrection, riot, Law, act, order, export or import control regulations, proclamation, decree, regulation, ordinance, or instructions of a Governmental Entity, judgment or decree of a court of competent jurisdiction or any other cause not reasonably within the control of the party claiming force majeure.

"***Governmental Entity***" means any national, state, local, native, or tribal government or any subdivision, agency, court, commission, department, board, bureau, regulatory authority or other division or instrumentality thereof.

"***Hazardous Materials***" means, without limitation, any waste, substance, product, or other material (whether solid, liquid, gas or mixed), which is or becomes identified, listed, published, or defined as a hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant, contaminant, radioactive material, oil, or petroleum waste under any Environmental Law.

"***Hydrocarbons***" means oil, natural gas, coalbed methane, natural gas liquids, and other hydrocarbons produced or processed in association therewith (whether or not such item is in

liquid or gaseous form), or any combination thereof, and any minerals produced in association therewith.

"*JOA*" means a joint operating agreement substantially in the form of Exhibit I.

"*Knowledge*" means, with respect to Emerald, the actual knowledge of Emerald's representatives listed on **Schedule 1.1(a)** following diligent inquiry and with respect to Koch, the actual knowledge of Koch's representatives listed on **Schedule 1.1(b)** following diligent inquiry.

"*Koch Indemnified Parties*" means Koch, its affiliates, and its and their Representatives.

"*Law*" means any statute, law, principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Entity.

"*Lien*" means any of the following: mortgage, lien (statutory or other), other security agreement, arrangement or interest, hypothecation, pledge or other deposit arrangement, assignment, charge, levy, executory seizure, attachment, garnishment, encumbrance (including any easement, exception, reservation or limitation, right of way, and the like), conditional sale, title retention, voting agreement or other similar agreement, arrangement, device or restriction, preemptive or similar right, the filing of any financial statement under the Uniform Commercial Code or comparable law of any jurisdiction, or any option, equity, claim or right of or obligation to any other Person of whatever kind and character; *provided, however,* that the term "*Lien*" shall not include any of the foregoing to the extent created by this Agreement.

"*Losses*" means any actual losses, costs, expenses (including court costs, reasonable fees and expenses of attorneys, technical experts and expert witnesses and the cost of investigation), liabilities, damages, demands, suits, claims, and sanctions of every kind and character (including civil fines) arising from, related to or reasonably incident to matters indemnified against; *excluding, however,* (x) any special, consequential, punitive or exemplary damages, diminution of value of any Purchased Assets, loss of profits incurred by a Party or loss incurred as a result of the indemnified party indemnifying a third party and (y) any increase in liability, loss, cost, expense, claim, award or judgment to the extent such increase is caused by the actions or omissions of any indemnified party after the Closing Date.

"*Material Adverse Effect*" means any state of facts, change, event, effect or occurrence (when taken together with all other states of fact, changes, events, effects or occurrences), that is (i) materially adverse to the ownership, operations or value of the applicable Party's Assets, or (ii) materially adverse to the ability of the applicable Party to consummate the transactions contemplated by this Agreement on a timely basis; *provided, however*, that no state of facts, change, event, effect or occurrence arising or related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a "*Material Adverse Effect*": (a) national or international business, economic or political conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its respective territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (b) events affecting the financial,

banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (c) conditions (or changes in such conditions) generally affecting the oil and gas industry or the natural gas liquids industry in any area or areas where the Assets are located; (d) increases in energy, electricity, natural gas, oil, or other raw materials or operating costs; (e) changes in generally accepted accounting principles or Law; (f) the taking of any action required by this Agreement; (g) changes as a result of the negotiation, announcement, pendency or performance of this Agreement, including by reason of the identity of the Parties or any communication by either Party or any of their respective Affiliates of their plans or intentions regarding the operation of the applicable Assets; (h) any actions taken or omitted to be taken by or at the request or with the written consent of a Party; (i) any event of Force Majeure; (j) changes in oil or natural gas prices, including changes in price differentials; or (k) effects or changes that are cured or no longer exist by the earlier of the Closing and the termination of this Agreement pursuant to Article 11.

"***Net Acre***" means, as computed separately with respect to each Emerald Lease, the (x) lessor's percentage interest in the leasehold estate created by the Emerald Lease *multiplied by* (y) the number of gross acres covered by the Emerald Lease *multiplied by* (z) Emerald's Working Interest in such Lease.

"***Person***" means any individual or entity, including, without limitation, any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or government, administrative or judicial authority (including any board, agency, political subdivision or other body thereof).

"***Plugging and Abandonment Obligations***" means any and all responsibility and liability for the following, arising out of or relating to the Emerald Assets, whether before, on, or after the Effective Time: (a) the necessary and proper plugging, replugging, and abandonment of all Emerald Wells; (b) the necessary and proper removal, abandonment, and disposal of all structures, pipelines, equipment, operating inventory, abandoned property, trash, refuse, and junk located on or comprising part of the Emerald Assets; (c) the necessary and proper capping and burying of all associated flow lines located on or comprising part of the Emerald Assets; and (d) the necessary and proper restoration of the surface and subsurface to the condition required by applicable laws, permits, orders, and contracts, except for interim reclamation previously required to be performed under any Environmental Law.

"***Production Taxes***" means all ad valorem, property, production, excise, net proceeds, severance, windfall profit and all other Taxes and similar obligations assessed against the Emerald Assets, or based upon or measured by the ownership of the Emerald Assets, or the production of Hydrocarbons or the receipt of proceeds therefrom, provided that Production Taxes shall not include income, franchise, or margin Taxes, and Transfer Taxes, but shall include any interest, penalties, additions to tax and fines assessed or due in respect of any Production Taxes, whether disputed or not.

"***Purchased Assets***" means a thirty percent (30%) interest in all of Emerald's right, title, and interest (unless the Working Interest and net revenue interest percentage being acquired in a particular Asset is otherwise set forth on **Exhibit A-1** or **Exhibit B-1**) in and to the Emerald Assets, but not including the Excluded Assets.

Execution Version

"*Release*" means any "release" or "disposal" as defined by or under any Environmental Law.

"*Remediation*" or "*Remediate*" means investigation, assessment, characterization, delineation, monitoring, sampling, analysis, removal action, remedial action, response action, corrective action, mitigation, treatment, cleanup, reporting, or permitting of (a) any Release of Hazardous Materials or other similar actions as required by any applicable Environmental Law from soil, land surface, groundwater, sediment, surface water, or subsurface strata or otherwise or (b) any failure of Emerald to operate Emerald's Assets in compliance with all applicable Environmental Laws where such noncompliance would have, individually or in the aggregate, a Material Adverse Effect or risk to human health or the environment.

"*Remediation Costs*" means all costs to Remediate an Environmental Defect, including losses resulting from interruptions to operations as a result of any Environmental Defect, to the extent required to bring an Environmental Defect Property into compliance with all applicable Environmental Laws or to achieve applicable action levels or clean-up standards sufficient to receive a No Further Action letter (or the equivalent) from the jurisdictional Governmental Entity, including the costs of any fines, penalties, judgments, or similar amounts assessed or alleged against Emerald.

"*Representatives*" means each Party's stockholders, members, managers, officers, directors, employees, attorneys, accountants, agents, and representatives.

"*Taxes*" means any taxes and assessments imposed by any Governmental Entity, including net income, gross income, profits, gross receipts, license, employment, stamp, occupation, premium, alternative or add-on minimum, ad valorem, real property, personal property, transfer, real property transfer, value added, sales, use, environmental (including taxes under Code Section 59A), customs, duties, capital stock, franchise, excise, withholding, social security (or similar), unemployment, disability, payroll, fuel, excess profits, windfall profit, severance, estimated or other tax, including any interest, penalty or addition thereto, whether disputed or not, and any expenses incurred in connection with the determination, settlement or litigation of the Tax liability, and "*Tax*" means any one of these.

"*Tax Return*" means any return, report or similar statement required to be filed with respect to any Tax (including any attached schedules), including, without limitation, any information return, claim for refund, amended return and declaration of estimated Tax.

"*Transfer Taxes*" means all sales, (including bulk sales, if applicable) use, value-added, documentary, stamp, gross receipts, registration, transfer, conveyance, excise, recording, license and other similar Taxes, levies, charges and fees, including all interest and penalties thereon and additions thereto, whether disputed or not; provided however, Transfer Taxes does not include any income, franchise, business and occupation, commercial activity, and similar taxes, including taxes measured by receipts that are not in the nature of a sales/use tax.

"*Value*" means the value set forth on **Exhibit A-1** for each Emerald Lease as a component of the Emerald Purchase Price or the value set forth on **Exhibit B-1** for each Emerald Well as a component of the Emerald Purchase Price.

"*Wells Effective Time*" means for each of the Emerald Wells, 7:00 a.m. Mountain Time on the respective spud date indicated for such Emerald Well on Exhibit B-1.

"*Working Interest*" means the interest in a property or asset that is burdened with the percentage of costs and expenses associated with the exploration, drilling, development, operation and abandonment of any Emerald Asset.

1.2    References and Construction.

(a)    When a reference is made in this Agreement to Articles, Sections, Exhibits or Schedules, such reference will be to an Article, Section, Exhibit or Schedule to this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Unless the context otherwise requires, (i) "or" is disjunctive but not necessarily exclusive, (ii) words in the singular include the plural and vice versa, (iii) the words "herein," "hereof," "hereby," "hereunder" and words of similar nature refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited, and (iv) the use in this Agreement of a pronoun in reference to a Party hereto includes the masculine, feminine or neuter, as the context may require.

(b)    The Parties have participated jointly in negotiating and drafting this Agreement.  In the event that an ambiguity or a question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

ARTICLE 2
PURCHASE AND SALE

2.1    Purchase and Sale.  Subject to the terms and conditions of this Agreement, at the Closing, Koch agrees to purchase from Emerald and Emerald agrees to sell, assign and deliver to Koch all of Emerald's right, title and interest in and to the Purchased Assets for the consideration specified in this Article 2.

2.2    Consideration.

(a)    Subject to the terms and conditions of this Agreement, at the Closing, as consideration for the acquisition of the Purchased Assets, Koch shall pay to Emerald the sum of Seventeen Million Four Hundred Forty-Eight Thousand Six Hundred Twenty-One Dollars ($17,448,621.00) in immediately available funds (the "*Emerald Purchase Price*") less any Title Defect Amounts, Casualty Losses, losses resulting from preferential rights to purchase pursuant to **Section 4.4,** amounts by which the Emerald Purchase Price is to be reduced attributable to any Environmental Defects pursuant to **Article 5** of this Agreement, and any other amounts to be deducted from the Emerald Purchase Price pursuant to **Sections 4.3** and **5.4** (the "*Net Emerald Purchase Price*") and less the Deposit Payment.

-8-

**Execution Version**

(b)      No later than five (5) business days after the date that this Agreement is executed by both parties, Koch shall deposit the Deposit Payment with an escrow agent reasonably acceptable to both Koch and Emerald (the "*Escrow Agent*").  In the event the transactions contemplated by this Agreement are not consummated for any reason, then the Escrow Agent shall return the Deposit Payment to Koch no later than three business days after the date on which this Agreement is terminated pursuant to Section 11.1.

2.3      Purchase and Sale of the Purchased Assets. The purchase and sale of the Purchased Assets consisting of the interests in the Emerald Leases shall be effective as of the Effective Time.  The purchase and sale of the Purchased Assets consisting of the interests in the Emerald Wells shall be effective as of the Wells Effective Time.

ARTICLE 3
DUE DILIGENCE REVIEW

3.1      Due Diligence Review.  Emerald will make its Records and Assets available to Koch and its Representatives for inspection and review, at Koch's sole cost, to permit Koch to perform its due diligence ("*Due Diligence Review*") pursuant to the terms and conditions of Sections 3.2 and 3.3, respectively. The notices pertaining to the Due Diligence Review for the Notice of Defective Interest (as defined in Section 4.2(b)) and the Environmental Defect Notice (as defined in Section 5.1)  must be received by Emerald no later than 5:00 p.m. Mountain Time on September 14, 2015 (the "*Defect Notice Date*").  Koch shall be entitled to conduct its Due Diligence Review until the Defect Notice Date (such period from the Effective Time through the Defect Notice Date, the "*Due Diligence Period*").

3.2      Access to Emerald Records.  Upon reasonable advance notice, Emerald will make the Emerald Records available to Koch so Koch and its Representatives may conduct, during the Due Diligence Period, at Koch's sole risk and expense, on-site inspections of all or any portion of the Emerald Records.

3.3      Access to the Emerald Assets.

(a)      Access.

(1)      To the extent that Emerald may do so as an operator or non-operator of Emerald Assets, Emerald will grant Koch and its Representatives access to the Emerald Assets upon reasonable prior notice during Emerald's normal business hours, so Koch and its Representatives may conduct, during the Due Diligence Period, at Koch's sole risk and expense, on-site inspections and a Phase I or Phase II environmental review of all or any portion of the Emerald Assets (each, an "*Environmental Assessment*").

(2)      If Koch or its agents prepares an Environmental Assessment of any Emerald Asset, Koch agrees to keep such final assessment confidential and to furnish final copies thereof to Emerald only upon request. In connection with any on-site inspections, if any, prior to Closing, Koch (1) agrees not to interfere with, and will cause

-9-

its Representatives not to interfere with, the normal operation of the Emerald Assets, and (2) agrees to comply with, and will cause its Representatives to comply with, all requirements of the operators of the Emerald Assets (to the extent such requirements are disclosed to Koch prior to such on-site inspections).

(b)    Indemnity.    Except to the extent caused by the negligence or willful misconduct of any member of the Emerald Indemnified Parties, Koch waives, releases and agrees to defend, indemnify, and hold harmless the Emerald Indemnified Parties from and against any and all losses arising out of, resulting from, or relating to the access afforded to Koch and its Representatives under this Agreement or the activities of Koch and its Representatives related to such access or any Environmental Assessment.

(c)    Clean-Up.    As soon as is reasonably practicable following completion of Koch's due diligence, Koch shall, at its sole cost and expense and without any cost or expense to the Emerald Indemnified Parties (1) repair all damage done to the Emerald Assets in connection with any Environmental Assessment, (2) restore the Emerald Assets to the approximate same or better condition in existence prior to commencement of any Environmental Assessment, and (3) remove all equipment, tools or other property brought onto the Emerald Assets in connection with any Environmental Assessment.

ARTICLE 4
TITLE MATTERS

4.1    Emerald's Title.

(a)    Defensible Title.    The term "***Defensible Title***" means such ownership of record to the Emerald Assets that is deducible from the applicable county, state and federal records and is free of any imperfection that a reasonable and prudent operator would not normally waive such that a reasonably prudent person engaged in the business of the ownership, development and operation of oil and gas leaseholds and properties and having knowledge of all of the facts and their legal bearing would be willing to accept the same, and that, subject to and except for Permitted Encumbrances as defined in Section 4.1(b):

(1)    entitles Emerald to receive a share of the Hydrocarbons produced, saved and marketed from any Emerald Lease or Emerald Well throughout the duration of the productive life of such Emerald Lease or Emerald Well, only insofar as to the specified formation(s) shown on **Exhibit A-1**, or **Exhibit B-1** for such Emerald Lease or Emerald Well, as applicable, and if there are no such specified formation(s), then as to all formations, after satisfaction of all royalties, overriding royalties, nonparticipating royalties, net profits interests or other similar burdens on or measured by production of Hydrocarbons (a "***Net Revenue Interest***"), of not less than the Net Revenue Interest share shown in **Exhibit A-1**, as applicable for such Emerald Lease (on an 8/8ths basis), or **Exhibit B-1**, as applicable for such Emerald Well;

(2)    obligates Emerald to bear a percentage of the costs and expenses for the maintenance, development, operation and the production relating to any Emerald

-10-

**Execution Version**

Well throughout the productive life of such Emerald Well ("***Working Interest***") not greater than the Working Interest shown in **Exhibit B-1**, from the currently producing formations for such Emerald Well, without increase, except increases to the extent that they are accompanied by a proportionate increase in Emerald's Net Revenue Interest;

      (3)    expires no earlier than the date specified on Exhibit A-1, or is held by production or held through inclusion within a unit if shown as such on Exhibit A-1, or is a properly suspended federal lease as shown on Exhibit A-1; and

      (4)    is not subject to any call(s) on or for production unless such call has been waived or amended in a manner satisfactory to Koch.

      (b)    <u>Permitted Encumbrances</u>. The term "***Permitted Encumbrances***" shall mean:

      (1)    lessors' royalties, overriding royalties, net profits interests, production payments, reversionary interests and similar burdens if the net cumulative effect of such burdens does not operate to reduce the Net Revenue Interests below those set forth in **Exhibit A-1**, as applicable for such Emerald Lease, or **Exhibit B-1**, as applicable for such Emerald Well, only insofar as to the specified formation(s) shown on **Exhibit A-1** or **Exhibit B-1** for such Emerald Lease or Emerald Well, as applicable, and if there are no such specified formation(s), then as to all formations;

      (2)    statutory liens for taxes that are not yet due and payable or that are being contested in good faith in the normal course of business and for which, if so required by statute, a bond has been posted;

      (3)    all rights to consent by, required notices to, filings with, or other actions by Governmental Entities, in connection with the conveyance of the applicable Emerald Asset if the same are customarily sought after such conveyance;

      (4)    rights of reassignment contained in any Emerald Leases, or assignments thereof, providing for reassignment upon the surrender or expiration of any Emerald Leases;

      (5)    easements, rights of way, servitudes, permits, surface leases and other rights with respect to surface operations, pipelines, grazing, logging, canals, ditches, reservoirs or the like, and easements for streets, alleys, highways, pipelines, telephone lines, power lines, railways and other easements and rights-of-way, on, over or in respect of any of the Emerald Assets or any restriction on access thereto that do not materially interfere with the operation of the affected Emerald Asset;

      (6)    any compulsory pooling order of the North Dakota Industrial Commission and/or communitization agreement with the Bureau of Land Management; *provided, however,* that the effect of any such item does not cause (i) the applicable net revenue interest to be less than as set forth in **Exhibit A-1** or **Exhibit B-1** respectively, only insofar as to the specified formation(s) shown on **Exhibit A-1** or **Exhibit B-1**, as applicable, and if there are no such specified formation(s), then as to all formations, for

-11-

the applicable Emerald Asset, or (ii) the Working Interest to be more than as set forth in **Exhibit B-1**, as applicable, from the currently producing formations unless the net revenue interest is also proportionally greater than that set forth in **Exhibit B-1**;

(7)    materialmen's, mechanics', operators' or other similar liens arising in the ordinary course of business (i) if such liens and charges have not been filed pursuant to law and the time for filing such liens and charges has expired, (ii) if filed, such liens and charges have not yet become due and payable or payment is being withheld as provided by law, or (iii) if their validity is being contested in good faith by appropriate action;

(8)    such Title Defects as Koch has waived in writing; and

(9)    any liens or encumbrances burdening the Emerald Assets which will be released at or before Closing.

(10)    any irregularities or deficiencies in title to easements, rights of way or surface use agreements that do not materially adversely affect the value of any Emerald Asset.

4.2    Purchase Price Adjustment Procedures.

(a)    Title Defect.   The term "*Title Defect*" means any lien, encumbrance obligation (including contract obligation), defect, or other matter (including without limitation a discrepancy in Net Revenue Interest or Working Interest) that causes Emerald not to have Defensible Title to any Emerald Lease or Emerald Well. Notwithstanding the foregoing, the following shall not be considered Title Defects:

(1)    defects based solely on lack of information in connection with documents properly filed of record in the appropriate state or county recorder's office and not contained in Emerald's files;

(2)    defects in the chain of title consisting of the mere failure to recite marital status in a document or omissions of successions of heirship or estate proceedings, unless Koch provides evidence that such failure or omission has resulted in another Person's actual and superior claim of title to the relevant Emerald Asset;

(3)    defects arising out of lack of corporate or other entity authorization unless Koch provides evidence that such corporate or other entity action was not authorized and results in another Person's actual and superior claim of title to the relevant Emerald Asset;

(4)    defects arising out of lack of survey, unless a survey is expressly required by applicable laws or regulations;

(5)    Liens created under deeds of trust, mortgages and similar instruments by the lessor under an Emerald Lease covering the lessor's surface and mineral interests in the land covered thereby which would customarily be accepted in

-12-

taking oil and gas leases or purchasing undeveloped oil and gas leases and for which the lessee would customarily seek a subordination of such Lien to the oil and gas leasehold estate prior to conducting drilling activities on the Emerald Lease, provided that the Liens set forth on **Exhibit 4.2** shall not be classified as a Title Defect;

(6)     defects based on failure to record an Emerald Lease issued by the Bureau of Land Management or the North Dakota Board of University and School Lands, or any assignments of record title or operating rights in such Emerald Leases, in the real property, conveyance or other records of the county in which such Emerald Lease is located; and

(7)     defects that have been cured by applicable laws of limitations, prescription or otherwise.

In addition to the foregoing, the Emerald Leases listed on Schedule 4.2 shall be deemed to be subject to Title Defects and shall be included among the Title Defect Properties to the extent that the defects identified in Schedule 4.2 have not been cured with respect to such Emerald Leases (the "*Defect Leases*").  To the extent the defects specified in Schedule 4.2 as affecting the Defect Leases are not cured prior to closing, Koch shall have the option to acquire a thirty percent (30%) interest in all of Emerald's right, title, and interest in and to all such Defect Leases for a period of eighteen (18) months following Closing (the "*Defect Lease Option Period*") on the same terms and conditions contained within this Agreement.  The consideration for such acquisition will be the Value set forth for the Defect Leases as identified individually by lease on Exhibit A-1.  During the Defect Lease Option Period, Emerald shall use all reasonable efforts to cure the defects identified on Schedule 4.2 and shall notify Koch upon curing such defects.

(b)     Notice of Defective Interest.  On or before the Defect Notice Date, Koch may formally advise Emerald in writing of any matters that in Koch's opinion constitute a Title Defect with respect to Emerald's title to all or any portion of the Emerald Leases and Emerald Wells ("*Notice of Defective Interests*").  The Notice of Defective Interests shall be in writing and contain the following: (1) a description of the alleged Title Defect(s), (2) a list of the Emerald Leases or Emerald Wells (and the applicable zone(s) therein) considered by Koch to be affected by the alleged Title Defect(s) (each a "*Title Defect Property*"), (3) the Value of each Emerald Lease or Emerald Well subject to the alleged Title Defect(s), (4) supporting documents reasonably necessary for Emerald (as well as any title attorney or examiner hired by Emerald) to verify the existence of the alleged Title Defect(s) to the extent such supporting documents are in the possession of Koch, and (5) the amount by which Koch reasonably believes the Value  of each Title Defect Property is reduced by the alleged Title Defect(s) and the computations and information upon which Koch's belief is based.  To give Emerald an opportunity to commence reviewing and curing Title Defects, Koch agrees to give Emerald written notice of all Title Defects discovered by Koch on an ongoing basis as soon as practicable following discovery of a given Title Defect; provided, however, any such written notice may be preliminary in nature and supplemented prior to the Defect Notice Date.  Any matters that may otherwise constitute a Title Defect, but of which Emerald has not been

-13-

**Execution Version**

notified by Koch in accordance with this Section 4.2(b) prior to the Defect Notice Date, shall be deemed to have been waived by Koch; provided however, that any such waiver by Koch shall not affect the special warranty of title by, through, and under Emerald.

(c)     Remedies for Title Defects.  Subject to (x) Emerald's continuing right to title dispute resolution under Section 4.3, (y) the Individual Title Threshold and (z) the Aggregate Title Deductible, in the event that any Title Defect timely asserted by Koch in accordance with Section 4.2(b) is not waived by Koch, contested by Emerald in accordance with Section 4.3 below, or cured on or before Closing, Emerald shall exclude the Title Defect Property from the transaction and reduce the Emerald Purchase Price by an amount equal to the Value of the Title Defect Property.

(d)     Title Defect Amount.  The "*Title Defect Amount*" means the amount by which the Value of the Title Defect Property affected by such Title Defect is reduced as a result of the existence of such Title Defect and shall be determined in accordance with the following methodology, terms and conditions:

(1)     if Koch and Emerald agree on the Title Defect Amount, that amount shall be the Title Defect Amount;

(2)     if the Title Defect is a Lien that is undisputed and liquidated in amount, then the Title Defect Amount shall be the amount of the payment necessary to remove such Title Defect from the Title Defect Property; and

(3)     if the Title Defect represents an obligation, encumbrance, burden or charge upon or other defect in title to the Title Defect Property of a type not described in subsections (1) or (2) above, the Title Defect Amount shall be determined by taking into account the following factors:  (i) any discrepancy between (A) the Net Revenue Interest or Working Interest for any Title Defect Property and (B) the Net Revenue Interest or Working Interest stated in **Exhibit A-1** or **Exhibit B-1**, respectively; (ii) the Value of the Title Defect Property; (iii) the portion of the Title Defect Property affected by the Title Defect; (iv) the legal effect of the Title Defect; (v) the values placed upon the Title Defect by Koch and Emerald; (vi) any discrepancy between (A) the Net Acre interest covered by a Emerald Lease and (B) the Net Acre interest covered by such Emerald Lease stated in **Exhibit A-1**; and (vii) such other reasonable factors as are necessary to make a proper evaluation.

Notwithstanding anything to the contrary in this Agreement, the aggregate Title Defect Amounts attributable to the effects of all Title Defects upon any Title Defect Property shall not exceed the Value of the Title Defect Property as set forth on **Exhibit A-1** or **Exhibit B-1**, as applicable;.

(e)     Title Threshold and Deductible.  Notwithstanding anything to the contrary, (1) in no event shall there be any adjustments to the Emerald Purchase Price or other remedies provided by (i) Emerald for any individual Title Defect, or (ii) Koch for any individual Title Benefit for which the Title Defect Amount or Title Benefit Amount, as applicable, does not exceed Ten Thousand Dollars ($10,000.00) ("*Individual Title Threshold*"); and (2) in no event shall there be any adjustments to the Emerald Purchase

-14-

**Execution Version**

Price or other remedies provided by (i) Emerald for any Title Defect that exceeds the Individual Title Threshold or (ii) Koch for any individual Title Benefit unless the Title Defect Amounts of all such Title Defects or Title Benefit Amounts of all such Title Benefits, in the aggregate, excluding any Title Defects cured by Emerald (with respect to Title Defects), exceeds a deductible in an amount equal to One Percent (1%) of the Emerald Purchase Price (the "***Aggregate Title Deductible***"), after which point Emerald or Koch shall be entitled to adjustments to the Emerald Purchase Price or other remedies only with respect to such Title Defects or Title Benefits, as applicable, in excess of such Aggregate Title Deductible.

(f)     Emerald's Right to Cure.

(1)     Emerald shall have the right, but not the obligation, to attempt, at its sole cost, to cure or remove at any time prior to Closing (the "***Cure Period***") any Title Defects of which it has been advised by Koch.

(2)     Subject to the provisions of this Article 4, if there is a reduction in the Emerald Purchase Price pursuant to Section 4.2(d), then Emerald shall retain the right but not the obligation for one hundred eighty (180) days after the Closing Date to attempt to cure any such Title Defects at Emerald's sole cost.  If Emerald cures any such Title Defect to Koch's reasonable satisfaction, then Koch shall promptly pay Emerald the Title Defect Amount with respect to the Title Defect that is so cured.

(g)     Title Benefits.  The term "***Title Benefit***" means any right, circumstance, or condition that operates to increase:

(1)     Emerald's Net Revenue Interest in any Emerald Lease or Emerald Well throughout the duration of the productive life of such Emerald Lease or Emerald Well, only insofar as to the specified formation(s) shown on **Exhibit A-1**, or **Exhibit B-1** for such Emerald Lease or Emerald Well, as applicable, and if there are no such specified formation(s), then as to all formations, above the Net Revenue Interest share shown in **Exhibit A-1** for such Emerald Lease (on an 8/8ths basis), or **Exhibit B-1** for such Emerald Well, to the extent the same does not cause a greater than proportionate increase in Emerald's Working Interest; or

(2)     Emerald's Net Acres in each such Emerald Lease above the Net Acres set forth in **Exhibit A-1**, only insofar as to the specified formation(s) shown on **Exhibit A-1** for such Emerald Lease, as applicable, and if there are no such specified formation(s), then as to all formations for such Emerald Lease.

(h)     Title Benefit Notice.  If Emerald or Koch discovers any Title Benefit, then such Party shall deliver to the other Party, prior to the Defect Notice Date, a notice with respect to such Title Benefit.  The notice must be in writing and be asserted in good faith and include (1) a description of the Title Benefit, (2) the Emerald Leases and/or Emerald Wells affected by the Title Benefit, (3) the Values of the Emerald Leases and/or Emerald Wells subject to such Title Benefit, and (4) the amount by which Emerald or Koch, as applicable, reasonably believes the value of those Emerald Leases and/or Emerald Wells

-15-

**Execution Version**

is increased by the Title Benefit, and the computations and information upon which such Party's belief is based.

(i)     Title Benefit Amount.  The amount by which the Value of any Emerald Lease or Emerald Well is increased as a result of the existence of a Title Benefit with respect thereto is the "***Title Benefit Amount***."  The Title Benefit Amount shall be determined in accordance with the same methodology, terms, and conditions for determining the Title Defect Amount.

4.3     Title Dispute Resolution.  The Parties shall resolve disputes concerning the following matters pursuant to this Section 4.3:  (a) the existence and scope of a Title Defect, Title Benefit, Title Defect Amount, or Title Benefit Amount, (b) the Title Defect Amount or Title Benefit Amount of that portion of the Emerald Asset affected by a Title Defect or Title Benefit, respectively, and (c) the adequacy of Emerald's Title Defect curative materials and Koch's reasonable satisfaction thereof (the "***Title Disputed Matters***").  The Parties agree to attempt to initially resolve all disputes through good faith negotiations.  If the Parties cannot resolve the Title Disputed Matters on or before Closing, then (y) with respect to all Title Defects subject to a Title Disputed Matter, the Emerald Purchase Price shall be reduced by the Value of the affected Emerald Asset, or (z) with respect to all Title Benefits subject to a Title Disputed Matter, the Emerald Purchase Price shall not be adjusted at Closing, and, at Closing, Koch shall pay the Title Escrow Amount to the Escrow Agent to be held as part of the Additional Escrow Amount.  The term "***Title Escrow Amount***" means (I) with respect to all Title Defects subject to a Title Disputed Matter, the Value of the affected Emerald Asset, and (II) with respect to all Title Benefits subject to a Title Disputed Matter, the Title Benefit Amount associated with such Title Benefit.  Further, the Title Disputed Matters will be finally determined by binding arbitration before an independent arbitrator appointed by the Parties, who shall be an oil and gas title attorney licensed in North Dakota or Colorado with a minimum of 10 years' experience with title issues affecting the types of properties which are the subject of the Title Disputed Matters.  The arbitrator shall employ such independent attorneys, petroleum engineers and/or other consultants as deemed necessary.  On or before thirty (30) days after Closing, Koch and Emerald shall present their respective positions in writing to the arbitrator, together with such evidence as each Party deems appropriate.  The arbitrator shall be instructed to resolve the dispute through a final decision within twenty (20) days after submission of the matters in dispute.  In the event that arbitration is selected by the Parties, then the Party that loses the matters in dispute as determined by the arbitrator's decision shall pay the full amount of any costs or fees assessed or charged by the arbitrator acting pursuant to this **Section 4.3**.

4.4     Preferential Purchase Rights.  If any preferential right to purchase any portion of the Assets is exercised prior to the Closing Date, or if the time allowed for the exercise of such preferential purchase right has not expired and Emerald has not received notice of an intent not to exercise, or waiver of, the preferential purchase right, then that portion of the Assets affected by such preferential purchase right shall be excluded from the Purchased Assets at Closing and the Emerald Purchase Price shall be adjusted downward by an amount equal to the Value of such affected Assets.

(a)     If a third party exercises its preferential right to purchase, but fails to consummate the transaction prior to the Closing, Emerald shall retain the affected Assets

-16-

at Closing and the Emerald Purchase Price shall be adjusted downward by an amount equal to the Value of such affected Assets.

(b)      If a third party exercises its preferential right to purchase, but does not consummate the transaction within the time allowed by the preferential purchase right (provided that the reason therefor is not Emerald's default), Emerald agrees to convey the affected Asset to Koch as soon as possible after the expiration of the time for consummation of the transaction by the holder of the preferential right, such conveyance to be effective as of the Effective Time, and Koch agrees to pay Emerald the Value of the affected Asset.(c)      If a preferential purchase right is not discovered prior to Closing, the affected Asset is conveyed to Koch at Closing, and the preferential purchase right is exercised after Closing, Koch agrees to convey such affected Asset to the party exercising such right on the same terms and conditions under which Emerald conveyed such Asset to Koch (with the purchase price being the Value of the affected Asset) and retain all amounts paid by the party exercising such preferential right to purchase. In the event of such exercise, Koch shall prepare, execute and deliver a form of conveyance of such Asset to such exercising party, such conveyance to be in form and substance as provided in this Agreement.

## ARTICLE 5
## ENVIRONMENTAL MATTERS

5.1      Environmental Defect Notice.  On or before the Defect Notice Date, Koch may formally advise Emerald in writing of any matters that in Koch's reasonable opinion constitute an Environmental Defect ("***Environmental Defect Notice***").  The Environmental Defect Notice shall be in writing and contain the following: (a) a description of the alleged Environmental Defect(s), (b) a list of the Emerald Assets considered by Koch to be affected by the alleged Environmental Defect(s) (each an "***Environmental Defect Property***"), (c) the Value of each Environmental Defect Property in accordance with the Value for the applicable Emerald Asset, (d) supporting documents reasonably necessary for Emerald (as well as any consultant hired by Emerald) to verify the existence of the alleged Environmental Defect(s), and (e) an estimate of Remediation Costs and the amount by which Koch reasonably believes the Value of each Environmental Defect Property is reduced by the alleged Environmental Defect(s) and the computations and information upon which Koch's belief is based.

5.2      Remedies for Environmental Defects.  Subject to (x) Emerald's continuing right to environmental dispute resolution under Section 5.4, (y) the Individual Environmental Threshold as defined in Section 5.3 and (z) the Aggregate Environmental Deductible as defined in Section 5.3, in the event that any Environmental Defect timely asserted by Koch in accordance with Section 5.1 is not waived by Koch, contested by Emerald in accordance with Section 5.4 below, or cured on or before Closing, Emerald shall exclude the Environmental Defect Property from the transaction and reduce the Emerald Purchase Price by an amount equal to the Value of the Environmental Defect Property.

5.3      Environmental Threshold; Deductible.  Notwithstanding anything to the contrary, (a) in no event shall there be any adjustments to the Emerald Purchase Price or other remedies provided by Emerald for any individual Environmental Defect for which the Remediation Costs

**Execution Version**

do not exceed Ten Thousand Dollars ($10,000.00) ("***Individual Environmental Threshold***"); and (b) in no event shall there be any adjustments to the Emerald Purchase Price or other remedies provided by Emerald for any Environmental Defect that exceeds the Individual Environmental Threshold unless the Remediation Costs of all Environmental Defects, in the aggregate, excluding any Environmental Defects cured by Emerald, exceed a deductible in an amount equal to One Percent (1%) of the Emerald Purchase Price (the "***Aggregate Environmental Deductible***"), after which point Koch shall be entitled to adjustments to the Emerald Purchase Price or other remedies only with respect to such Remediation Costs in excess of such Aggregate Environmental Deductible.

5.4     Environmental Dispute Resolution.  The Parties shall resolve disputes concerning the following matters pursuant to this Section 5.4: (a) the existence and scope of an Environmental Defect or the Remediation Costs, (b) the Remediation Costs of that portion of the Emerald Asset affected by an Environmental Defect and (c) the adequacy of Emerald's cure of an Environmental Defect and Koch's reasonable satisfaction thereof (the "***Environmental Disputed Matters***").  The Parties agree to attempt to initially resolve all disputes through good faith negotiations.  If Emerald elects to challenge the existence and/or scope of the Environmental Defect and/or the Remediation Cost pursuant to this Section 5.4 (the "***Environmental Disputed Matters***"), and such dispute has not been resolved as of the Closing Date, then the Emerald Purchase Price shall be reduced by the Value of such Environmental Defect Property (such amount, the "***Environmental Escrow Amount***"), and, at Closing, Koch shall pay such Environmental Escrow Amount to the Escrow Agent, as part of the Additional Escrow Amount.  If the Parties cannot resolve disputes regarding the Environmental Disputed Matters within forty-five (45) days following Closing, the Environmental Disputed Matters will be finally determined by binding arbitration before an independent arbitrator appointed by the Parties, provided that the independent arbitrator shall be qualified by education, knowledge of, and experience with environmental defects affecting the types of properties which are subject to or relate to the disputed Environmental Defect or Environmental Disputed Matters.  The arbitrator shall employ such independent attorneys and/or other consultants as the arbitrator deems necessary, with the costs of such employment to be shared equally by Emerald and Koch.  On or before thirty (30) days after Closing, Emerald and Koch shall present their respective positions in writing to the arbitrator, together with such evidence as each Party deems appropriate.  The arbitrator shall be instructed to resolve the dispute through a final decision within twenty (20) days after submission of the matters in dispute.  Each Party shall pay half of any costs or fees assessed or charged by the arbitrator acting pursuant to this **Article 5**.  Upon final resolution of any Environmental Disputed Matter, the Escrow Agent shall deliver the applicable Environmental Escrow Amount out of the Additional Escrow Amount in accordance with the decision of the arbitrator.

ARTICLE 6
KOCH'S REPRESENTATIONS AND WARRANTIES

Except as set forth in the schedule delivered to Emerald prior to the execution of this Agreement setting forth specific exceptions to Koch's representations and warranties set forth in this Agreement (each section of which qualifies the correspondingly numbered representation and warranty by Koch) (the "***Koch Disclosed Materials***"), Koch represents and warrants to Emerald as of the date hereof and as of the Closing Date as follows:

**Execution Version**

6.1     Organization and Standing. Koch is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to carry on its business in such other jurisdictions as may be necessary, except where the failure to be so qualified would not have a Material Adverse Effect.

6.2     Power. Koch has all requisite limited liability company power and authority to carry on its business as presently conducted, to enter into this Agreement, and to perform its obligations hereunder.  The execution and delivery of this Agreement does not, and the fulfillment of and compliance with the terms and conditions hereof will not, violate, or be in conflict with, any material provision of Koch's governing documents, or any judgment, decree, order, statute, rule or regulation applicable to Koch.

6.3     Authorization and Enforceability. Assuming the due authorization, execution and delivery by Emerald, this Agreement constitutes Koch's legal, valid and binding obligation, enforceable in accordance with its terms, subject, however, to the effects of bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other laws for the protection of creditors, as well as to general principles of equity, regardless whether such enforceability is considered in a proceeding in equity or at law.

6.4     Liability for Brokers' Fees. Koch has not incurred any liability, contingent or otherwise, for investment bankers', brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Emerald shall have any responsibility whatsoever.

6.5     Litigation.   There are no actions, suits or proceedings pending or, to the Knowledge of Koch, threatened, against Koch in any court or by or before any Governmental Entity that would have a Material Adverse Effect on Koch's ability to consummate the transactions contemplated by this Agreement and to assume the liabilities to be assumed by Koch under this Agreement.

6.6     Judgments. There are no unsatisfied judgments or injunctions issued by a court of competent jurisdiction or other Governmental Entity outstanding against Koch.

6.7     No Other Representations or Warranties; Disclosed Materials.  Except for the representations and warranties contained in this Article 6 (as qualified by the Koch Disclosed Materials), neither Koch nor any other Person makes (and Emerald is not relying upon) any other express or implied representation or warranty with respect to Koch or the transactions contemplated by this Agreement, and Koch disclaims any other representations or warranties not contained in this Article 6, whether made by Koch, any Affiliate of Koch or any of their respective officers, directors, managers, employees or agents.  Except for the representations and warranties contained in this Article 6 (as qualified by the Koch Disclosed Materials), Koch disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Emerald or any of its Affiliates or any of its officers, directors, managers, employees or agents (including any opinion, information, projection or advice that may have been or may be provided to Emerald by any director, officer, employee, agent, consultant or representative of Koch or any of its Affiliates).  The disclosure of any matter or item in the Koch Disclosed Materials shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is

-19-

material or that such matter would or would reasonably be expected to result in a Material Adverse Effect.

6.8     Koch's Evaluation.

(a)     Review.  Koch is an experienced and knowledgeable investor in the oil and gas industry or is an owner of oil, gas and mineral properties and is aware of its risks. Koch has been afforded the opportunity to examine the Emerald Records and materials made available to it by Emerald in Emerald's offices with respect to the Emerald Assets. Koch acknowledges that Emerald has not made any representations or warranties as to the Emerald Records or otherwise except as expressly and specifically provided herein and that Koch may not rely on any of Emerald's estimates with respect to reserves, the value of the Purchased Assets, projections as to future events or other internal analyses or forward looking statements.

(b)     Independent Evaluation.  In entering into this Agreement, Koch acknowledges and affirms that it has relied and will rely solely on the terms of this Agreement and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax or other consequences of this transaction including without limitation its own estimate and appraisal of the extent and value of the Hydrocarbon reserves of the Emerald Assets.

## ARTICLE 7
## EMERALD'S REPRESENTATIONS AND WARRANTIES

Except as set forth in the schedule delivered to Koch prior to the execution of this Agreement setting forth specific exceptions to Emerald's representations and warranties set forth in this Agreement (each section of which qualifies the correspondingly numbered representation and warranty by Emerald) (the "*Emerald Disclosed Materials*"), Emerald represents and warrants to Koch as of the date hereof and as of the Closing Date as follows:

7.1     Organization and Standing.  Emerald Oil is a corporation duly organized, validly existing and in good standing under the laws of Delaware, (ii) Emerald WB and Emerald NWB are each a limited liability company duly organized, validly existing and in good standing under the laws of Colorado, and (iii) each of Emerald Oil, Emerald WB, and Emerald NWB is duly qualified to carry on its business in such other jurisdictions as may be necessary, except where the failure to be so qualified would not have a Material Adverse Effect.

7.2     Power.  Emerald has all requisite power and authority to carry on its business as presently conducted, to enter into this Agreement, and to perform its obligations hereunder.  The execution and delivery of this Agreement does not, and the fulfillment of and compliance with the terms and conditions hereof will not, as of Closing, violate, or be in conflict with, any material provision of Emerald's governing documents, or any judgment, decree, order, statute, rule or regulation applicable to Emerald.

7.3     Authorization and Enforceability.  Assuming the due authorization, execution and delivery by Koch, this Agreement constitutes Emerald's legal, valid and binding obligation, enforceable in accordance with its terms, subject, however, to the effects of bankruptcy,

-20-

insolvency, reorganization, moratorium and other laws for the protection of creditors, as well as to general principles of equity, regardless whether such enforceability is considered in a proceeding in equity or at law.

7.4 Liability for Brokers' Fees. Emerald has not incurred any liability, contingent or otherwise, for investment bankers', brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Koch shall have any responsibility whatsoever.

7.5 Litigation. Except as provided on **Schedule 7.5**, there are no actions, suits, or proceedings pending or threatened against Emerald (with respect to the Emerald Assets) or any of the Emerald Assets, in any court or by or before any Governmental Entity.

7.6 Material Agreements. Except for the Leases, **Exhibit D-1** includes the following contracts (the "***Emerald Material Agreements***") by which any of the Emerald Assets are bound as of the date hereof: (a) any agreement with any Affiliate of Emerald; (b) any agreement or contract for the sale, exchange, other disposition of Hydrocarbons produced from or attributable to Emerald's interest in the Emerald Assets, or providing for a call or calls on the production of Hydrocarbons produced from or attributable to Emerald's interest in the Emerald Assets or for the purchase, processing or transportation of any Hydrocarbons, in each case that is not cancelable without penalty or other payment on not more than ninety (90) days prior written notice, (c) any agreement of or binding upon Emerald to sell, lease, farmout, or otherwise dispose of any interest in any of the Emerald Assets on or after the date hereof, other than nonconsent penalties for nonparticipation in operations under operating agreements or conventional rights of reassignment arising in connection with Emerald's surrender or release of any of the Emerald Assets; (d) any Tax partnership agreement of or binding upon Emerald affecting any of the Emerald Assets; and (e) any agreement that creates any area of mutual interest or similar provision with respect to the Emerald Assets. Emerald is not (and to Emerald's Knowledge, no other Person is) in material default (or with the giving of notice or the lapse of time or both, would not be in default) under any Emerald Material Agreement. Following execution of this Agreement and prior to Closing, Emerald will provide Koch or make available to Koch, true, correct and complete copies of the Emerald Material Agreements. The Emerald Material Agreements are in full force and effect in accordance with their terms, are valid and binding obligations of Emerald, and are enforceable in accordance with their terms, except as may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium and similar laws affecting creditor's rights generally and by equitable principles.

7.7 Preferential Purchase Rights. All preferential purchase rights, and any Emerald Assets subject to such preferential purchase rights, are listed on **Schedule 7.7**.  Prior to Closing, Emerald shall attempt to obtain all consents that if not obtained by Closing would invalidate the conveyance or assignment of any Emerald Asset (the "***Required Consents***") and shall provide all notices required in connection with any preferential purchase rights.

7.8 Taxes. All Taxes pertaining to the Emerald Assets based on or measured by Emerald's ownership of the Emerald Assets for all taxable periods prior to the taxable period in which this Agreement is executed that were required to be paid prior to the Effective Time have been paid and all returns and reports with respect to such matters have been duly and timely filed.  All income Taxes pertaining to Emerald's ownership of the Emerald Assets that, if unpaid,

Execution Version

could give rise to a lien or other claim against any of the Emerald Assets have been properly paid. Emerald has not received written notice of any pending claim against or audit of Emerald from any taxing authority for the assessment of any material Tax pertaining to the Emerald Assets that, if unpaid, could give rise to a lien or other claim against any of the Emerald Assets. No agreement, waiver, or other document or arrangement extending or having the effect of extending the period for assessment or collection of Taxes (including, but not limited to, any applicable statute of limitation) or the period for filing any Tax Return, which Tax Return has since not been filed. There are no liens for any Taxes upon any of the Emerald Assets, except for liens arising as a matter of law relating to current Taxes not yet due. Except as listed on **Schedule 7.8**, none of the Emerald Assets are considered owned by a partnership as defined in Section 761 of the Code nor has any election been made pursuant to Treasury Regulations issued under Section 761 of the Code to consider any of the Emerald Assets as no longer owed by such a partnership. No power of attorney with respect to any Tax matter is currently in force with respect to the Emerald Assets that would, in any manner, bind, obligate or restrict Koch. None of the transactions taken pursuant to this Agreement by Emerald will give rise to any withholding obligation under any provision of Law (including Section 1445 of the Code).

7.9     Judgments.  There are no unsatisfied judgments or injunctions issued by a court of competent jurisdiction or other Governmental Entity outstanding against Emerald related to the Emerald Assets.

7.10     Compliance with Law And Government Authorizations.  The Emerald Assets are being operated in compliance with all applicable Laws.  Notwithstanding the foregoing, this Section 7.10 does not relate to Taxes or Environmental Laws.

7.11     Environmental Matters.

(a)     Except as set forth in **Schedule 7.11**, (i) the operations of Emerald with respect to the Emerald Assets are in compliance with all applicable Environmental Laws, (ii) Emerald has not received from any Person, with respect to the Emerald Assets, any Environmental Notice that either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date and (iii) there are no threatened Environmental Claims, which have been received in writing by Emerald with respect to the Emerald Assets.

(b)     Except as set forth in **Schedule 7.11**, Emerald has obtained and is in compliance with all Environmental Permits necessary for the ownership, lease, operation, or use of the Emerald Assets.

(c)     None of the Emerald Assets is listed on the National Priorities List under CERCLA.

7.12     Lease Status/Rentals/Royalties.  To Emerald's Knowledge, all rentals, royalties and operating expenses payable with respect to the Emerald Assets prior to the Effective Time, have been duly and properly paid in all material respects, except as would not, individually or in the aggregate, have a Material Adverse Effect.  To Emerald's Knowledge, there are no currently pending requests or demands for payments, adjustments of payments or performance pursuant to

-22-

obligations under the Leases, to the extent that non-compliance with the forgoing would have a Material Adverse Effect on any of the Emerald Assets.

7.13    Well Status.  Except as set forth in **Schedule 7.13**, there are no wells located on the Emerald Assets that: (a) Emerald is obligated by Law or contract to currently plug and abandon; or (b) to the extent plugged and abandoned, have not been plugged in accordance with applicable material requirements of each Governmental Entity having jurisdiction over the Emerald Assets.

7.14    Condition of Emerald Wells. There are no conditions affecting the Emerald Wells that would prevent normal, unobstructed production from any Emerald Wells that have been completed or that would prevent normal completion practices of any Emerald Wells that are not yet completed.

7.15    No Other Representations or Warranties; Disclosed Materials.  Except for the representations and warranties contained in this Article 7 (as qualified by the Emerald Disclosed Materials), neither Emerald nor any other Person makes (and Koch is not relying upon) any other express or implied representation or warranty with respect to Emerald (including the value, condition or use of any Emerald Asset) or the transactions contemplated by this Agreement, and Emerald disclaims any other representations or warranties not contained in this Article 7, whether made by Emerald, any Affiliate of Emerald or any of their respective officers, directors, managers, employees or agents.  Except for the representations and warranties contained in this Article 7 (as qualified by the Emerald Disclosed Materials), Emerald disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Koch or any of its Affiliates or any of its officers, directors, managers, employees or agents (including any opinion, information, projection or advice that may have been or may be provided to Koch by any director, officer, employee, agent, consultant or representative of Emerald or any of its Affiliates).  The disclosure of any matter or item in the Emerald Disclosed Materials shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would or would reasonably be expected to result in a Material Adverse Effect.

7.16    Disclaimer.  EXCEPT AS EXPRESSLY WARRANTED, REPRESENTED OR COVENANTED OTHERWISE IN THIS AGREEMENT OR IN THE SPECIAL WARRANTY OF TITLE CONTAINED IN THE ASSIGNMENT, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING AND WITHOUT LIMITING IN ANY RESPECT KOCH INDEMNIFIED PARTIES' RIGHTS TO DEFENSE AND INDEMNIFICATION UNDER ARTICLE 13, EMERALD EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO (I) EMERALD'S TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE EMERALD ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF PETROLEUM SUBSTANCES IN OR FROM THE EMERALD ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE EMERALD ASSETS OR FUTURE REVENUES GENERATED BY THE EMERALD ASSETS, (V) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM THE EMERALD ASSETS, OR

WHETHER PRODUCTION HAS BEEN CONTINUOUS OR IN PAYING QUANTITIES, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE EMERALD ASSETS, OR (VII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO KOCH OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, AND EXCEPT AS STATED IN THIS AGREEMENT, FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE EMERALD ASSETS, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT KOCH SHALL BE DEEMED TO BE OBTAINING THE PURCHASED ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT KOCH HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS KOCH DEEMS APPROPRIATE.

7.17  Emerald's Evaluation. In entering into this Agreement, Emerald acknowledges and affirms that it has relied and will rely solely on the terms of this Agreement and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax or other consequences of this transaction.

ARTICLE 8
COVENANTS AND AGREEMENTS

8.1  Covenants and Agreements of Emerald.

(a)  Emerald covenants and agrees with Koch that except as otherwise consented to in writing by Koch or provided in this Agreement, from the date of execution of this Agreement to the Closing Date, Emerald shall (i) operate the Assets or cause the Assets to be operated in a manner consistent in all material respects with past practice; (ii) pay or cause to be paid its proportionate share of all costs and expenses incurred in connection with such operations; (iii) maintain the Assets in their current condition, ordinary wear and tear excepted; (iv) preserve the present relationships with Persons having business dealings with Emerald with respect to the Assets; (v) comply with all contractual and other obligations with respect to the Assets; (vi) not take any action which would adversely affect the ability of the Parties to consummate the transactions contemplated by this Agreement; (vii) notify Koch of ongoing activities and major capital expenditures relating to the Assets, consulting with Koch regarding all such matters and operations involving expenditures in excess of Fifty Thousand Dollars ($50,000.00); (viii) promptly notify Koch if it receives written notice of any claim, suit, action, or other proceeding relating to the Assets; and (ix) comply in all material respects with all applicable Law.

(b)  Emerald covenants and agrees with Koch that except as otherwise consented to in writing by Koch or provided in this Agreement, from the date of execution of this Agreement to the Closing Date, Emerald shall not (i) make or rescind

**Execution Version**

any election relating to Taxes; (ii) make any material change to any of its methods of accounting or methods of reporting income or deductions for Taxes or accounting practice or policy from those employed in the preparation of Emerald's most recent Tax Return; (iii) settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit, or controversy in excess of Twenty-Five Thousand Dollars ($25,000.00); (iii) subject to any Lien or other encumbrance or, except for Permitted Encumbrances, permit, allow, or suffer to be encumbered, any of the Assets; (iv) cancel or compromise any debt or claim or waive or release any material right of Emerald with respect to the Assets; (v) enter into any commitment for capital expenditures relating to the Assets in excess of Fifty Thousand Dollars ($50,000.00) for any individual commitment and Three Hundred Thousand Dollars ($300,000.00) for all commitments in the aggregate; (vi) introduce any material change with respect to the operation of the Assets, including any material change in the types, nature, composition, or quality of products or services currently in use; (vii) terminate, amend, restate, supplement, or waive any rights under any material contract, agreement, permit, or instrument relating to the Assets; (viii) agree to do anything that would make any of Emerald's representations and warranties in this Agreement untrue or incorrect; (ix) sell lease, convey, or otherwise dispose of any part of, or interest in, the Assets; or (x) enter into any farmout, farmin, or other similar contract or arrangement with respect to the Assets; enter into any new contracts affecting the Assets with obligations in excess of thirty (30) days.

(c)    Emerald covenants and agrees that at least fifteen (15) days prior to the Closing Date, it shall deliver, or cause to be delivered to Koch, a form of partial release of any pledges, mortgages, financing statements, fixture filings and security agreements, if any, affecting the Assets.

(d)    Emerald covenants and agrees that within thirty days of the Closing Date, it will provide Koch with a authority for expenditure (the "*AFE*") for Koch's proportionate share of the costs arising out of the drilling of the Emerald Wells from and after the Wells Effective Time in accordance with each JOA to be executed at Closing to govern each of the Emerald Wells. Together with the AFE, Emerald will submit payment to Koch of its share of the production from the Emerald Wells from and after the Wells Effective Time.

8.2    Covenants and Agreements of the Parties.

(a)    No Unreasonable Delay. Each Party covenants and agrees that it shall use all reasonable efforts to assure that as of the Closing Date it will not be under any material legal or contractual restriction that would prohibit or delay the timely consummation of the transactions contemplated hereby.

(b)    Communication Between the Parties Regarding Breach. If Koch or Emerald acquires Knowledge during its due diligence that leads either Party to believe that the other Party has materially breached a representation or warranty under this Agreement, the non-breaching Party shall inform the alleged breaching Party in writing of such potential breach as soon as possible, but in any event, at or prior to Closing.

**Execution Version**

(c)    <u>Casualty Loss</u>.  Prior to Closing, if a portion of the Assets is destroyed by fire or other casualty or if a portion of the Assets is taken or threatened to be taken in condemnation or under the right of eminent domain ("***Casualty Loss***"), Koch shall not be obligated to purchase such Asset.  If Koch declines to purchase such Asset, the Emerald Purchase Price shall be reduced by the Value of such Asset.  If Koch elects to purchase such Asset, the Emerald Purchase Price shall be reduced by the estimated cost to repair such Asset (with equipment of similar utility), less all insurance proceeds which shall be payable to Koch, up to the Value thereof (the reduction being the "***Net Casualty Loss***").  Emerald, at its sole option, may elect to cure such Casualty Loss and, in such event, Emerald shall be entitled to all insurance proceeds.  If Emerald elects to cure such Casualty Loss, Emerald may replace any personal property that is the subject of a Casualty Loss with equipment of similar grade and utility, or replace any real property with real property of similar nature and kind if such property is acceptable to Koch in its sole discretion.  If Emerald elects to cure the Casualty Loss, Koch shall purchase the affected Asset at Closing for the Value thereof.

(d)    <u>Cooperation and Good Faith</u>.  Upon the terms and subject to the conditions set forth in this Agreement, Koch and Emerald will use their respective reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Party or Parties hereto in doing, all things reasonably necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions, including using reasonable efforts to: (i) cause the conditions set forth in **Article 10** to be satisfied and (ii) execute or deliver any additional instruments reasonably necessary to consummate the transactions contemplated by this Agreement and to fully carry out the purposes of this Agreement; *provided, however,* that the foregoing provisions of this <u>Section 8.3(d)</u> will not require (y) any Party to perform, satisfy or discharge any obligations of any other Party under this Agreement or otherwise or (z) Emerald or Koch to pay any money or other consideration or grant forbearances to any third party in order to perform, satisfy or discharge any of its obligations under this Agreement.

(e)    <u>JOA</u>.  Each Party covenants and agrees that it shall execute a JOA in the form of <u>Exhibit I</u> for each drilling spacing unit established by the Parties following Closing.

ARTICLE 9
TAX MATTERS

9.1    <u>Tax Reports and Returns</u>.  For Tax periods in which the Effective Time occurs, Emerald agrees to forward to Koch within five (5) days of receipt copies of any Tax reports and returns received or filed by Emerald after Closing and provide Koch with any information Emerald has that is reasonably necessary for Koch to file any required Tax Return related to the Purchased Assets.  Koch agrees to file all Tax Returns and reports applicable to the Purchased Assets that Koch is required to file after the Closing and, to pay all required Production Taxes payable with respect to the Purchased Assets.  Emerald agrees to file all Tax Returns and reports required to be filed by Emerald with respect to its ownership, operation, or transfer of the Purchased Assets or any portion thereof.

**Execution Version**

9.2    <u>Tax Cooperation.</u>  The Parties shall cooperate fully as and to the extent reasonably requested by the other party, in connection with the filing of any Tax Returns and any audit, litigation or other proceeding (each, a "***Tax Proceeding***") with respect to Taxes relating to or in connection with the Purchased Assets.  Such cooperation shall include the retention and (upon the other Party's request) the provision of such records and information which are reasonably relevant to any such Tax Return or Tax Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

9.3    <u>Transfer Taxes.</u>  Koch shall be responsible for any Transfer Taxes, if any.  If required by applicable Law, Emerald shall, in accordance with applicable Law, calculate and remit any Transfer Taxes, and Koch shall promptly reimburse Emerald therefor.  If Emerald receives notice that any Transfer Taxes are due, Emerald shall promptly forward such notice to Koch.

9.4    <u>Allocation of Emerald Purchase Price.</u>  Schedule 9.4 sets forth an allocation of the Emerald Purchase Price among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate), which allocation shall be binding upon Emerald and Koch (the "Allocation Schedule").  Emerald and Koch shall cooperate to update the Allocation Schedule to reflect any adjustments to the Emerald Purchase Price pursuant to this Article 9 in a manner consistent with Schedule 9.4, which updates will be jointly prepared by Emerald and Koch within one hundred twenty (120) days after the Closing Date.  The allocation of the Emerald Purchase Price as set forth in the Allocation Schedule (as updated) shall be reflected on a completed Form 8594 (Asset Acquisition Statement Under Section 1060), which form Emerald and Koch will each file separately with the Internal Revenue Service pursuant to the requirements of Section 1060(b) of the Code.  The Parties agree not to take a tax reporting position inconsistent with the Allocation Schedule.  The Parties further agree that the allocations set forth in the Allocation Schedule (as updated) represent reasonable estimates of the fair market values of the Purchased Assets described therein.

ARTICLE 10
CONDITIONS PRECEDENT TO CLOSING

10.1    <u>Koch's Conditions.</u>  The obligations of Koch to consummate the transactions contemplated in this Agreement are subject, to the satisfaction (or waiver in writing by Koch) at or prior to the Closing of the following conditions precedent:

(a)    All representations and warranties of Emerald contained in this Agreement will be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties are made as of a specified date, in which case such representations and warranties shall be true and correct as of the specified date).

(b)    Emerald shall have performed and satisfied in all material respects all covenants and agreements required by this Agreement to be performed and satisfied by Emerald at or prior to the Closing.

(c)     No temporary restraining order, preliminary or permanent injunction, or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

(d)     The aggregate value of all Title Defect Amounts, Title Disputed Matters, Environmental Escrow Amounts, Environmental Disputed Matters, losses resulting from preferential rights to purchase pursuant to **Section 4.4**, and Net Casualty Losses does not exceed ten percent (10%) of the Emerald Purchase Price.  In the event any Title Defect Amount, Title Disputed Matter, Environmental Escrow Amount, Environmental Disputed Matter, loss resulting from a preferential right to purchase pursuant to **Section 4.4**, or a Casualty Loss affects or corresponds to the Emerald Wells, Koch shall not be obligated to pay the amounts specified in the AFE or otherwise acquire an interest in or participate in the Emerald Wells.

(e)     A form of the draft Development Agreement by and between Emerald, Tallgrass Energy Partners LP and USG Wheatland Pipeline, LLC shall have been delivered to Koch in form and substance satisfactory to Koch.

(f)     Emerald shall obtain and provide to Koch a waiver of all rights of Burlington Resources Oil & Gas Company LP and its successor(s) in interest under Article XXI of Exhibit C to that certain Agreement to Farmout and Lease Minerals by and between Burlington Resources Oil & Gas Company LP and Emerald Oil, Inc., dated September 18, 2013 (the "*BR Farmout*") in form and substance satisfactory to Koch. Emerald shall also obtain and provide to Koch either (i) a waiver of all rights of Burlington Resources Oil & Gas Company LP and its successor(s) in interest under Article XXIII of the BR Farmout, or (ii) a binding amendment, in form and substance satisfactory to Koch, to section (b) of Exhibit 6 to that certain Agreement to Farmout and Lease Minerals by and between Burlington Resources Oil & Gas Company LP and Emerald Oil, Inc., dated September 18, 2013 deleting the portion of the second sentence of that paragraph that states "at Farmor's posted price or in the absence of such posted price," deleting that sentence that states "[f]or purposes hereof the price paid by Farmor for crude oil and accepted or taken by Second Party therefor shall be conclusively deemed the current market price for such oil," and inserting a method of determining a market price that is acceptable to Koch, Emerald and Burlington Resources Oil & Gas Company LP and its successor(s) in interest.  For the avoidance of doubt, satisfaction of this condition shall satisfy the condition required for Defensible Title in Section 4.1(a)(4) of this Agreement with respect to the BR Farmout.

(g)     Emerald shall execute and deliver to Koch the Area of Mutual Interest Agreement substantially in the form of Exhibit G (the "*AMI Agreement*") and the Drilling Agreement substantially in the form of Exhibit H (the "*Drilling Agreement*").

(h)     Emerald shall execute and deliver to Koch three JOAs, one to govern operations on each of the three Emerald Wells.

10.2    Emerald's Conditions.    The obligations of Emerald to consummate the transactions contemplated in this Agreement are subject, to the satisfaction (or waiver in writing by Emerald) at or prior to the Closing of the following conditions precedent:

(a)    All representations and warranties of Koch contained in this Agreement will be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties are made as of a specified date, in which case such representations and warranties shall be true and correct as of the specified date).

(b)    Koch shall have performed and satisfied in all material respects all covenants and agreements required by this Agreement to be performed and satisfied by Koch at or prior to the Closing.

(c)    No temporary restraining order, preliminary or permanent injunction, or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

(d)    Koch shall execute and deliver to Emerald the AMI Agreement and the Drilling Agreement.

ARTICLE 11
RIGHT OF TERMINATION

11.1    Termination.    This Agreement may be terminated in accordance with the following provisions:

(a)    by mutual consent of Koch and Emerald; or

(b)    by Koch or Emerald if the Closing has not occurred on or before October 14, 2015 (the "*Termination Date*"); provided that the right to terminate this Agreement under this Section 11.1(b) shall not be available to the Party requesting termination if the Closing has failed to occur because of such Party's breach of representation, warranty or covenant;

11.2    Liabilities Upon Termination.

(a)    Return of Deposit.    If Closing does not occur for any reason, then Koch shall be entitled to require that the Escrow Agent return the Deposit Payment to Koch, which deposit shall constitute the maximum amount of any damages that Emerald would be liable to Koch for any failure to consummate the transactions contemplated by this Agreement for any reason.

(b)    Other Termination; Specific Performance.    If Closing does not occur because either Party has breached any representation, warranty or covenant set forth in this Agreement, and such breach has caused a failure of any condition in Section 10.1 or 10.2 to be satisfied, each Party shall be entitled to pursue any and all other rights and

-29-

**Execution Version**

remedies to which such Party may be entitled at law or in equity, including without limitation the remedy of specific performance.

ARTICLE 12
CLOSING

12.1   Date of Closing.  Subject to the satisfaction of the conditions to Closing set forth in Article 10, the "***Closing***" of the transactions contemplated hereby shall be held on or before September 30, 2015, or a later date agreed to by Emerald and Koch prior to the Termination Date.  The date the Closing actually occurs is called the "***Closing Date***."

12.2   Place of Closing.  Subject to the satisfaction of the conditions to Closing set forth in Article 10, the Closing shall be held at the offices of Emerald at 9:00 a.m. Mountain Standard Time or at such other time and place as Emerald and Koch may agree in writing.

12.3   Closing Obligations.  Subject to the satisfaction of the conditions to Closing set forth in Article 10, at Closing, the following events shall occur, each being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

(a)   Subject to the terms and conditions of this Agreement, Koch shall pay or cause to be paid to Emerald the Net Emerald Purchase Price less the Deposit Payment.

(b)   Subject to the terms and conditions of this Agreement, the Escrow Agent shall pay or cause to be paid to Emerald the Deposit Payment.

(c)   Emerald shall execute, acknowledge and deliver to Koch (i) an Assignment and Conveyance of Purchased Assets effective as of the Effective Time substantially in the form of **Exhibit E-1** (the "***Emerald Assignment***") with a special warranty of title by, through and under Emerald but not otherwise and with no warranties, express or implied, as to the personal property, fixtures or condition of the Purchased Assets which are conveyed "as is, where is"; and (ii) such other assignments, certificates of title, or deeds necessary to transfer the Purchased Assets to Koch including, without limitation, federal and state forms of assignment.

(d)   Koch and Emerald shall each deliver a certificate duly executed by an officer thereof confirming that the closing conditions set forth in Sections 10.1(a) and (b) and 10.2(a) and (b), respectively, have been satisfied;

(e)   Koch shall cause the Emerald Asset Purchase Price to be paid pursuant to Section 2.1 by wire transfer of immediately available funds;

(f)   Emerald shall execute and deliver to Koch an affidavit of non-foreign status and no requirement for withholding under Section 1445 of the Code in the form of **Exhibit F**;

(g)   Emerald shall deliver, or cause to be delivered to Koch, in a recordable form, in form and substance satisfactory to Koch in its sole and absolute discretion, of

**Execution Version**

release of any pledges, mortgages, financing statements, fixture filings and security agreements, if any, affecting the Assets;

(h)     Each Party shall execute and deliver to the other Party its respective signature page to the JOA; and

(i)     Koch and Emerald shall take such other actions and deliver such other documents as are contemplated by this Agreement.

## ARTICLE 13
## INDEMNIFICATION

13.1   <u>Retained Liabilities</u>.  Upon Closing Emerald retains and agrees to pay, perform, fulfill and discharge all claims, costs, expenses, liabilities and obligations accruing or relating to the following (the "***Retained Liabilities***"):

(a)     All expenses, including without limitation all royalties and taxes, in respect of any and all Hydrocarbons sold from the Emerald Wells and services performed on the Emerald Wells by or on behalf of Emerald on or before the Wells Effective Time and all other expenses, including without limitation all royalties and taxes, in respect of any and all Hydrocarbons sold from the Emerald Leases and services performed on the Assets by or on behalf of Emerald on or before the Effective Time;

(b)     All Plugging and Abandonment Obligations with respect to all oil or natural gas wells, production units, and gas and water gathering systems, flow lines and any other facilities associated therewith or located on the Emerald Leases as of the Effective Time, excepting the Emerald Wells;

(c)     The breach by or default of Emerald accruing under any agreement, contract, permit, or instrument with respect to any period prior to the Effective Time;

(d)     Any pending or currently threatened legal proceeding, or any pending or currently threatened claim arising out of, relating to or otherwise in respect of (i) the operation of the Assets to the extent such legal proceeding or claim relates to such operation on or prior to the Effective Time, or (ii) any Excluded Asset;

(e)     All amounts required to be paid by Emerald hereunder;

(f)     The Excluded Assets of Emerald, including any Environmental Liabilities arising out of the ownership, operation, use or maintenance thereof arising prior to the Effective Time;

(g)     Fines or penalties assessed for periods prior to the Effective Time by any Governmental Entity under any Environmental Laws and related to the Assets, but only to the extent such fines or penalties relate to (1) non-compliances under Environmental Laws arising out of or resulting from the operation of the Assets prior to the Effective Time; (2) Conditions on, at, or underlying the Assets, or migrating therefrom prior to the

-31-

Effective Time; or (3) releases of Hazardous Materials from Emerald's operation of the Assets that occurred prior to the Effective Time; and

(h)    Any injury, death or casualty occurring on or attributable to the Assets or the operations thereof prior to the Effective Time, including without limitation claims for personal injury or, property damage.

13.2    Indemnification.  After the Closing, Emerald and Koch shall indemnify each other as follows:

(a)    Koch's Indemnification.  Koch shall defend, indemnify and save and hold harmless Emerald and its Affiliates and their respective members, managers, shareholders, officers, directors, employees and agents (the "*Emerald Indemnified Parties*"), from and against all Losses which arise directly or indirectly from or in connection with (i) any breach by Koch of any of Koch's representations and warranties contained in this Agreement or in the certificate delivered pursuant to Section 12.3(b), or (ii) any breach of Koch's covenants or agreements contained in this Agreement.

(b)    Emerald's Indemnification.  Emerald shall defend, indemnify and save and hold harmless Koch and its Affiliates and their respective members, managers, shareholders, officers, directors, employees and agents (the *"Koch Indemnified Parties"*), from and against all Losses which arise directly or indirectly from or in connection with (i) any breach by Emerald of any of Emerald's representations and warranties contained in this Agreement or in the certificate delivered pursuant to Section 12.3(b),   (ii) any breach of Emerald's covenants or agreements contained in this Agreement, or (iii) the Retained Liabilities.

(c)    Limitations on Indemnity.  Notwithstanding anything to the contrary set forth herein, each of Koch and Emerald shall have no liability for indemnification hereunder or for any Losses pursuant to Section 13.2(a)(ii) or (b)(ii), as applicable, until the total of all Losses with respect to such matters exceed with respect to Emerald's obligations under Section 13.2(b)(ii) and Koch's obligations under Section 13.2(a)(ii), Two and One Half Percent (2.5%) of the Emerald Purchase Price (the "*Deductible*"), after which point the Emerald Indemnified Parties or the Koch Indemnified Parties, as applicable, shall be entitled to indemnification only in excess of the Deductible.  The aggregate liability of Koch or Emerald, as applicable for indemnification pursuant to Section 13.2(a)(ii) or (b)(ii), as applicable, with respect to Losses suffered by the Emerald Indemnified Parties or the Koch Indemnified Parties, as applicable, shall not exceed Twenty Percent (20%) of the  Emerald Purchase Price (the "*Cap*").  Notwithstanding the foregoing, the Deductible and the Cap will not apply to a breach of the Fundamental Representations or to Emerald's obligations under Section 13.2(b)(iii).

(d)    Notwithstanding anything to the contrary contained in this Agreement, from and after Closing, the Parties' sole and exclusive remedy against each other with respect to breaches of the representations, warranties, covenants and agreements of the Parties contained in this Agreement is set forth in this Section 13.2, and if no such right of indemnification is expressly provided, then such claims are hereby waived to the

-32-

fullest extent permitted by Law; *provided however*, that each Party shall retain the right to seek injunctive or other equitable relief, including specific performance for breaches of this Agreement.

13.3   Procedure.   The indemnifications contained in this Article 13 shall be implemented as follows:

(a)   Claim Notice.   The Party seeking indemnification under the terms of this Agreement ("*Indemnified Party*") shall submit a written "*Claim Notice*" to the other Party ("*Indemnifying Party*") which, to be effective, must be delivered prior to the end of the Survival Period applicable under Section 13.4 to the representation or warranty that is the subject of such Claim Notice and must state:  (i) the amount of each payment claimed by an Indemnified Party to be owing, (ii) the basis for such claim, with supporting documentation, and (iii) a list identifying to the extent reasonably possible each separate item of Loss for which payment is so claimed.  Unless, within sixty days of receipt of a Claim Notice, the Indemnifying Party provides written notice to the Indemnified Party that it contests the Losses identified in such Claim Notice, the Indemnifying Party shall, subject to the other terms of this Section 13.3, pay to the Indemnified Party the amount of the Losses related to such indemnification claim or the uncontested portion thereof.  If the Indemnifying Party objects to a Claim Notice on the basis that it lacks sufficient information, it shall promptly request from the Indemnified Party any specific additional information reasonably necessary for it to assess such indemnification claim, and the Indemnified Party shall provide the additional information reasonably requested.  Upon receipt of such additional information, the Indemnifying Party shall notify the Indemnified Party of any withdrawal or modification of the objection.  All disputed indemnification claims shall be resolved by Emerald and Koch in accordance with either (A) a mutual agreement between Emerald and Koch, which shall be memorialized in writing, or (B) litigation in accordance with Section 14.8.

(b)   Information.   Promptly after the Indemnified Party receives notice of a claim or legal action by a third party that may result in a Loss for which indemnification may be sought under this Article 13 (a "*Claim*"), the Indemnified Party shall give written notice of such Claim to the Indemnifying Party.  If the Indemnifying Party or its counsel so requests, the Indemnified Party shall furnish the Indemnifying Party with copies of all pleadings and other information with respect to such Claim.  At the election of the Indemnifying Party made within sixty (60) days after receipt of such notice, the Indemnified Party shall permit the Indemnifying Party to assume control of such Claim (to the extent only that such Claim, legal action or other matter relates to a Loss for which the Indemnifying Party is liable), including the determination of all appropriate actions, the negotiation of settlements on behalf of the Indemnified Party, and the conduct of litigation through attorneys of the Indemnifying Party's choice; *provided, however,* that no such settlement can result in any liability or cost to the Indemnified Party for which it is entitled to be indemnified hereunder without its consent.  If the Indemnifying Party elects to assume control, (i) any expense incurred by the Indemnified Party thereafter for investigation or defense of the matter shall be borne by the Indemnified Party, and (ii) the Indemnified Party shall give all reasonable information and assistance, other than pecuniary, that the Indemnifying Party shall deem necessary to the proper defense of such

**Execution Version**

Claim, legal action, or other matter.  In the absence of such an election, the Indemnified Party will use its best efforts to defend, at the Indemnifying Party's expense, any claim, legal action or other matter to which such other Party's indemnification under this Article 14 applies until the Indemnifying Party assumes such defense, and, if the Indemnifying Party fails to assume such defense within the time period provided above, settle the same in the Indemnified Party's reasonable discretion at the Indemnifying Party's expense with the Indemnifying Party's consent which shall not be unreasonably withheld.  If such a Claim requires immediate action, both the Indemnified Party and the Indemnifying Party will cooperate in good faith to take appropriate action so as not to jeopardize defense of such Claim or either Party's position with respect to such Claim.  If the Indemnifying Party is entitled to, and does, assume the defense of any such Claim, the Indemnified Party shall have the right to employ separate counsel at its own expense and to participate in the defense thereof; *provided, however,* that notwithstanding the foregoing, the Indemnifying Party shall pay the reasonable attorneys' fees of the Indemnified Party if the Indemnified Party's counsel shall have advised the Indemnified Party that there is a conflict of interest that could make it inappropriate under applicable standards of professional conduct to have common counsel for the Indemnifying Party and the Indemnified Party (provided that the Indemnifying Party shall not be responsible for paying for more than one separate firm of attorneys and one local counsel to represent all of the Indemnified Parties subject to such Claim).

13.4    Survival of Warranties, Representations and Covenants.  All representations and warranties contained in Articles 6 and 7 of this Agreement shall survive the Closing and remain in full force and effect until 5:00 p.m., Denver, Colorado time, on the date that is one (1) year after the date of Closing, at which time they shall terminate, except that those representations and warranties set forth in Sections 6.1 (Organization and Standing), 6.2 (Power) and 6.3 (Authorization and Enforceability) made by Koch, and Sections 7.1 (Organization and Standing), 7.2 (Power) and 7.3 (Authorization and Enforceability) made by Emerald (those representations made by Koch and Emerald, collectively the "***Fundamental Representations***"), will survive indefinitely (the applicable period, being referred to herein as the "***Survival Period***").  The covenants and performance obligations contained in this Agreement that contemplate performance after the Closing shall survive the Closing and shall continue until all obligations with respect thereto shall have been performed or satisfied or shall have been terminated in accordance with their terms.  Both Parties acknowledge that the limitations on survival in this Section 13.4 are a contractual statute of limitations that limits such Party's ability to make a claim against the other Party that such Party may otherwise have available under Law.

13.5    Reservation as to Non-Parties.  Nothing herein is intended to limit or otherwise waive any recourse Emerald or Koch may have against any non-party for any obligations or liabilities that may be incurred with respect to the Assets.

13.6    Reductions in Losses.  The amount of any Losses for which an Indemnified Person is entitled to indemnity under this Article 13 shall be reduced by the amount of insurance proceeds realized by the Indemnified Person or its Affiliates with respect to such Losses (net of any collection costs, and excluding the proceeds of any insurance policy issued or underwritten by the Indemnified Person or its insurance captive or other Affiliate), and by the amount of any

-34-

net Tax benefit actually realized by either Party as a result of the events giving rise to the Losses in question.

13.7    Waiver.  Neither Party shall have any obligation or liability under this Agreement or in connection with or with respect to the transactions contemplated by this Agreement for any breach, misrepresentation, or noncompliance with respect to any representation, warranty, covenant, indemnity, or obligation if such breach, misrepresentation, or noncompliance shall have been waived by the other Party, or if the other Party had knowledge of the relevant facts at or before Closing.

## ARTICLE 14
## MISCELLANEOUS

14.1    Exhibits and Schedules.  The Exhibits and Schedules to this Agreement are hereby incorporated in this Agreement by reference and constitute a part of this Agreement.

14.2    Expenses.  Except as otherwise specifically provided, all fees, costs and expenses incurred by Emerald or Koch in negotiating this Agreement or in consummating the transactions contemplated by this Agreement shall be paid by the Party incurring the same, including, without limitation, engineering, land, title, legal and accounting fees, costs and expenses.

14.3    Notices.  All notices and communications required or permitted under this Agreement shall be in writing and addressed as set forth below.  Any communication or delivery hereunder shall be deemed to have been duly made and the receiving Party charged with notice (i) if personally delivered, when received, (ii) if sent by facsimile transmission, when received, (iii) if mailed, five (5) Business Days after mailing, certified mail, return receipt requested, or (iv) if sent by overnight courier, one (1) Business Day after sending.  All notices shall be addressed as follows:

If to Koch:

Koch Exploration Company, LLC
1200 17th Street, Suite 2050
Denver, CO  80202
Attn:  Land Manager
Telephone:  (303)325-2583
Fax:  (303)325-2598

With a copy to:

Chief Counsel, Koch Minerals
4111 E. 37th St. N.
Wichita, KS 67220

-35-

**Execution Version**

If to Emerald:

> Emerald Oil, Inc.
> 1600 Broadway, Suite 1360
> Denver, CO 80202
> Attn: James Muchmore
> Telephone: 303-595-5600

Any Party may, by written notice so delivered to the other Party, change the address or individual to which delivery shall thereafter be made.

14.4    Amendments.  This Agreement may not be amended except by an instrument expressly modifying this Agreement signed by each of the Parties.  Except for waivers specifically provided for in this Agreement, no waiver by either Party of any breach of any provision of this Agreement shall be binding unless made expressly in writing.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless expressly so provided.  Delay in the exercise, or non-exercise, of any such right is not a waiver of that right.

14.5    Assignment.  Neither Party shall assign all or any portion of its respective rights or delegate all or any portion of its respective duties hereunder without the written consent of the other Party, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, either Party shall be permitted to assign all or any portion of its respective rights or delegate all or any portion of its respective duties hereunder to any Affiliate.

14.6    Headings.  The headings of the Articles and Sections of this Agreement are for guidance and convenience of reference only and shall not limit or otherwise affect any of the terms or provisions of this Agreement.

14.7    Counterparts/Fax Signatures.  This Agreement may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile or by electronic image scan transmission in .pdf format shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile or electronic image scan transmission in .pdf format shall be deemed to be their original signatures for all purposes.  Any Party that delivers an executed counterpart signature page by facsimile or by electronic scan transmission in .pdf format shall promptly thereafter deliver a manually executed counterpart signature page to each of the other Parties; *provided, however,* that the failure to do so shall not affect the validity, enforceability, or binding effect of this Agreement.

14.8    Governing Law and Jurisdiction.

**Execution Version**

(a)     This Agreement and the transactions contemplated hereby shall be construed in accordance with, and governed by, the laws of the State of Colorado, without regards to conflicts of laws principles.

(b)     The Parties agree that the appropriate, exclusive and convenient forum for any Disputes shall be the state or federal courts of the City of Denver, Denver County, Colorado.  Each of the Parties hereto unconditionally and irrevocably consents and submits to the personal jurisdiction of the state or federal courts of the City of Denver, Denver County, Colorado for the resolution of all Disputes.

(c)     THE PARTIES HERETO AGREE THAT THEY HEREBY IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY DISPUTES BETWEEN ANY OF THE PARTIES HERETO.

14.9     Entire Agreement.  This Agreement constitutes the entire understanding among the Parties, their respective partners, members, trustees, shareholders, officers, directors and employees with respect to the subject matter hereof, superseding all negotiations, prior discussions and prior agreements and understandings relating to such subject matter.

14.10    Binding Effect.  This Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto, and their respective successors and assigns.  Notwithstanding anything to the contrary herein, this Agreement is not a binding agreement between the Parties hereto unless and until this Agreement is duly executed in writing by representatives of the Parties and delivered by the Parties.

14.11    No Third-Party Beneficiaries.  This Agreement is intended only to benefit the Parties hereto and their respective permitted successors and assigns

14.12    No Vicarious Liability.  Emerald and Koch shall not, and shall cause the Emerald Indemnified Parties and the Koch Indemnified Parties not to, assert or threaten any claim or other method of recovery, in contract, in tort or under statute, against any Person other than Koch or Emerald.  Koch and Emerald, as applicable shall be liable for all attorneys' fees and court costs arising from a breach of this Section 14.12.

14.13    Publicity.  Neither Emerald or Koch nor any of their respective Affiliates or representatives shall issue or cause the publication of any press release or other announcement with respect to the transactions contemplated by this Agreement without the prior consultation of the other Party, except as may be required by applicable Law, and each Party shall use its reasonable efforts to provide copies of such release or other announcement to the other Party hereto, and give due consideration to such comments as each such other Party may have, prior to such release or other announcement.

14.14    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction. Should any provision of this Agreement

-37-

**Execution Version**

be or become invalid or unenforceable as a whole or in part, this Agreement shall be reformed to come closest to the original intent and purposes of the parties hereto.

[Signature page follows.]

-38-

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the day and year first above written.

KOCH EXPLORATION COMPANY, LLC

By:_____

Name:_____

Title:_____

EMERALD OIL, INC.

By:_____

Name: McAndrew A. Rudisill
Title:   President and Chief Executive Officer

EMERALD WB LLC

By:_____

Name: McAndrew A. Rudisill
Title: President and Chief Executive Officer

EMERALD NWB, LLC

By:_____

Name: McAndrew A. Rudisill
Title: President and Chief Executive Officer

**Exhibit A-1**

EMERALD LEASES

**Exhibit B-1**

EMERALD WELLS

**Exhibit D-1**

EMERALD MATERIAL AGREEMENTS

**Exhibit E-1**

FORM OF ASSIGNMENT AND CONVEYANCE OF PURCHASED ASSETS

**Exhibit F**

AFFIDAVIT OF NON-FOREIGN STATUS

**Exhibit G**

AMI AGREEMENT

**Exhibit H**

DRILLING AGREEMENT

**Exhibit I**

JOINT OPERATING AGREEMENT

**Schedule 1.1(a)**

EMERALD'S KNOWLEDGE REPRESENTATIVES

McAndrew Rudisill
Mike Murray
Karl Osterbuhr
Michael Dickinson
Ryan Smith
James Muchmore

**Schedule 1.1(b)**

KOCH'S KNOWLEDGE REPRESENTATIVES

Brian Kissick
John Mueller
Clay Roark
Paula Rauchfuss

**Schedule 1.1(c)**

EMERALD EXCLUDED ASSETS

Emerald Excluded Assets include any tangible assets on the Emerald Leases and on the Emerald Wells, including but not limited to tank batteries, pump jacks and any other property and equipment facilitating the operation and maintenance of the Emerald Leases and Emerald Wells.

**Schedule 4.2**

DEFECT LEASES

Attached

**Schedule 7.5**

EMERALD PENDING OR THREATENED LITIGATION

Emerald Oil vs. Zavanna, LLC, Case No. 27-2014-CV-00222 (State of North Dakota, County of McKenzie, District Court Northwest Judicial District).

**Schedule 7.7**

PREFERENTIAL RIGHTS TO PURCHASE

Agreement to Farmout and Lease Minerals by and between Burlington Resources Oil & Gas Company LP and Emerald Oil, Inc., dated September 18, 2013.

**Schedule 7.8**

EMERALD ASSETS OWNED BY A PARTNERSHIP

None.

**Schedule 7.11**

ENVIRONMENTAL MATTERS

None.

## Schedule 7.13

## EMERALD WELL STATUS

| API NO. | SPUD DATE | COMP START DATE | DOFP | WELL NAME | TWP | RGE | SEC 1 | SEC 2 | OPERATOR NAME |
|---|---|---|---|---|---|---|---|---|---|
| 33053064380000 | 3/20/2015 | 5/25/2015 | 6/10/2015 | GREG MARMALARD FEDERAL 3-28-33H | 147N | 103W | 28 | 33 | EMERALD OIL |
| 33053064360000 | 12/11/2014 | 5/27/2015 | 6/8/2015 | DAGNY TAGGART 3-21-16H | 147N | 103W | 16 | 21 | EMERALD OIL |
| 33053061020000 | 11/12/2014 | 6/21/2015 | 7/5/2015 | ERIC STRATTON FEDERAL 5-36-25H | 147N | 104W | 25 | 36 | EMERALD OIL |

**Schedule 9.4**

ALLOCATION SCHEDULE

Attached

# EXHIBIT 2

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT
## HORIZONTAL MODIFICATIONS

OPERATING AGREEMENT

DATED

March 20 ____ , __2015__ ,
_Year_

**OPERATOR**   Emerald Oil, Inc.

**CONTRACT AREA**   Greg Marmalard DSU

T147N R103W, 5th P.M.

Section 28

Section 33

**COUNTY OR PARISH OF**   McKenzie, North Dakota   **, STATE OF**   N. Dakota

COPYRIGHT 2013 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PROFESSIONAL
LANDMEN, 4100 FOSSIL CREEK BLVD. FORT
WORTH, TEXAS, 76137, APPROVED FORM.
A.A.P.L. NO. 610 - 1989 (Horz.)

EXHIBIT

2

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 2 |
| III. | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | **TITLES** | 3 |
| | A. TITLE EXAMINATION | 3 |
| | B. LOSS OR FAILURE OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 4 |
| | 4. Curing Title | 4 |
| V. | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR | 5 |
| | 1. Competitive Rates and Use of Affiliates | 5 |
| | 2. Discharge of Joint Account Obligations | 5 |
| | 3. Protection from Liens | 5 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL | 5 |
| | B. SUBSEQUENT OPERATIONS | 6 |
| | 1. Proposed Operations | 6 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | 9. Spudder Rigs | 9 |
| | 10. Multi-Well Pads | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS | 10 |
| | E. ABANDONMENT OF WELLS | 10 |
| | 1. Abandonment of Dry Holes | 10 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS | 11 |
| | G. TAKING PRODUCTION IN KIND | 11 |
| | (Option 1) Gas Balancing Agreement | 11 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** | 12 |
| | A. LIABILITY OF PARTIES | 12 |
| | B. LIENS AND SECURITY INTERESTS | 12 |
| | C. ADVANCES | 12 |
| | D. DEFAULTS AND REMEDIES | 13 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 13 |
| | F. TAXES | 13 |
| VIII. | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 14 |
| | A. SURRENDER OF LEASES | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 14 |
| | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST | 15 |

i

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**TABLE OF CONTENTS**

| Article | Title | Page |
|---------|-------|------|
| | E.  WAIVER OF RIGHTS TO PARTITION | 15 |
| | F. | 15 |
| IX. | **INTERNAL REVENUE CODE ELECTION** | 15 |
| X. | **CLAIMS AND LAWSUITS** | 15 |
| XI. | **FORCE MAJEURE** | 16 |
| XII. | **NOTICES** | 16 |
| XIII. | **TERM OF AGREEMENT** | 16 |
| XIV. | **COMPLIANCE WITH LAWS AND REGULATIONS** | 16 |
| | A. LAWS, REGULATIONS AND ORDERS | 16 |
| | B. GOVERNING LAW | 16 |
| | C. REGULATORY AGENCIES | 16 |
| XV. | **MISCELLANEOUS** | 17 |
| | A. EXECUTION | 17 |
| | B. SUCCESSORS AND ASSIGNS | 17 |
| | C. COUNTERPARTS | 17 |
| | D. SEVERABILITY | 17 |
| XVI. | **OTHER PROVISIONS** | 18 |
| | A. CONFLICT OF TERMS | 18 |
| | B. OPERATOR'S DUTY | 18 |
| | C. PRIORITY OF OPERATIONS – HORIZONTAL WELLS | 18 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Emerald Oil, Inc.___                                    ,
hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder. An AFE is not a contractual commitment. Rather it is only an estimate, made in good faith. An AFE for a Horizontal Well shall clearly stipulate that the well being proposed is a Horizontal Well and shall include all Completion operations for the proposed Horizontal Well.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser. When used in connection with a Horizontal Well, the term "Deepen" shall mean an operation whereby a Lateral is drilled to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) to the Displacement to which the Lateral was drilled pursuant to a previous proposal.

E. The term "Displacement" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall otherwise mean the length of a Lateral.

F. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

G. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

H. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located. When used in connection with a Horizontal Well, the term "Drillsite" shall mean (i) the surface hole location, and (ii) the Oil and Gas Leases or Oil and Gas Interests within the Drilling Unit on or under which the wellbore, including the Lateral, is located.

I. The term "Horizontal Rig Move-On Period" shall mean the number of days after the date of rig release of a Spudder Rig until the date a rig capable of drilling a Horizontal Well to its Total Measured Depth has moved on to location.

J. The term "Horizontal Well" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean a well containing one or more Laterals which are drilled, Completed or Recompleted in a manner in which the horizontal component of the Completion interval (1) extends at least one hundred feet (100') in the objective formation(s) and (2) exceeds the vertical component of the Completion interval in the objective formation(s).

K. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

L. The term "Lateral" shall mean that portion of a wellbore that deviates from approximate vertical orientation to approximate horizontal orientation and all wellbore beyond such deviation to Total Measured Depth.

M. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

N. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

O. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

P. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

Q. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

R. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone. When used in connection with a Horizontal Well, the term "Plug Back" shall mean an operation to test or Complete the well at a stratigraphically shallower Zone in which the operation has been or is being Completed and which is not in an existing Lateral.

S. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

T. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

U. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties. When used in connection with a Horizontal Well, the term "Sidetrack" shall mean the directional control and deviation of a well outside the existing Lateral(s) so as to change the Zone or the direction of a Lateral from the approved proposal unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.

V. The term "Spudder Rig" shall mean a drilling rig utilized only for drilling all or part of the vertical component of a Horizontal Well; a rig used only for setting conductor pipe shall not be considered a Spudder Rig.

W. The term "Terminus" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction

-1-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

over the Contract Area, in the absence of which the term shall mean the furthest point drilled in the Lateral.

X. The term "Total Measured Depth," when used in connection with a Horizontal Well, shall mean the distance from the surface of the ground to the Terminus, as measured along and including the vertical component of the well and Lateral(s). When the proposed operation(s) is the drilling of, or operation on, a Horizontal Well, the terms "depth" or "total depth" wherever used in this agreement shall be deemed to read "Total Measured Depth" insofar as it applies to such well.

Y. The term "Vertical Well" shall mean a well drilled, Completed or Recompleted other than a Horizontal Well.

Z. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

_X_ A. Exhibit "A," shall include the following information:

    (1) Description of lands subject to this agreement,

    (2) Restrictions, if any, as to depths, formations, or substances,

    (3) Parties to agreement with addresses and telephone numbers for notice purposes,

    (4) Percentages or fractional interests of parties to this agreement,

    (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement.

    (6) Burdens on production.

_X_ B. Exhibit "B," Form of Lease. Intentionally left blank.

_X_ C. Exhibit "C," Accounting Procedure.

_X_ D. Exhibit "D," Insurance.

_X_ E. Exhibit "E," Gas Balancing Agreement.

_X_ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

___ G. ~~Exhibit "G," Tax Partnership~~ Intentionally omitted.

_X_ H. Other: Memorandum of Operating Agreement

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, _____25%_____ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

ARTICLE IV.

TITLES

A. Title Examination:

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

B. Loss or Failure of Title:

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an

-3-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

**ARTICLE V.**

**OPERATOR**

**A. Designation and Responsibilities of Operator:**

Emerald Oil, Inc. shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Vote Required: When there is only one (1) Non-Operator, the vote of two (2) or more parties shall not be required under Articles B.1 and B.2.

4. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

hours of labor and the compensation for services performed shall be determined Operator, and all such employees or contractors shall be the employees or contractors of Operator

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each participating Non-Operator or its duly authorized representative, at the participating Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each participating Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the participating Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting participating Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise participating Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to participating Non-Operators such reports, test results and notices regarding the progress of operations on the well as the participating Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**

~~A. Initial Well:~~

~~On or before the _____ day of _____, ___2015___, Operator shall commence the drilling of the Initial Well at the following location (if a Horizontal Well, surface and Terminus/Termini of the Lateral(s)):~~

~~TBD~~

~~and shall thereafter continue the drilling of the well (horizontally if a Horizontal Well) with due diligence to~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill or re-enter any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement (and to all other parties in the case of a proposal for Sidetracking or Deepening as to a Vertical Well), specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation as outlined in an AFE. A proposal for the drilling of or other operations for a Horizontal Well shall: (1) state that the proposed operation is a Horizontal Well operation; (2) include drilling and Completion plans specifying the proposed: (i) Total Measured Depth(s), (ii) surface hole location(s), (iii) Terminus/Termini, (iv) Displacement(s), (v) utilization and scheduling of rig(s) (Spudder Rig, drilling and Completion), and (vi) stimulation operations, staging and sizing; and (3) include estimated drilling and Completion costs as set forth in an AFE. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays.

Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying

-6-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) 100_____ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) 400_____ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties ___400___ % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to

-7-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period. . If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

This Article VI.B.4 shall not apply to Deepening operations within an existing Lateral of a Horizontal Well.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

This Article VI.B.5, "Sidetracking," shall not apply to operations in an existing Lateral of a Horizontal Well.

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period

-8-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern or an approved exception thereto for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

9. Spudder Rigs.

(a) Within Approved Horizontal Well proposals (i.e. proposals which include an approved AFE). If an approved Horizontal Well proposal provides that a Spudder Rig shall be utilized, and Operator desires to extend the proposed Horizontal Rig Move-On Period, Operator may obtain one or more extensions, each for a period of time not to exceed ___30 days only upon notice and the affirmative vote of not less than _____51 % in interest of the Consenting Parties to the drilling of the proposed well.

(b) Not Within Approved Horizontal Well proposals. If an approved Horizontal Well proposal does not provide that a Spudder Rig may be utilized, and Operator subsequently desires to utilize a Spudder Rig, Operator may utilize a Spudder Rig upon notice to the Drilling Parties (which notice shall include a Horizontal Rig Move-On Period) and the affirmative vote of not less than _____51_____ % in interest of the Consenting Parties. Extension(s) of the Horizontal Rig Move-On Period may be requested by Operator in the same manner as provided in Article VI.B.9.(a) immediately above.

(c) Failure to meet Horizontal Rig Move-On Period. If a rig capable of drilling a Horizontal Well to its Total Measured Depth has not commenced operations within the Horizontal Rig Move-On Period, or any approved extension(s) thereof, unless _____51_____ % in interest of the Consenting Parties agree to abandon the operation, Operator shall re-propose the well in the manner provided in Article VI.B of this agreement. Any party who was a Non-Consenting Party to the original drilling proposal shall be entitled to a new election. Costs of the operation, incurred both before and after such re-proposal, shall be borne as follows:

(1) Operator shall promptly reimburse all unused funds previously advanced for the drilling of the well to each party who advanced such unused funds;

(2) If the well's drilling operations are subsequently resumed, all costs, whether incurred before or after the re-proposal, shall be borne by the Consenting Parties to the re-proposed well; and, the Consenting Parties shall proportionately reimburse each party who consented to the original proposal but did not consent to the re-proposal such party's share of costs incurred prior to the re-proposal.

(3) If the well's drilling operations are not subsequently resumed pursuant to a re-proposal as herein provided, all costs incurred prior to the re-proposal, and all costs of abandonment, shall be borne and paid by the original Consenting Parties.

(d) Commencement of Operations. For purposes of Article VI.B., and subject to the provisions of this sub-section 9, the date a Spudder Rig commences actual drilling operations shall be considered the commencement of drilling operations of the proposed well.

10. Multi-well Pads. If multiple Horizontal Wells are drilled or proposed to be drilled from a single pad or location, the costs of such pad or location shall be allocated, and/or reallocated as necessary, to the Consenting Parties of each of the wells thereon.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☑ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completion and equipping of a Horizontal Well, including tankage and/or surface facilities. For any Horizontal Well subject to this Agreement, Completion operations shall be included in the proposed drilling operations for such well.

☑ Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of a Vertical Well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties;      provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

Notwithstanding anything herein to the contrary, Option No. 1 shall apply to any Horizontal Well and Option No. 2 shall apply to any Vertical Well.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

-9-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ One Hundred _____ Thousand _____ Dollars ($ __100,000.00__ ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties.. Any party who has not relinquished its interest in

a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least ____51__% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

1. <u>Abandonment of Dry Holes:</u> Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. <u>Abandonment of Wells That Have Produced:</u> Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. <u>Abandonment of Non-Consent Operations:</u> The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

-10-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing _____51_____ % of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☑ **Option No. 1: Gas Balancing Agreement Attached**

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

~~In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day to day basis for any reason are not exactly equal to a party's respective proportion ate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.~~

Each party shall have a right to take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area. Subject to each party's right to take in kind, Operator shall market Oil and Gas produced from the Contract Area exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. If any party elects to take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, any extra expenditure incurred in the taking in kind or separate disposition by such party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of the joint account's surface facilities. The Operator will provide the parties taking their proportionate share of Oil and Gas production in kind with proportionate capacity, access, and priority to Operator's owned or contracted for Oil, Gas and water take away and delivery facilities or contractual transportation capacities located downstream of the joint account-owned surface facilities (the "Downstream Facilities") and any fees paid by a party, or by Operator on behalf of such party, for use of the Downstream Facilities shall in no event exceed the fees paid by Operator to third parties for use of the Downstream Facilities.

Subject to the parties' right to take in kind, Operator may require non-taking parties to pay a marketing fee for Oil marketed by Operator or its affiliates from a non-taking party(s) share of Oil, provided that such fee(s) shall not exceed $1.20 per barrel of Oil or $500,000 in the aggregate on an annual basis. In the event that Operator elects to market Oil through an independent nonaffiliated third party, then Operator will pass through any fees charged by such third party to Non-Operator. Operator shall not charge any party any additional marketing, logistics, or operations fees that exceed the fees paid by Operator to a third party that is not an affiliate of Operator beyond, or in addition to, those specified in this paragraph.

☐ ~~**Option No. 2: No Gas Balancing Agreement:**~~

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,~~

-11-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non taking party's share of production under the terms of any existing contract of Operator shall not give the non taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non Operators upon reasonable request.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have  established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other  with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount

-12-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator shall not have the right to demand payment in advance from any Non-Operator. In a given month, Operator shall submit to each Non-Operator an itemized statement of expenses incurred in the previous month or the current month for which Operator is in receipt of an invoice, together with an invoice for such Non-Operator's share thereof. Each such statement and invoice for the payment of incurred expense shall be submitted on or before the 20th day of the next month. Each party shall pay to Operator its proportionate share of such incurred expenses, as invoiced in accordance with this paragraph, within ten (10) business days after such invoice is received. If any party fails to pay said invoice within said time, the amount due shall bear interest as provided in Exhibit "C" until paid.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on

-13-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**
**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

-14-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**ARTICLE IX.**

**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed ___Fifty Thousand_____ Dollars ($ ___50,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the

-15-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

**This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state in which the lands resides shall govern.**

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

-16-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

## ARTICLE XV.
## MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. Except as otherwise provided in Article IV.B, in the event operations on a well shall be commenced without execution of this agreement by all persons listed on Exhibit "A" as having a current interest in such well, or in the event that subsequent to the commencement of operations on the well previously unknown or undisclosed persons owning working interests in a well are discovered, or both, the parties executing this agreement agree to one of the following:

☐ Option No. 1: Operator shall indemnify executing Non-Operators with respect to all costs incurred for the well which would have been charged to each such person under this agreement as if such person had executed the same and Operator shall receive all revenues which would have been received by each such person under this agreement as if such person had executed the same.

☑ Option No. 2: The Operator shall advise all parties of the total interest of the parties that have executed this agreement. Each party executing this agreement, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the Operator of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interest of all parties executing this agreement) of non-executing persons' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of non-executing persons' interests together with all or a portion of its proportionate part of any non-executing persons interests that any executing party did not elect to take. Any interest of non-executing persons that is not carried by an executing party shall be deemed to be carried by the Operator. Failure to advise the Operator within the time required shall be deemed an election under (i).

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.
## OTHER PROVISIONS

**A. Conflict of Terms:**

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Article I through XV of this agreement and the provisions of this Article XVI, the provisions of this Article XVI shall govern.

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of that certain Purchase and Sale Agreement dated July 31, 2015, and this Joint Operating Agreement, the provisions of the Purchase and Sale Agreement shall govern.

Notwithstanding anything herein to the contrary, Non-Operators shall not be obligated to make any payments in advance of Operator incurring the expense or cost for which Non-Operators are responsible under this Agreement.

**B. Operator's Duty:**

Unless drilling operations are terminated pursuant to Article VI.F, Operator shall drill a Horizontal Well to the objective Zone(s) and drill the Lateral in the Zone(s) at least to a Displacement to which a reasonably prudent operator would deem further drilling is neither justified nor required.

**C. Priority of Operations – Horizontal Wells:**

Notwithstanding Article VI.B.6 or anything else in this agreement to the contrary, it is agreed that where a Horizontal Well subject to this agreement has been drilled to the objective Displacement and the Consenting Parties cannot agree upon the sequence and timing of further operations regarding such Horizontal Well, the following elections shall control the order of priority enumerated hereafter:

| | |
|---|---|
| First: | Testing, coring or logging; |
| Second: | Complete drilling operations of all proposed Laterals; |
| Third: | Extend or Deepen a Lateral; |
| Fourth: | Kick out and drill an additional Lateral in the same Zone; |
| Fifth: | Plug Back the well to a Zone above the Zone in which a Lateral was drilled; if there is more than one proposal to Plug Back, the proposal to Plug Back to the next deepest prospective Zone shall have priority over a proposal to Plug Back to a shallower prospective Zone; |
| Sixth: | Sidetrack; and |
| Seventh: | Plug and abandon as provided for in Article VI.E |

Provided, however, that if, at the time the Consenting Parties are considering any of the above, the hole is in such a condition that a reasonably prudent operator would not conduct the particular contemplated operation involved for fear of placing the hole in jeopardy or losing the hole prior to Completing the Horizontal Well in the objective Zone, such operation shall be eliminated from the priorities set forth above.

-17-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**Priority of Operations – Vertical Wells:**

If at any time there is more than one operation proposed in connection with any well subject to this agreement and if the Consenting Parties do not agree on the sequence of proposed operations, such proposed operations shall be conducted in the following *sequence*:

First        -testing, coring or logging;

Second    -completion attempts without plugging back in ascending order from deepest to shallowest depths;

Third       -deepening of a well below the authorized depth in descending order from shallowest to deepest depths;

Fourth     -sidetracking of the well in the order of least deviation from the original bottomhole location to the greatest deviation;

Fifth         -plugging back and completion attempts in order from deepest to shallowest Depths;

Sixth        -plug and abandon the well

It is provided, however, that if at any time while the participating Parties are considering the above elections the hole is in such a condition that, in the opinion of the Operator (in accord with the standards of a reasonable prudent operator), the Operator should decline to conduct the operations contemplated by the particular election for fear of placing the hole in jeopardy or losing the hole prior to completing the well at the authorized depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation which is less likely to jeopardize the well, in the opinion of the majority in interest of the participating Parties, will be conducted. If the interest of participating Parties are equally divided as to whether or not such operations may jeopardize the well, the Operator's opinion shall prevail. This provision is intended to apply only after reaching authorized depth or the objective formation and prior to completion of a well as producer and does not apply to any well that has been completed as a producer.

D.    To provide public notice of this Operating Agreement and rights, obligations and security interests hereby created, the parties all agree that Operator may file in the appropriate records of the County (Parish) in which the Contract Area is located and in the office of the Secretary of State of the state where the Contract Area is located, a MEMORANDUM OF OPERATING AGREEMENT in the same form as attached hereto as Exhibit "G". Upon request, Operator shall provide each Non-Operator a copy of the recorded document.

E.    Plugging and Abandoning: It is understood and agreed that where the terms "plugging and abandoning" or "plugged and abandoned" are used in this Agreement such terms shall be deemed to include all costs associated with plugging and abandoning a well including, but not limited to, any costs of remediating contamination and/or surface restoration, to the extent that such remediation and/or surface restoration is required by the lease(s), applicable laws or regulation or by prevailing oil field practices.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

IN WITNESS WHEREOF, this agreement shall be effective as of the _____1st_____ day of _____October_____,
_____2015_____, who has prepared and circulated this form for execution, represents and warrants
that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating
Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made
by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____,
have been made to the form.

**ATTEST OR WITNESS:**

 

_____

_____

**OPERATOR**
EMERALD OIL, INC.
_____

By _____

RYAN L. SMITH
Type or print name

Title CHIEF FINANCIAL OFFICER

Date _____

Tax ID or S.S. No. 77-0639000


**NON-OPERATORS**

 

_____

_____

KOCH EXPLORATION COMPANY, LLC
_____

By _____

_____
Type or print name Brian J. Kissick

Title Vice President Exploration

Date _____

Tax ID or S.S. No. _____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of     _____ )
                            ) ss.
County of   _____ )

        This instrument was acknowledged before me on

_____ by _____ .

(Seal, if any)

                                    _____

                                    Title (and Rank) _____

                                    My commission expires _____

Acknowledgment in representative capacity:

State of     _____ )
                            ) ss.
County of   _____ )

        This instrument was acknowledged before me on

_____ by _____ as

_____ of _____ .

(Seal, if any)

                                    _____

                                    Title (and Rank) _____

                                    My commission expires _____

-20-

EXHIBIT "A"

Attached to and made a part of that certain Joint Operating Agreement dated September 30, 2015 but effective March 20, 2015 between Emerald Oil, Inc. as Operator, and Non-Operators, and covering certain lands located in McKenzie County, North Dakota

1. Contract Area:          Section 28: ALL & Section 33: ALL, Township 147 North, Range 103 West (1280.00 acres)

2. Restrictions as to Production and Depth:  none

3. Parties and Percentages to this agreement:

GREG MARMALARD 3-28-33H

|  | BPO WI | APO WI |
|---|---|---|
| Emerald WB LLC. | 68.87109 | 67.109374 |
| Koch Exploration Company, LLC | 30.000000 | 30.000000 |
| Advanced Resources LLC | 1.12891 | 1.12891 |
| Schafenergy, LLC | 0.000000 | .199220 |
| American Minerals Management, LLC | 0.000000 | 1.56250 |
|  | 100.000% | 100.000% |

Section 28: ALL & Section 33: ALL, Township 147 North, Range 103 West (1280.00 acres) exclusive of the GREG MARMALARD 3-28-33H

|  | BPO WI | APO WI |
|---|---|---|
| Emerald WB LLC. | 67.109374 | 67.109374 |
| Koch Exploration Company, LLC | 30.000000 | 30.000000 |
| Advanced Resources LLC | 1.12891 | 1.12891 |
| Schafenergy, LLC | .199220 | .199220 |
| American Minerals Management, LLC | 1.56250 | 1.56250 |
|  | 100.000% | 100.000% |

4. Oil and Gas Leases Subject to this Agreement:

Any oil and gas leasehold or mineral/working/operating interest(s) or rights, or any amendment to any lease or leases (whether or not included on Exhibit A-1) acquired by or currently leased by Emerald Oil, Inc. or any of its entities, as Operator or The Other Signatory Parties, et al, insofar and only insofar as such acquired lease(s) or interest(s) or right(s) cover any portion of Sections 28 and 33, T147N R103W, McKenzie County, ND.

See Exhibit A-1 for a list of Oil and Gas Leases Subject to this Agreement.

**END OF EXHIBIT A**

EXHIBIT "A-1"

Attached to and made part of that certain Operating Agreement covering Sections 28 and 33, T147N R103W, effective March 20, 2015 by and between Emerald Oil, Inc. as Operator and The Other Signatory Parties as Non-Operator.


## Lease 1

**Serial Number:** N/A
**Dated:** 3/19/2015
**Recorded:** Doc. No. 481417
**Lessor:** M. Susan Travis Trust
**Present Lessees:** Emerald WB, LLC 70.00%
      Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North, Range 103 West, Section 28:S2NE, N2SE, among other lands
**Primary Term:** 2 years
**Royalty:** 18.75%

## Lease 2

**Serial Number:** N/A
**Dated:** 12/1/14
**Recorded:** Doc. No. 480860
**Lessor:** Red Crown Royalties, LLC
**Present Lessee:** American Minerals Management 100.00%
**Description:** Township 147 North, Range 103 West, Section 28:S2NE, N2SE, among other lands
**Primary Term:** 3 years
**Royalty:** 18.75%

## Lease 3

**Serial Number:** N/A
**Dated:** 3/19/2015
**Recorded:** Doc. No. 481418
**Lessor:** Ronald J. Crighton
**Present Lessees:** Emerald WB, LLC 70.00%
      Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North, Range 103 West, Section 28:S2NE, N2SE, among other lands
**Primary Term:** 2 years
**Royalty:** 18.75%

**Lease 4**

**Serial Number:** N/A
**Dated:** Effective 5/21/2013
**Recorded:** Doc. No. 451387
**Lessor:** Frederick W. McCoy, Jr Revocable Trust
**Present Lessees:** Advanced Resources, LLC  85.00%
    Schafenergy, LLC  15.00%
**Description:** Township 147 North, Range 103 West, Section 28:S2NE, N2SE, among other lands
**Primary Term:** 3 years
**Royalty:** 20.00%
**Comments:** Advanced Resources, LLC was formerly owned by Irish Oil & Gas, Inc.
Wellbore Assignment of record dated 4/15/15 from Irish Oil & Gas to Advanced Resources, LLC, for Marmalard 3-28-33H, Doc. 480620.

**Lease 5**

**Serial Number:** N/A
**Dated:** Effective 5/21/2013
**Recorded:** Doc. No. 451967
**Lessor:** The A.H. Seebold Trust dtd. 2-20-1980
**Present Lessees:** Advanced Resources, LLC  85.00%
    Schafenergy, LLC        15.00%
**Description:** Township 147 North, Range 103 West, Section 28:S2NE, N2SE, among other lands
**Primary Term:** 3 years
**Royalty:** 20.00%
**Comments:** Advanced Resources, LLC was formerly owned by Irish Oil & Gas, Inc.
Wellbore Assignment of record dated 4/15/15 from Irish Oil & Gas to Advanced Resources, LLC, for Marmalard 3-28-33H, Doc. 480620.

**Lease 6**

**Serial Number**: N/A
**Dated:** 9/18/213
**Recorded:** Doc. No.  458440
**Lessor:** Burlington Resources Oil & Gas
**Present Lessees:** Emerald WB, LLC     70.00%
    Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North, Range 103 West, Section 33: ALL
**Primary Term:** 2 years
**Royalty:** 20.00%

**Lease 7**

**Serial Number**: USA NDM 94112
**Dated:** 2/1/2015
**Recorded:** Unrecorded
**Lessor:** United States of America
**Present Lessees:** Emerald WB, LLC     70.00%
    Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North, Range 103 West, Section 28: N2NE, S2SE and W2
**Primary Term:** 10 years
**Royalty:** 12.5%

EXHIBIT "B"

FORM OF LEASE

(This page intentionally left blank)



COPAS 2005 Accounting Procedure
Recommended by COPAS

# Exhibit " C"
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

Attached to and made part of _that certain_ Joint Operating Agreement     dated     20th  of March,     2015, by and between Emerald Oil, Inc. Emerald WB, LLC and Emerald NWB, LLC as Operator and Koch Exploration Company LLC as Non-operator.

### I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1.  **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

"**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

"**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

"**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

"**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.

"**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

"**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

"**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

"**Joint Operations**" means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**COPAS**

"**Joint Property**" means the real and personal property subject to the Agreement.

"**Laws**" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"**Non-Operators**" means the Parties to the Agreement other than the Operator.

"**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

"**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"**Parties**" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

"**Participating Party**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"**Personal Expenses**" means reimbursed costs for travel and temporary living expenses.

"**Railway Receiving Point**" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

"**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

"**Supply Store**" means a recognized source or common stock point for a given Material item.

"**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2.  **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section 1.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

2



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3.    ADVANCES AND PAYMENTS BY THE PARTIES**

A.    Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.    Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

    (1)    being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

    (2)    being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

    (3)    being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

    (4)    charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4.    ADJUSTMENTS**

A.    Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.    All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

    (1)    a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

    (2)    an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

    (3)    a government/regulatory audit, or

    (4)    a working interest ownership or Participating Interest adjustment.

**5.    EXPENDITURE AUDITS**

A.    A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)