## ARTICLE XV.
## MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. Except as otherwise provided in Article IV.B, in the event operations on a well shall be commenced without execution of this agreement by all persons listed on Exhibit "A" as having a current interest in such well, or in the event that subsequent to the commencement of operations on the well previously unknown or undisclosed persons owning working interests in a well are discovered, or both, the parties executing this agreement agree to one of the following:

☐ Option No. 1: Operator shall indemnify executing Non-Operators with respect to all costs incurred for the well which would have been charged to each such person under this agreement as if such person had executed the same and Operator shall receive all revenues which would have been received by each such person under this agreement as if such person had executed the same.

☑ Option No. 2: The Operator shall advise all parties of the total interest of the parties that have executed this agreement. Each party executing this agreement, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the Operator of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interest of all parties executing this agreement) of non-executing persons' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of non-executing persons' interests together with all or a portion of its proportionate part of any non-executing persons interests that any executing party did not elect to take. Any interest of non-executing persons that is not carried by an executing party shall be deemed to be carried by the Operator. Failure to advise the Operator within the time required shall be deemed an election under (i).

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.
## OTHER PROVISIONS

**A. Conflict of Terms:**

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Article I through XV of this agreement and the provisions of this Article XVI, the provisions of this Article XVI shall govern.

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of that certain Purchase and Sale Agreement dated July 31, 2015, and this Joint Operating Agreement, the provisions of the Purchase and Sale Agreement shall govern.

Notwithstanding anything herein to the contrary, Non-Operators shall not be obligated to make any payments in advance of Operator incurring the expense or cost for which Non-Operators are responsible under this Agreement.

**B. Operator's Duty:**

Unless drilling operations are terminated pursuant to Article VI.F, Operator shall drill a Horizontal Well to the objective Zone(s) and drill the Lateral in the Zone(s) at least to a Displacement to which a reasonably prudent operator would deem further drilling is neither justified nor required.

**C. Priority of Operations – Horizontal Wells:**

Notwithstanding Article VI.B.6 or anything else in this agreement to the contrary, it is agreed that where a Horizontal Well subject to this agreement has been drilled to the objective Displacement and the Consenting Parties cannot agree upon the sequence and timing of further operations regarding such Horizontal Well, the following elections shall control the order of priority enumerated hereafter:

First: Testing, coring or logging;
Second: Complete drilling operations of all proposed Laterals;
Third: Extend or Deepen a Lateral;
Fourth: Kick out and drill an additional Lateral in the same Zone;
Fifth: Plug Back the well to a Zone above the Zone in which a Lateral was drilled; if there is more than one proposal to Plug Back, the proposal to Plug Back to the next deepest prospective Zone shall have priority over a proposal to Plug Back to a shallower prospective Zone;
Sixth: Sidetrack; and
Seventh: Plug and abandon as provided for in Article VI.E

Provided, however, that if, at the time the Consenting Parties are considering any of the above, the hole is in such a condition that a reasonably prudent operator would not conduct the particular contemplated operation involved for fear of placing the hole in jeopardy or losing the hole prior to Completing the Horizontal Well in the objective Zone, such operation shall be eliminated from the priorities set forth above.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**Priority of Operations – Vertical Wells:**

If at any time there is more than one operation proposed in connection with any well subject to this agreement and if the Consenting Parties do not agree on the sequence of proposed operations, such proposed operations shall be conducted in the following *sequence*:

| | | |
|---|---|---|
| First | -testing, coring or logging; | |
| Second | -completion attempts without plugging back in ascending order from deepest to shallowest depths; | |
| Third | -deepening of a well below the authorized depth in descending order from shallowest to deepest depths; | |
| Fourth | -sidetracking of the well in the order of least deviation from the original bottomhole location to the greatest deviation; | |
| Fifth | -plugging back and completion attempts in order from deepest to shallowest Depths; | |
| Sixth | -plug and abandon the well | |

It is provided, however, that if at any time while the participating Parties are considering the above elections the hole is in such a condition that, in the opinion of the Operator (in accord with the standards of a reasonable prudent operator), the Operator should decline to conduct the operations contemplated by the particular election for fear of placing the hole in jeopardy or losing the hole prior to completing the well at the authorized depth or objective formation, such election shall not be given the priority herein above set forth. In such event, the operation which is less likely to jeopardize the well, in the opinion of the majority in interest of the participating Parties, will be conducted. If the interest of participating Parties are equally divided as to whether or not such operations may jeopardize the well, the Operator's opinion shall prevail. This provision is intended to apply only after reaching authorized depth or the objective formation and prior to completion of a well as producer and does not apply to any well that has been completed as a producer.

D.   To provide public notice of this Operating Agreement and rights, obligations and security interests hereby created, the parties all agree that Operator may file in the appropriate records of the County (Parish) in which the Contract Area is located and in the office of the Secretary of State of the state where the Contract Area is located, a MEMORANDUM OF OPERATING AGREEMENT in the same form as attached hereto as Exhibit "G". Upon request, Operator shall provide each Non-Operator a copy of the recorded document.

E.   Plugging and Abandoning: It is understood and agreed that where the terms "plugging and abandoning" or "plugged and abandoned" are used in this Agreement such terms shall be deemed to include all costs associated with plugging and abandoning a well including, but not limited to, any costs of remediating contamination and/or surface restoration, to the extent that such remediation and/or surface restoration is required by the lease(s), applicable laws or regulation or by prevailing oil field practices.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

IN WITNESS WHEREOF, this agreement shall be effective as of the _____1st_____ day of ____October____.

____2015____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.

**ATTEST OR WITNESS:**

**OPERATOR**
EMERALD OIL, INC.

By _____

RYAN L. SMITH
Type or print name

Title CHIEF FINANCIAL OFFICER

Date    10 / 1 /15

Tax ID or S.S. No.    77 - 0639000

**NON-OPERATORS**

KOCH EXPLORATION COMPANY, LLC

By _____

BRIAN J. KISSICK
Type or print name Brian J. Kissick

Title  Vice President Exploration

Date    10 / 1 /15

Tax ID or S.S. No. _____

-19-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of     _____ )
                            ) ss.
County of   _____ )

       This instrument was acknowledged before me on

_____ by _____ .

(Seal, if any)

                                           _____

                                           Title (and Rank)   _____

                                           My commission expires _____

Acknowledgment in representative capacity:

State of     _____ )
                            ) ss.
County of   _____ )

       This instrument was acknowledged before me on

_____ by _____ as

_____ of _____ .

(Seal, if any)

                                           _____

                                           Title (and Rank)   _____

                                           My commission expires _____

-20-

EXHIBIT "A"

Attached to and made a part of that certain Joint Operating Agreement dated September 30, 2015 but effective December 11, 2014 between Emerald Oil, Inc. as Operator, and Non-Operators, and covering certain lands located in McKenzie County, North Dakota.

1.  Contract Area:        Section 16: ALL & Section 21: ALL, Township 147 North, Range 103 West (1280.00 acres)

2.  Restrictions as to Production and Depth:  none

3.  Parties and Percentages to this agreement:

|  | BPO WI | APO WI |
|---|---|---|
| Emerald WB, LLC | 70.000000 | 70.000000 |
| Koch Exploration Company, LLC | 30.000000 | 30.000000 |
|  | 100.000% | 100.000% |

4. Oil and Gas Leases Subject to this Agreement:

Any oil and gas leasehold or mineral/working/operating interest(s) or rights, or any amendment to any lease or leases (whether or not included on Exhibit A-1) acquired by or currently leased by Emerald Oil, Inc. or any of its entities, as Operator or The Other Signatory Parties, et al, insofar and only insofar as such acquired lease(s) or interest(s) or right(s) cover any portion of Sections16 and 21, T147N R103W, McKenzie County, ND.

See Exhibit A-1 for a list of Oil and Gas Leases Subject to this Agreement.

**END OF EXHIBIT A**

EXHIBIT "A-1"

Attached to and made part of that certain Operating Agreement covering Sections 16 and 21, T147N R103W,
effective December 11, 2014 by and between Emerald Oil, Inc. as Operator and The Other Signatory Parties as
Non-Operator.

**Lease 1**

**Serial Number**: N/A
**Dated:** 9/30/2008
**Recorded:** Doc. No. 382613
**Lessor:** LEROY & VIRGINIA LELAND H/W
**Present Lessees:** Emerald WB LLC  70.00%
        Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section 16:  All, Section 21: E2
**Primary Term:** 3 years, 2 year extension
**Royalty:** 18.75%

**Lease 2**

**Serial Number**: N/A
**Dated:** 9/30/2008
**Recorded:** Doc. No. 382615
**Lessor:** RAYMOND & JEANIE LELAND H/W
**Present Lessees:** Emerald WB LLC  70.00%
        Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section16: All, Section 21: All
**Primary Term:** 3 years, 2 year extension
**Royalty:** 18.75%

**Lease 3**

**Serial Number**: N/A
**Dated:**       9/30/2008
**Recorded:** Doc. No.  382616
**Lessor:** GARY J & GEORGIA LELAND H/W
**Present Lessees:** Emerald WB LLC  70.00%
        Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section16: All, Section 21: All
**Primary Term:** 5 years, 3 year extension
**Royalty:**   18.75%

**Lease 4**

**Serial Number**: N/A
**Dated:** 9/30/2008
**Recorded:** Doc. No. 382617
**Lessor:** JOE LELAND
**Present Lessees:** Emerald WB LLC  70.00%
        Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section16: All, Section 21: All
**Primary Term:** 5 years, 3 year extension
**Royalty:** 18.75%

**Lease 5**

**Serial Number**:  ND OG 08 01163
**Dated:** 11/4/2008
**Recorded:**  Doc. No. 386143
**Lessor:** STATE OF ND OG 08 01163
**Present Lessees:** Emerald WB LLC  70.00%
        Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section 16:  NE
**Primary Term:** 5 years
**Royalty:** 16.67%

**Lease 7**

**Serial Number**: ND OG 08 01164
**Dated:** 11/4/2008
**Recorded:** Doc. No. 386144
**Lessor:** STATE OF ND OG 08 01164
**Present Lessees:** Emerald WB LLC 70.00%
         Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section 16: NW
**Primary Term:** 5 years
**Royalty:** 16.67%

**Lease 8**

**Serial Number**: ND OG 08 01165
**Dated:** 11/4/2008
**Recorded:** Doc. No. 386145
**Lessor:** STATE OF ND OG 08 01165
**Present Lessees:** Emerald WB LLC 70.00%
         Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section 16: SE
**Primary Term:** 5 years
**Royalty:** 16.67%

**Lease 9**

**Serial Number**: ND OG 08 01166
**Dated:** 11/4/2008
**Recorded:** Doc. No. 386146
**Lessor:** STATE OF ND OG 08 01166
**Present Lessees:** Emerald WB LLC 70.00%
         Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section 16: SW
**Primary Term:** 5 years
**Royalty:** 16.67%

**Lease 10**

**Serial Number**: N/A
**Dated:** Effective: 10/1/2011
**Recorded:** Doc. No. 419593
**Lessor:** MYRON K & ARDEHL A LELAND H/W
**Present Lessees:** Emerald WB LLC 70.00%
         Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section 16: All, Section 21: E2
**Primary Term:** 2 years, 3 year extension
**Royalty:** 18.75%

**Lease 11**
**Serial Number**: N/A
**Dated:** 9/30/2008
**Recorded:** Doc. No. 382618 384
**Lessor:** LYNN SIMS CO TRUSTEE
**Present Lessees:** Emerald WB LLC 70.00%
         Koch Exploration Company, LLC 30.00%
**Description:** Township 147 North Range 103 West Section 16: All, Section 21: E2
**Primary Term:** 5 years, 3 year extension
**Royalty:** 18.75%



COPAS 2005 Accounting Procedure
Recommended by COPAS

## Exhibit " C"
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

Attached to and made part of _that certain Joint Operating Agreement_ dated _11th of December,_ _2014, by and between Emerald Oil, Inc. Emerald WB, LLC and Emerald NWB, LLC as Operator and Koch Exploration Company LLC as Non-operator._

### I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1.  **DEFINITIONS**

    All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

    "**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

    "**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

    "**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

    "**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

    "**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.

    "**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

    "**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

    - Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
    - Responsibility for day-to-day direct oversight of rig operations
    - Responsibility for day-to-day direct oversight of construction operations
    - Coordination of job priorities and approval of work procedures
    - Responsibility for optimal resource utilization (equipment, Materials, personnel)
    - Responsibility for meeting production and field operating expense targets
    - Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
    - Responsibility for all emergency responses with field staff
    - Responsibility for implementing safety and environmental practices
    - Responsibility for field adherence to company policy
    - Responsibility for employment decisions and performance appraisals for field personnel
    - Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

    "**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

    "**Joint Operations**" means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

"Joint Property" means the real and personal property subject to the Agreement.

"Laws" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"Material" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"Non-Operators" means the Parties to the Agreement other than the Operator.

"Offshore Facilities" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"Off-site" means any location that is not considered On-site as defined in this Accounting Procedure.

"On-site" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"Operator" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"Parties" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"Participating Interest" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

"Participating Party" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"Personal Expenses" means reimbursed costs for travel and temporary living expenses.

"Railway Receiving Point" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

"Shore Base Facilities" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

"Supply Store" means a recognized source or common stock point for a given Material item.

"Technical Services" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2. **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section 1.2 and/or Section 1.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



3. ADVANCES AND PAYMENTS BY THE PARTIES

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3) a government/regulatory audit, or

(4) a working interest ownership or Participating Interest adjustment.

5. EXPENDITURE AUDITS

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section 1.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section 1.5.B or 1.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section 1.5.B or 1.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section 1.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections 1.5.B or 1.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section 1.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E. ☑ (*Optional Provision -- Forfeiture Penalties*)
*If the Non-Operators fail to meet the deadline in Section 1.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section 1.5.B or 1.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6.  APPROVAL BY PARTIES

A.  GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

4



Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6 B.

### B.    AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of ___eighty percent___ (80%___) or more Parties, one of which is the Operator, having a combined working interest of at least __eighty percent___ (___80__%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

### C.    AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

### 1.    RENTALS AND ROYALTIES

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

### 2.    LABOR

A.    Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)    Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)    Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)    Operator's employees providing First Level Supervision,

(4)    Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)    Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.    Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3. MATERIAL

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. TRANSPORTATION

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

   (1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

   (2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5. SERVICES

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____twelve_____ percent (12_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

## 7.   AFFILIATES

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

## 8.   DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

## 9.   LEGAL EXPENSE

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

## 10.   TAXES AND PERMITS

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

## 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

## 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

## 14. ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

## 15. OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

### III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

I.  **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ (Alternative 1)  Fixed Rate Basis, Section III.1.B.
☐ (Alternative 2)  Percentage Basis, Section III.1.C.

A.  **TECHNICAL SERVICES**

(i)  Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead — Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for On-site Technical Services, including third party Technical Services:

☐ (Alternative 1 – Direct) shall be charged <u>direct</u> to the Joint Account.

☑ (Alternative 2 – Overhead) shall be covered by the <u>overhead</u> rates.

(ii)  Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for Off-site Technical Services, including third party Technical Services:

☐ (Alternative 1 – All Overhead) shall be covered by the <u>overhead</u> rates.

☐ (Alternative 2 – All Direct) shall be charged <u>direct</u> to the Joint Account.

☑ (Alternative 3 – Drilling Direct) shall be charged <u>direct</u> to the Joint Account, <u>only</u> to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B.  **OVERHEAD—FIXED RATE BASIS**

(1)  The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ _10,000.00_  (prorated for less than a full month)

Producing Well Rate per month $ __1,000.00__

(2)  Application of Overhead—Drilling Well Rate shall be as follows:

(a)  Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work-days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C. ~~OVERHEAD—PERCENTAGE BASIS~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.~~

~~(b) Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*), all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead—Percentage Basis shall be as follows:~~

~~(a) The Development Rate shall be applied to all costs in connection with:~~

~~[i] drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work-days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv] expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead—Major Construction and Catastrophe*).~~

~~(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead—Major Construction and Catastrophe*).~~

2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.    If the Operator absorbs the engineering, design and drafting costs related to the project:

   (1)    ____5____ % of total costs if such costs are less than $100,000; plus

   (2)    ____3____ % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)    ____2____ % of total costs in excess of $1,000,000.

B.    If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

   (1)    ____5____ % of total costs if such costs are less than $100,000; plus

   (2)    ____3____ % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)    ____2____ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.    AMENDMENT OF OVERHEAD RATES

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.    DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



## 2. TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A.   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

   (a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

   (b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

### B.   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

### C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



D.    CONDITION

(1)    Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)    Condition "B"    Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)    Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)    Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5)    Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.    OTHER PRICING PROVISIONS

(1)    Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)    Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

## 3. DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

## 4. SPECIAL PRICING PROVISIONS

### A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

### B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

### C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

## 1.  DIRECTED INVENTORIES

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.  A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section 1.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.  Actual transportation costs and Personal Expenses for the inventory team.

C.  Reasonable charges for report preparation and distribution to the Non-Operators.

## 2.  NON-DIRECTED INVENTORIES

### A.  OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

### B.  NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

### C.  SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

EXHIBIT "D"
TO OPERATING AGREEMENT

INSURANCE

Attached to and made part of that certain Joint Operating Agreement dated 11 of December 2014, by and between Emerald Oil, Inc, Emerald WB, LLC and Emerald NWB, LLC as Operator and Koch Exploration  Company, LLC as Non-operator.

Operator shall at all times while performing operations hereunder, maintain in full force and effect the following insurance coverage or will further cause all third parties with whom it contracts relating to operations on leases to provide like insurance coverage:

A.  Workers' Compensation providing statutory benefits and Employer's Liability with limits of $1,000,000 each accident for bodily injury by accident, $1,000,000 each employee bodily injury by disease, $1,000,000 policy limit for bodily injury by disease, covering all employees engaged in the performance of work in the state having jurisdiction over each employee. This policy shall contain a waiver of subrogation in favor of the Non-Operating working interest owners with respect to the operations covered by this agreement.

B.  Comprehensive General Liability Insurance, covering operations hereunder, with a combined single limit per occurrence of $1,000,000 for bodily injury and property damage. Such policy shall be endorsed to provide Blanket Contractual Liability covering obligations assumed herein.

C.  Comprehensive Automobile Insurance including non-owned and hired vehicle coverage with a combined single limit per occurrence of $1,000,000 for bodily injury and property damage scheduled as underlying to the excess liability limits.

D.  Umbrella or Excess Liability with limits of $10,000,000 per occurrence to be excess of the primary liability coverage required for commercial general liability, auto liability and employer's liability.

E.  Control of well (wild well) insurance will be carried by Operator for the benefit of the Joint Account with limits of $10,000,000 any one occurrence combined single limit for drilling, deepening and workover wells; $5,000,000 any one occurrence combined single limit for all other wells. Should any party wish to not be covered by such insurance they should provide written evidence of such election to Operator.

Operator will furnish Non Operator, prior to commencing operations, valid certificates of insurance certifying the above coverage.

Non-Operators have the specific right to carry their own individual General Liability and should provide written evidence of such election to Operator.

EXHIBIT "E"

## GAS BALANCING AGREEMENT

Attached to and made part of that certain Joint Operating Agreement dated 11 of December 2014, by and between Emerald Oil, Inc, Emerald WB, LLC and Emerald NWB, LLC as Operator and Koch Exploration Company, LLC as Non-operator.

During the period or periods when any party hereto has no market for or its purchaser is unable to take, or if any party fails to take its share of gas, the other parties shall be entitled to produce each month one hundred percent (100%) of the allowable gas production assigned to the subject well or wells by the appropriate governmental entity having jurisdiction, and each of such parties shall take its pro rata share. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interests, but each party taking such gas shall own all of the gas delivered to its purchaser. Each party unable to market its share of the gas produced shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operations, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to twenty-five percent (25%) of each overproduced party's share of gas produced. If more than one party is entitled to the additional gas produced, they shall divide such additional gas in accordance with working interest participation.

In the event production of gas from the Contract Area permanently ceases prior to the time that the accounts of the parties have been balanced, or in the event all parties agree that insufficient recoverable reserves remain to allow for balancing as set forth in the paragraph above, a balancing shall be accomplished by a money settlement. Such settlement shall be based upon the weighted average price received by each overproduced party for its share of gas produced and sold.

At all times while gas is produced from the Contract Area, each party shall use its best efforts to make appropriate settlement of all royalties, overriding royalty interests, and other similar payments out of or in lieu of production for which it is responsible, as if each party were taking or delivering to a purchaser its share, and only its share, of such gas production. Each party hereto agrees to indemnify and hold each other party harmless from any and all claims relating to royalties, overriding royalty interests, and other similar payments out of or in lieu of production asserted by the owners to whom each party is accountable.

EXHIBIT "F"

## NON-DISCRIMINATION AND CERTIFICATION OF
## NON-SEGREGATED FACILITIES

Attached to and made part of that certain Joint Operating Agreement dated 2011 of MarchDecember 20154, by and between Emerald Oil, Inc, Emerald WB, LLC and Emerald NWB, LLC as Operator and Koch Exploration Company, LLC as Non-operator.

1.    **During the performance of this Contract, the Operator agrees as follows:**

A.    The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting office setting forth the provisions of this non-discrimination clause.

B.    The Operator will, in all solicitations or advertisements for employees placeed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

C.    The Operator will send to each labor union or representative or workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting office, advising the labor union or worker's representatives of the Operator's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

D.    The Operator will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and by the rules, regulations and relevant orders of the Secretary of Labor.

E.    The Operator will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

F.    In the event of Operator's non-compliance with the non-discrimination obligations of this contract or with any of such rules, regulations or orders, this contract may be canceled, terminated or suspended, or in whole or in part, and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in said Executive Order No. 11246 of September 24, 1965, or by rules, regulation or order of the Secretary of Labor, or as otherwise provided by law.

G.    The Operator will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each contractor or vendor. The Operator will take such action with respect to any contract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for non-compliance; provided, however, that in the event the Operator becomes involved in or is threatened with litigation with a contractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interest of the United States.

2.    **Equal Employment Opportunity Reporting.**

The Operator, unless exempt, agrees to file with the appropriate federal agency a complete and accurate report on Standard Form 100 (EEO-1) within thirty (30) days after the signing of this Agreement or the award of any such purchase order, as the case may be, (unless such a report has been filed in the last 12 months), and agrees to continue to file such reports annually, on or before March 31st. (41 CFR 60-1.7(a)).

3. **Affirmative Action Compliance Program.**

The Operator agrees to develop and maintain a current written affirmative action compliance program for each of its establishments in accordance with the regulations of the Secretary of Labor promulgated under Executive Order No. 11246, as amended (41 CFR 60-01.40).

4. **Veteran's Employment.**

In the event the agreement to which this exhibit is attached is for the purpose of carrying with any department or agency of the United States for the procurement of personal property and non-personal services (including construction) for the United States as provided by Section 2012 of Title 38 USC, Operator agrees to give special emphasis to the employment of qualified disabled veterans and veterans of the Vietnam era and to list immediately with the appropriate local employment service office all of its suitable employment openings.

5. **Equal Opportunity in Employment Certification of Non-Segregated Facilities.**

Operator, by entering into the contract to which this Exhibit D-F is attached, certifies that he does not maintain or provide for his employees any segregated facilities at any of his establishments, and that he does not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. Operator agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants, and other eating areas, time clocks, locker rooms, and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color or national origin, because of habit, local custom, or otherwise. He further agrees that (except where he has obtained identical certifications from proposed contracts for specific time periods) he will obtain identical certifications from proposed contractors prior to the award of contracts exceeding $10,000.00 which are not exempt from the provisions of the Equal Opportunity clause, that he will retain such certifications in his files; and that he will forward the following notice to such proposed contractors (except where the proposed contractors have submitted identical certifications for specific time periods):

6. **Notice to Prospective Contractors of Requirement for Certifications of Facilities.**

A Certification of Non-Segregated Facilities, as required by the May 9, 1967 Order (32 F.R. 7439, May 19, 1967) on Elimination of Segregated Facilities, by the Secretary of Labor, must be submitted prior to the award of a contract exceeding $10,000.00 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each contract or for all contracts during a period (i.e., quarterly, semi-annually, or annually).

EXHIBIT "H"

MEMORANDUM OF OPERATING AGREEMENT
AND FINANCING STATEMENT

Attached to and made part of that certain Joint Operating Agreement dated 11 of December 2014, by and between Emerald Oil, Inc, Emerald WB, LLC and Emerald NWB, LLC as Operator and Koch Exploration Company, LLC as Non-operator.

1. This Memorandum of Operating Agreement and Financing Statement (called the "Memorandum"), shall be effective when the Operating Agreement referred to in Paragraph 2. below becomes effective, that being ___(Date)___ .

2. The Parties have entered into an Operating Agreement, providing for the development and production of crude oil, natural gas, and associated substances from the lands described in Exhibit "A" to this Memorandum (the "Contract Area"), designating _____ as Operator, whose address is _____, to conduct operations.

3. The Operating Agreement provides for certain liens and/or security interests to secure payment by the parties to that Agreement of their respective share of costs under the Operating Agreement. The Operating Agreement contains an Accounting Procedure along with other provisions which supplement the lien and/or security interest provisions, including non-consent clauses which provide that Parties who elect not to participate in certain operations shall be deemed to have relinquished their interest until the consenting Parties are able to recover their costs of the operations plus a specified amount. Any person or firm desiring additional information regarding the Operating Agreement or who wish to inspect a copy of the Operating Agreement should contact the Operator.

4. The purpose of this Memorandum is to more fully describe and implement the liens and/or security interests provided for in the Operating Agreement, and to place third parties on notice of them.

5. In consideration of the mutual rights and obligations of the Parties, they agree as follows:

   5.1. The Operator shall conduct, direct, and have full control of all Operations on the Contract Area as permitted, required by, and within the limits of the Operating Agreement.

   5.2. The liability of the Parties shall be several, not joint or collective. Each Party shall be responsible only for its obligations and shall be liable only for its proportionate share of costs.

   5.3. Each Non-Operator grants to Operator a lien on its oil and gas rights in the Contract Area, and a security interest in its share of oil and or gas when extracted and its interest in all equipment, to secure payment of its share of expenses, together with any interest at the rate provided in the Accounting Procedure referred to in Paragraph 3. above. To the extent that Operator has a security interest under the Uniform Commercial Code of the State in which properties subject to the Operating Agreement are located (the "Code"), Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the rights or security interest for the payment thereof.

   5.4. If any Non-Operator fails to pay its share of costs when due, Operator may require other Non-Operators to pay their proportionate part of the unpaid share, and the other Non-Operators shall be subrogated to Operator's lien and security interest.

5.5. The Operator grants to Non-Operators a lien and security interest equivalent to that granted to Operator as described in Paragraph 5.3 above, to secure payment by Operator of its own share of costs when due.

6. For purposes of protecting the liens and security interest, the Parties agree that this Memorandum shall cover all right, title, and interest of the debtor(s) in:

6.1. Property Subject to Security Interests

(a) All personal property located on or used in connection with the Contract Area.

(b) All fixtures on the Contract Area.

(c) All oil, gas, and associated substances of value in, on, or under the Contract Area which may be extracted from it.

(d) All accounts resulting from the sale of the items described in subparagraph (c) at the wellhead of every well located on the Contract Area or on lands pooled with it.

(e) All items used, useful, or purchased for the production, treatment, storage, transportation, manufacture, or sale of the items described in subparagraph (c).

(f) All accounts, contract rights, rights under any gas balancing agreement, general intangibles, equipment, inventory, farmout rights, option farmout rights, acreage and or cash contributions, and conversion rights in or to the Contract Area, whether now owned or existing or later acquired or arising, including but not limited to all interest in any partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area or in any property encumbered by this Memorandum.

(g) All severed and extracted oil, gas, and associated substances now or later produced from or attributable to the Contract Area, including, without limitation, oil, gas, and associated substances in tanks or pipelines or otherwise held for treatment, transportation, manufacture, processing or sale.

(h) All the proceeds and products of the items described in the foregoing paragraphs now existing or later arising, and all substitutions, replacements thereof, or accessions thereto.

(i) All personal property and fixtures now and later acquired in furtherance of the purposes of this Operating Agreement. Certain of the above-described items are or are to become fixtures on the Contract Area.

(j) The proceeds and products of collateral are also covered.

6.2. Property Subject to Liens

(a) All real property within the Contract Area, including all oil, gas and associated substances of value in, on or under the Contract Area which may be extracted from the real property.

(b) All fixtures within the Contract Area.

(c) All real property and fixtures now and later acquired in furtherance of the purposes of the Operating Agreement.

7. The above items will be financed at the wellhead of the well or wells located on the Contract Area, and this Memorandum is to be filed for record in the real estate records of the county or counties in which the Contract Area is located, and in the appropriate

Uniform Commercial Code records. All Parties who have executed the Operating Agreement and all farmors and option farmors who have granted support within the Contract Area are identified on Exhibit "B."

8. On default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law or the practice of the State in which the Contract Area is located, each Party to the Agreement and any successor to a Party by assignment, operation of law, or otherwise, shall have, and is given and vested with, the power and authority to take possession of and sell any interest which the defaulting Party has in the subject lands and to foreclose this lien in the manner provided by law.

9. On expiration of the Operating Agreement and the satisfaction of all debts, the Operator shall file of record a release and termination of that Agreement on behalf of all parties concerned. On the filing of the release and termination, all benefits and obligations under this Memorandum shall terminate as to all Parties who have executed or ratified this Memorandum. In addition, the Operator shall have the right to file a continuation statement on behalf of all Parties who have executed or ratified this Memorandum.

10. It is understood and agreed by the Parties that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the State where the Contract Area is located, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term or provision held to be invalid.

11. This Memorandum shall be binding on and shall inure to the benefit of the Parties and their respective heirs, devisees, legal representatives, successors and assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who have executed this Memorandum.

12. A Party having an interest in the Contract Area can ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and the ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart of it. By execution or ratification of this Memorandum, the Party consents to its ratification and adoption by any Party who may have or may acquire any interest in the Contract Area.

13. This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording, only one copy of this Memorandum with individual signature pages attached to it needs to be filed of record.

(NAME AND ADDRESS)

By:

Name:
Title:

(NAME AND ADDRESS)

By:

Name:
Title:

(acknowledgments)

EXHIBIT "B"

FORM OF LEASE

(This page intentionally left blank)