## Exhibit 3

**Limited Liability Company Operating Agreement of New Emerald Energy Holdings, LLC**

KE 41357638

**Execution Version**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## NEW EMERALD ENERGY HOLDINGS, LLC

**a Delaware Limited Liability Company**

**Dated as of November 1, 2016**

Limited Liability Company interests in New Emerald Energy Holdings, LLC, a Delaware limited liability company, have not been registered with or qualified by the Securities and Exchange Commission or any securities regulatory authority of any state. The interests are being sold in reliance upon exemptions from such registration or qualification requirements. The interests cannot be sold, transferred, assigned or otherwise disposed of except in compliance with the restrictions on transferability contained in the Limited Liability Company Agreement of New Emerald Energy Holdings, LLC, as such may be amended or restated from time to time, and applicable federal and state securities laws.

## TABLE OF CONTENTS

ARTICLE I        ORGANIZATIONAL MATTERS ...................................................................1

    Section 1.1.    Formation.................................................................................1
    Section 1.2.    Name .......................................................................................1
    Section 1.3.    Purpose....................................................................................1
    Section 1.4.    Registered Office and Registered Agent; Principal Place of
                Business ..................................................................................1
    Section 1.5.    Foreign Qualification ..............................................................2
    Section 1.6.    Term .......................................................................................2
    Section 1.7.    Ownership................................................................................2
    Section 1.8.    Liability to Third Parties .........................................................2
    Section 1.9.    Tax Year..................................................................................2
    Section 1.10.   Tax Classification of the Company...........................................2

ARTICLE II       DEFINITIONS, REFERENCES AND DEFINITIONS ..................................2

    Section 2.1.    Definitions...............................................................................2
    Section 2.2.    Other Defined Terms .............................................................16
    Section 2.3.    References and Construction ..................................................16

ARTICLE III      CAPITALIZATION ..................................................................................17

    Section 3.1.    Capital Contributions.............................................................17
    Section 3.2.    Capital Accounts....................................................................18
    Section 3.3.    Additional Issuances of Interests ...........................................19
    Section 3.4.    Class B Members ...................................................................20
    Section 3.5.    Unit Certificates ....................................................................20

ARTICLE IV       ALLOCATIONS AND DISTRIBUTIONS...................................................21

    Section 4.1.    Allocations .............................................................................21
    Section 4.2.    Distributions..........................................................................28
    Section 4.3.    Tax Distributions ...................................................................29

ARTICLE V        MANAGEMENT AND GOVERNANCE PROVISIONS .............................29

    Section 5.1.    Management by Board.............................................................29
    Section 5.2.    Composition of Board.............................................................29
    Section 5.3.    Removal of Managers .............................................................31
    Section 5.4.    Vacancies ...............................................................................31
    Section 5.5.    Meetings of Board...................................................................31
    Section 5.6.    Compensation of Managers ....................................................33
    Section 5.7.    Actions Requiring Board Approval .........................................33
    Section 5.8.    Duties of Managers and Members...........................................37
    Section 5.9.    Other Investments of Member Related Parties; Waiver of Conflicts
                of Interest and Negation of Duties and Obligations...............38
    Section 5.10.   Officers ..................................................................................40
    Section 5.11.   Budget ....................................................................................40
    Section 5.12.   Asset Manager Power and Authority.......................................43

i

ARTICLE VI      TRANSFERS OF INTERESTS OF PARTNERS ........................................43

    Section 6.1.   Transfers ...................................................................43
    Section 6.2.   Right of First Refusal.............................................................43
    Section 6.3.   Right of First Offer ...............................................................44
    Section 6.4.   Drag-Along Rights .................................................................45
    Section 6.5.   Tag-Along Rights...................................................................46
    Section 6.6.   Liquidity Event .....................................................................48
    Section 6.7.   [Reserved] ............................................................................51
    Section 6.8.   Buy/Sell Rights .....................................................................51
    Section 6.9.   Assumption of Assignee .........................................................53
    Section 6.10.  Other Assignment Void ..........................................................54

ARTICLE VII     ACCOUNTING, BANKING AND TAX MATTERS .................................54

    Section 7.1.   Books and Records .................................................................54
    Section 7.2.   Reporting................................................................................54
    Section 7.3.   Tax Information .....................................................................55
    Section 7.4.   Fiscal Year ............................................................................55
    Section 7.5.   Bank Accounts .......................................................................55
    Section 7.6.   Tax Matters ...........................................................................55

ARTICLE VIII    INDEMNIFICATION...............................................................................56

    Section 8.1.   Power to Indemnify in Actions, Suits or Proceedings ...............56
    Section 8.2.   Expenses Payable in Advance .................................................57
    Section 8.3.   Nonexclusivity of Indemnification and Advancement of Expenses..........57
    Section 8.4.   Insurance ...............................................................................57
    Section 8.5.   Survival of Indemnification and Advancement of Expenses....................57
    Section 8.6.   Limitation on Indemnification ................................................58
    Section 8.7.   Indemnification of Employees and Agents...............................58
    Section 8.8.   Severability ...........................................................................58
    Section 8.9.   Company as Indemnitor of First Resort...................................58

ARTICLE IX      DISSOLUTION, LIQUIDATION, AND TERMINATION ..........................59

    Section 9.1.   Dissolution ............................................................................59
    Section 9.2.   Procedure ..............................................................................59
    Section 9.3.   Certificate of Cancellation .....................................................59

ARTICLE X       REPRESENTATIONS ..............................................................................59

    Section 10.1.  Certain Representations and Warranties of the Members........................59

ARTICLE XI      GENERAL PROVISIONS .........................................................................60

    Section 11.1.  Successors and Assigns............................................................60
    Section 11.2.  Directly or Indirectly.............................................................60
    Section 11.3.  Governing Law ......................................................................60
    Section 11.4.  Severability ...........................................................................61
    Section 11.5.  Further Assurances.................................................................61
    Section 11.6.  No Third Party Beneficiaries .................................................61
    Section 11.7.  Amendment; Waiver...............................................................61
    Section 11.8.  Notices ..................................................................................61

WEIL:\95894375\17\39110.0004

Section 11.9.   Press Releases ..................................................................................62
Section 11.10. Confidentiality ..................................................................................62
Section 11.11. Specific Performance .......................................................................62
Section 11.12. Reimbursement of Expenses............................................................62
Section 11.13. Entire Agreement .............................................................................63
Section 11.14. Counterparts.....................................................................................63


Schedule I      Percentage Interests

Exhibit A       Initial Managers
Exhibit B       Initial Officers

WEIL:\95894375\17\39110.0004

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**NEW EMERALD ENERGY HOLDINGS, LLC**

THIS LIMITED LIABILITY COMPANY AGREEMENT, dated as of November 1, 2016 ("Effective Date"), of New Emerald Energy Holdings, LLC, a Delaware limited liability company (the "Company") is duly executed by DAKOTA MIDSTREAM, LLC, a Delaware limited liability company ("DMS"), FT SOF V AIV Holdings I, LLC, a Delaware limited liability company ("FT SOF V"), FT SOF VII AIV Holdings I, LLC, a Delaware limited liability company ("FT SOF VII"), FT SOF IV Holdings, LLC, a Delaware limited liability company ("FT SOF IV") (FT SOF V, FT SOF VII and FT SOV IV, collectively, "Fir Tree"), CL Energy Opportunity Fund, L.P., a Delaware limited partnership  ("Crestline") and the other parties listed as members on Schedule I of this Agreement and the signature pages hereto from time to time in each Person's capacity as a Member of the Company (each a "Member", and together collectively, the "Members").

## ARTICLE I
## ORGANIZATIONAL MATTERS

Section 1.1.    Formation.  On October 17, 2016, the Company was formed by the filing of a Certificate of Formation (the "Certificate") with the Secretary of State of the State of Delaware, in accordance with the provisions of the Delaware Limited Liability Company Act (as amended from time to time, or any successor statutes thereto, being called the "Company Law"). Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration, dissolution and termination of the Company shall be governed by the Company Law.

Section 1.2.    Name.  The name of the Company is "New Emerald Energy Holdings, LLC". The business of the Company shall be conducted in the name of the Company. If the Applicable Law of a jurisdiction where the Company does business requires the Company to do business under a different name, the Board shall choose another name to do business in such jurisdiction.  In such a case, the business of the Company in such jurisdiction may be conducted under such other name or names as the Board may select..

Section 1.3.    Purpose.  The Company is organized for the purposes of (a) engaging, directly or through its Subsidiaries, in the Oil and Gas Business in the continental United States and (b) engaging, directly or through its Subsidiaries, in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient in furtherance of or otherwise relating to the foregoing purpose, as determined by the Board.

Section 1.4.    Registered Office and Registered Agent; Principal Place of Business.

(a)    The registered office of the Company required by the Company Law to be maintained in the State of Delaware shall be the initial registered office named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by Applicable Law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other person or persons as the Board may designate from time to time.

1

(b)     The principal place of business of the Company shall be such location as designated by the Board.

Section 1.5.     Foreign Qualification.  Prior to the Company's conducting business in any jurisdiction other than Delaware, the Company shall comply with all requirements necessary to qualify the Company as a foreign limited liability company in such jurisdiction.  At the request of the Board, each Member agrees to execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

Section 1.6.     Term.   The existence of the Company commenced on the date the Certificate was filed with the Secretary of State of Delaware and shall continue in existence until it is dissolved and terminated in accordance with the terms of this Agreement.

Section 1.7.     Ownership.   The Interest of each Member in the Company is personal property for all purposes.   All property owned by the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company, and no Member has any ownership interest in any specific property of the Company.   The Company shall hold all of its property in its own name.   Each Member waives any right to partition any property of the Company for the term of the Company.

Section 1.8.     Liability to Third Parties.   The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, will be solely the debts, obligations and liabilities of the Company and the Members will not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company.

Section 1.9.     Tax Year.  The tax year of the Company (the "Tax Year") for income tax purposes will end on December 31st unless otherwise determined by the Board or required under the Code.

Section 1.10.   Tax Classification of the Company.  The Company intends to be classified as a partnership for U.S. federal income tax purposes and shall not make any elections to change such classification or to be excluded from the provisions of subchapter K of the Code, in each case without the unanimous written consent of the Members.

## ARTICLE II
## DEFINITIONS, REFERENCES AND DEFINITIONS

Section 2.1.     Definitions.

When used in this Agreement, the following terms have the respective meanings assigned to them in this Section 2.1:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Tax Year or other period, after giving effect to the following adjustments:

2

(a)      Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to this Agreement or is deemed to be obligated to restore to the Company pursuant to Treasury Regulations Section 1.704–1(b)(2)(ii)(c) or the penultimate sentence of each of Treasury Regulations Sections 1.704–2(g)(1) and 1.704–2(i)(5); and

(b)      Debit to such Capital Account such Member's share of the items described in Treasury Regulations Sections 1.704–1(b)(2)(ii)(d)(5) and 1.704–1(b)(2)(ii)(d)(6).

The foregoing definition is intended to comply with the provisions of Treasury Regulations Section 1.704–1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" means, when used with respect to any Person, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Person. For the purposes of this definition, the terms "controlling, controlled by, or under common control" mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person and (ii) any fund managed by (A) such Member or its Affiliates (as described in clause (i) above) or (B) the investment manager or manager of such Member or any Affiliate (as described in clause (i) above) of such investment manager or manager.

"Agreement" means this Limited Liability Company Agreement of New Emerald Energy Holdings, LLC, as may be hereafter amended, restated, modified or changed in accordance with the terms hereof.

"Allocation Period" means (a) the period commencing on the Effective Date and ending on the last day of the Company's Tax Year, (b) any subsequent period commencing on the first day of the Company's Tax Year and ending on the last day of the Company's Tax Year, or (c) any portion of any period described in clause (a) or (b) for which the Company is required to allocate Profits, Losses, and other items of Company income, gain, loss or deduction pursuant to Section 4.1.

"Applicable Federal Rate" means the interest rate specified for debt instruments of equivalent terms pursuant to Code Section 1274(d)(1).

"Applicable Law" means any statute, law, rule, or regulation, or any judgment, order, writ, injunction, or decree of any Governmental Entity to which a specified Person, matter or property is subject.

"Appraisal Report" has the meaning set forth in Section 5.7(b).

"Approved Exit" has the meaning set forth in Section 6.6(c).

"Asset Manager" means any counterparty to a Management Agreement designated in such Management Agreement as the Asset Manager.

"Asset Purchase Agreement" means that certain Asset Purchase Agreement, dated as of November 1, 2016, by and among Emerald Oil, Inc., a Delaware corporation, Emerald WB LLC,

3

a Colorado limited liability company, Emerald NWB, LLC, a Delaware limited liability company, Emerald DB, LLC, a Delaware limited liability company, EOX Marketing, LLC, a Delaware limited liability company, New Emerald Energy, LLC, a Texas limited liability company, and Cortland Capital Market Services LLC, a Delaware limited liability company.

"Available Cash" means the cash and cash equivalents of the Company on hand less cash reserves determined by the Board, in its reasonable discretion, to be necessary or appropriate to (a) provide an adequate level of working capital for the conduct of the business of the Company and its Subsidiaries or (b) comply with Law or any loan agreement, security agreement, mortgage, debt instrument or other agreement or obligation to which the Company or its Subsidiaries is a party or by which they are bound or their assets are subject.

"Baseline Budget" has the meaning set forth in Section 5.11(b).

"Board" has the meaning set forth in Section 5.1.

"Budget" means the annual or any other budget of the Company and each of its Subsidiaries as approved by the Board.

"Business Day" means a day other than a Saturday or a Sunday, on which commercial banks are authorized to be open for business with the public in Fort Worth, Texas; New York, New York; and Denver, Colorado.

"Business Opportunity" has the meaning set forth in Section 5.8(b)(iii).

"Buy/Sell Election Notice" has the meaning set forth in Section 6.8(b).

"Buy/Seller Offer" has the meaning set forth in Section 6.8(a).

"Buy/Sell Unit Price" has the meaning set forth in Section 6.8(a).

"Capital" means the amount of cash and the initial Gross Asset Value of any property (net of any liabilities assumed by the Company) contributed or deemed contributed to the Company by the Members pursuant to the terms of this Agreement.

"Capital Account" has the meaning forth in Section 3.2.

"Capital Contribution" means any amount of Capital contributed to the Company by a Member pursuant to the terms of this Agreement.  Any reference to the Capital Contributions of a Member will include the Capital Contributions made by a predecessor holder of the Units of such Member.

"Certificate" has the meaning set forth in Section 1.1.

"Class A Members" means FT SOF V, FT SOF VII, FT SOF IV, Crestline, DMS any other Person acquiring Class A Units, and admitted to the Company as a Class A Member, after the Effective Date in accordance with the terms of this Agreement, in each case in such Person's capacity as a holder of Class A Units.

4

"Class A Units" means Interests in the Company designated as Class A Units and entitled to distributions as more particularly set forth in this Agreement, and all securities into or for which such Class A Units may be converted, reclassified or exchanged.

"Class B Member" means any Person to whom Class B Units are issued on or after the Effective Date in accordance with the terms of this Agreement, in each case in such Person's capacity as a holder of Class B Units.

"Class B Units" means Interests in the Company designated as Class B Units and entitled to distributions as more particularly set forth in this Agreement, and all securities into or for which such Class B Units may be converted, reclassified or exchanged.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any comparable successor statute or statutes.

"Company" has the meaning set forth in the Preamble.

"Company Law" has the meaning set forth in Section 1.1.

"Company Minimum Gain" has the same meaning as "partnership minimum gain" set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Company Sale Value" means the amount that the Company would receive in an all cash sale of all of the Company's assets and businesses as a going concern (free and clear of all Liens and after payment of indebtedness for borrowed money) in an arm's length transaction with an unaffiliated third-party consummated immediately preceding the event giving rise to the determination of the Company Sale Value (assuming that all of the proceeds of such sale were paid directly to the Company).

"Compensatory Interests" has the meaning set forth in Section 4.1(h).

"Control", "Controlling" or "Controlled" means, as to a specified Person, the beneficial ownership, directly or indirectly, of more than 50% of the voting power of the outstanding Voting Interests of such Person or the power or authority, by contract or otherwise, to direct the management, activities or policies of such Entity.

"Covered Person" has the meaning set forth in Section 8.1.

"Current Market Value" when used with reference to any capital stock or other security on any date means: (i) if the capital stock or security is then listed or admitted to trading on a national securities exchange, is quoted on the OTC Bulletin Board or is quoted on any other interdealer quotation system or regularly quoted by member firms of the Financial Industry Regulatory Authority, the volume weighted average of the Trading Prices of such security on the date of determination (if a trading day) and on each of the five (5) trading days immediately preceding, and on each of the five (5) trading days immediately following, the date of the determination (any such capital stock or security so listed, traded or quoted being referred to as "Publicly Traded") or (ii) if the capital stock or security is not Publicly Traded, the Fair Market Value of such capital stock or security.

"Crestline" has the meaning set forth in the Preamble.

5

"Crestline Manager" has the meaning set forth in Section 5.2(a)(ii).

"Depletable Property" means each separate oil and gas property as defined in Section 614 of the Code owned from time to time by the Company as a result of a Capital Contribution, acquisition or otherwise.

"Depreciation" means, for each Allocation Period or other period, an amount equal to the depreciation, amortization or other cost recovery deduction (other than Simulated Depletion) allowable for U.S. federal income tax purposes with respect to an asset for such Allocation Period or other period, except that (a) with respect to any property the Gross Asset Value of which differs from its adjusted tax basis for U.S. federal income tax purposes and which difference is being eliminated by use of the "remedial method" pursuant to Treasury Regulations Section 1.704-3(d), Depreciation for such Allocation Period or other period will be the amount of book basis recovered for such Allocation Period or other period under the rules prescribed by Treasury Regulations Section 1.704–3(d)(2) and (b) with respect to any other property the Gross Asset Value of which differs from its adjusted basis for U.S. federal income tax purposes at the beginning of such Allocation Period or other period, Depreciation for such Allocation Period or other period will be an amount that bears the same ratio to such beginning Gross Asset Value as the U.S. federal income tax depreciation, amortization or other cost recovery deduction for such Allocation Period or other period bears to such beginning adjusted tax basis. Notwithstanding the foregoing, if the U.S. federal income tax depreciation, amortization or other cost recovery deduction for such Allocation Period or other period is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Members.

"Dispose" (including the correlative terms "Disposed" or "Disposition") means any sale, assignment, transfer, conveyance, gift, pledge, distribution, hypothecation or other encumbrance or any other disposition, whether voluntary, involuntary or by merger or operation of law, and whether effected directly or indirectly.

"Disposing Member" has the meaning set forth in Section 6.3(a).

"Distribution Threshold" has the meaning set forth in Section 4.1(i).

"DMS" has the meaning set forth in the Preamble.

"DMS Settlement" means the terms as set forth in the letter of intent dated September 21, 2016, among Emerald Oil, Inc., DMS and the Lenders.

"Drag Along Disposing Member" has the meaning set forth in Section 6.4(a).

"Drag Along Notice" has the meaning set forth in Section 6.4(b).

"Drag Along Participant" has the meaning set forth in Section 6.4(a).

"Drag-Along Sale" has the meaning set forth in Section 6.4(a).

"Effective Date" has the meaning set forth in the Preamble.

WEIL:\95894375\17\39110.0004

"Electronic Transmission" means a form of communication that (i) does not directly involve the physical transmission of paper, (ii) creates a record that may be retained, retrieved, and reviewed by the recipient, and (iii) may be directly reproduced in paper form by the recipient through an automated process.

"Emerald Debt" shall have the meaning assigned to the term "Credit Agreement Indebtedness" in the Asset Purchase Agreement.

"Emergency Expenditures" means expenditures which are reasonably necessary to be expended in order to mitigate or remedy the endangerment of property, the health or safety of any Person or the environment.

"Entity" means any corporation, limited liability company, general partnership, limited partnership, venture, trust, business trust, unincorporated association, estate or other entity.

"Equity Interest" means, with respect to any Person, any and all shares, interests, participations or other equivalents, including (i) if such Person is a limited liability company, membership interests (however designated, whether voting or nonvoting) in such limited liability company and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such limited liability company, (ii) Preferred Stock and (iii) if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether such shares, interests, participations or other equivalents are outstanding on the Effective Date or issued after the Effective Date, but excluding debt securities convertible or exchangeable into such equity, unless and until such instruments are so converted or exchanged.

"Exempt Equity Interests" has the meaning set forth in the definition of Oil and Gas Business.

"Fair Market Value" means the fair market value as determined in good faith by the Board, subject to Section 5.7(b). In determining the Fair Market Value of any non-cash property, all factors which the Board determines might reasonably affect such value shall be taken into account; provided, however, that (i) the Fair Market Value of any non-cash property that consists of Publicly Traded securities or similar instruments shall be the Current Market Value thereof, determined by reference to a record date which shall be fixed by the Board as of a date not less than five (5) trading days before and no more than ten (10) trading days before the proposed action requiring a determination of Fair Market Value of any such non-cash property and (ii) in no event shall any non-cash property be valued at less than the price at which the Company can require a third Person to buy the non-cash property, taking into account the creditworthiness of the Person with such purchase obligation, the availability of any collateral for the obligation, and other factors that the Board deems appropriate. The Fair Market Value shall be determined without reduction based upon any lack of control, minority ownership, marketability or other similar discounts.

"Fir Tree" has the meaning set forth in the Preamble. For purposes of this Agreement, whenever an action is to be taken by, or a consent is required of, Fir Tree, such action will be deemed taken, or consent will be deemed given, if the Fir Tree Members holding a majority of the Class A Units held by all Fir Tree Members take such action or give such consent.

7

"Fir Tree Manager" has the meaning set forth in Section 5.2(a)(i).

"GAAP" means United States generally accepted accounting principles and practices, consistently applied, which are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor).

"Governmental Entity" means any court or tribunal in any jurisdiction (domestic or foreign) or any governmental or regulatory body, agency, department, commission, board, bureau or other authority or instrumentality (domestic or foreign).

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company is the gross fair market value of such asset as agreed upon between the Board and the contributing Member at the time of contribution.

(b)     The Gross Asset Value of all Company assets immediately prior to the occurrence of any event described in subparagraphs (i) through (v) below may be adjusted to equal their respective gross fair market values, as determined by the Board using such reasonable method of valuation as it may adopt, as of the following times:

(i)     the acquisition of an additional Interest in the Company by a new or existing Member in exchange for more than a *de minimis* Capital Contribution, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative Interests of the Members in the Company;

(ii)     the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for an Interest in the Company, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative Interests of the Members in the Company;

(iii)     the liquidation or dissolution of the Company within the meaning of Treasury Regulations Section 1.704–1(b)(2)(ii)(g);

(iv)     the grant of an Interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in his capacity as a Member, or by a new Member acting in his capacity as a Member or in anticipation of becoming a Member of the Company, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative Interests of the Members in the Company; and

(v)     at such other times as the Board may reasonably determine to be necessary or advisable in order to comply with Treasury Regulations Sections 1.704–1(b) and 1.704–2.

8

(c)    The Gross Asset Value of any Company asset distributed to a Member shall be the gross fair market value of such asset (taking Code Section 7701(g) into account) on the date of distribution.

(d)    The Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704–1(b)(2)(iv)(m), and subparagraph (f) of the definition of "Profits" and "Losses" or Section 4.1(b)(iv) hereof; provided, however, that Gross Asset Values will not be adjusted pursuant to this subparagraph (d) to the extent that an adjustment pursuant to subparagraph (b) above is made in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

(e)    If the Gross Asset Values of Company assets has been determined or adjusted pursuant to clauses (b) or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and for purposes of computing Simulated Depletion and other items allocated pursuant to Article IV.

"Guarantee Obligation" means, as to any person (the "guaranteeing person"), any obligation of (i) the guaranteeing person or (ii) another person (including any bank under any letter of credit), if to induce the creation of such obligation of such other person the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"Hydrocarbons" means oil, gas, condensate and/or other liquid or gaseous hydrocarbons or any combination thereof or products therefrom.

"Indebtedness" means, with respect to any person at any date, without duplication, all (i) indebtedness of such person for borrowed money; (ii) obligations of such person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such person's business); (iii) obligations of such person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such person; (vi)

9

obligations of such person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such person; (viii) Guarantee Obligations of such person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such person, whether or not such person has assumed or become liable for the payment of such obligation.

"Independent Accountant" means any independent accountant appointed pursuant to Section 5.7(a)(xxxi).

"Independent Appraiser" has the meaning set forth in Section 5.7(b).

"Initial Budget" has the meaning set forth in Section 5.11(a).

"Initiating Member" has the meaning set forth in Section 6.8(a).

"Interest" means any legal or beneficial interest in, or equity securities of, the Company (or any successor of the Company).

"IPO Exchange" has the meaning set forth in Section 6.6(f)(iv).

"IPO Securities" has the meaning set forth in Section 6.6(f)(iv).

"Issuance Notice" has the meaning set forth in Section 3.1(c).

"Joint Manager" has the meaning set forth in Section 5.2(a)(iii).

"Lenders" shall have the meaning assigned to such term in the Asset Purchase Agreement.

"Lien" means any mortgage, lien (statutory or other), other security agreement, arrangement or interest, hypothecation, pledge or other deposit arrangement, assignment, charge, levy, executory seizure, attachment, garnishment, encumbrance (including any easement, exception, reservation or limitation, right of way, and the like), conditional sale, title retention, voting agreement or other similar agreement, arrangement, device or restriction, preemptive or similar right, the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, or restriction on sale, transfer, assignment, disposition or other alienation, provided, however, that the term "Lien" shall not include any of the foregoing to the extent created by this Agreement.

"Liquidity Event" means any event wherein cash or cash equivalent proceeds to the Members on account of their respective Interests are generated outside the ordinary operation of the Company and/or its Subsidiaries in conjunction with (i) a Disposition of all or substantially all of the assets of the Company or any of its Subsidiaries, (ii) a Disposition by the Members of all of the equity of the Company (through a sale, merger or similar transaction) or any of its Subsidiaries, or (iii) a public offering of securities of the Company or any of its Subsidiaries or a contribution by the Company or any Subsidiaries of the Company of all or substantially all of its

WEIL:\95894375\17\39110.0004

assets to a limited partnership in a master limited partnership structure, in one or a series of related transactions and, in the case of (i) or (iii), the distribution by the Company to the Members of all or substantially all of the proceeds or residual publicly traded securities received or retained by the Company and its Subsidiaries pursuant to such transaction.

"Liquidity Event Notice" has the meaning set forth in Section 6.6(a).

"Management Agreement" means any management or services agreement pursuant to which certain rights and obligations of the Company may from time to time be delegated to an Asset Manager.

"Manager" or "Managers" has the meaning set forth in Section 5.1.

"Material Agreement" means any contract, agreement, document, instrument or series of related contracts, agreements, documents or instruments that (i) would obligate, or would reasonably be expected to obligate, the Company to (a) expend or commit to expend in excess of $100,000 or more or (b) transfer assets with a value of $100,000 or more, or (ii) which cannot be terminated by the Company upon notice of sixty (60) days or less without any liability.

"Member" or "Members" shall have the meaning set forth in the Preamble, and shall also include any Person (other than the Company) who hereafter acquires Units and is admitted as a member of the Company in accordance with this Agreement.

"Member Indemnitor" has the meaning set forth in Section 8.9.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" set forth in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i) with respect to "partner minimum gain."

"Member Related Parties" has the meaning set forth in Section 5.9(a).

"Non-Initiating Member" has the meaning set forth in Section 6.8(a).

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2).

"Observer" has the meaning set forth in Section 5.2(e).

"Offered Units" has the meaning set forth in Section 6.3(a).

"Oil and Gas Business" means owning, managing, acquiring, attempting to acquire, soliciting the acquisition of, operating, controlling or developing Oil and Gas Interests, or engaging in or being connected with, as a principal, owner, officer, director, employee,

WEIL:\95894375\17\39110.0004

shareholder, consultant, contractor, partner, member, joint venturer, agent, equity owner or in any other capacity whatsoever, any of the foregoing activities or any other Upstream Activities; provided, however, that in no event shall the ownership of Equity Interests of any Person, be considered (and shall be deemed not to be) within the scope of this definition if (a) neither the holder of such Equity Interests nor any of its Affiliates is an officer of or member of the board of such Person and otherwise has no role or involvement in the conduct of the business of such Person other than any voting rights associated with such Equity Interest and (b) such Equity Interests do not represent beneficial ownership of five percent (5%) or greater of the issued and outstanding Equity Interests of such Person ((a) and (b), collectively, "Exempt Equity Interests").

"Oil and Gas Interests" means: (a) interests in and rights with respect to Hydrocarbons (including revenues or net revenues therefrom) of any kind and nature including without limitation working, royalty and overriding royalty interests, mineral interests, leasehold interests, production payments, operating rights, net profits interests, other non-working interests and non-operating interests; (b) contracts or agreements relating to or for the acquisition of any of the foregoing; (c) easements, rights of way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the operation of any of the foregoing; and (d) interests in equipment and machinery (including well equipment and machinery), oil and gas production, gathering, transmission, compression, treating, processing and storage facilities (including tanks, tank batteries, pipelines and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing; provided, however, that in no event shall Exempt Equity Interests be considered (and shall be deemed not to constitute) "Oil and Gas Interests" for the purposes of this Agreement.

"Option Period" has the meaning set forth in Section 6.2(a).

"Other Investments" has the meaning set forth in Section 5.9(a)(i).

"Percentage Interest" means the number of the Class A Units held by such Class A Member divided by the number of Class A Units outstanding, expressed as a percentage, as described on Schedule I attached hereto and made a part hereof, as such percentage may fluctuate from time to time as a result of additional contributions made by a Member in accordance with this Agreement pursuant to Section 3.1 and Section 3.3.

"Permitted Transferee" means (i) as to Fir Tree, Fir Tree or any Affiliate of Fir Tree, (iii) as to Crestline, Crestline or any Affiliate of Crestline and (iii) as to any other Member, any Affiliate of such Member.

"Person" means any individual person or Entity.

"Preemptive Right" has the meaning set forth in Section 3.1(c).

"Preemptive Units" has the meaning set forth in Section 3.1(c).

"Preferred Stock" means, with respect to any person, any and all Equity Interests (however designated) of such person whether now outstanding or issued after the Effective Date with a preference over another class or series of Equity Interests of such person with respect to the payment of dividends or upon liquidation.

WEIL:\95894375\17\39110.0004

"Proceedings" means all proceedings, actions, claims, suits, investigations and inquiries by or before any arbitrator or Governmental Entity.

"Profits" and "Losses" means, for each Allocation Period or other period, an amount equal to the Company's taxable income or loss for such Allocation Period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, deduction or credit required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

(a)     any income of the Company that is exempt from U.S. federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of Profits and Losses will increase the amount of such income and/or decrease the amount of such loss;

(b)     any expenditure of the Company described in Code Section 705(a)(2)(B) or treated as a Code Section 705(a)(2)(B) expenditure pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of Profits and Losses, will decrease the amount of such income and/or increase the amount of such loss;

(c)     gain or loss resulting from any disposition of any Company assets (other than Depletable Property) where such gain or loss is recognized for U.S. federal income tax purposes will be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(d)     gain resulting from any disposition of a Depletable Property shall be treated as being equal to the corresponding Simulated Gain;

(e)     in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such income or loss, Depreciation will be taken into account for such Allocation Period or other period;

(f)     to the extent an adjustment to the adjusted tax basis of any asset included in Company assets pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and will be taken into account for the purposes of computing Profits and Losses;

(g)     if the Gross Asset Value of any Company asset is adjusted in accordance with subparagraph (b) or subparagraph (c) of the definition of "Gross Asset Value" above, the amount of such adjustment will be taken into account in the Allocation Period of such adjustment as gain or loss from the disposition of such asset for purposes of computing Profits or Losses; and

13

(h)    notwithstanding any other provision of this definition of Profits and Losses, any items that are specially allocated pursuant to Section 4.1(b) hereof will not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 4.1(b) hereof will be determined by applying rules analogous to those set forth in this definition of Profits and Losses.

"Proposed Budget" has the meaning set forth in Section 5.11(c).

"Prudent Industry Practices" means, at a particular time, any of the practices, methods, standards of care, skill, safety and diligence, as the same may change from time to time, but applied in light of the facts known at the time, that are consistent with the general standards applied or utilized under comparable circumstances by a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good upstream industry practice.

"Publicly Traded" has the meaning set forth in the definition of Current Market Value.

"Public Offering" means the sale in a firm underwritten public offering registered under the Securities Act of any class of equity securities of the Company (or any successor thereto).

"Qualified Appraiser" means an investment bank or appraisal firm with experience in valuing businesses or non–public securities in the upstream oil and gas industry or non-cash property that is the subject of appraisal hereunder, as applicable, with no material engagement with the parties engaged in the dispute giving rise to the engagement of such investment bank or appraisal firm or any of their Affiliates in the prior two (2) years.

"Qualified Member" means any Member that owns at least one percent (1%) of the Class A Units; provided, that if a Member's Percentage Interest drops below one percent (1%) as a result of dilution, such Member shall not lose its status as a Qualified Member.

"Required Representations" has the meaning set forth in Section 6.4(b).

"ROFO Add-On Terms" has the meaning set forth in Section 6.3(a).

"ROFO Offer" has the meaning set forth in Section 6.3(a).

"ROFR Notice" has the meaning set forth in Section 6.2(a).

"Sale Notice" has the meaning set forth in Section 6.3(a).

"Securities Act" means the Securities Act of 1933, as amended.

"Selling Member" has the meaning set forth in Section 6.2(a).

"Simulated Basis" means the Gross Asset Value of any Depletable Property. The Simulated Basis of each Depletable Property shall be allocated to each Member in accordance with such Member's Percentage Interest as of the time such Depletable Property is contributed to or acquired by the Company (and any additions to such Simulated Basis resulting from

14

expenditures required to be capitalized in such Simulated Basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such Simulated Basis to be in accordance with their Percentage Interest as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Percentage Interest as determined immediately following the occurrence of an event giving rise to an adjustment to the Gross Asset Values of the Company's Depletable Properties pursuant to clause (b) of the definition of Gross Asset Value.

"Simulated Depletion" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis) and in the manner specified in Treasury Regulation Section 1.704-1(b)(2)(iv)(k)(2). For purposes of computing Simulated Depletion with respect to any Depletable Property, the Simulated Basis of such property shall be deemed to be the Gross Asset Value of such property, and in no event shall such allowance, in the aggregate, exceed such Simulated Basis. For purposes of computing Simulated Depletion, the Board will apply on a property-by-property basis the simulated percentage depletion method or the simulated cost depletion method, as determined by the Board, under Treasury Regulation Section 1.704-1(b)(2)(iv)(k)(2).

"Simulated Gain" or "Simulated Loss" means the simulated gain or simulated loss computed by the Company with respect to each amount of gain or loss realized from the sale or other disposition of Depletable Property as calculated in Treasury Regulation Section 1.704-1(b)(2)(iv)(k)(2).

"Sponsor Blocker" has the meaning set forth in Section 6.6(f)(v).

"Subsidiary" means, with respect to any specified Entity, any corporation, association, partnership or other business entity (a) which is Controlled by such Entity and (b) the outstanding equity securities of which entitled to more than 50% of the distributions therefrom are held, directly or indirectly, by such Entity.

"Supermajority of the Voting Power" has the meaning set forth in Section 5.2(b).

"Tag-Along Disposing Member" has the meaning set forth in Section 6.5(a).

"Tag-Along Notice" has the meaning set forth in Section 6.5(b).

"Tag-Along Partial Sale" has the meaning set forth in Section 6.5(d).

"Tag-Along Participant" has the meaning set forth in Section 6.5(a).

"Tag-Along Sale" has the meaning set forth in Section 6.5(a).

"Tax Matters Representative" has the meaning set forth in Section 7.6(a).

"Tax Year" has the meaning set forth in Section 1.9.

"Third Party Sale" has the meaning set forth in Section 6.8(e)(ii).

15

"Trading Price" means, for any trading day, the last reported sale price (regular way) or, in case no such reported sale takes place on such day, the average of the closing bid and asked prices (regular way) for such day, in each case, (i) on the principal national securities exchange on which the shares of such capital stock are listed, (ii) if (i) does not apply, as quoted on the OTC Bulletin Board, (iii) if (i) and (ii) do not apply, as reported or quoted on any other interdealer quotation system, including the Pink Sheets, on which such capital stock or security is then traded or quoted or (iv) if (i) through (iii) do not apply, as otherwise reported by any member firm of the National Association of Securities Dealers, Inc. selected by the Board.

"Transferring Persons" has the meaning set forth in Section 6.4(b).

"Treasury Regulations" means Income Tax Regulations promulgated under the Code, as amended from time to time.

"Unit Certificate" has the meaning set forth in Section 3.5(a).

"Units" means the Class A Units and, if any Class B Units shall have been issued and remain outstanding, the Class B Units.

"Upstream Activities" means the exploration, drilling and production of Hydrocarbons and the ownership, acquisition, disposition, operation, maintenance, expansion, construction, commissioning and decommissioning of assets directly related thereto.

"Upstream Assets" means assets of the type used in the operation of any Oil & Gas Business.

"Voting Interests" means, as to a specified Person: (i) in the case of a corporation, the outstanding securities thereof entitled to vote on the election of directors; (ii) in the case of a limited partnership, the general partnership interests therein; (iii) in the case of a limited liability company, partnership or venture, the securities or interests therein entitled to manage or elect the managers or other governing body of such Person; (iv) in the case of a trust or estate, the interest therein entitled to appoint or elect the trustee or similar governing body thereof; and (v) in the case of any other Person, the interest therein entitled to elect the governing body of such Person or otherwise exercise the power to direct or cause the direction of the management and policies of such Person.

Section 2.2.   Other Defined Terms.   Other terms are defined in the text of this Agreement and unless expressly limited, have the meanings given whenever used in this Agreement.

Section 2.3.   References and Construction.

(a)   All references in this Agreement to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.

(b)   Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.

16

(c)     The words "this Agreement," "this instrument," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

(d)     Words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

(e)     Pronouns in masculine, feminine, or neuter gender shall be construed to state and include any other gender.

(f)     Examples shall not be construed to limit, expressly or by implication, the matter they illustrate.

(g)     The word "or" is not exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions.

(h)     No consideration shall be given to the fact or presumption that one party had a greater or lesser role in drafting this Agreement.

(i)     All references in this Agreement to "$" or "dollars" shall refer to U.S. Dollars.

(j)     Unless the context otherwise requires or unless otherwise provided in this Agreement, the terms defined in this Agreement which refer to a particular agreement, instrument or document shall also refer to and include all renewals, extensions, modifications, amendments or restatements of such agreement, instrument or document, provided that nothing contained in this subsection shall be construed to authorize such renewal, extension, modification, amendment or restatement.

(k)     Each Schedule and Exhibit is incorporated in this Agreement by reference and made a part of this Agreement for all purposes, and references to this Agreement shall also include such Schedule and Exhibit, unless the context in which used shall otherwise require.

## ARTICLE III
## CAPITALIZATION

Section 3.1.    Capital Contributions.

(a)     Initial Contributions. As of the Effective Date, each Member shall contribute, or has contributed, or shall be deemed to have contributed the amount of Capital Contributions set forth opposite such Member's name on Schedule I, in exchange for the number of Class A Units set forth opposite such Member's name on Schedule I. The initial Capital Contribution of each of Fir Tree and Crestline pursuant to this Section 3.1 consists of an amount of cash and the Gross Asset Value of the Emerald Debt contributed (or deemed contributed) by such Member as set forth opposite each such Member's name on Schedule I, and the initial Capital Contribution of DMS pursuant to this Section 3.1 consists of the Gross Asset Value of the consideration provided by DMS to the Company pursuant to the DMS Settlement which shall be deemed the amount set forth opposite DMS' name on Schedule I.

17

(b)  Additional Contributions. No Member shall be required to make any additional Capital Contributions to the Company. No Member shall be permitted to make any additional Capital Contribution to the Company unless approval is obtained pursuant to Section 5.7(a)(xi). Upon the receipt of any such Capital Contribution and in consideration of such additional Capital Contribution made by any Member pursuant to this Section 3.1(b), and subject to the preemptive rights provided for in Section 3.1(c), there shall be issued to such Member a number of Class A Units equal to the quotient of (x) the amount of such Capital Contribution, divided by (y) the Fair Market Value of a Class A Unit, as determined by the Board, subject to Section 5.7(b) (provided that for any additional Capital Contribution made on or prior to the six-month anniversary of the Effective Date, the Fair Market Value of a Class A Unit shall be deemed to be $1,000 for purposes of this clause "(y)").

(c)  Preemptive Rights. In the event that the Board determines to issue additional Class A Units (such additional Class A Units, the "Preemptive Units") to any Member in exchange for an additional Capital Contribution pursuant to Section 3.1(b), the Board shall provide written notice (an "Issuance Notice") to each other Class A Member at least twenty (20) Business Days prior to the date of such issuance. Each Class A Member shall have the right (a "Preemptive Right") to purchase up to such number of additional Class A Units equal to (i) such Class A Member's Percentage Interest *multiplied* by (ii) the number of Preemptive Units (rounded to the nearest whole number) to be issued. A Class A Member may exercise its rights (if any) under this Section 3.1(c) by delivering written notice of its election to purchase such Preemptive Units to the Board within fifteen (15) Business Days after receipt of the Issuance Notice. A delivery of such notice (which notice shall specify the number of Preemptive Units requested to be purchased by the Class A Member submitting such notice) by such Class A Member shall constitute a binding agreement of such Class A Member to purchase, at the price and on the terms and conditions specified in the Issuance Notice, the number of Preemptive Units specified in such Class A Member's notice. If, at the end of such fifteen (15) Business Day period, any Class A Member has not exercised its right to purchase any of its *pro rata* share of such Preemptive Units, such Class A Member shall be deemed to have waived all of its rights under this Section 3.1(c) with respect to, and only with respect to, the purchase of such Preemptive Units specified in the Issuance Notice, such Class A Member's Percentage Interest shall be decreased accordingly as a result of the issuance of the Preemptive Rights and the Preemptive Units not purchased by such member shall be offered to the other Members who purchased their full share of Preemptive Units in accordance with the procedures set forth above, *mutatis mutandis*.

(d)  No Capital Contribution to the Company may be required or permitted from any Person other than in accordance with this Section 3.1 and Section 3.3, and no Person shall be issued or granted any Class A Units or any other Interest by the Company other than as provided in this Section 3.1 and Section 3.3, without prior approval of the Board pursuant to Section 5.7(a)(xii).

(e)  Schedule I shall be amended upon the occurrence of any additional Capital Contributions to reflect such additional Capital Contributions, the issuance of Class A Units in exchange therefor and the Percentage Interest of each Class A Member after giving effect to such additional Capital Contributions.

Section 3.2.  Capital Accounts.  The Company will establish and maintain a capital account for each Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv) (a

18

"Capital Account").  Each Capital Account shall be adjusted to reflect such Member's share of allocations of Profits and Losses and distributions as provided in ARTICLE IV of this Agreement, and any additional Capital Contributions to the Company or withdrawals of capital from the Company, including, in such adjustments, the consequences of liabilities assumed, or which are secured by property contributed or distributed, and taking into account Code Section 752(c) and any other applicable provision of the Code and related Treasury Regulations.  Such Capital Account maintenance provisions, together with the other provisions of this Agreement are intended to and shall further be interpreted and adjusted to comply with the Treasury Regulations under Code Section 704(b), and in particular with Treasury Regulations Section 1.704-1(b), as determined in good faith by the Board.  Members will have no obligation to restore any negative balance in their respective Capital Account at any time during the term of the Company or upon dissolution and liquidation.  Except as otherwise provided in the Treasury Regulations, a transferee of all or a portion of a Member's Units shall succeed to the Capital Account of the transferor to the extent allocable to the transferred Units; provided, however, that in the event a Member Disposes of Units that do not constitute all of such Member's Units, prior to consummating such Disposition, such Member shall notify the Company of which Units are being transferred by such Member (including any Capital Contributions and distributions previously made in respect of such Units), and the transferee of such Units shall succeed to the portion of the Capital Account and characteristics associated with such Units.

Section 3.3.    Additional Issuances of Interests.  Subject to approval pursuant to Section 5.7(a)(xii), the Board is hereby authorized, at any time and from time to time, to cause the Company to issue Interests to Persons in one or more classes, or one or more series of any of such classes, with such designations, preferences and relative, participating, optional or other special rights, powers and duties all as shall be determined by the Board, including (a) the allocations of items of Company income, gain, loss, deduction and credit to each such class or series of Interests; (b) the right of each such class or series of Interests to receive (on a preferred basis) or otherwise share in Company distributions; (c) the rights of each such class or series of Interests upon dissolution and liquidation of the Company; (d) the price at and the terms and conditions on which such class or series of Interests may be redeemed by the Company, if such Interests are redeemable by the Company; (e) the rate at and the terms and conditions on which such class or series of Interests may be converted into any other class or series of Interests of the Company, if any class or series of Interests are issued with the privilege of conversion; and (f) the right of such class or series of Interests to vote on matters relating to the relative rights and preferences of such class.  Upon the issuance of any class or series of Interests pursuant to the preceding sentence which shall not be identical to the Units outstanding and held by the Members as of the Effective Date, a Supermajority of the Voting Power without the necessity of obtaining the consent at the time of any Member or other holder of Units, may amend any provision of this Agreement and may add any new provision to this Agreement, and cause the Company to execute, swear to, acknowledge, deliver, file and record an amended Certificate and whatever other documents may be required in connection therewith, as shall be necessary or desirable to reflect the issuance of such class or series of Interests and the relative rights and preferences of such class or series of Interests as to the matters set forth in the preceding sentence.  The Board shall do all things necessary to comply with the Company Law and is authorized and directed to do all things it deems to be necessary or advisable in connection with any such future issuance to reflect the issuance of the Interests and the admission of any Member acquiring the Interests, including compliance with any statute, rule, regulation or guideline of any federal, state or other governmental agency or any securities exchange on which the Interests

19

or other such security is listed for trading.  At any time that the Company proposes to issue Interests to any Person pursuant to this Section 3.3, and any of Fir Tree, Crestline, Affiliates of Fir Tree or Crestline  or a combination of Fir Tree, Crestline or Affiliates of Fir tree or Crestline propose to purchase 25% or more of such Interests then DMS shall have the preemptive right to purchase its Percentage Interest share of such offered Interests proposed to be purchased by Fir Tree, Crestline, Affiliates of Fir Tree or Crestline  or a combination of Fir Tree, Crestline or Affiliates of Fir tree or Crestline share of such offered Interests.

Section 3.4.    Class B Members.

(a)    There is hereby established a separate class of Units designated as Class B Units, such class consisting solely of one thousand (1,000) Class B Units.

(b)    The Board may from time to time issue Class B Units upon approval pursuant to Section 5.7(a)(xii).

(c)    Class B Members shall have no obligation to make any Capital Contributions to the Company in exchange for or on account of the Class B Units.

(d)    Except as required by the Company Act, the Class B Units shall have no rights (including voting rights) other than the right to receive distributions allocated to the Class B Units in this Agreement.

(e)    Prior to the issuance of any Class B Units, the amount and priority of distributions allocated to the Class B Units shall be reflected in an amendment to this Agreement, which amendment shall be approved by the Board pursuant to Section 5.2 and made in accordance with Section 11.7.

Section 3.5.    Unit Certificates.

(a)    The Units initially shall be uncertificated, provided that the Board may, in its sole discretion, elect to cause the Company to evidence ownership of Units by issuing a certificate (each, a "Unit Certificate") executed by appropriate officers of the Company certifying the number of Units owned by each Member.

(b)    Notwithstanding anything to the contrary contained in this Agreement, in order to effect a valid Disposition of Units for which a Unit Certificate has been issued, prior to the effectiveness of such Disposition, the transferring Member, as applicable, shall surrender the subject Unit Certificate to the Company together with a transfer power duly executed by the transferring Member, as applicable, with the transferring Member's signature thereon guaranteed by a medallion stamp upon the Board's request.  Upon such compliance, surrender and delivery, the Company shall execute and deliver a new Unit Certificate in the name of the assignee(s) and in the denominations specified in the Disposition documentation, and shall issue to the transferring Member, as applicable, a new Unit Certificate evidencing the portion of the surrendered Unit Certificate, if any, not so Disposed, and the surrendered Unit Certificate shall promptly be cancelled.

(c)    The Company shall issue a new Unit Certificate in place of any Unit Certificate theretofore issued by it that is alleged to have been lost, stolen or destroyed, provided

WEIL:\95894375\17\39110.0004

that as a condition precedent thereto the Board may in its discretion require the Member that is the record owner of any allegedly lost, stolen or destroyed Unit Certificate to deliver to the Company a duly executed affidavit of loss and an agreement and/or a bond sufficient to indemnify the Company against any adverse claim in connection with the issue of a new Unit Certificate.

(d)     Notwithstanding anything to the contrary contained in this Agreement, the Board and the Company shall be entitled to rely exclusively on record ownership of Units for which a Unit Certificate has been issued as evidenced by outstanding Unit Certificates and the Company's records thereof.  The Company shall treat the record owner of a Unit Certificate as the holder of the Units evidenced thereby unless and until such Units have been Disposed of in accordance with this Agreement.

### ARTICLE IV
### ALLOCATIONS AND DISTRIBUTIONS

Section 4.1.    Allocations. General Application. The rules set forth below in this Section 4.1 shall apply for the purposes of determining each Member's general allocable share of the items of income, gain, loss or expense of the Company comprising Profits or Losses of the Company for each Tax Year, determining special allocations of other items of income, gain, loss and expense, and adjusting the balance of each Member's Capital Account to reflect the aforementioned general and special allocations.  For each Tax Year, the special allocations in Section 4.1(b) shall be made immediately prior to the general allocations of Section 4.1(a).

(a)     General Allocations.

(i)     Allocations for a Tax Year.  The items of income, expense, gain and loss of the Company comprising Profits or Losses of the Company for a Tax Year shall be allocated among the Persons who were Members during such Tax Year in a manner that will, as nearly as possible, cause the Capital Account balance of each Member at the end of such Tax Year to equal the excess (which may be negative) of:

(A)     the hypothetical distribution (if any) that such Member would receive if, on the last day of the Tax Year: (x) all Company assets, including cash, were sold for cash equal to their Gross Asset Values, taking into account any adjustments thereto for such Tax Year; (y) all Company liabilities were satisfied in cash according to their terms (limited, with respect to each Nonrecourse Liability, to the Gross Asset Value of the assets securing such liability); and (z) the net proceeds thereof (after satisfaction of such liabilities) were distributed in full pursuant to Section 4.2(a); over

(B)     the sum of: (x) the amount, if any, which such Member is obligated to contribute to the capital of the Company; and (y) such Member's share of the Company Minimum Gain determined pursuant to Treasury Regulations Section 1.704-2(g), and (z) such Member's share of Member Nonrecourse Debt Minimum Gain determined pursuant to

21

WEIL:\95894375\17\39110.0004

Treasury Regulations Section 1.704-2(i)(5), all computed immediately prior to the hypothetical sale described in Section 4.1(a)(i)(A).

(ii)     Loss Limitation.  Notwithstanding anything to the contrary in this Section 4.1, the amount of items of Company expense and loss, Simulated Depletion or Simulated Losses allocated pursuant to this Section 4.1 to any Member shall not exceed the maximum amount of such items that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any fiscal year.  All such items in excess of the limitation set forth in this Section 4.1 shall be allocated first, to Members who would not have an Adjusted Capital Account Deficit, pro rata, in proportion to their Capital Account balances, adjusted as provided in clauses (i) and (ii) of the definition of Adjusted Capital Account Deficit, until no Member would be entitled to any further allocation, and thereafter, to all Members, pro rata, in proportion to their Percentage Interests.

(b)     Special Allocations. The following special allocations shall be made in the following order:

(i)     Minimum Gain Chargeback.  In the event that there is a net decrease during a Tax Year in either Company Minimum Gain or Member Nonrecourse Debt Minimum Gain, then notwithstanding any other provision of this Section 4.1, each Member shall receive such special allocations of items of Company income and gain as are required in order to conform to Treasury Regulations Section 1.704-2.

(ii)     Qualified Income Offset.  Subject to Section 4.1(b)(i), but notwithstanding any other provision of this Section 4.1, items of income and gain shall be specially allocated to the Members in a manner that complies with the "qualified income offset" requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3).

(iii)     Deficit Capital Accounts Generally.  In the event that a Member has a deficit Capital Account balance at the end of any Tax Year which is in excess of the sum of: (i) the amount such Member is then obligated to restore pursuant to this Agreement; and (ii) the amount such Member is then deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), respectively, such Member shall be specially allocated items of Company income and gain and Simulated Gain in an amount of such excess as quickly as possible, provided that any allocation under this Section 4.1(b)(iii) shall be made only if and to the extent that a Member would have a deficit Capital Account balance in excess of such sum after all allocations provided for in this Section 4.1 have been tentatively made as if this Section 4.1(b)(iii) were not in this Agreement.

(iv)     Deductions Attributable to Member Nonrecourse Debt.  Any item of Company loss or expense that is attributable to Member Nonrecourse Debt shall be specially allocated to the Members in the manner in which they share the

22

economic risk of loss (as defined in Treasury Regulations Section 1.752-2) for such Member Nonrecourse Debt.

(v)     Allocation of Nonrecourse Deductions. Each Nonrecourse Deduction of the Company shall be specially allocated among the Members pro rata to their relative ownership of Class A Units.

(vi)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(vii)     The allocations pursuant to Section 4.1(b)(i), (ii) and (iii) shall be comprised of a proportionate share of each of the Company's items of income or gain.

(viii)     Simulated Depletion, Simulated Loss. Simulated Depletion for each Depletable Property, and Simulated Loss upon disposition of Depletable Property, shall be allocated among the Members in proportion to their shares of Simulated Basis in such property.

(c)     Allocation of Nonrecourse Liabilities. For purposes of determining each Member's share of Nonrecourse Liabilities, if any, of the Company in accordance with Treasury Regulations Section 1.752-3(a)(3), the Members' interests in Company profits shall be determined in the same manner as prescribed by Section 4.1(b)(v).

(d)     Other Allocation Rules.

(i)     Tax Allocations; Other Allocation Rules.

(A)     Tax Allocations.

(1)     Tax allocations of each item of income, gain, loss, or deduction of the Company for U.S. federal income tax purposes for each Tax Year or other accounting period of the Company shall be made consistent with and in the same proportion as the corresponding allocations of such items of income, gain, loss or deduction that are made pursuant to Section 4.1(a) and Section 4.1(b) for such year or period.

23

(2)    Notwithstanding the foregoing, solely for tax purposes, items of income, expense, gain and loss with respect to Company assets reflected hereunder in the Members' Capital Accounts and on the books of the Company at values that differ from the Company's adjusted tax basis in such assets shall be allocated among the Members so as to take account of those differences in a manner which will comply with Code Sections 704(b) and 704(c) and the Treasury Regulations promulgated thereunder, and the Company shall, at the discretion of the Board, make, or not make, "curative" or "remedial" allocations (within the meaning of the Treasury Regulations Section 1.704-3).

(B)    For any Allocation Period or other period during which any part of any Interest in the Company is transferred between the Members or to another Person (other than by pledge of, or grant of a security interest in, such Interest), the portion of the Profits, Losses and other items of income, gain, loss, deduction and credit that are allocable with respect to such part of an Interest in the Company will be apportioned between the transferor and the transferee under any method allowed pursuant to Code Section 706 and the applicable Treasury Regulations as determined by the Board.

(C)    Credits.  All tax credits of the Company for a fiscal year or other accounting period (or portion thereof, if appropriate) shall be allocated among the Members in accordance with their interests in such items in a manner reasonably determined by the Tax Matters Representative, consistent with applicable law.

(e)    Income Tax Allocations with respect to Depletable Properties.

(i)    Pursuant to Section 613A(c)(7)(D) of the Code and the Treasury Regulations promulgated thereunder, cost and percentage depletion deductions with respect to any Depletable Property shall be computed separately by the Members rather than the Company. For purposes of such computations, the U.S. federal income tax basis of each Depletable Property shall be allocated to each Member in accordance with such Member's Percentage Interest as of the time such Depletable Property is contributed to or acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their respective Percentage Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' respective Percentage Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Gross Asset Values of the Company's Depletable Properties pursuant to clause (b) of the definition of Gross Asset Value.

(ii)    For purposes of the separate computation of gain or loss by each Member on the taxable disposition of Depletable Property, the amount realized

24

from such disposition shall be allocated (i) first, to the Members up to an amount equal to the Simulated Basis in such Depletable Property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gains.

(iii)    The allocations described in clauses (i) and (ii) of this Section 4.1(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) of the Code; provided that the Company, upon approval of the Board (by a Supermajority of the Voting Power) may make special allocations of U.S. federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to Depletable Properties, in such manner as determined consistent with the principles outlined in Section 4.1(d)(i)(A)(2). The provisions of this Section 4.1(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704–1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(iv)    Each Member shall separately keep records of its share of the adjusted tax basis in each Depletable Property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition of such property by the Company. Upon the request of the Company, each Member shall advise the Company of its adjusted tax basis in each Depletable Property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection. The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto. The Company shall provide each Member with information reasonably requested by such Member to comply with this Section 4.1(e)(iv) and other tax reporting obligations.

(f)    Tax Withholding.  If withholding or other taxes are paid or required to be paid in respect of payments made to or by the Company, such payments or obligations shall be treated as follows:

(i)    If the Company (A) receives proceeds in respect of which a tax has been withheld, or (B) pays any tax in respect of any Member, the Company shall be treated as having received cash in an amount equal to the amount of such tax, and, for all purposes of this Agreement each Member shall be treated as having received a distribution under Section 4.2(a) equal to the portion of the tax allocable to such Member, as reasonably determined by the Tax Matters Representative.  In the event that the Company receives a refund of taxes previously withheld by a third party from one (1) or more payments to the Company, the economic benefit of such refund shall be apportioned among the Members in a manner reasonably determined by the Board to offset the prior operation of this Section 4.1(f) in respect of such withheld taxes.

25

(ii)    The Company is authorized to withhold from any payment made to, or any distributive share of, or pay in respect of, a Member any taxes required by law to be withheld or paid.  If the Company incurs a withholding tax obligation with respect to the share of income allocated to any Member, any amount which is: (a) actually withheld from a distribution that would otherwise have been made to such Member; and (b) paid over to the applicable taxing authority in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Member under Section 4.2(a).

(iii)    Taxes withheld pursuant to Section 4.1(f)(i) or (ii), but which exceed the amount, if any, of the distribution which would otherwise have been made to such Member, shall be treated as an interest-free advance to such Member.  Amounts treated as advanced to any Member pursuant to this Section 4.1(f)(iii) shall be repaid by such Member to the Company within thirty (30) days after the Board gives notice to such Member making demand therefor.  Any amounts so advanced and not timely repaid shall bear interest, commencing on the expiration of said 30 day period, compounded monthly on unpaid balances, at an annual rate equal to the Applicable Federal Rate as of such expiration date.  The Company shall collect any unpaid amounts from any Company distributions that would otherwise be made to such Member.

(iv)    The Company shall not be liable for any excess taxes withheld or paid in respect of any Member's Units, and, in the event of any such overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.  If the Company or any of its respective Affiliates, or any of their respective shareholders, partners, members, officers, directors, employees, managers and, as determined by the Board in its discretion, consultants or agents, becomes liable as a result of a failure to withhold and remit taxes in respect of any Member, then such Member shall, unless otherwise agreed by the Board in writing, to the fullest extent permitted by law, indemnify and hold harmless the Company or any of its respective Affiliates, or any of their respective shareholders, partners, members, officers, directors, employees, managers and, as determined by the Board in its discretion, consultants or agents, as the case may be, in respect of all taxes, including interest and penalties, and any expenses incurred in any examination, determination, resolution and payment of such liability.  The provisions contained in this Section 4.1(f) shall survive the termination of the Company, the termination of this Agreement and the Transfer of any Units.

(v)    Notwithstanding anything in this Section 4.1(f) hereof, any severance, production or similar taxes withheld from any payment to the Company or any directly or indirectly owned subsidiary of the Company shall not be deemed distributed to any Member or deemed to be a payment received by any Member for any purpose of this Agreement.

(g)    Publicly Traded Partnerships.  To ensure that Units are not traded on an established securities market within the meaning of Treasury Regulations Section 1.7704-1(b) or readily tradable on a secondary market or the substantial equivalent thereof within the meaning

26

of Treasury Regulations Section 1.7704-1(c), notwithstanding anything to the contrary contained in this Agreement:

(i)       Establishment of a Market.  The Company shall not participate in the establishment of any market or the inclusion of Units thereon; and

(ii)      Non-Recognition of Certain Market Transfers.  The Company shall not recognize any Transfer made on any market by: (x) redeeming any Units of a Member; or (y) admitting as a Member any transferee pursuant to a Transfer or otherwise recognizing any rights of any transferee, such as a right of such transferee to receive Company distributions (directly or indirectly) or to acquire an interest in the capital or profits of the Company.

(h)      Elections with Respect to Issuance of Certain Compensatory Equity Interests.  The Board shall have the right to amend this Agreement without the approval of any other Member upon publication of final regulations in the Federal Register (or other official pronouncement) to (i) direct and authorize the election of a safe harbor under proposed Treasury Regulations Section 1.83-3(l) (or any similar provision) under which the fair market value of a Company interest that is transferred in connection with the performance of services ("Compensatory Interests") is treated as being equal to the liquidation value of that interest, (ii) provide for an agreement by the Company and all of its Members to comply with all the requirements set forth in such regulations and Notice 2005-43 (and any other guidance provided by the IRS with respect to such election) with respect to all Company interests transferred in connection with the performance of services while the election remains effective, and (iii) provide for any other related amendments; provided, however, that (x) such amendment shall not adversely affect the interests of any Member without, in each case, the written consent of each Member so affected, it being understood that the Company's ability or inability to deduct any amounts with respect to any such Compensatory Interests will not constitute such an adverse effect, and (y) the Board provides a copy of such amendment to the Members at least ten (10) days prior to the effective date thereof.

(i)       Profits Interests.  The Company and each Class B Member agree to treat each Class B Unit as a separate "profits interest" within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343 as amplified by Rev. Proc. 2001-43, 2001-2 C.B. 191, and this Agreement shall be interpreted accordingly. Notwithstanding anything herein to the contrary, distributions to each holder of Class B Units pursuant to Section 4.2(a) hereof shall be limited to the extent necessary so that each Class B Unit qualifies as a "profits interest" under Rev. Proc. 93-27 (such limitation, "Distribution Threshold"), and this Agreement shall be interpreted accordingly. Additionally, in accordance with Rev. Proc. 2001-43, 2001-2 C.B. 191, the Company shall treat a holder of a Class B Unit as the owner of such Class B Unit from the date it is granted, and shall file its IRS Form 1065, and issue appropriate Schedule K-1s to such holder of Class B Units, allocating to such holder of Class B Units its distributive share of all items of income, gain, loss, deduction and credit associated with such Class B Unit as if it were fully vested. Each holder of Class B Units agrees to take into account such distributive share in computing its U.S. federal income tax liability for the entire period during which it holds the Class B Unit. The Company and each holder of Class B Units agree not to claim a deduction (as wages, compensation or otherwise) for the Fair Market Value of such Class B Unit issued to such holder of Class B Units, either at the time of grant of the Class B Unit or at the time the Class B Unit becomes substantially vested, if applicable. The undertakings contained in this Section 4.1(i) shall be construed in accordance

27

with Section 4 of Rev. Proc. 2001-43. The provisions of this Section 4.1(i) shall apply regardless of whether or not the holder of a Class B Unit files an election pursuant to Code Section 83(b).

Section 4.2.    Distributions.

(a)    Distributions from the Company will be made from Available Cash or in accordance with Section 4.2(e) at any time, and from time to time, as determined by the Board by a Supermajority of the Voting Power.

(b)    At any time there shall be no Class B Units outstanding, distributions shall be made to the holders of Class A Units *pro rata* based on their respective Percentage Interests.

(c)    At any time there shall be Class B Units outstanding, distributions shall be as reflected in an amendment to this Agreement, which amendment shall be approved by the Board pursuant to Section 5.2 and made in accordance with Section 11.7; provided that all Class A Units shall be treated in a proportionate manner relative to the allocation of distributions among the Class A Units and the Class B Units and amounts allocated to the Class A Units shall be allocated among the holders of Class A Units based on their relative Percentage Interests.

For the avoidance of doubt, no distributions will be made under this Agreement other than distributions made pursuant to Section 4.2 and Section 4.3 (as modified by ARTICLE VI, as applicable).

(d)    Any distributions pursuant to this Section 4.2 made in error or in violation of Section 18-607(a) of the Company Law, will, upon demand by the Board, be returned to the Company.

(a)    Cash and Non-Cash Distributions.

(i)    Subject to Section 4.2(e)(ii), if any distribution consists of both cash and non–cash property, then unless otherwise determined by a Supermajority of Voting Power the cash and non–cash property shall be distributed on a pro rata basis such that the total amount of property distributed on account of each Unit shall contain the same percentage of cash and the same percentage of non–cash property (based on the Fair Market Value of such non–cash property), and, to the extent the non–cash Distributable Property shall consist of more than one item of non–cash property, the Board shall, to the extent practicable, allocate to each Unit receiving a distribution the same percentage (as a percentage of the total value of cash and non–cash property distributed) of each item or type of non–cash property.

(ii)    If any distribution consists of both cash and non–cash property and such distribution is allocated among more than one class of Units, then the cash and non–cash property shall be distributed on a pro rata basis such that the total amount of property distributed to each class of Units receiving a distribution shall contain the same percentage of cash and the same percentage of non–cash property (based on the Fair Market Value of such non–cash property), and, to the

28

extent the non–cash Distributable Property shall consist of more than one item of non–cash property, the Board shall, to the extent practicable, allocate to each class of Units receiving a distribution the same percentage (as a percentage of the total value of cash and non–cash property distributed) of each item or type of non–cash property.

(iii)   The amount of any non-cash property to be distributed in accordance with Section 4.2(a) shall be its Fair Market Value.

Section 4.3.   Tax Distributions.

(a)   Subject to the Company Law, within thirty (30) days after the end of each calendar quarter, the Board may, in its sole discretion, cause the Company to make a distribution and, in any event, before April 15th of each year, the Board shall cause the Company to make a distribution, to the extent of Available Cash, to the Members in amounts sufficient to enable the Members to discharge any U.S. federal, state and local tax liability arising as a result of the allocation of income or gain pursuant to this Agreement, determined by assuming the applicability of the highest combined U.S. federal, state and local income tax rates (including for this purpose any tax under Code Section 1411 or similar provisions of law) applicable to an individual or corporation (whichever is higher) resident in New York, New York.   The amount of such tax liability shall be calculated taking into account such other matters and making such other assumptions as the Board determines in its reasonable discretion to be appropriate.

(b)   All distributions made to a Member pursuant to this Section 4.3 on account of the taxable income allocated to such Member shall be treated as advance distributions under Section 4.2(a) and shall be taken into account in determining the amount of future distributions to such Member, and for purposes of determining the amount of distributions to be made to the Members pursuant to Section 4.2(a), distributions made pursuant to this Section 4.3 shall be taken into account at such time as they are made pursuant to this Section 4.3.

### ARTICLE V
### MANAGEMENT AND GOVERNANCE PROVISIONS

Section 5.1.   Management by Board.   Except for matters in which the approval of the Members is required by this Agreement or by non-waivable provisions of the Company Law, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of managers (each individually, a "Manager", and together collectively, the "Managers"), who shall act as a board (when acting as a board, the Managers are referred to in this Agreement as the "Board").

Section 5.2.   Composition of Board.

(a)   From and after the Effective Date unless changed in accordance with this Agreement, the number of Managers comprising the entire Board shall be five (5) and the Board shall consist of the following Managers:

(i)   Two (2) Managers appointed by Fir Tree and its respective Permitted Transferees, collectively (each such Manager, a "Fir Tree Manager");

29

(ii)     Two (2) Managers appointed by  Crestline and its respective Permitted Transferees, collectively (each such Manager, a "Crestline Manager"); and

(iii)     One (1) Manager jointly appointed by Fir Tree and its Permitted Transferees, collectively, and Crestline and its Permitted Transferees (the "Joint Manager").

The initial appointees to the Board, as prescribed by the foregoing provisions of this Section 5.2, are set forth in Exhibit A. Commencing on the Effective Date, the Board shall be composed of such appointees, each of whom shall serve until his or her successor is duly selected in accordance with this Agreement and qualified or until such individual's death, disability, retirement, resignation or removal.

(b)     For purposes of any vote, approval, consent or other action to be taken by the Board, each Manager shall possess one (1) vote.  As used in this Agreement, a "Supermajority of the Voting Power" means those Managers whose aggregate votes equal or exceed four (4).  The act of a Supermajority of the Voting Power shall be deemed an action or approval by the Board.

(c)     The number of Managers serving on the Board, from time to time, may be increased or decreased by the Board in accordance with Section 5.7(a)(xviii), with the minimum number of Managers at any time being five (5).

(d)

(i)     The right of each of Fir Tree and Crestline to appoint Managers pursuant to Section 5.2(a) is transferable and may be assigned, transferred or conveyed by Fir Tree or Crestline, as applicable, to any transferee of their Class A Units pursuant to a Disposition of Fir Tree's or Crestline's Class A Units permitted in accordance with Article VI; provided that such rights shall only be transferred to any such transferee (A) to the extent such rights are expressly assigned to such transferee in connection with such Disposition or (B) if such transferee acquires all of Fir Trees Class A Units held at the time of such Disposition such transferee shall succeed to and hold all of Fir Tree's or Crestline's, as applicable, rights as held by Fir Tree or Crestline, as applicable, at the time of such Disposition.

(ii)     If any Class A Member who has a right to appoint Managers pursuant to Section 5.2(a) shall (together with its Permitted Transferees) at any time own less than ten percent (10%) of the outstanding Class A Units, such Class A Member shall no longer be entitled to designate any Managers, all of its Managers shall be deemed to have concurrently resigned as a Manager of the Company and all references and provisions in this Agreement requiring the vote of or granting any rights to any Managers designed by such Class A Member shall be inapplicable and disregarded, in each case, with no further action required by such Manager, the Company or any other Class A Member.

30

WEIL:\95894375\17\39110.0004

(e)    For so long as DMS holds outstanding Class A Units, the Class A Members and the Company shall permit one (1) individual designated by DMS to attend and observe meetings of the Board as an observer (each, an "Observer").

(i)    Each Observer shall receive all notices of Board meetings and all related materials (including agendas and presentations) at the same time as such material are delivered to the Managers, provided that, and subject to the other provisions of this Section 5.2(e), the Board may: (A) impose reasonable restrictions on the provision of such materials to any Observer, including restrictions on whom the Observer may share such materials with, restricting the duplication of such materials or requiring the return, deletion or destruction of such materials following the conclusion of any Board meeting; or (B) request that an Observer not attend all or any portion of a Board meeting due to confidentiality considerations or other reasonable purposes. Such designation of an Observer by DMS may be changed by DMS from time to time by providing written notice to the Company.

(ii)    Each Observer shall have the same obligation to keep confidential any information furnished to such Observer in connection with such Observer's role as Observer or in connection with attendance at Board meetings as Managers have in respect of such information, whether such obligation arises as a result of this Agreement, applicable law, or otherwise.

(iii)    For the avoidance of doubt, an Observer shall not be entitled to vote at any meetings of the Board.

Section 5.3.    Removal of Managers.  Any Fir Tree Manager may be removed from the Board, with or without cause, by Fir Tree or its Permitted Transferees. Any Crestline Manager may be removed from the Board, with or without cause, by Crestline or its Permitted Transferees.  The Joint Manager may be removed from the Board, with or without cause, upon the mutual agreement of Fir Tree or its Permitted Transferees, on the one hand, and Crestline or its Permitted Transferees, on the other.

Section 5.4.    Vacancies.  Subject to Section 5.2, in the event that a vacancy is created on the Board at any time by the death, disability, retirement, resignation or removal of a Fir Tree Manager, Crestline Manager or the Joint Manager, the Members who appointed such Manager shall have the sole and exclusive right to appoint a replacement therefor, which appointment shall be effective upon written notice of such appointment delivered to the other Member or the remaining members of the Board.

Section 5.5.    Meetings of Board.

(a)    Meetings of the Board, regular or special, may be held at any location either in or outside of the State of Delaware.

(b)    Regular meetings of the Board, shall be held at such times and places as may be fixed from time to time by the Board on ten (10) days prior notice to each Manager, personally or by facsimile, Electronic Transmission or overnight courier. Any and all business may be transacted at any regular meeting.

31

(c)     Special meetings of the Board may be called by any Manager on forty-eight (48) hours prior notice to each other Manager, personally or by facsimile, Electronic Transmission, or overnight courier. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

(d)     At all meetings of the Board, the presence (or representation if permitted by Delaware law) of Managers representing at least a Supermajority of the Voting Power shall be necessary and sufficient to constitute a quorum for the transaction of business. If a quorum shall not be present at any meeting of the Board, the Managers present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. At any such adjourned meeting at which a quorum is present, any business may be transacted that might have been transacted at the meeting as originally convened.

(e)     At a meeting of the Board at which a quorum is present, approval by the Board of any action and any determination by the Board of any matter required by this Agreement shall require the affirmative vote in favor of such action of those Managers with a Supermajority of the Voting Power, unless a greater vote is required by this Agreement.

(f)     All meetings of the Board shall be presided over by the chairman of the meeting, who shall be a person designated by a majority in number of the Managers present at the meeting. The chairman of any meeting of the Board shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as determined by him to be in order.

(g)     Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by at least the requisite number of Managers (or persons holding the proxy, delegation or authorization of a Manager as permitted by subsections (h) and (i) below) that would be required to approve such action if taken at a meeting of the Board; provided, however, that if any action is proposed to be taken by written consent, such written consent shall be distributed to all of the Managers for execution at substantially the same time. An Electronic Transmission by a Manager, or a facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this Section 5.5(g).  If any action is taken by the Board by written consent of less than all the Managers, a copy of such executed written consent must be provided promptly, and in no event later than five (5) days after execution, to those Managers who did not execute such written consent.

(h)     Subject to the provisions of this Agreement and Applicable Law regarding notice of meetings and the granting of proxies, persons serving on the Board (i) may participate in and hold a meeting of the Board by using conference telephone, Electronic Transmission, or similar communications equipment by means of which all persons participating in the meeting can hear each other, and (ii) may grant a proxy to another Manager or delegate its right to act to another Manager which proxy or delegation shall be effective as the attendance or action at the meeting or action by written consent of the Manager giving such proxy or delegation. Participation in a meeting pursuant to this Section 5.5(h) shall constitute presence in person at such meeting, except when a person participates in the meeting for the sole purpose of objecting

32

to the transaction of any business on the ground that the meeting was not lawfully called or convened.

(i)        Without limiting Section 5.5(h) regarding the granting of proxies, (i) any Fir Tree Manager absent from a meeting or unavailable to sign a written consent may be represented by any other Fir Tree Manager, who may cast the vote of the absent Fir Tree Manager according to the written instructions, general or special, of the absent Fir Tree Manager, and (ii) any Crestline Manager absent from a meeting or unavailable to sign a written consent may be represented by any other Crestline Manager, who may cast the vote of the absent Crestline Manager according to the written instructions, general or special, of the absent Crestline Manager.

Section 5.6.    Compensation of Managers.  No person will be paid any fee for serving on the Board.

Section 5.7.    Actions Requiring Board Approval.

(a)        For avoidance of doubt, the Company shall not take (or, with respect to any Subsidiary of the Company, approve or permit to occur) nor shall any officer or Asset Manager (notwithstanding any authority granted to such officer or Asset Manager pursuant to Section 5.10, Section 5.12 or any Management Agreement) take any of the following actions without having first received the approval of the Supermajority of the Voting Power in accordance with this Agreement:

(i)        approve, amend or modify any Budget (except as expressly contemplated by Section 5.11)

(ii)       incur, directly or through any Subsidiary of the Company, any expenditure or series of related expenditures not otherwise a part of an approved Budget, except any expenditure or series of related expenditures as permitted under Section 5.11;

(iii)      (A) enter into, amend, modify, terminate or otherwise change (including by waiver or consent) in any material respect, or grant any consent or waiver on behalf of the Company under, any Management Agreement or (B) enter into, amend, modify, terminate or otherwise change (including by waiver or consent) in any material respect any Material Agreement to which the Company or any Subsidiary of the Company is a party;

(iv)       effect any Disposition of assets of the Company or any Subsidiary of the Company, other than the sale of Hydrocarbons produced from the assets of the Company and its Subsidiaries and dispositions of assets of immaterial value, in each case in the ordinary course of business (but which shall not in any case include any interest under an oil and gas lease);

(v)        effect any acquisition of assets on behalf of the Company or any of its Subsidiaries or series of such acquisitions, or to incur any costs associated therewith, which individually or in the aggregate exceeds $25,000;

33

(vi)    except as expressly provided for in a Budget, create, incur, assume, guarantee, refinance or prepay, any Indebtedness of the Company or any Subsidiary of the Company, or amend, modify or otherwise alter the terms and provisions of any such Indebtedness (including by waiver or consent);

(vii)    mortgage, pledge, assign in trust or otherwise encumber or create a Lien (other than statutory Liens) upon any property or assets of the Company or any Subsidiary of the Company, or assign any monies owed or to be owed to the Company or any Subsidiary of the Company, except for customary Liens contained in or arising under operating or similar agreements executed by or binding on the Company or such Subsidiary of the Company or to secure Indebtedness of the Company or such Subsidiary of the Company permitted under Section 5.7(a)(vi);

(viii)    guarantee in the name or on behalf of the Company, or any Subsidiary of the Company, the performance of any contract or other obligation of any other Person;

(ix)    make any material election or filing with respect to the Company or any Subsidiary of the Company with any Governmental Entity with regulatory authority over the Company or any Subsidiary of the Company or all or any portion of their assets, including with respect to tax matters governed by the Internal Revenue Service;

(x)    make any determination of Available Cash or make any distribution under Section 4.2 or Section 4.3;

(xi)    accept any Capital Contribution;

(xii)    issue any Interests or any debentures, bonds or any other security (including, without limitation, any units, warrants or securities convertible into or exchangeable or exercisable for any other security of the Company or any Subsidiary of the Company), in each case including issuances of securities in connection with any employee incentive plan or as consideration in any acquisition (whether by share purchase, asset purchase or merger),

(xiii)    or admit any additional Members of the Company;

(xiv)    authorize or engage in any Liquidity Event, unless such Liquidity Event is effected pursuant to and accordance with Section 6.6, or to approve any Liquidity Event as an Approved Exit pursuant to Section 6.6(c);

(xv)    to approve, appoint or remove any officer of the Company;

(xvi)    initiate, compromise or settle any lawsuit, administrative matter or other dispute where the amount the Company or any Subsidiary of the Company may recover or might be obligated to pay, as applicable, is in excess of $50,000, or to repair or replace property or assets of the Company or any Subsidiary of the Company damaged or destroyed as a result of an accident or other occurrence

34

when the Company's or such Subsidiary's share of the costs of repair or replacement (either individually or in the aggregate, but net of insurance proceeds) is in excess of $100,000; provided, however, that if any lawsuit, administrative matter or other dispute is initiated by any Member, its Affiliates, appointed Managers, partners, members, managers or employees, against the Company, the approval of a majority of the Managers appointed by such other Members shall be required to approve any compromise or settlement of such lawsuit, administrative matter or dispute;

(xvii)   [Reserved];

(xviii)  subject to Section 11.7, to make any amendment to the Certificate, this Agreement or any other governing documents of the Company or any Subsidiary of the Company;

(xix)    change the Tax Matters Representative;

(xx)     engage or appoint, or terminate the engagement of, any reserve engineer;

(xxi)    enter into or become obligated under any swap, collar, floor, cap or other derivative contract or any option, forward sale, exchange-traded contract or other hedging contract with respect to interest rates or commodity prices or basis differentials;

(xxii)   other than in connection with a Liquidity Event, merge, combine, or consolidate the Company or any Subsidiary of the Company with any other Entity, convert the Company or any Subsidiary of the Company into another form of Entity, or exchange Interests or any equity securities of any Subsidiary of the Company with any other Person;

(xxiii)  except as provided in Section 9.1(b) and Section 9.1(c), liquidate or dissolve the Company or any Subsidiary of the Company, commence a voluntary bankruptcy by the Company or any Subsidiary of the Company, or consent to the appointment of a receiver, liquidator, assignee, custodian, or trustee for the purposes of winding up the affairs of the Company or any Subsidiary of the Company;

(xxiv)   engage in any transactions on behalf of the Company or any Subsidiary of the Company with any Member, Manager, officer, employee or other Affiliate of the Company or any Subsidiary of the Company or their respective Affiliates, except (A) pursuant to a written agreement with such Person previously approved by a Supermajority of Voting Power, (B) on terms no less favorable than would be obtained in a comparable arms-length transaction with a Person that is not an Affiliate of the Company or (C) for reimbursement of reasonable business expenses of employees incurred in the ordinary course of business of the Company or its Subsidiaries;

35

(xxv)   enter into any agreement or take any action that would cause the Company or any Subsidiary of the Company or all or any portion of their assets to be subject to regulation by the Federal Energy Regulatory Commission (or any successor entity) or to be subject to regulation as a public utility under applicable U.S. federal or state law;

(xxvi) other than as provided in this Agreement, sponsor, maintain, administer or contribute to any employee benefit plan (including plans described in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended) or grant any other employment, consulting, bonus, stock option, stock purchase or other equity-based, benefit, incentive compensation, profit sharing, savings, retirement (including early retirement and supplemental retirement), disability, insurance, vacation, incentive, deferred compensation, retention, termination, severance, change of control or other fringe, welfare or other employee benefit plan, program, agreement, contract, policy or binding arrangement, in each case for the benefit of any officers of the Company or its Subsidiaries;

(xxvii) organize a Subsidiary of the Company that is not wholly owned by the Company or a wholly owned Subsidiary of the Company;

(xxviii)change any method of accounting (except as required by GAAP or in connection with a tax-related action or decision by the Tax Matters Representative pursuant to authority granted herein); provided, however, that any new method of accounting elected pursuant to this Section 5.7(a)(xxviii) shall be in compliance with any regulatory requirements for each Member;

(xxix)  to take any action outside of the Company's purpose as set forth in Section 1.3;

(xxx)   redeem or otherwise acquire any Interests;

(xxxi)  engage or appoint any accounting firm other than, or terminate the engagement of, the Independent Accountant;

(xxxii) enter into any farm-out, farm-in, joint venture, partnership, joint development, participation, exploration of similar agreement;

(xxxiii)or take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

(b)      All determinations and approvals of Fair Market Value required by this Agreement shall be made by a Supermajority of the Voting Power unless otherwise provided in this Section 5.7(b).  If the approval of a Supermajority of the Voting Power cannot be obtained in connection with any determination of Fair Market Value, such disputed determination shall be submitted to a nationally recognized investment bank selected by a Supermajority of the Voting Power on behalf of the Company, or any replacement approved by a Supermajority of the Voting Power (the "Independent Appraiser"); provided, however, that in the event a Supermajority of the Voting Power cannot agree on an Independent Appraiser within five (5) Business Days each

36

of the Fir Tree Managers, collectively, and the Crestline Managers, collectively, shall submit the names of three (3) Independent Appraisers, and each party shall be entitled to strike one (1) name from the other party's list of Independent Appraisers, and the Independent Appraiser shall be selected by lot from the remaining firms. The Independent Appraiser shall submit to the Board a written report ("Appraisal Report") within thirty (30) days of its engagement setting forth such determination.  The expenses of the Independent Appraiser shall be shared by the Members in the same proportions as their Percentage Interests.  The determination of the Independent Appraiser as to Fair Market Value shall be final and binding upon the Company, the Board and all Members.  The matter dependent on such determination of Fair Market Value, with respect to which such disagreement occurs shall be deferred until the determination of Fair Market Value pursuant to this Section 5.7(b).

Section 5.8.   Duties of Managers and Members.

(a)   Except as otherwise provided to the contrary in this Agreement, to the fullest extent permitted by the Company Law, a person, in performing his duties and obligations as a Manager under this Agreement, shall be entitled to act or omit to act at the direction of the Member or Members that designated such person to serve as a Manager, considering only such factors, including the separate interests of the designating Members, as such Manager or Members choose to consider, and any action of a Manager or failure to act, taken or omitted in good faith reliance on the foregoing provisions shall not, as between the Company and the other Members, on the one hand, and the Manager or Members designating such Manager, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent such exists under the Company Law or any other Applicable Law) on the part of such Manager or Members to the Company or any other Manager or Member of the Company.

(b)   The Members (in their own names and in the name and on behalf of the Company):

(i)   agree that (A) the terms of this Section 5.8, to the extent that they modify or limit a duty or other obligation, if any, that a Manager (in its capacity as a Manager) may have to the Company or any other Member under the Company Law or other Applicable Law, are reasonable in form, scope and content; (B) the terms of this Section 5.8 are expressly intended to restrict the duties, including any fiduciary or similar duties, of a Manager (in its capacity as a Manager) to the Company and the Members, as permitted by Section 18-1101 of the Company Law; and (C) the terms of this Section 5.8 shall control to the fullest extent possible if it is in conflict with a duty, if any, that a Manager (in its capacity as a Manager) may have to the Company or another Member under the Company Law or any other Applicable Law;

(ii)   waive to the fullest extent permitted by the Company Law, any duty or other obligation, if any, that any Manager (in its capacity as a Manager) may have to the Company or another Member, pursuant to the Company Law or any other Applicable Law;

(iii)   agree that (A) the legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines will not be applied to any ventures or activities of any Members, Managers or their respective Affiliates, (B) no

37

Member, Manager or its Affiliates will have any obligation to the Company or any other Member with respect to any opportunity to expand the Company's business, whether geographically or otherwise, (C) each of the Company and DMS hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any Member, Manager or its Affiliates participates or desires or seeks to participate (each, a "Business Opportunity"), (D) no Member, Manager or its Affiliates shall have any obligation to communicate or offer any Business Opportunity to the Company or any other Member, and may pursue for itself or direct, sell, assign or transfer to any other Person any such Business Opportunity and (E) each Member, Manager and its Affiliates shall be entitled to and may have business interests and activities that are in direct competition with the Company or a Member or that are enhanced by the activities of the Company, and neither the Company nor any Member shall have any rights by virtue of this Agreement in any business venture of any Fir Tree Related Party or Crestline Related Party; provided, notwithstanding the foregoing, each Member agrees that it will disclose to the other Members if such Member or (to such Member's knowledge) an Affiliate of such Member has an interest in another entity that proposes to engage in a transaction with the Company, which disclosure shall be made as promptly as reasonably possible after such Member becomes aware of the proposed transaction;

(c)    The Members (in their own names and in the name and on behalf of the Company), acknowledge, affirm and agree that (i) no Member would be willing to make an investment in the Company, and (ii) no person appointed by Fir Tree or Crestline to serve on the Board would be willing to so serve, in the absence of this Section 5.8.

Section 5.9.    Other Investments of Member Related Parties; Waiver of Conflicts of Interest and Negation of Duties and Obligations.  Subject to, and without limiting the provisions of, any Management Agreement:

(a)    each Member acknowledges and affirms that each Member and each Member's respective employees, members, managers, partners, other equity owners, representatives and Affiliates and agents (collectively, the "Member Related Parties"):

(i)    (A) have participated (directly or indirectly) and will continue to participate (directly or indirectly) in venture capital, private equity and other direct investments in corporations, joint ventures, limited liability companies and other entities (the "Other Investments"), including Other Investments engaged in various aspects of the United States "upstream," "downstream" and "midstream" oil and gas business that may, are or will be competitive with the Company's business or that could be suitable for the Company, (B) have interests in, participate with, aid and maintain seats on the board of directors or similar governing bodies of, Other Investments, and (C) may develop or become aware of business opportunities for Other Investments; and

(ii)    may or will, as a result of or arising from the matters referenced in clause (i) above, the nature of the Member Related Parties' businesses and other factors, have conflicts of interest or potential conflicts of interest with the Company and/or other Members;

38

(b)      the Members (individually and on behalf of the Company), expressly (i) waive any such conflicts of interest or potential conflicts of interest and agree that no Member Related Party or its respective representatives shall have any liability to any Member or any Affiliate thereof, or the Company with respect to such conflicts of interest or potential conflicts of interest and (ii) acknowledge and agree that the Member Related Parties and their respective representatives will not have any duty to disclose to the Company, any other Member or the Board or any Managers any such business opportunities, whether or not competitive with the Company's business and whether or not the Company might be interested in such business opportunity for itself.  The Members (for themselves and on behalf of the Company) also acknowledge that the Member Related Parties and their representatives have duties not to disclose confidential information of or related to the Other Investments;

(c)      the Members (individually and on behalf of the Company) hereby:

(i)      agree that (A) the terms of <u>Section 5.8</u> and this <u>Section 5.9</u>, to the extent that they modify or limit any fiduciary duty (including any duty of loyalty) or other similar obligation, if any, that an Member Related Party (including in its capacity as an officer of the Company) may have to the Company or another Member under the Company Law or other Applicable Law, are reasonable in form, scope and content; and (B) the terms of <u>Section 5.8</u> and this <u>Section 5.9</u> shall control to the fullest extent possible if it is in conflict with any fiduciary duty (including any duty of loyalty) or similar obligation, if any, that an Member Related Party or its representatives may have to the Company or another Member under the Company Law or any other Applicable Law; and

(ii)      waive any fiduciary duty (including any duty of loyalty) or other similar obligation, if any, that an Member Related Party or its representatives (including in its capacity as an officer of the Company) may have to the Company, any Manager or another Member, pursuant to the Company Law or any other Applicable Law, to the extent permissible under Applicable Law and as necessary to give effect to the terms of <u>Section 5.8</u> and this <u>Section 5.9;</u>

(d)      whenever in this Agreement Fir Tree, Crestline or any representative thereof (which shall include for purposes of this Agreement a Manager appointed by Fir Tree or Crestline, as applicable, or instructed to act by Fir Tree or Crestline, as applicable) is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, Fir Tree, Crestline or the representative thereof, as the case may be, shall be entitled to consider only such interests and factors as Fir Tree, Crestline or such representative, as applicable, desires, including Fir Tree's or Crestline's own interests, and shall have no duty or obligation to give any consideration to any interests of or factors affecting the Company or any other Member, or (ii) in its "good faith" or under another expressed standard, Fir Tree, Crestline or the representative thereof, as the case may be, shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other agreement contemplated herein or by relevant provisions of law or in equity or otherwise; and

(e)      the Members (individually and on behalf of the Company) acknowledge, affirm and agree that (i) the execution and delivery of this Agreement by the Members is of material benefit to the Company and the Members, and (ii) Fir Tree and Crestline would not be

39

willing to (x) execute and deliver this Agreement, and (y) make its agreed Capital Contributions to the Company, without the benefit of Section 5.8 and this Section 5.9 and the agreement of the parties, including the Members, set forth therein and herein.

Section 5.10.    Officers.

(a)    Subject to Section 5.7(a)(xv), the Board may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Delaware, a Member or a Manager. Any such officers so designated shall only have such authority and perform such duties (i) as necessary or appropriate to carry out and implement such actions as approved by the Board pursuant to Section 5.7(a) or included in any Budget as approved by the Board pursuant to Section 5.7(a)(i) or as permitted under Section 5.11, or (ii) as the Board otherwise may, from time to time, delegate to them; provided that, unless such authority or duty is specifically delegated to the officer in question (either for a specific transaction or generally), no such officer shall have the power to acquire or lease real property, to borrow money on behalf of the Company (other than draws under existing credit facilities of the Company approved by the Board), to issue notes, debentures, securities, equity or other interests of or in the Company, to make investments in or to acquire securities of any Person, to give guarantees or indemnities, to merge, liquidate or dissolve the Company, or to sell or lease all or any substantial portion of the assets of the Company.  The Board (subject to Section 5.7(a)(xv)) may assign titles to particular officers, but the assignment of such titles shall not constitute a delegation of the authority or duties that are normally associated with that office absent an express delegation of such in accordance with the foregoing sentence. Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner provided in this Agreement. Any number of offices may be held by the same person. The salaries or other compensation, if any, of the officers of the Company shall be fixed from time to time by the Board.  As of the Effective Date, the initial officers of the Company shall be as set forth on Exhibit B.

(b)    Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any officer may be removed as such, either with or without cause, by the Board (subject to Section 5.7(a)(xv)); provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed. Designation of an officer shall not of itself create contract rights. Any vacancy occurring in any office of the Company may be filled by the Board (subject to Section 5.7(a)(xv)).

Section 5.11.    Budget.

(a)    The Managers or officers of the Company shall prepare, or cause to be prepared, as soon as reasonably practical following the Effective Date, a Budget for the period from the Effective Date through December 31, 2016, (the "Initial Budget"), which upon approval by the Board shall then be approved for all purposes of this Agreement without the need of further approval by the Board (subject to quarterly review of the Board as described in Section 5.11(b)).

WEIL:\95894375\17\39110.0004

(b)     The Board shall review and approve each Budget, including the Initial Budget, at least quarterly (or more frequently as determined by the Board as set forth in Section 5.7(a)(i) during the year to which such Budget relates), and the Budget shall be amended or modified to reflect any amendments or modifications thereto approved by the Board and as so modified or amended shall thereafter constitute the Budget for the remainder of the calendar year to which such Budget relates.  Each Budget, including the Initial Budget, shall be divided into at least two sections as follows: (i) a section setting forth expenditures which are fundamental to the operation of the Company (the "Baseline Budget") and (ii) a section setting forth expenditures related to the growth and development of the assets of the Company.

(c)     The officers of the Company shall prepare or cause to be prepared and presented to the Board not later than December 1 of each calendar year (beginning December 1, 2016 (for calendar year 2017)) a draft Budget for the next succeeding calendar year (the "Proposed Budget") for approval in accordance with Section 5.7(a)(i).  Each Proposed Budget shall include the following:

      (i)     projected monthly income statements, balance sheets and cash flow statements on a consolidated basis for the calendar year covered by such Proposed Budget and a projected monthly income statement and capital expenditures for each major capital project;

      (ii)     estimates of the expenditures covered by the proposed Budget by budget category, in reasonable detail to identify the nature, scope and duration of the activity in question;

      (iii)     estimates of the schedule pursuant to which capital costs and expenses included in the Budget are anticipated to be incurred by the Company;

      (iv)     estimates of revenues and estimated returns on invested capital;

      (v)     progress on capital projects included in prior Budgets, including any shortfalls or overages and a Budget to actual variance analysis;

      (vi)     any costs and expenses estimated to be expended due to health, safety, security and environmental issues or any regulatory issues; and

      (vii)     any other information and/or detail reasonably requested by the Board.

(d)     Expenditures in a Budget may extend over more than one calendar year because such expenditures represent activities or operations that require commitments in excess of one calendar year.  Once such expenditures have been approved by the Board as part of a Budget, unless the Board determines otherwise in accordance with its quarterly review pursuant to Section 5.11(b), such expenditures shall not be required to be resubmitted for approval on an annual or other periodic basis, but instead all such items, until completed, automatically shall be included in future Budgets (subject to limits and amounts as previously approved) as items which have already been approved.

WEIL:\95894375\17\39110.0004

(e)     If the Board does not approve a Proposed Budget for a calendar year on or prior to the December 20 preceding January 1 of the calendar year to which such Proposed Budget relates, the officers shall use good faith efforts to prepare or to cause to be prepared a revised Proposed Budget for approval by the Board; provided, however, that the Board shall have the right to revise the Proposed Budget and to approve the Proposed Budget that it has revised, in each case in its sole discretion.  Each Proposed Budget approved hereunder by the Board in accordance with Section 5.7(a)(i) shall be deemed a "Budget."

(f)     To the extent that any Proposed Budget is not approved by the Board in accordance with Section 5.7(a)(i) by January 1 of the fiscal year to which such Proposed Budget relates, then, until such Proposed Budget is approved by the Board in accordance with Section 5.7(a)(i) the Baseline Budget for the current calendar year shall be equal to the Baseline Budget for the most recent completed calendar year included in a Budget approved by the Board in accordance with Section 5.7(a)(i) (excluding non-recurring items and non-recurring capital expenditures for the maintenance, development or construction of Upstream Assets other than as provided in Section 5.11(d) but including recurring maintenance capital expenditures).

(g)     The Company shall not incur expenditures in excess of amounts set forth in the Budget without prior approval of the Board in accordance with Section 5.7(a)(i), provided that the Company may expend without prior approval of the Board up to ten percent (10%) in excess of the authorized amount for any category of capital expenditures during a calendar year (excluding any amounts included in the Budget as line items for contingencies and overruns), such excess expenditures not to exceed in the aggregate ten percent (10%) of the aggregate of the amount for capital expenditures set forth in the Budget for such calendar year.  Any variances from the Budget for capital expenditures other than variances for capital expenditures within and not in excess of the ten percent (10%) variance permitted herein year shall require the approval of the Board as set forth in Section 5.7(a)(i), and if so approved, each such variance shall be added to the Budget for such calendar year which, as so amended, shall thereafter be the Budget for such calendar year.  The ten percent (10%) variance permitted herein shall be calculated with respect to the original amounts set forth in the approved Budget or, once amended, the amended amount.

(h)     Notwithstanding anything to the contrary in this Agreement, the Company is expressly authorized to (i) make Emergency Expenditures and incur liabilities without prior authorization or approval of the Board when necessary or advisable, subject to Prudent Industry Practices, to deal with emergencies, including explosions, fires, spills, or any other similar event, which may endanger property, lives, or the environment.  The officers of the Company shall as soon as practicable report to the Board the nature of any such emergency which arises, the measures they intend to take in respect of such emergency and the estimated related expenditures or (ii) prior to the earlier of the approval by the Board of the Initial Budget or the first Budget, make expenditures without prior authorization or approval of the Board when necessary or advisable, subject to Prudent Industry Practices, to comply with the contractual or legal obligations of the Company or provide for the operation of the assets of the Company in accordance with Prudent Industry Practice; provided expenditures (or a series of related expenditures made pursuant to this clause (i), other than expenditures to comply with the express monetary obligations of the Company set forth (by dollar amount or calculation methodology) in a contract to which the Company is a Party as of the Effective Date or approved by the Board, may not exceed $100,000, individually or in the aggregate.

WEIL:\95894375\17\39110.0004

Section 5.12.  Asset Manager Power and Authority.  Pursuant to its authority set forth in Section 5.1, the Board may delegate to a designated Asset Manager the responsibility for the day to day management of the business of the Company and its Subsidiaries and implementation of all decisions and resolutions of the Board pursuant to a Management Agreement; provided, however, that, notwithstanding the foregoing, for so long as DMS holds at least one percent (1%) of the outstanding Class A Units, without the consent of DMS the Board may not authorize the Company to provide consideration to an Asset Manager that is an Affiliate of any Member for services provided pursuant to any delegation pursuant to this Section 5.12 greater than such consideration that, as a whole, is substantially comparable to consideration that would be provided for substantially comparable services obtained on an arm's length basis from an Asset Manager that is not an Affiliate of any Member.

## ARTICLE VI
## TRANSFERS OF INTERESTS OF PARTNERS

Section 6.1.  Transfers.  No Disposition of all or part of a Member's Interest in the Company may be made except (a) with the prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), of Fir Tree and Crestline or (b) to a Permitted Transferee upon providing ten (10) Business Days prior written notice of the intended Disposition to the Company and the other Members, provided, however, that any such Disposition pursuant to clause "(a)" or "(b)" must (i) comply with this Article VI, (ii) comply with the Securities Act and all applicable state securities or "blue sky" laws and (iii) in the case of a Disposition pursuant to clause "(a)" only, without the prior written consent (which consent may be granted or withheld in such Person's sole discretion) of Fir Tree and Crestline, be for all and not less than all of a Member's Interest in the Company. Notwithstanding the foregoing, the Class B Units shall not be directly transferable, except in connection with any Disposition of all of the Class A Units held by the Class B Member permitted under this Agreement.

Section 6.2.  Right of First Refusal.  DMS may Dispose of all (but not less than all) of its Interest in the Company, subject to Section 6.1 and the following:

(a)  If DMS or any liquidator, receiver, trustee in bankruptcy or similar authority having control over DMS or DMS's assets (the "Selling Member") proposes to Dispose of all (but not less than all) of its Interest in the Company (other than in connection with a Disposition pursuant to Section 6.4, Section 6.5, or Section 6.6,), it must first give written notice (a "ROFR Notice") to each other Member of its intention to effect such Disposition describing all of the material terms and conditions of the proposed Disposition, including the identity of the prospective transferee(s) and the purchase price for its Interest, and include an affirmative offer to Dispose of its Interest to the other Members under those same terms and conditions as set forth in the ROFR Notice. Each of the other Members have the option, for a period of ten (10) Business Days from the date that the ROFR Notice is delivered to the other Members (the "Option Period"), to elect to purchase the Selling Member's Interest; provided that (i) the Selling Member shall be required to make the Required Representations to such Members electing to acquire such Interests and (ii) if any portion of the consideration to be received by the Selling Member consists of non-cash consideration, the Members electing to acquire such Interests may, in lieu of such non-cash consideration, deliver cash in an amount equal to the fair market value of such non-cash consideration, such fair market value to be determined jointly by the Selling Member and the acquiring Member and if such Persons are unable to agree on such fair market value such value shall be determined by an independent appraisal firm with experience or

43

reasonable capability in valuing such non-cash property as determined by the Board and the time period for the other Members to elect to purchase the Interests of the Selling Member shall be tolled pending the appraisal of such non-cash property and the Option Period shall not expire until at least five (5) days after the appraisal has been completed and the appraised value as determined by the independent appraisal firm has been delivered to such other Members. Each Member electing to acquire the Selling Member's Interest must notify the Selling Member of its election in writing before the expiration of the Option Period. If more than one Member elects to purchase the Interest, each purchasing Member will purchase its proportionate share, based on the ratio of its Percentage Interest compared to the Percentage Interests of all purchasing Members. A purchasing Member may elect to purchase less than all of its share of the Interest being offered provided all Purchasing Members elect to purchase all of the Interest being offered. The closing will take place at the offices of the Company at 9:00 a.m. on the first business day following the expiration of forty-five (45) days after expiration of the Option Period, or any other time agreed to by the Selling Member and the purchasing Members.

(b)     If no Member exercises its option to purchase under Section 6.2(a), the Selling Member will then have a period of sixty (60) days following the expiration of the option period to Dispose of the Interest described in the notice strictly in accordance with the terms and conditions included in the notice, including the price set forth therein.  If a Disposition is not made within sixty (60) days following expiration of the Option Period on the terms and conditions included in the ROFR Notice, a new notice as required in the manner provided above is necessary before the Interest may be Disposed of, and the Members will again have the option to purchase the Interest. If a Member who has exercised its option to purchase does not thereafter timely close the transaction, the Selling Member may proceed with its proposed Disposition in accordance with the terms of this Section 6.2(b).

(c)     The remedies at law for breach of any of the obligations in this Section 6.2 are inadequate because of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply fully with each of the obligations, and (ii) the uniqueness of the Company business and the Company relationship. Accordingly, each of the obligations in this Section 6.2 is enforceable by specific performance.

(d)     Notwithstanding anything to the contrary contained in this Section 6.2, no Disposition of any Interest under this Section 6.2 will be permitted if the Disposition would cause a default under any Material Agreement.

Section 6.3.    Right of First Offer.

(a)     Subject to Section 6.1, if any Member other than DMS (such Member or Members, the "Disposing Member") intends to Dispose of all or a portion of its Units (the "Offered Units"), then the Disposing Member shall promptly deliver written notice (the "Sale Notice") to the other Members (other than DMS), which Sale Notice shall include (i) the proposed per unit price for the Offered Units and (ii) any other proposed material terms (including any proposed working capital or similar adjustments that may affect the per unit price for the Offered Units).  Within fifteen (15) Business Days after the receipt of the Sale Notice by the other Members (other than DMS), the other Members (other than DMS) shall have the right, but not the obligation, to elect (the "ROFO Offer") to purchase all, but not less than all, of the Offered Units upon the terms set forth in the Sale Notice.  Any ROFO Offer shall be in writing and shall contain any other material terms ("ROFO Add-On Terms") not set forth in the Sale

44

Notice on which such other Member proposes to purchase all of the Offered Units and shall provide the sources of all equity and debt financing to be utilized in connection therewith.

(b)     If the Disposing Member does not receive a ROFO Offer within the 15-day period provided in Section 6.3(a) or the Disposing Member receives a ROFO Offer containing ROFO Add-On Terms within the 15-day period provided in Section 6.3(a) and determines to reject such offer, then the Disposing Member shall be free to Dispose of the Offered Units to a third party at a higher price (giving effect to any working capital or similar adjustments that may affect the per unit price for the Offered Units and without regard to any post-closing indemnification obligations) than that set forth in the Sale Notice and on terms and conditions acceptable to such Disposing Member during the 365-day period immediately following the expiration of such 15-day period or the rejection of such offer, as applicable. After such 365-day period, any proposed Disposition shall once again be subject to the terms and conditions of this Section 6.3 to the extent provided herein.

(c)     If the ROFO Offer is accepted by the Disposing Member, then the Member making such ROFO Offer will have thirty (30) days from such acceptance within which to close its purchase of the Offered Units pursuant to the terms and at the price set forth in the Sale Notice, as modified by any ROFO Add-On Terms, if applicable. Under such circumstances, the Disposing Member and such other Member shall negotiate in good faith the additional terms applicable to such purchase beyond those that were included in the ROFO Offer, provided that the Disposing Member shall only be required to make the Required Representations and will not be required to make any representations and warranties with respect to the operations or finances of the Company and if the Disposing Member and such other Member do not agree on such other terms within such thirty (30) day period then the Disposing Member shall be free to Dispose of the Offered Units to a third party as provided in Section 6.3(b) as if a ROFO Offer had not been received within the 15-day period provided in Section 6.3(a).

(d)     The Company shall reasonably cooperate with the Disposing Member and any potential buyer of such Offered Units in connection with any due diligence investigation associated with such Disposition.

Section 6.4.   Drag-Along Rights.

(a)     In the event that Fir Tree and Crestline (collectively, the "Drag-Along Disposing Member") propose to Dispose (other than in connection with a Disposition to a Permitted Transferee) of their Class A Units, then such Drag-Along Disposing Member may, at its option, require all but not less than all of the other Members (each, a "Drag-Along Participant") to participate in such Disposition (a "Drag-Along Sale") on the same terms and conditions (including the same per Unit price) as the Drag-Along Disposing Member.

(b)     The Drag-Along Disposing Member shall deliver a notice ("Drag-Along Notice") to the Drag-Along Participants, which shall set forth all relevant information with respect to the proposed Disposition, including the identity of the buyer, the proposed purchase price, the Interests that are the subject of the sale, and any other material terms and conditions of the proposed Disposition (including copies of all available and relevant proposed purchase and sale documents). Each Drag-Along Participant shall thereupon be required to participate in such Disposition on the terms and conditions set forth in the Drag-Along Notice and to Dispose of all, but not less than all, of its Interests in the Company pursuant to such Disposition; provided,

however, that a Drag-Along Participant shall not be required to make any representations and warranties in connection with such Disposition other than representations and warranties as to (i) such Drag-Along Participant's ownership of its Interests free and clear of all Liens and (ii) such Drag-Along Participant's power and authority to sell such Interests (the "Required Representations"). In no event shall (x) the consideration to be received by any Drag-Along Participant in connection with a Disposition consist of any form of non-cash consideration other than freely tradable publicly traded securities or (y) the amount of any indemnity obligation of any Drag-Along Participant exceed the amount of cash and the fair market value of any non-cash consideration received by such Drag-Along Participant in such Disposition, except in the case of fraud by such Drag-Along Participant. Any indemnification or other obligation assumed or incurred in connection with a Disposition shall be allocated among all holders of Units Disposing of Units in such transaction (collectively, the "Transferring Persons") in the same proportion as the consideration received by the Transferring Persons, in each case other than with respect to the Required Representations.

(c)    Promptly after the consummation of the Disposition pursuant to this Section 6.4, the Drag-Along Disposing Member shall give notice thereof to the Drag-Along Participants, shall remit to each such Drag-Along Participant any funds due to such Drag-Along Participant and held by the Drag-Along Disposing Member, and shall furnish such other evidence of the completion of such Disposition and the terms thereof as may be reasonably requested by such Drag-Along Participant. If within ninety (90) days after the Drag-Along Disposing Member gives the Drag-Along Notice, it has not completed the Disposition, it shall return to each Drag-Along Participant any documents in possession of the Drag-Along Disposing Member executed by such Drag-Along Participant in connection with such proposed Disposition, and the Drag-Along Disposing Member shall thereafter be required to re-comply with the provisions of this Section 6.4 if it wishes to require any Member to sell its Interests in the same proposed Disposition.

Section 6.5.    Tag-Along Rights.

(a)    In the event a Class A Member (other than DMS) or group of Affiliated Class A Members proposes to Dispose (other than in connection with a Disposition to a Permitted Transferee) of any of its Class A Units prior to a Public Offering and such Class A Units constitute fifty percent (50%) or more of the outstanding Class A Units held by such Class A Member (the "Tag-Along Disposing Member") and does not elect to exercise its rights under Section 6.4, then such Tag-Along Disposing Member shall permit the other Members (each, a "Tag-Along Participant") to participate in such Disposition (a "Tag-Along Sale") by Disposing of a proportionate share of their respective Class A Units (based on the Percentage Interest of such Tag-Along Disposing Member being Disposed of by the Tag-Along Disposing Member) on the same terms and conditions (including the same per Unit price) as the Tag-Along Disposing Member.

(b)    At least twenty (20) Business Days prior to the date on which the Tag-Along Disposing Member expects to consummate the Disposition, the Tag-Along Disposing Member shall deliver a notice ("Tag-Along Notice") to the Tag-Along Participants, which shall set forth all relevant information with respect to the proposed Disposition, including the identity of the buyer, the proposed purchase price, the precise Interests that are the subject of the sale, the expected closing date of the Disposition, and any other terms and conditions of the proposed Disposition (including copies of all available and relevant proposed purchase and sale

46

documents). Any Tag-Along Participant electing to participate in the Disposition shall provide the Tag-Along Disposing Member with written notice thereof within ten (10) Business Days prior to the date on which the Tag-Along Disposing Member expects to consummate the Disposition (or if the Tag-Along Disposing Member delivers an amended Tag-Along Notice, within ten (10) days after the delivery of such amended Tag-Along Notice (and the closing of the Disposition shall not occur prior to the expiration of ten (10) days after such amended Tag-Along Notice has been delivered to each Tag-Along Participant)); provided, however, in the event the acquiring Person is unwilling to acquire all of the Class A Units offered to it by the Tag-Along Disposing Member and the Tag-Along Participants electing to participate in the Disposition, the Class A Units to be included in the Tag-Along Sale shall be allocated pro rata among such Class A Members based on the ratio of Class A Units each such Member elected to include in such Tag-Along Sale compared to the aggregate number of Class A Units all such members elected to include in such Tag-Along Sale.  Each Tag-Along Participant electing to Dispose of its Interests shall execute such documents as are executed by the Tag-Along Disposing Member with respect to the Disposition; provided, however, that each Tag-Along Participant shall be required to make only the Required Representations.  In no event shall (i) the consideration to be received by any Tag-Along Participant in connection with a Disposition consist of any form of non-cash consideration other than freely tradable publicly traded securities, except to the extent it receives its proportionate share of any other form of non-cash consideration received by the Tag-Along Disposing Member, or (ii) the amount of any indemnity obligation of any Tag-Along Participant exceed the amount of cash and the fair market value of any non-cash consideration received by such Tag-Along Participant in such Disposition, except in the case of fraud by such Tag-Along Participant.  Any indemnification or other obligation assumed or incurred in connection with a Disposition shall be allocated among the Transferring Persons in the same proportion as the consideration received by the Transferring Persons, in each case other than with respect to the Required Representations.

(c)    After the consummation of the Disposition pursuant to this Section 6.5, the Tag-Along Disposing Member shall give notice thereof to the Tag-Along Participants, shall remit to each such Tag-Along Participant any funds due to such Tag-Along Participant and held by the Tag-Along Disposing Member, and shall furnish such other evidence of the completion of such Disposition and the terms thereof as may be reasonably requested by such Tag-Along Participant.  If within ninety (90) days after the Tag-Along Disposing Member gives the Tag-Along Notice (or the amended Tag-Along Notice, if applicable) it has not completed the Disposition, it shall return to each Tag-Along Participant any documents in possession of the Tag-Along Disposing Member executed by such Tag-Along Participant in connection with such proposed Disposition.

(d)    Each Member selling any Units pursuant to any Disposition pursuant to this Section 6.5 in which less than all of the outstanding Units are sold (a "Tag-Along Partial Sale") shall, prior to the consummation of such sale, notify the Board of which Units are being sold by such Member (including any Capital Contributions and distributions previously made in respect of such Units) pursuant to such Tag-Along Partial Sale.  The transferee of such Units shall succeed to the portion of the Capital Account and characteristics associated with such Units.

WEIL:\95894375\17\39110.0004

Section 6.6.    <u>Liquidity Event</u>.

(a)    Notwithstanding anything to the contrary set forth herein following the third (3rd) anniversary of the Effective Date, each of Fir Tree and Crestline shall have the right, so long as the Company has not effected a Public Offering, at each of their express direction and in each of their sole discretion, to direct the Board to take such actions to effect a Liquidity Event upon delivering a written notice thereof to the Board (a "<u>Liquidity Event Notice</u>") of such direction.  The Board shall use commercially reasonable efforts to consummate a Liquidity Event as soon as practicable following the delivery of a Liquidity Event Notice.

(b)    Upon receipt of a Liquidity Event Notice, the Company shall diligently pursue the consummation of a Liquidity Event in good faith and the Board shall manage the business and affairs of the Company primarily with a view toward the consummation of such Liquidity Event as soon as reasonably practicable following the exercise of such right.  Each Member shall, and shall cause its Affiliates to, take all actions, including those set forth in <u>Section 6.6(c)</u> and <u>Section 6.6(f)</u>, if applicable, reasonably necessary or appropriate to (i) cooperate with the Company in working toward the consummation of a Liquidity Event and (ii) cause its Manager appointees to act in accordance with this <u>Section 6.6</u>.

(c)    If the Board approves a Liquidity Event (an "<u>Approved Exit</u>"), each Member shall raise no objections against such Approved Exit and, to the extent necessary to effect the consummation of such Approved Exit, vote for and consent to such Approved Exit; <u>provided</u>, <u>however</u>, that any such vote, consent or approval by a Member shall not constitute a waiver or otherwise affect any rights or obligations of any Member under this <u>Section 6.6</u> or <u>Section 6.8</u> of this Agreement with respect to such Approved Exit or any rights of a Member with respect to or arising as a result of such Approved Exit under any agreement to which such Member is a party.  If the Approved Exit is structured as a (i) merger, consolidation or sale of assets, each Member shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger, consolidation or sale of assets or (ii) sale of Units, each Member shall agree to sell all of his, her or its Units or rights to acquire Units on the terms and conditions approved by the Board.  Each Member shall take all necessary or desirable actions in connection with the consummation of the Approved Exit as reasonably requested by the Board.

(d)    In any Approved Exit, the consideration received by the Company shall be allocated and distributed to each Member in accordance with <u>Section 4.2</u> after all the liabilities of the Company have been satisfied in full or provided for.

(e)    Members shall bear their pro rata share (based upon the allocation set forth in <u>Section 6.6(d)</u>) of the costs of any sale of Interests pursuant to an Approved Exit to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party.  For purposes of this <u>Section 6.6</u>, costs incurred by Members in exercising reasonable efforts to take all actions in connection with the consummation of an Approved Exit in accordance with this <u>Section 6.6</u> shall be deemed to be for the benefit of all Members.  Costs incurred by Members solely on their own behalf will not be considered costs of the transaction hereunder.

(f)    If the Board determines that the Liquidity Event shall be a Public Offering:

WEIL:\95894375\17\39110.0004

(i)      each Member agrees that it will, and will cause its Affiliates and any Manager appointed by such Member to, and the Company shall:

(A)      if the underwriters in any Public Offering request that all Members hold their Interest (or any equity securities of any Entity effecting such Public Offering) for a period of time following the Public Offering, do so and enter into a customary lock-up agreement;

(B)      complete and execute all consents, questionnaires, powers of attorney, indemnities, underwriting agreements and other documents as may reasonably be required or advisable in connection with a Public Offering; provided that no such Person shall be required to make any representations or warranties in connection with a Public Offering other than representations and warranties regarding such Person and, if applicable, such Person's intended method of distribution;

(C)      if determined by the Board to be reasonably necessary or appropriate in connection with a Public Offering, do all things reasonably necessary or advisable to effect any recapitalization, reorganization, conversion, contribution and/or exchange of Interests into other equity interests and related reorganization of the Company and its Subsidiaries; provided that any such recapitalization, reorganization, conversion, contribution and/or exchange does not change the relative rights, obligations and preferences of the Members in the Company (or its successor) with respect to their ownership of Interests, except in accordance with this Section 6.6;

(D)      consent to certain additional restrictions on the transfer of Interests (or any equity securities of any Entity effecting such Public Offering) which the Board determines may be required in order to permit compliance with the Securities Act or other Applicable Law;

(E)      use commercially reasonable efforts to accommodate any such other reasonable actions required by the United States Securities and Exchange Commission or similar governmental authority to effect the Public Offering; and

(F)      make modifications to this Agreement (or any other agreement then governing the rights and obligations of the Members with respect to the Company or any successor to the Company) as are customary and appropriate for companies that conduct a Public Offering, such modifications to be in form and substance reasonably satisfactory to Fir Tree and Crestline.

(ii)      The Company shall be responsible for its own costs, fees and expenses in connection with a Public Offering and shall reimburse the Members and their Affiliates for the reasonable out-of-pocket costs, fees and expenses (excluding underwriting discounts, selling commissions and similar fees) incurred

49

by them in connection with a Public Offering, including the reasonable costs, fees and expenses of one outside counsel for each Member.

(iii)    Each of the Members shall be granted customary demand and piggyback registration rights effective from and after the Public Offering, as well as the right to include their Interests (or any securities for which such Interests are exchanged or into which such Interests are converted) in the Public Offering on a pro rata basis (based on the relative percentages of securities of this type to be included in the Public Offering held by the Members immediately prior to the Public Offering); provided that if the managing underwriter or the placement agent advises the Company or the Board that the inclusion of securities of the Members in the Company or any Affiliate of the Company requested to be included for sale in a secondary offering in connection with the Public Offering would materially and adversely affect the price, distribution or timing of the offering, then the Company shall have the right to exclude all or any portion of such securities of the Company or any Affiliate or successor of the Company from sale in connection with the Public Offering, with such exclusions applied to the Members' pro rata share of such securities (based on the relative percentages of securities to be included in the Public Offering held by the Members immediately prior to the Public Offering).

(iv)    If required by the managing underwriter or the placement agent, each Member's Interests may be converted or exchanged in accordance with this Section 6.6(c)(iv) (the "IPO Exchange") into publicly traded equity securities of the Company, an Affiliate of the Company or a Subsidiary of the Company in a Public Offering (the "IPO Securities") as reasonably determined by the Board. In connection with any IPO Exchange, the Interests of each Member will be converted into or exchanged for IPO Securities such that each Member will receive IPO Securities having a value equal to the amount that such Member would have received if, immediately prior to the consummation of the Public Offering, all of the Company's assets had been sold for their Fair Market Values and the resulting amount had been distributed by the Company pursuant to the rights and preferences set forth in Section 4.2 and Section 4.3 as in effect immediately prior to such distribution.

(v)    In the event that (i) the issuer of the IPO Securities in an IPO Exchange effected pursuant to Section 6.6(f)(iv) is a C corporation for U.S. federal income tax purposes and (ii) Fir Tree, Crestline or any of their Permitted Transferees hold all or a portion of their Interests through one or more "blocker" entities treated as C corporations for U.S. federal income tax purposes (each, a "Sponsor Blocker"), upon the written request of Fir Tree and/or Crestline or any of their Permitted Transferees, the Company and each of the Members agrees that it will, at the expense of the Company, take such actions and execute such documents as may reasonably be necessary to cause such Sponsor Blocker to be merged with or acquired by the issuer of the IPO Securities and to cause the IPO Securities to be issued to the shareholders or members of the Sponsor Blocker in a transaction in which gain or loss is not intended to be recognized for U.S. federal income tax purposes.

50

Section 6.7.   [Reserved]

Section 6.8.   Buy/Sell Rights.

(a)   If a Liquidity Event is not consummated during the period beginning as of the date the Liquidity Event Notice is delivered to the Board through the first anniversary of such date, either Fir Tree or Crestline (the "Initiating Member") may initiate the buy sell procedure set forth in this Section 6.8 by delivering to the other (the "Non-Initiating Member") written notice specifying such Member's determination of the Company Sale Value and the amount that would be distributable to each holder of Units by applying Section 4.2 based on an amount equal to the Company Sale Value as of the date of such transaction (giving effect to all distributions actually made pursuant to this Agreement through the date of the transaction for purposes of allocations under Section 4.2) (such aggregate amount as would be distributable to each Member, the "Buy/Sell Unit Price"), and the other terms and conditions pursuant to which the Initiating Member proposes to purchase all of the Units held by the Non-Initiating Member (the "Buy/Sell Offer").  If either Fir Tree or Crestline has transferred all or a portion of its Units then Fir Tree or Crestline, as the case may be, and such transferee (whether or not the transferee has been admitted as a Member or is only an assignee) will collectively be considered as Fir Tree or Crestline, respectively, for purposes of this Section 6.8 and all Units held by Fir Tree or Crestline (including all such transferees), as the case may be, shall be subject to purchase by the Initiating Member under the provisions of this Section 6.8.

(b)   No later than thirty (30) days following receipt of the Buy/Sell Offer, the Non-Initiating Member must notify (a "Buy/Sell Election Notice") the Initiating Member of its election to either:

(i)   sell all Units held by the Non-Initiating Member and its Affiliates to the Initiating Member for a per Unit price equal to the Buy/Sell Unit Price and on such other terms specified in the Buy/Sell Offer; or

(ii)   purchase all Units held by the Initiating Member and its Affiliates for a per Unit price equal to the Buy/Sell Unit Price; provided that if the Initiating Member has transferred all or a portion of its Units, then the Units held by the Initiating Member and such transferees (whether or not the transferee has been admitted as a Member or is only an assignee) will collectively be considered as held by the Initiating Member for purposes of this Section 6.8(b)(ii) and Section 6.8(c) and Section 6.8(d) and the Units held by the Initiating Member (including all such transferees) shall be subject to purchase by the Non-Initiating Member under this Section 6.8.

(c)   If the Non-Initiating Member fails to deliver a Buy/Sell Election Notice to the Initiating Member within the thirty (30) day period (or fails to close the purchase in accordance with Section 6.8(d) within the time period set forth therein), then the Non-Initiating Member will conclusively be deemed for all purposes to have elected to sell all Units held by the Non-Initiating Member as set forth in Section 6.8(b)(i), and this deemed election will be treated as having occurred on the last day of the thirty (30) day period (or ninety (90) day period under Section 6.8(d), if applicable).

51

(d)    If the Non-Initiating Member elects to purchase all Units held by the Initiating Member pursuant to Section 6.8(b)(ii), then the closing of any sale under Section 6.8(b)(ii) to the Non-Initiating Member will be held at the principal office of the Company, unless otherwise mutually agreed, on a mutually acceptable date not more than ninety (90) days after receipt by the Initiating Member of the Non-Initiating Member's Buy/Sell Election Notice electing to purchase the Units held by the Initiating Member.

(e)    If the Non-Initiating Member elects to sell all of the Units held by the Non-Initiating Member pursuant to Section 6.8(b)(i), then the Initiating Member may elect:

(i)    to purchase such Units for the Buy/Sell Unit Price with the closing of any sale to be held at the principal office of the Company unless otherwise mutually agreed, on a mutually acceptable date not more than ninety (90) days after receipt by the Initiating Member of the Buy/Sell Election Notice; provided that the Initiating Member may elect to assign its rights to purchase such Units to any one or more other Persons (which assignment shall not relieve the Initiating Member of its obligations under this Section 6.8); or

(ii)    The Initiating Member may seek a third party purchaser for one hundred percent (100%) of the Units whether through an asset or equity sale or a sale in any other form ("Third Party Sale").

(f)    The Initiating Member must notify the Non-Initiating Member of its election of Section 6.8(e)(i) or Section 6.8(e)(ii) within thirty (30) days after the Initiating Member's receipt of the Buy/Sell Election Notice. If the Initiating Member fails to timely notify the Non-Initiating Member of its election, then the Initiating Member shall be deemed to have made an election of Section 6.8(e)(i).

(g)    If the Initiating Member pursues a Third Party Sale:

(i)    The Non-Initiating Member and the Company shall cooperate in the Initiating Member's Third Party Sale process in any manner reasonably requested by the Initiating Member. The Initiating Member will bear all costs and fees incurred in connection with the Third Party Sale (including without limitation all reasonable and necessary third party costs and fees, including attorneys' fees, incurred by the Non-Initiating Member in cooperating in such Third Party Sale process), except each Member will bear the costs and fees of its own independent advisors.

(ii)    The Initiating Member will have the requisite authority to negotiate and approve the Third Party Sale (which Third Party Sale will be conditioned on the consummation of the purchase or redemption of the Units of the Non-Initiating Member at the Buy/Sell Unit Price); and to this end the Initiating Member will have exclusive authority during this period to approve such a sale and any related agreements without the necessity of obtaining the consent or approval of the Board or the other Member; provided, however, that any representations and warranties relating specifically to any Member shall only be made by that Member and any indemnification provided by the Members shall be made on a several, not joint, basis; provided further, however, that the Non-

52

Initiating Member shall be required to make only the Required Representations. In no event shall (A) the consideration to be received by any Transferring Person in connection with a Third Party Sale consist of any form of non-cash consideration other than freely tradable publicly traded securities or (B) the amount of any indemnity obligation of any Transferring Person exceed the amount of cash and the fair market value of any non-cash consideration received by such Transferring Person in such Third Party Sale, except in the case of fraud by such Transferring Person. Any indemnification or other obligation assumed or incurred in connection with a Disposition shall be allocated among the Transferring Persons in the same proportion as the consideration received by the Transferring Persons, in each case other than with respect to the Required Representations.

(iii)     If the Initiating Member successfully negotiates a Third Party Sale, then prior to or upon consummation of the Third Party Sale, the Initiating Member will purchase the Units held by the Non-Initiating Member at the Buy/Sell Unit Price, or cause the purchaser in such Third Party Sale to purchase such Units at the Buy/Sell Unit Price. The purchase of such Units will be held at such time and place as will be elected by the Initiating Member but in any event not more than ninety (90) days after the Initiating Member's receipt of the Buy/Sell Election Notice, subject to extension for such period of time (not to exceed thirty (30) days) as necessary to permit the Initiating Member or the third party purchaser to obtain any required governmental approvals but in any event will occur no later than upon the consummation of the Third Party Sale.

(iv)     If the Initiating Member is unsuccessful in completing a Third Party Sale or the redemption or purchase of the Units held by the Non-Initiating Member is not consummated within the time period specified in Section 6.8(g)(iii), then Initiating Member will purchase the Units held by the Non-Initiating Member pursuant to Section 6.8(e)(i) within thirty (30) days after the one hundred twenty (120) day period set forth in Section 6.8(g)(iii).

(h)     It is expressly agreed that the remedy at law for breach of any of the obligations set forth in this Section 6.8 is inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with each of said obligations, and (ii) the uniqueness of the Company's business and the Company's relationship with the Members. Accordingly, each of the aforesaid obligations will be, and are hereby expressly made, enforceable by specific performance.

(i)     Notwithstanding anything contained in this Section 6.8, each transferee of a Member's Units or any interest therein shall be subject to the terms of this Section 6.8 (whether or not such transferee has been admitted as a Member) but a Member who has transferred its Units or any interest therein to any Person shall not be liable or responsible for any noncompliance or compliance, respectively, with this Section 6.8, by any such transferee of such Member who is not an Affiliate of such Member.

Section 6.9.     Assumption of Assignee. Any Disposition of an Interest in the Company permitted under this ARTICLE VI must be in writing, and the assignee must expressly agree in writing to be bound by the terms of this Agreement and assume and agree to perform all of the

53

assignor's agreements and obligations existing or arising with respect to the assigned Interest after the assignment. Upon any assignment and assumption, the assignor will be relieved of his agreements and obligations arising under this Agreement after the date of the assignment (but not before) to the extent of the Interest assigned, and if one hundred percent (100%) of that Member's Interest is assigned, such Member will be deemed to have withdrawn from the Company; provided, however, the assignee may only be admitted as a Member by the consent of the Board as required under this Agreement. An executed copy of each assignment of an Interest in the Company and the assumption of a Member's obligations must be delivered to each Member and to the Company. Except as otherwise expressly provided herein, no permitted assignment will cause a termination or winding-up of the Company.

Section 6.10.   Other Assignment Void.   Any purported Disposition of an Interest in the Company not permitted by this ARTICLE VI is null and void *ab initio* and of no effect whatsoever.

## ARTICLE VII
## ACCOUNTING, BANKING AND TAX MATTERS

Section 7.1.   Books and Records.   At all times during the continuance of the Company, the Company shall maintain separate books of account and shall cause each Subsidiary of the Company to maintain separate books of account, in each case, that shall show a true, complete and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company's and each such Subsidiary's business, as the case may be, on an industry standard federal tax book basis and in accordance with GAAP (subject to change pursuant to Section 5.7(a)(xxviii). Such books of account, together with a certified copy of this Agreement and of the Certificate, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times by each Member and its duly authorized representative for any purpose reasonably related to such Member's interest in the Company. Any Member that is not a Qualified Member shall only be entitled to such information, access to the Company's books and records, and reports as are required to be provided to such Member by non-waivable provisions of law.

Section 7.2.   Reporting.

(a)   Not later than forty-five (45) days after the end of each calendar quarter, the Company will provide each member with (i) an unaudited balance sheet, profit and loss statement and statement of cash flows of the Company and each of its Subsidiaries as of the end of such calendar quarter, all in accordance with GAAP or as otherwise determined by the Board, (ii) projected monthly income statements, balance sheets and cash flow statements on a consolidated basis for the next succeeding calendar quarter, (iii) estimates of revenues and estimated returns on invested capital for the next succeeding calendar quarter, and (iv) a report of the Company with respect to the operational status of the Company and each of its Subsidiaries for such quarterly period, and a Budget to actual variance analysis.

(b)   Not later than ninety (90) days after the end of each calendar year, the Company will provide each Member with (i) an audited balance sheet, profit and loss statement and statement of cash flows of the Company and each of its Subsidiaries as of the end of such calendar year, all in accordance with GAAP or as otherwise determined by the Board, (ii) a

capital account statement setting forth each Member's share of the capital of the Company, and (iii) a report of the Company with respect to the operational status of the Company and each of its subsidiaries for such yearly period and a Budget to actual variance analysis.

(c)     The Company shall prepare (or cause to be prepared) and provide to each Member such additional reports and information as the Board from time to time determines or as from time to time requested by Fir Tree or Crestline.

Section 7.3.     Tax Information.

(a)     The Company will provide the Members information necessary (including an estimated Schedule K-1 within sixty (60) days of the end of each calendar year and a final Schedule K-1 within ninety (90) days of the end of each calendar year) for the preparation by the Members for their federal, state and local income and other tax returns.

(b)     Promptly upon request, each Member shall provide the Company with any information, representations, certifications or forms relating to such Member (or information regarding such Member's direct or indirect owners) necessary to (x) allow the Company to comply with any tax reporting, tax withholding or tax payment obligations of the Company or (y) to establish the Company's legal entitlement to an exemption from, or reduction of, withholding or any other taxes or similar payments.

Section 7.4.     Fiscal Year.  The calendar year shall be selected as the accounting year of the Company and the books of account shall be maintained on an accrual basis.

Section 7.5.     Bank Accounts.  At the direction of the Board, the president or other authorized officer of the Company shall cause one or more bank accounts to be maintained in the name of the Company in such bank or banks as may be determined by the Board, which accounts shall be used for the payment of expenditures incurred by the Company and in which shall be deposited any and all receipts of the Company. All such receipts shall be and remain the property of the Company, shall be received, held and disbursed by the Board for the purposes specified in this Agreement and shall not be commingled with the funds of any other person. Asset Manager shall have authority to act with respect to bank accounts of the Company as provided in and subject to the terms of the Management Services Agreement until such authority is revoked or modified by the Board and written notice thereof is delivered to Asset Manager.

Section 7.6.     Tax Matters.

(a)     Designation.  Management, or its designee, is hereby designated as the "tax matters partner" or "partnership representative" for the Company, as applicable, within the meaning of the Code (the "Tax Matters Representative").  In such capacity, the Tax Matters Representative shall have all of the rights, authority and power, and shall be subject to all of the regulations of, a tax matters partner or partnership representative to the extent provided in the Code and the Treasury Regulations.

(b)     Foreign, State and Local Tax Law.  If any foreign, state or local tax law provides for a tax matters partner or person having similar rights, powers, authority or obligations, the Tax Matters Representative or its designee shall also serve in such capacity.  In

55

all other cases, the Tax Matters Representative shall represent the Company in all tax matters to the extent allowed by law.

(c)    Expenses of the Tax Matters Representative.  Expenses incurred by the Tax Matters Representative as the Tax Matters Representative, or in a similar capacity as set forth in this Section 7.6, shall be borne by the Company as Company expenses.  Such expenses shall include, without limitation, fees of attorneys and other tax professionals, accountants, appraisers and experts, filing fees and reasonable out of pocket costs.

(d)    Effect of Certain Decisions by Tax Matters Representative.  Any decisions made by the Tax Matters Representative, including, without limitation, whether or not to settle or contest any tax matter, whether or not to extend the period of limitations for the assessment or collection of any tax and the choice of forum for such contest shall be made in the Tax Matters Representative's reasonable discretion; provided, however, that the Tax Matters Representative shall not (i) agree to the extension of the statute of limitations for making assessments on behalf of the Company without first obtaining the written consent of the Members holding a majority of the outstanding Class A Units, or (ii) to the extent the Tax Matters Representative is acting as the tax matters partner within the meaning of the Code, bind any other Member to a settlement agreement in tax audits without obtaining the written concurrence of such Member.

(e)    Inconsistent Return Positions.  No Member shall file a notice with the IRS in connection with such Member's intention to treat an item on such Member's U.S. federal income tax return in a manner that is inconsistent with the treatment of such item on the Company's U.S. federal income tax return, unless such Member has, not less than thirty (30) days prior to the filing of such notice, provided the Company with a copy of the notice and thereafter in a timely manner provides such other information related thereto as the Company or the Board shall reasonably request.  Within one (1) week of receipt of such notice by the Company, the Company shall remit copies of such notification to the other Members.

(f)    Determinations by Board.  All tax and accounting matters not specifically and expressly provided for by the terms of this Agreement shall be determined by the Board.

## ARTICLE VIII
## INDEMNIFICATION

Section 8.1.    Power to Indemnify in Actions, Suits or Proceedings.  The Company shall, to the fullest extent permitted by Company Law, indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or Proceeding, whether civil, criminal, administrative or investigative by reason of the fact that he is or was a Member, officer, or Manager of the Company, or is or was serving at the request of the Company as a member, officer, or director of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (a "Covered Person"), against expenses (including attorneys' fees), liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such liabilities, judgments, penalties, fines and amounts paid in settlement) actually and reasonably incurred by such Covered Person in connection with such action, suit or Proceeding, provided that:

56

(a)    such Covered Person acted in good faith and in a manner such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, or

(b)    with respect to any criminal action or Proceeding, such Covered Person had no reasonable cause to believe his conduct was unlawful.

The termination of any action, suit or Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that a Covered Person did not act in good faith and in a manner which such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 8.2.    Expenses Payable in Advance.    The Company shall, to the fullest extent permitted by the Company Law, advance expenses incurred by a Covered Person in defending or investigating a threatened or pending action, suit or Proceeding in advance of the final disposition of such action, suit or Proceeding promptly upon (but in any event within five (5) days of) receipt of an unsecured undertaking by or on behalf of such Covered Person to repay such amount if it shall ultimately be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this ARTICLE VIII.

Section 8.3.    Nonexclusivity of Indemnification and Advancement of Expenses.    The indemnification and advancement of expenses provided by or granted pursuant to this ARTICLE VIII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any agreement, contract, vote of Members or the Board or pursuant to the direction (howsoever embodied) of any court of competent jurisdiction or otherwise, both as to action in a Covered Person's official capacity and as to action in another capacity while holding such office, it being the policy of the Company that indemnification of the persons specified in Section 8.1 shall be made to the fullest extent permitted by law unless the Board authorizes broader protection set forth in the other provisions of this ARTICLE VIII. The provisions of this ARTICLE VIII shall not be deemed to preclude the indemnification of any person who is not specified in Section 8.1 but whom the Company has the power or obligation to indemnify under the provisions of the Company Law or otherwise.

Section 8.4.    Insurance.    On such terms as the Board approves, the Company shall purchase and maintain insurance on behalf of any person who is or was a Covered Person against any liability asserted against such Covered Person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as such, whether or not the Company would have the power or the obligation to indemnify the Covered Person against such liability under the provisions of this ARTICLE VIII.    The insurance referenced in this Section 8.4 is not mandatory but discretionary upon approval of the Board.

Section 8.5.    Survival of Indemnification and Advancement of Expenses.    The indemnification and advancement of expenses provided by, or granted pursuant to, this ARTICLE VIII shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a Member, officer or director and shall inure to the benefit of the heirs, executors and administrators of such a person and shall survive the liquidation of the Company. No amendment or repeal of the provisions of this ARTICLE VIII which adversely affects the rights of any Covered Person under this ARTICLE VIII with respect to the acts or

57

WEIL:\95894375\17\39110.0004

omissions of such Covered Person at any time prior to such amendment or repeal shall apply to such Covered Person without the written consent of the Covered Person.

Section 8.6.    Limitation on Indemnification.    Notwithstanding anything else in this Agreement to the contrary, the Company shall not be obligated to indemnify any Covered Person or advance expenses to any Covered Person for (i) any Proceeding initiated by such Covered Person against the Company unless that Proceeding was brought to enforce such Covered Person's right to indemnification under this ARTICLE VIII and, in such Proceeding, it is determined that such Covered Person is entitled to indemnification, or (ii) any Proceeding brought by the Company against such Covered Person unless such Covered Person is found not to be liable to the Company.

Section 8.7.    Indemnification of Employees and Agents.    The Company may, to the extent authorized from time to time by the Board, provide rights to indemnification and the advancement of expenses to employees and agents of the Company similar to those conferred in this ARTICLE VIII to Members, officers or Managers of the Company.

Section 8.8.    Severability.    The provisions of this ARTICLE VIII are intended to comply with the Company Law. To the extent that any provision of this ARTICLE VIII authorizes or requires indemnification or the advancement of expenses contrary to the Company Law or the Certificate, the Company's power to indemnify or advance expenses under such provision shall be limited to that permitted by the Company Law and the Certificate and any limitation required by the Company Law or the Certificate shall not affect the validity of any other provision of this ARTICLE VIII.

Section 8.9.    Company as Indemnitor of First Resort.    The rights of indemnification provided in this ARTICLE VIII are in addition to any rights to which a Covered Person may otherwise be entitled by contract (including, without limitation, advancement of expenses) or as a matter of law.  The Company hereby acknowledges that the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by the Members and certain of their Affiliates (collectively, the "Member Indemnitors").  The Company hereby agrees that (a) the Company is the indemnitor of first resort for matters covered by this ARTICLE VIII (i.e., its obligations to the Covered Persons under ARTICLE VIII are primary and any obligation of the Member Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Covered Persons are secondary), (b) the Company shall be required to advance the full amount of expenses incurred by the Covered Persons and shall be liable for all expenses, liabilities, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of ARTICLE VIII (or any other agreement between the Company and the Covered Persons), without regard to any rights the Covered Persons may have against the Member Indemnitors, and (c) the Company irrevocably waives, relinquishes and releases the Member Indemnitors from any and all claims against the Member Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Company further agrees that no advancement or payment by the Member Indemnitors on behalf of a Covered Person with respect to any claim for which the Covered Person has sought indemnification from the Company pursuant to ARTICLE VIII shall affect the foregoing and the Member Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Covered Persons against the Company.  The Company agrees that the Member

58

Indemnitors who are not Members are express third party beneficiaries of the terms of this Section 8.9.

## ARTICLE IX
## DISSOLUTION, LIQUIDATION, AND TERMINATION

Section 9.1. <u>Dissolution</u>. The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following:

(a) the election by the Supermajority of the Voting Power to dissolve the Company;

(b) the sale by the Company and its Subsidiaries of all or substantially all of their assets (other than the equity interest in the Subsidiaries); and

(c) entry of a decree of judicial dissolution of the Company under the Company Law.

Section 9.2. <u>Procedure</u>. Any dissolution and winding up of the Company shall be conducted in accordance with the provisions of the Company Law by a Supermajority of the Voting Power, or if a Supermajority of the Voting Power so desires, a Person selected by a Supermajority of the Voting Power, acting as liquidator to wind up the affairs of the Company and make final distributions; <u>provided</u>, <u>however</u>, that distributions to the Members in a dissolution shall be made in accordance with Section 4.2 and Section 4.3.

Section 9.3. <u>Certificate of Cancellation</u>. On completion of the distribution of Company assets as provided in this Agreement, the Company shall be terminated and the Member shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 1.5, and take such other actions as may be necessary to terminate the existence of the Company.

## ARTICLE X
## REPRESENTATIONS

Section 10.1. <u>Certain Representations and Warranties of the Members</u>. Each Member hereby represents and warrants to the Company and each other Member as of the Effective Date and as of each date after the Effective Date such Member makes an additional Capital Contribution in exchange for additional Units or other Interests that:

(a) such Member has full power and authority to enter into this Agreement and to perform its obligations hereunder;

(b) the execution, delivery and performance of this Agreement do not conflict with any other agreement or arrangement to which such Member is a party or by which it is or its assets are bound;

(c) all property contributed to the Company by such Member, and any property thereafter to be contributed to the Company by such Member, has been or will be duly and lawfully acquired and will be contributed to the Company without any liens or encumbrances (other than statutory liens for taxes not yet due or owing);

WEIL:\95894375\17\39110.0004

(d)      such Member is and will be acquiring its interest in the Company for investment purposes only for his or its own account and not with a view to the distribution, reoffer, resale, or other disposition not in compliance with the Securities Act and applicable state securities laws;

(e)      such Member alone or together with his or its representatives, possesses such expertise, knowledge, and sophistication in financial and business matters generally, and in the type of transactions in which the Company proposes to engage in particular, that such Member is capable of evaluating the merits and economic risks of acquiring and holding an Interest, and that such Member is able to bear all such economic risks now and in the future;

(f)      such Member has had access to all of the information with respect to his or its Interest that such Member deems necessary to make a complete evaluation thereof;

(g)      such Member's decision to acquire an Interest for investment has been based solely upon the evaluation made by such Member;

(h)      such Member is aware that he, she or it may have to bear the economic risk of such Member's investment in the Company for an indefinite period of time because Interests have not been registered under the Securities Act or under the securities laws of any state, and, therefore, such Interests cannot be sold unless they are subsequently registered under the Securities Act and any applicable state securities laws or an exemption from registration is available;

(i)      such Member is aware that only the Company can take action to register Interests in the Company and that the Company is under no such obligation and does not propose or intend to attempt to do so other than pursuant to the terms of this Agreement;

(j)      such Member is aware that this Agreement provides restrictions on the ability of a Member to Dispose of its Interests, and such Member will not seek to effect any Disposition of his, her or its Interests other than in accordance with such restrictions; and

(k)      such Member is an "accredited investor" within the meaning ascribed to such term under Regulation D of the Securities Act.

## ARTICLE XI
## GENERAL PROVISIONS

Section 11.1.  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Members and their respective legal representatives, successors, and assigns.

Section 11.2.  <u>Directly or Indirectly</u>.  Where any provision of this Agreement refers to action to be taken by any person, or which such person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such person, including actions taken by or on behalf of any Affiliate of such person.

Section 11.3.  <u>Governing Law</u>.  This Agreement is governed by and will be construed in accordance with the laws of the State of Delaware, excluding any conflict of laws rule or

WEIL:\95894375\17\39110.0004

principle (whether under the laws of Delaware or any other jurisdiction) that might refer the governance or the construction of this Agreement to the law of another jurisdiction.

Section 11.4.  Severability.   If any provision of this Agreement is held to be unenforceable, this Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed unenforceable, and in all other respects this Agreement shall remain in full force and effect; provided, however, that if any provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by Applicable Law.

Section 11.5.  Further Assurances.   In connection with this Agreement and the transactions contemplated hereby, the Members shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 11.6.  No Third Party Beneficiaries.  Except as otherwise provided in ARTICLE VIII, it is the intent of the Member that no third-party beneficiary rights be created or deemed to exist in favor of any person not a party to this Agreement, unless otherwise expressly agreed to in writing by the parties.

Section 11.7.  Amendment; Waiver.   Except as otherwise provided herein, no amendment of this Agreement shall be effective unless such amendment is executed by Fir Tree and Crestline; provided, however, that in no event shall this Agreement be amended, supplemented, or otherwise modified (i) to require any Member to make a Capital Contribution to the Company without that Member's prior written consent, (ii) in any manner that would adversely affect any Member's rights under this Agreement with respect to a class of Interests in a disproportionate or discriminatory manner (as compared to any other Member with respect to such same class of Interests), without such Member's prior written consent, (iii) in a manner that otherwise adversely affects any other rights of a Member under this Agreement in a disproportionate or discriminatory manner (as compared to any other Member) without such Member's prior written consent or (iv) to amend Section 5.2 without all of the Members' prior written consent; provided further, however, that no Member approval shall be required for any amendment made to Schedule I in accordance with Section 3.1 or for any amendment to reflect the terms of any Interests issued pursuant to Section 3.3 or to admit any Person who acquires interests pursuant to Section 3.3 as a new member to the Company except as described in subclause (iv) above.  Neither the waiver by a Member of a breach of or a default under any of the provisions of this Agreement, nor the failure of a Member, on one or more occasion, to enforce any of the provisions of this Agreement or to exercise any right, remedy or privilege hereunder, shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provisions, rights, remedies or privileges hereunder.

Section 11.8.  Notices.  All notices, demands, requests or other communications which may be or are required to be given, served or sent by a Member pursuant to this Agreement shall be in writing and shall be hand delivered (including delivery by courier), mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or transmitted by Electronic Transmission, addressed as set forth on Schedule I attached hereto.  Each Member may designate by notice in writing a new address to which any notice, demand, request or communication may thereafter be so given, served or sent.  Each notice, demand, request or communication which shall be delivered, mailed or transmitted in the manner described above

shall be deemed sufficiently given, served, sent or received for all purposes at such time as it is delivered to the addressee (with an affidavit of personal delivery, the return receipt or the delivery receipt being deemed conclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

Section 11.9. <u>Press Releases</u>.  Any public announcement or similar publicity with respect to this Agreement or the transactions contemplated by this Agreement will be issued, if at all, at such time and in such manner mutually agreed by the Members.

Section 11.10. <u>Confidentiality</u>.

(a)    Each Member agrees that the provisions of this Agreement, all understandings, agreements and other arrangements between and among the Members, and all other non-public information received from or otherwise relating to the Company or its business will be confidential, and will not be disclosed or otherwise released to any other Person (other than another party hereto), without the written consent of the Members, unless such disclosure or release is otherwise permitted pursuant to the terms of a separate agreement between the Company (or one of its Subsidiaries), on the one hand, and such Member, on the other. The obligations of the Members hereunder will not apply to the extent that the disclosure of information otherwise determined to be confidential is required by Applicable Law; <u>provided</u>, that prior to disclosing such confidential information, to the extent practicable a Member must notify the Company thereof, which notice will include the basis upon which such Member believes the information is required to be disclosed.  The terms of this <u>Section 11.10</u> shall survive with respect to each Member until the earlier to occur of (a) the date following one year from the date of the liquidation of the Company and (b) the date following two (2) years from the date of termination or Disposition of the entirety of such Member's Units.

(b)    Notwithstanding <u>Section 11.9</u> or <u>Section 11.10</u>, each of the Members may provide information regarding the Company, its Subsidiaries, this Agreement, and the assets, operations and financial information and business plans regarding the Company and its Subsidiaries to (i) their respective legal, financial and accounting advisors, (ii) their respective members, partners, managers, and officers and the members, partners, managers, and officers of their Affiliates who Control them, (iii) current and prospective investors and other financing sources of a Member or its Affiliates and (iv) potential purchasers or participants, directly or indirectly through such person or an Affiliate of such Person, of Units, <u>provided</u> any such potential purchaser or participant executes a confidentiality agreement with the Company in form and substance reasonably satisfactory to the Members (which consent shall not be unreasonably withheld, conditioned or delayed).

Section 11.11. <u>Specific Performance</u>.  Each Member acknowledges that monetary damages are not necessarily an adequate remedy for the breach by any Member of this Agreement and that the non-breaching Members shall be entitled to specific performance, injunction, and other appropriate equitable remedies, without the posting of any bond or proving actual damages would occur in the absence of specific performance.

Section 11.12. <u>Reimbursement of Expenses</u>.  Each Member shall be solely responsible for and shall bear all of its own costs, fees and expenses, including the fees and expenses of legal counsel, financial advisors, consultants and representatives, incurred in connection with its

WEIL:\95894375\17\39110.0004

investment in the Company, including in connection with negotiating, drafting and executing this Agreement.

Section 11.13. <u>Entire Agreement</u>.  This Agreement (including the Schedules hereto) contains the entire agreement between the Members with respect to the matters contemplated herein, and supersedes all prior oral or written agreements, commitments or understandings with respect to the matters provided for herein and therein.

Section 11.14. <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which may be delivered by facsimile or electronic means, but all of which together will constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WEIL:\95894375\17\39110.0004

IN WITNESS WHEREOF, the Members have caused this Company Agreement to be executed as of the date first above written.

**FT SOF V AIV HOLDINGS I, LLC**

By:
     Name:
     Title:

**FT SOF VII AIV HOLDINGS I, LLC**

By:
     Name:
     Title:

**FT SOF IV HOLDINGS, LLC**

By:
     Name:
     Title:

**CL ENERGY OPPORTUNITY FUND, L.P.**

By:
    Name:
    Title:

Case 16-10704-CTG   Doc 874-3   Filed 11/01/16   Page 71 of 74

**DAKOTA MIDSTREAM, LLC**

By: _____
      Name: _____
      Title: _____

SIGNATURE PAGE TO LIMITED LIABILITY COMPANY AGREEMENT OF NEW EMERALD ENERGY HOLDINGS, LLC

WEIL:\95894375\17\39110.0004

## SCHEDULE I

## COMPANY PERCENTAGE INTERESTS

**CLASS A MEMBERS:**

| Member | Address | Initial Capital Contribution | Additional Capital Contributions | Class A Units | Percentage Interest |
|---|---|---|---|---|---|
| FT SOF V AIV Holdings I, LLC | c/o Fir Tree Partners 55 West 46th Street, 29th Floor New York, NY 10036 | $18,950,750.00 | | 18,950.75 | 16.2925% |
| FT SOF VII AIV Holdings I, LLC | c/o Fir Tree Partners 55 West 46th Street, 29th Floor New York, NY 10036 | $16,243,500.00 | | 16,243.5 | 13.965% |
| FT SOF IV Holdings, LLC | c/o Fir Tree Partners 55 West 46th Street, 29th Floor New York, NY 10036 | $18,950,750.00 | | 18,950.75 | 16.2925% |
| CL Energy Opportunity Fund, L.P. | c/o: Crestline Investors, Inc. 201 Main Street, Suite 1900 Fort Worth, TX 76102 | $56,355,000.00 | | 56,355 | 48.45% |
| Dakota Midstream, LLC | 1400 Wewatta Street Suite #310 Denver, Colorado 80202 | $5,815,789.47 | | 5,815.79 | 5.00% |

WEIL:\95894375\17\39110.0004

## EXHIBIT A

## <u>INITIAL MANAGERS</u>

<u>Fir Tree Managers</u>:

Evan Lederman
David Proman

<u>Crestline Managers</u>:

Keith Williams
Rahul Vaid

<u>Fir Tree/Crestline Manager</u>

Intentionally left vacant as of the Effective Date pending appointment by Fir Tree and Crestline
pursuant to <u>Article 5</u>

**EXHIBIT B**

**<u>INITIAL OFFICERS</u>**

Evan Lederman, Co-CEO
David Proman, Vice President
Clinton Biondo, Vice President
Brian Meyer, Vice President
Keith Williams, Co-CEO
Jesus Payan, Vice President
John Cochran, Vice President