*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| EMERALD OIL, INC., *et al.*,[1] | ) | Case No. 16-10704 (KG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE DEBTORS' AMENDED
## JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
            ryan.bennett@kirkland.com
            travis.bayer@kirkland.com

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
            crobinson@pszjlaw.com
            jmulvihill@pszjlaw.com

*Counsel to the Debtors*

Dated:  February 8, 2017

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include:  Emerald Oil, Inc. (9000); Emerald DB, LLC (2953); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887).  The location of the Debtors' service address is:  200 Columbine Street, Suite 500, Denver, Colorado 80206.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (THIS "DISCLOSURE STATEMENT") TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' AMENDED JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN"). NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE

AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE XI OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED. YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN AND ARTICLE IX OF THIS DISCLOSURE STATEMENT ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS AND THE COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

# TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION**............................................................................................................**1**
   A.    The Plan ................................................................................................................1
   B.    The Plan Structure..............................................................................................1
   C.    The Adequacy of this Disclosure Statement .....................................................2

**ARTICLE II. TREATMENT OF CLAIMS AND INTERESTS** ......................................................**3**
   A.    Class 1—Allowed Priority Claims ....................................................................5
   B.    Class 2—Credit Facility Claims .......................................................................5
   C.    Class 3—Other Secured Claims ........................................................................5
   D.    Class 4—General Unsecured Claims .................................................................6
   E.    Class 5—Intercompany Claims..........................................................................6
   F.    Class 6—Section 510(b) Claims ........................................................................6
   G.    Class 7—Intercompany Interests ......................................................................6
   H.    Class 8—Interests in Parent ..............................................................................7

**ARTICLE III. VOTING AND CONFIRMATION** ..........................................................................**7**
   A.    Classes Entitled to Vote on the Plan .................................................................7
   B.    Votes Required for Acceptance by a Class ........................................................7
   C.    Certain Factors to Be Considered Prior to Voting ............................................7
   D.    Classes Not Entitled to Vote on the Plan ..........................................................8
   E.    Solicitation Procedures ......................................................................................8
   F.    Voting Procedures..............................................................................................9
   G.    Plan Objection Deadline ..................................................................................11
   H.    Confirmation Hearing ......................................................................................11

**ARTICLE IV. BUSINESS DESCRIPTION**...................................................................................**12**
   A.    Corporate History.............................................................................................12
   B.    Prepetition Capital Structure ...........................................................................15

**ARTICLE V. EVENTS LEADING TO THE CHAPTER 11 CASES** ........................................**17**
   A.    Industry Challenges..........................................................................................17
   B.    Adverse Market Conditions .............................................................................17
   C.    Proactive and Disciplined Approach to Addressing Liquidity Constraints.....................18
   D.    Other Attempts to Address Liquidity ..............................................................19
   E.    Events of Default and Temporary Forbearance ..............................................19
   F.    Sale Term Sheet ...............................................................................................20

**ARTICLE VI. EVENTS OF THE CHAPTER 11 CASES**............................................................**20**
   A.    First Day Pleadings and Other Case Matters ..................................................20
   B.    Claims Bar Date ...............................................................................................21
   C.    The Sale Transaction........................................................................................22
   D.    DMS Litigation ................................................................................................23
   E.    The Lender-Committee Settlement ..................................................................23
   F.    BLM Leases .....................................................................................................24

**ARTICLE VII. SUMMARY OF THE PLAN** ...............................................................................**24**
   A.    Administrative and Priority Claims .................................................................25
   B.    Classification, Treatment, and Voting of Claims and Interests........................26
   C.    Means for Implementation of the Plan ............................................................29
   D.    Treatment of Executory Contracts and Unexpired Leases ..............................36
   E.    Provisions Governing Distributions.................................................................38
   F.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims and Interests ............41

G.       Settlement, Release, Injunction, and Related Provisions ...................................................43
H.       Confirmation and Substantial Consummation of the Plan .............................................47
I.        Modification, Revocation, or Withdrawal of the Plan ....................................................48
J.        Retention of Jurisdiction .................................................................................................49
K.       Miscellaneous Provisions.................................................................................................51

**ARTICLE VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.......................53**
A.       Confirmation Hearing ......................................................................................................54
B.       Confirmation Standards ...................................................................................................55
C.       Alternative Plans..............................................................................................................56
D.       Acceptance by Impaired Classes......................................................................................56
E.       Confirmation Without Acceptance by All Impaired Classes ..........................................57

**ARTICLE IX. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING................................58**
A.       Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under
         the Plan ............................................................................................................................58
B.       Certain Bankruptcy Law Considerations .........................................................................59
C.       Disclosure Statement Disclaimer ....................................................................................61
D.       Liquidation under Chapter 7 ...........................................................................................63

**ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES .........................63**
A.       Certain United States Federal Income Tax Consequences to Holders of Allowed Claims............64
B.       Certain United States Federal Income Tax Consequences to the Debtors ......................66

**ARTICLE XI. RECOMMENDATION OF THE DEBTORS ...............................................................67**

**EXHIBITS**

EXHIBIT A      Debtors' Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code

EXHIBIT B      Liquidation Analysis

# ARTICLE I.

# INTRODUCTION

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the *Debtors' Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"), which the Debtors are seeking to have confirmed by the Bankruptcy Court.[1]    A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.    The rules of interpretation set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

**Each of the Debtors' boards of managers or directors, or sole member has approved the Plan and believes the Plan is in the best interests of the Debtors' Estates.  As such, the Debtors recommend that all Holders of Claims entitled to vote accept the Plan by returning their ballots (each, a "Ballot") so as to be <u>actually</u> <u>received</u> by the Solicitation Agent (as defined herein) no later than <u>March 13, 2017, at 4:00 p.m. (prevailing Eastern Time)</u>.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing on <u>March 22, 2017, at 10:00 a.m. (prevailing Eastern Time)</u>.**

A.     *The Plan*

As more fully described below, the Debtors filed voluntary petitions for relief pursuant to chapter 11 on the Petition Date.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors filed the Plan, the terms of which are more fully described herein, contemporaneously herewith.  The Plan contemplates a liquidation of each of the Debtors and their Estates and is therefore referred to as a "plan of liquidation."  The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates and therefore seek to confirm the Plan.

Generally speaking, the Plan:   (a) provides for the full and final resolution of certain funded debt obligations; (b) designates a Plan Administrator to (i) wind down the Debtors' businesses and affairs; (ii) pay and reconcile Claims; and (iii) administer the Plan in an efficacious manner; (c) provides for the release of any remaining Avoidance Actions and Cash distributions from the GUC Reserve on a Pro Rata basis to Holders of Allowed General Unsecured Claims that are Participating GUC Holders (as defined below); and (d) provides for 100 percent recoveries for Holders of Allowed Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Other Secured Claims.  The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below.   Holders of Claims in Class 2 (Credit Facility Claims), and Class 4 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

B.     *The Plan Structure*

The Plan proposes to fund creditor recoveries from the proceeds of a Sale Transaction pursuant to which the Debtors sold substantially all of the assets of the Estates.  As set forth in more detail in Article VI.C below, following a robust marketing process, on May 25, 2016, the Debtors and the Stalking Horse Bidder (as defined herein) executed an asset purchase agreement.  Following the entry of the Bidding Procedures Order (as defined herein) approving the Bidding Procedures Motion (as defined herein) and related sale procedures, the Debtors continued to use their best efforts to market the assets of the estates in order to obtain Qualified Bids (as defined in the Bidding Procedures Order) prior to the September 27, 2016 bid deadline.  As the auction approached, the pool of

---

[1]     Unless otherwise specified herein, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

potential bidders narrowed to include the Stalking Horse Bidder and the Debtors' Credit Facility Agent, on behalf of the Lenders under their prepetition credit facility and postpetition debtor-in-possession financing facility. As described in the *Notice of Successful Bidder and Cancellation of Auction* [Docket No. 752], the Credit Facility Agent, on behalf of the Lenders, exercised its credit bid right (the "Lender Bid") for the benefit of and on behalf of a newly formed entity controlled by the Lenders (the "Purchaser"). Thereafter, the Stalking Horse Bidder indicated it would not participate further in an auction and the Debtors, in consultation with their advisors, determined the Lender Bid to be the highest and best bid. As set forth in more detail herein, following a hearing on the issues, the Bankruptcy Court entered an order approving the Sale Transaction on November 1, 2016. On November 1, 2016, the Debtors consummated the Sale Transaction with the Lenders.

Pursuant to the Plan, the Debtors, Post-Effective Date Debtor, or Plan Administrator shall pay or provide for payments of Claims as follows:

- as provided in Article VII.C.7 herein, the Plan Administrator shall establish the Priority Claims Reserve, which Priority Claims Reserve shall be used to pay Allowed Priority Claims in full;

- as provided in Article VII.A.3 herein, the Debtors or the Post-Effective Date Debtor shall fund the Professional Fee Escrow, which Professional Fee Escrow shall be used to pay Allowed Professional Fee Claims;

- as provided in Article VII.C.7 herein, the Plan Administrator shall establish the Other Secured Claims Reserve, which Other Secured Claims Reserve shall be used to pay Allowed Other Secured Claims; and

- as provided in Article VII.C.7. herein, the Plan Administrator shall establish the GUC Reserve, which GUC Reserve shall be used to pay Allowed General Unsecured Claims of Participating GUC Holders. **Holders of Allowed Claims in Class 4 (General Unsecured Claims) that vote to accept the Plan (each, a Participating GUC Holder) will receive their Pro Rata share of the Cash held in the GUC Reserve, as set forth in Article VIII.F of the Plan, on account of such Claims. Holders in Class 4 that vote to reject the Plan or abstain from voting (each, a Non-Participating GUC Holder) will not receive any distribution on account of such Allowed Class 4 Claims.**

Each of the Distribution Reserve Accounts described above will be funded from the Sale Proceeds generated from the Sale Transaction and Cash on hand. Surplus Cash from the General Account, as set forth in Article VIII.G of the Plan, will be paid to Holders of Class 2 Credit Facility Claims, *provided* that if the Lenders receive a full recovery on account of their Allowed Credit Facility Claims, surplus Cash from the General Account shall be paid to the Holders of Allowed General Unsecured Claims from and after the time the Lenders have fully recovered on account of their Allowed Credit Facility Claims. The Debtors believe that the Plan is in the best interest the Estates, including Holders of General Unsecured Claims, and urge such Holders to vote to accept the Plan.

C.    *The Adequacy of this Disclosure Statement*

Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. The Debtors submit this Disclosure Statement in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history and structure, business operations, and prepetition capital structure and indebtedness (Article IV hereof);

- the events leading to the Chapter 11 Cases (Article V hereof);

- the significant pleadings Filed in the Chapter 11 Cases and certain relief granted by the Bankruptcy Court in connection therewith (Article VI hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the Holders of Claims entitled to vote, the procedures for voting on the Plan, and projected recoveries (Articles II, III, VII, and VIII hereof);

- the method of distribution of any recoveries that may be available to certain Holders of Claims pursuant to the Plan, the process for resolving Disputed Claims, and other significant aspects of the Plan (Article VII hereof);

- the releases contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Article VII hereof);

- the statutory requirements for confirming the Plan (Article VIII hereof);

- certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article IX hereof); and

- certain United States federal income tax consequences of the Plan (Article X hereof).

In light of the foregoing, the Debtors believe that this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

## ARTICLE II.

## TREATMENT OF CLAIMS AND INTERESTS

As set forth in Articles II and III of the Plan, and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims, which are unclassified Claims under the Plan) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the treatment of all unclassified Claims under the Plan. The treatment and projected recoveries of unclassified Claims are described in summary form below for illustrative purposes only. To the extent that any inconsistency exists between the summary contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Unclassified Claim | Plan Treatment | Projected Amount of Allowed Claims | Projected Plan Recovery |
|---|---|---|---|
| Administrative Claims | Unimpaired | $0 | 100% |
| Priority Tax Claims | Unimpaired | $0 | 100% |
| Professional Fee Claims | Unimpaired | $900,000.00 | 100% |

The table below summarizes the classification and treatment of all classified Claims and Interests under the Plan.[2]

The classification, treatment, and projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change. *Additionally, recoveries available to Holders of Claims are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims actually Allowed exceeds the estimates provided below. In such an instance, the recoveries available to Holders of Allowed Claims could be materially lower when compared to the estimates provided below. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.*

| Class | Claim or Interest | Plan Treatment | Voting Rights | Projected Amount of Allowed Claims or Interests | Projected Plan Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) | $0 | N/A |
| 2 | Credit Facility Claims | Impaired | Entitled to Vote | $27,678,151.00 | 0–1% |
| 3 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) | $966,508.26 | 100% |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | $202,337,769.72 | 1% |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | $463,533.45 | 0% |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | 0% |
| 8 | Interest in Parent | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | 0% |

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Debtors or the Plan Administrator, as applicable.

---

[2]    As described below and in the Plan, the Debtors seek authority to substantively consolidate the Estates for all purposes associated with Confirmation and Consummation of the Plan.

A.      *Class 1—Allowed Priority Claims*

    1.   *Classification*:  Class 1 consists of Allowed Priority Claims against any Debtor.

    2.   *Treatment*:  Each Holder of an Allowed Class 1 Claim shall either (i) be paid by the Plan Administrator from the Priority Claims Reserve, as set forth in Article VIII.C of the Plan, the amount of such Holder's Allowed Class 1 Claim on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter), and (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment from the Post-Effective Date Debtor Assets that may be agreed upon in writing by the Plan Administrator and such Holder. The Cash payment shall be in exchange for and in full satisfaction and discharge of the Holder's Allowed Priority Claim.

    3.   *Voting*:  Class 1 is Unimpaired.  Each Holder of an Allowed Class 1 Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Class 1 Claim is not entitled to vote to accept or reject the Plan.

B.      *Class 2—Credit Facility Claims*

    1.   *Classification*:  Class 2 consists of all Credit Facility Claims.

    2.   *Allowance*:  Class 2 Claims shall be Allowed in the amount of $27,678,151.00.

    3.   *Treatment*:  Each Holder of an Allowed Class 2 Claim shall be satisfied in full by the payment by the Plan Administrator of the distributions of surplus Cash from the General Account, as set forth in Article VIII.G of the Plan.  Such payments shall be in exchange for and in full satisfaction and discharge of all Allowed Class 2 Claims.

    4.   *Voting*:  Class 2 is Impaired.  Each Holder of an Allowed Class 2 Claim is entitled to vote to accept or reject the Plan.

C.      *Class 3—Other Secured Claims*

    1.   *Classification*:  Class 3 consists of all Other Secured Claims, including all Secured Tax Claims, against any Debtor.

    2.   *Treatment*:  Except to the extent that a Holder of an Allowed Class 3 Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Class 3 Claim, each such Holder shall receive, at the Plan Administrator's election:

        a)   payment in full in Cash of such Holder's Allowed Other Secured Claim with a distribution from the Other Secured Claims Reserve;

        b)   the Post-Effective Date Debtor's interest in the Collateral securing such Holder's Allowed Other Secured Claims; or

        c)   such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

    3.   *Voting*:  Class 3 is Unimpaired.  Each Holder of an Allowed Class 3 Claim is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Class 3 Claim is not entitled to vote to accept or reject the Plan.

D.    *Class 4—General Unsecured Claims*

    1.   *Classification*:  Class 4 consists of all General Unsecured Claims against any Debtor.

    2.   *Allowance:*  The Indenture Trustee shall have an Allowed General Unsecured Claim entitled to treatment as an Allowed Class 4 Claim in the amount of $149,919,000.00 for all of its Claims under the Convertible Notes and Convertible Notes Indenture, and all other Claims asserted by the Indenture Trustee shall be deemed disallowed.

    3.   *Treatment*:  Each Holder of an Allowed Class 4 Claim shall receive, as applicable:

        a)    If the Allowed Class 4 Claim is held by a Participating GUC Holder, such Holders will receive its Pro Rata share of the Cash held in the GUC Reserve, as set forth in Article VIII.F of the Plan; or

        b)    If the Allowed Class 4 Claim is held by a Non-Participating GUC Holder, such Holders will not receive any distribution on account of such Allowed Class 4 Claim.

    4.   *Voting*:  Class 4 is Impaired.  Each Holder of an Allowed Class 4 Claim is entitled to vote to accept or reject the Plan.

E.    *Class 5—Intercompany Claims*

    1.   *Classification*: Class 5 consists of all Intercompany Claims.

    2.   *Treatment*:  Class 5 Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Class 5 Claim will not receive any distribution on account of such Class 5 Claim.

    3.   *Voting*:  Class 5 is Impaired.  Each Holder of a Class 5 Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

F.    *Class 6—Section 510(b) Claims*

    1.   *Classification*:  Class 6 consists of all Section 510(b) Claims.

    2.   *Treatment*:  Class 6 Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Class 6 Claim will not receive any distribution on account of such Class 6 Claim.  The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist.

    3.   *Voting*:  Class 6 is Impaired.  Each Holder of a Class 6 Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

G.    *Class 7—Intercompany Interests*

    1.   *Classification*: Class 7 consists of all Intercompany Interests.

    2.   *Treatment*:  Class 7 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of Class 7 Interests will not receive any distribution on account of such Class 7 Interests.

3.  *Voting*:  Class 7 is Impaired.  Each Holder of Class 7 Interests is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

H.  *Class 8—Interests in Parent*

1.  *Classification*:  Class 8 consists of all Interests in the Parent.

2.  *Treatment*:  Class 8 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of Class 8 Interests will not receive any distribution on account of such Class 8 Interests.

3.  *Voting*:  Class 8 is Impaired.  Each Holder of Class 8 Interests is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

## ARTICLE III.

## VOTING AND CONFIRMATION

On the date hereof, the Debtors Filed a motion seeking entry of a proposed Disclosure Statement Order approving this Disclosure Statement.

A.  *Classes Entitled to Vote on the Plan*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status |
|-------|-------|--------|
| 2 | Credit Facility Claims | Impaired |
| 4 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot.  If your Claim or Interest is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provide to you.

B.  *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

C.  *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to Article IX hereof, entitled "Certain Risk Factors to be Considered Before Voting."

D.    *Classes Not Entitled to Vote on the Plan*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Allowed Priority Claims | Unimpaired | Presumed to Accept |
| 3 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Interests | Impaired | Deemed to Reject |
| 8 | Interests in Parent | Impaired | Deemed to Reject |

E.    *Solicitation Procedures*

1.    *Solicitation Agent*

The Debtors retained Donlin Recano & Company, Inc. ("Donlin Recano") to act, among other things, as the solicitation agent (the "Solicitation Agent") in connection with the solicitation of votes to accept or reject the Plan.

2.      *Solicitation Package*

Pursuant to the Disclosure Statement Order, Holders of Claims who are entitled to vote to accept or reject the Plan as of February 7, 2017 (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;  and

- this Disclosure Statement, including the Plan as an exhibit thereto.

3.      *Distribution of the Solicitation Package and Plan Supplement*

The Debtors will cause Donlin Recano to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before February 13, 2017, which will be at least 28 days before the Voting Deadline (*i.e.*, 4:00 p.m. prevailing Eastern Time on March 13, 2017).

The Solicitation Package (except for the Ballots) may also be obtained:  (a) from Donlin Recano by (i) visiting http://www.donlinrecano.com/emerald; (ii) writing to Emerald Oil, Inc., Ballot Processing Center, c/o Donlin, Recano & Company, Inc., Attn.:  Emerald Oil, Inc., *et al.*, 6201 15th Ave, Brooklyn, NY 11219; and/or (iii) emailing Balloting@DonlinRecano.com; or (b) for a fee via PACER at http://www.deb.uscourts.gov.

At least 14 days prior to the Confirmation Hearing, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at http://www.donlinrecano.com/emerald.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) from Dolin Recano by (i) calling the Debtors' restructuring hotline at 877-208-9515 (toll free) or 212-771-1128 (international); (ii) visiting the Debtors' restructuring website at:  http://www.donlinrecano.com/emerald; (iii) writing to Donlin, Recano & Company, Inc., Attn: Emerald Oil, Inc., *et. al.*, Ballot Processing, 6201 15th Ave, Brooklyn, NY 11219; and/or (iv) emailing Balloting@DonlinRecano.com; or (b) for a fee via PACER at http://www.deb.uscourts.gov.

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such Holders will receive only the Confirmation Hearing Notice and a non-voting status notice.  The Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims or Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

F.      *Voting Procedures*

If, as of the Voting Record Date, you are a Holder of a Claim in Class 2 or 4—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided.  If your Claim or Interest is not included in the Voting Classes you are not entitled to vote and you will not receive a Solicitation Package.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

1.      *Voting Deadline*

The Disclosure Statement Order established a deadline to vote on the Plan of March 13, 2017, at 4:00 p.m., prevailing Eastern Time (the "Voting Deadline").  To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by Donlin Recano no later than the Voting Deadline.

2.        *Voting Instructions*

As described above, the Debtors have retained Donlin Recano to serve as the Solicitation Agent for purposes of the Plan.  Donlin Recano is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
|---|
| To be counted, all Ballots must be **actually received** by Donlin Recano by the Voting Deadline, which is March 13, 2017, at 4:00 p.m., prevailing Eastern Time, at the following address:<br><br>Emerald Oil, Inc. Ballot Processing<br>c/o Donlin, Recano & Company, Inc.<br>6201 15th Ave<br>Brooklyn, NY 11219<br><br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by Donlin Recano at:<br>877-208-9515 (toll free) or 212-771-1128 (international). |

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan.  All votes to accept or reject the Plan must be cast by using the appropriate Ballot.  All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; or (c) hand-delivery, so that the Ballots are **actually received** by Donlin Recano no later than the Voting Deadline at the return address set forth in the applicable Ballot.  Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder.  By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

All Ballots will be accompanied by postage prepaid return envelopes.  It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

As described more fully on the applicable Ballots, Holders who are entitled to vote on the Plan may opt out of the third party release provided in Article X.E of the Plan by (a) checking the box on the Ballot and (b) voting to reject the Plan or abstaining from voting on the Plan.  If a Holder votes to accept the Plan, such Holder will be deemed to consent to the third party release, even if such Holder elects to opt out of the third party release.  The election to withhold consent to grant such release is at such Holder's option.  Likewise, any such Holder that votes to accept or reject the Plan and submits a Ballot without checking the box to opt out of the third party release will be deemed to consent to the third party release.  Accordingly, the Debtors urge Holders permitted to vote on the Plan to thoroughly and carefully read their Ballots, including their right to opt out of the third party release.

Holders of Allowed Claims in Class 4 (General Unsecured Claims) that vote to accept the Plan (each, a Participating GUC Holder) will receive their Pro Rata share of the Cash held in the GUC Reserve, as set forth in Article VIII.F of the Plan, on account of such Claims.  Holders in Class 4 that vote to reject the Plan or abstain from voting (each, a Non-Participating GUC Holder) will not receive any distribution on account of such Allowed Class 4 Claims.

10

3.       *Disputed Claims Procedures*

The Disclosure Statement Order authorizes the Debtors to temporarily allow Claims against which an objection is pending as of the Voting Record Date in an amount that the Bankruptcy Court deems appropriate for purposes of permitting the Holder of such Claim to vote to accept or reject the Plan.  Pursuant to the Solicitation Procedures, if a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is Filed with the Court on or prior to ten days before the Voting Deadline: (i) the Debtors shall cause the applicable Holder to be served with a disputed claim notice; and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined below) occurs.  The Holder of a Claim in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court fewer than ten days before the Voting Deadline, the applicable Claim shall be deemed temporarily allowed *for voting purposes only*, without further action by the Holder of such Claim and without further order of the Bankruptcy Court, unless the Bankruptcy Court orders otherwise.

A "<u>Resolution Event</u>" means the occurrence of one or more of the following events no later than three days prior to the Voting Deadline:  (i) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (ii) an order of the Bankruptcy Court is entered temporarily allowing such Claim *for voting purposes only* pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (iii) a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; (iv) a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder to vote its Claim in an agreed upon amount; or (v) the pending objection is voluntarily withdrawn by the objecting party.  No later than two Business Days following the occurrence of a Resolution Event, the Debtors shall cause Donlin Recano to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant Holder.

G.       *Plan Objection Deadline*

The Disclosure Statement Order established March 13, 2017, at 4:00 p.m., prevailing Eastern Time, as the deadline to object to Confirmation of the Plan (the "<u>Plan Objection Deadline</u>").  All objections to the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are **<u>actually</u>** **<u>received</u>** on or before the Plan Objection Deadline.

H.       *Confirmation Hearing*

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing.  The Disclosure Statement Order scheduled the Confirmation Hearing to commence on March 22, 2017, at 10:00 a.m., prevailing Eastern Time, before the Honorable Kevin Gross, United States Bankruptcy Judge, in Courtroom No. 3 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served on the entities who have Filed objections to the Plan, without further notice to other parties in interest.   The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

# ARTICLE IV.

## BUSINESS DESCRIPTION

A.    *Corporate History*

    1.    *Introduction*

Emerald Oil, Inc. ("Emerald"), together with its Debtor-Affiliates, is a Denver-based independent exploration and production company that was focused on acquiring acreage and developing wells in the Williston Basin of North Dakota. The Debtors held leasehold interests that provided them the right to drill and maintain wells in specific geographic areas. The Debtors designed and drilled oil and natural gas wells on acreage where they held a controlling working interest and then operated those wells with the expectation of producing hydrocarbons. In general, the Debtors' lease agreements were for three to five year primary terms. Once a well was drilled and production established, the unit was considered held by production, meaning the lease continued as long as hydrocarbons were being commercially produced. Other locations within the drilling unit created for a well could also be drilled at any time as long as the lease was held by production.

As of March 15, 2016, the Debtors leased approximately 76,000 net acres (approximately 128,000 gross acres) in the Williston Basin, located in McKenzie, Dunn, Billings, and Stark Counties in North Dakota. The Debtors' primary geologic targets were the Middle Bakken and Three Forks formations along with the Pronghorn sand. The Debtors transported the majority of produced hydrocarbons and water out of the basin via pipeline and sold the produced hydrocarbons to various end users. Upon receipt of proceeds representing the gross amount of hydrocarbons produced, the Debtors then distributed the allocated production to the appropriate working interest parties, leaseholders, and governmental entities.

While producing, the Debtors' average cycle time from spudding an individual well to realizing revenues was approximately 60 days. Emerald marketed its own produced crude oil to end users via its wholly owned subsidiary, EOX Marketing, LLC ("EOX"). Collectively, as of June 30, 2016, the Debtors estimate that their holdings included proved developed oil reserves of approximately 12,800 MBbls, all of which were located in the Williston Basin, and proved developed natural gas reserves of approximately 9,900 MMcf.

Emerald is the direct parent of each of the four other Debtors. Emerald is not the direct or indirect parent of any other entity. A graphical depiction of the Debtors' organizational structure appears below:



    2.    *Exploration and Production Process Overview.*

As explained more fully below, the Debtors' business generally consisted of four stages: exploration, appraisal, production, and transportation.

(a)    *Exploration*

The first stage of the process consisted of locating oil or natural gas deposits by examining the surface and sub-surface structure of a particular geographic area. Exploration and production companies seek to identify geographic characteristics that indicate oil or natural gas may be present in a certain area. Exploration and production companies use several techniques to identify these deposits. For instance, data from offset well locations drilled by other operators is gathered and analyzed to identify specific geologic zones. These geologic zones are then mapped over an exploration and production company's leasehold position to establish areas that are proven to hold commercial amounts of recoverable hydrocarbons. The geologic mapping process is not perfect, as there are multiple variables that must be analyzed. As a result, the assumptions used when mapping the geologic properties of an area can have a significant impact on the resulting map.

(b)    *Appraisal*

Once a set of targets has been identified by geologic mapping or otherwise, the next step is to assess the likelihood of discovering an active hydrocarbon system at each target. This step is accomplished through drilling or "spudding" an exploration well. The purpose of an exploration well is to accumulate additional information regarding the targeted rock formation.

Wells usually are drilled by rotary drilling. Rotary drilling uses a hollow pipe with a drill bit on the end. To facilitate the drilling process, a mixture of chemicals, referred to as "mud," is pumped down the middle of the drill pipe. Mud then exits through the drill bit and circulates back up to the surface between the drill pipe and the walls of the well. The purpose of mud is to carry away cuttings from the drill bit, provide lubrication to prevent the drill pipe from getting stuck in the well bore, provide hydraulic pressure to prevent oil from "blowing out" of the well, and deposit a thin, impermeable layer of mud over reservoir zones to prevent further invasion and/or damage of the reservoir by drilling fluids.

Wells generally are drilled in stages. When the bottom of each stage is reached, the freshly drilled hole, known as an "open-hole," is cased off with steel pipe, converting the "open-hole" to a "cased-hole." Casing is used to prevent the hole from collapsing on top of the drill pipe.

Simply drilling a hole into the ground rarely conclusively reveals whether the well has intersected an oil or gas reservoir. This unfortunate fact is especially true with respect to shale or tight oil or gas wells, which often require additional operations, including fracking, to start the flow of oil and gas. As a result, once the exploration well is drilled, the exploration and production company begins a set of operations designed to acquire additional information regarding the presence, quantity, and location of hydrocarbons in the surrounding area.

Such information can be acquired through a combination of mud analysis, coring, and wirelogging. Mud analysis consists of geologists analyzing the returned mud cuttings to identify what type of rock formation has been drilled through. However, mud analysis does not shed any light on the depth of each type of rock as cuttings do not necessarily rise to the surface in a uniform manner. Coring involves bringing physical samples from the well to the surface for analysis. Although coring is a more accurate way to assess the formation being drilled through, it is also more expensive and often requires working with multiple third-party consultants.

Wirelogging involves lowering an electrode on the end of a long cable to the bottom of a well and continuously recording the voltage difference between the electrode and the surface while slowly pulling the electrode up to the surface. This process capitalizes on the fact that reservoirs bearing water or hydrocarbons react differently to the drilling mud, producing different voltage responses as the wire-line log moves through the well. Because wirelogging requires access to the well, no drilling may take place while wirelogging is ongoing.

The only way to definitively determine whether oil or gas exists in economic quantities is a well test. A well test involves setting up equipment so oil and gas can flow to the surface in a controlled manner. Measurement of flow rates, properties of the fluids or gas produced, and fluid surface pressures will provide an exploration and production company with definitive information about the permeability, content, and potential flow rate of a reservoir.

(c)     *Production*

Upon completion of the appraisal stage, exploration and production companies begin extracting the hydrocarbons.  Extracted oil is gathered by a network of pipes into a central treatment plant where any associated gas or water is removed.  The crude oil is then either piped or trucked to a refinery or export terminal.  The water or gas removed from the oil will either be reinjected into the field from which it came or be sent to the local gas market.  Gas is piped back to a central processing station, where any water, sulphur, or other impurities are removed.  If gas is destined for local market distribution, it is usually treated before being sent to the market.  If there is not a sufficient local market for the gas, the gas may be transmitted to a plant for treatment and potentially cooled for export as a liquid.  Crude oil has historically constituted approximately 98 percent of the Debtors' revenue stream.

(d)     *Transportation*

Crude oil and natural gas can be transported to the end user through several means:  via a network of pipelines, by trucking, or by rail.  All three methods of transportation gather and transport crude oil and natural gas from its origin to end markets.  Exploration and production companies, including the Debtors, are dependent on seamless interaction with hydrocarbon gatherers, transporters, and processors in order to maintain both profitable and environmentally compliant operations.

3.     *Acreage Holdings*

As of February 2016, the Debtors held approximately 76,000 net acres in the Williston Basin.  The Debtors operated approximately 100 percent of this total net acreage.  More specifically, the Debtors' acreage holdings comprised the operating areas below (all figures are approximate):

- 54,000 net acres in the Low Rider area of McKenzie County, North Dakota;

- 20,000 net acres in the Lewis & Clark area of McKenzie County, North Dakota (south of the Low Rider area); and

- 2,000 net acres in the Pronghorn Sand formation in Stark and Billings Counties, North Dakota, in the core of the Pronghorn field.

4.     *Employees*

As of the date of this Disclosure Statement, the Debtors employed approximately 19 individuals on a full-time basis.  Approximately three employees are paid on an hourly basis and approximately 16 employees receive a salary.  The Debtors do not employ any individuals on a part-time basis.  None of the employees receive a commission, and none are represented by a union or collective bargaining unit.  In addition to the employees, the Debtors also retain from time to time specialized individuals as independent contractors to complete discrete projects.  The Debtors currently retain one independent contractor in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time.

5.     *Production and Proved Reserves*

As described above, in recent years the Debtors have primarily focused their operations on exploration, development, and production in the Williston Basin.  The Debtors' aggressive focus on the Williston Basin resulted in substantial increases in both production and proved reserves from 2010–2014, although proved reserves dropped off dramatically in 2015 as the Debtors' undeveloped reserves became effectively currently worthless due to drops in commodity prices:

The significant increase in proved reserves through the 2014 fiscal year (a 99 percent year-over-year increase) was driven primarily through increased drilling activity in the Debtors' operated well program, which continued through 2015.  The Debtors initially believed their production profile would continue to grow in 2016,

with a focus on the operated drilling program to convert Emerald's substantial undeveloped operated leasehold position to production; however, as described further herein, continued commodity price pressure stalled these plans.

B.    *Prepetition Capital Structure*

    1.    *The Debtors' Prepetition Capital Structure*

As of December 31, 2015, the Debtors estimated approximately $291 million in total assets (with $28 million in current assets) and approximately $337 million in total liabilities. As described in greater detail below, as of the Petition Date, the principal amount of the Debtors' consolidated funded debt obligations totaled approximately $260.5 million, comprising approximately $111 million of obligations under the Credit Facility (as defined herein) and approximately $148.5 million of obligations under the Convertible Notes (as defined herein).

    2.    *The Credit Facility*

Emerald is the borrower under that certain Amended and Restated Credit Agreement, dated as of May 1, 2014 (as amended from time to time, the "Credit Agreement"), with Wells Fargo Bank, N.A., as initial administrative agent (in such capacity, the "Agent"), and the lenders from time to time party thereto (the "Lenders").[3] The Credit Agreement provided for a senior secured reserve-based revolving credit facility with a maximum commitment of $400 million (the "Credit Facility"). The obligations owing in respect of the Credit Agreement were guaranteed by each of the other Debtors (the "Guarantors").

The Credit Agreement granted the Agent and the Lenders a first priority lien on substantially all of the assets of Emerald and the Guarantors, including a pledge of Emerald's interests in the Guarantors. On April 30, 2015, in connection with the scheduled semiannual borrowing base redetermination, Emerald and the Lenders entered into an amendment to the Credit Facility. The amendment to the Credit Facility reduced the borrowing base from $250 million to $200 million. On October 6, 2015, the Agent notified Emerald that the borrowing base was further decreased to $120 million, as described more fully below. On February 3, 2016, The Bank of Nova Scotia ("BNS") notified Emerald that Emerald's existing hedges had been terminated for approximately $17.5 million with all proceeds going to pay down of the existing base deficiency. Concurrently, the borrowing base was reduced from $120 million to $113 million.

The Credit Agreement permitted the Debtors to hedge (typically in the form of a swap agreement) up to 60 percent of proved reserves for the first 24 months of the term of the particular swap agreement and 80 percent of projected production from proved developed producing reserves from the 24th month up to the 60th month of the swap agreement, subject to certain restrictions. As of September 30, 2015, Emerald had hedges covering 70 percent of its projected production through 2016. However, as of the Petition Date, all of the Debtors' swap agreements had terminated, and the Debtors therefore no longer had hedges in place.

    3.    *The DIP Facility*

Following the commencement of the Chapter 11 Cases, Emerald, the Lenders, and the Agent amended the Credit Agreement to provide for postpetition debtor-in-possession financing. On March 24, 2016, Emerald, as borrower, and its Debtor-Affiliates, as guarantors, entered into that certain Debtor in Possession Financing Amendment to Amended and Restated Credit Agreement (the "DIP Financing Amendment"), pursuant to which the Lenders agreed to make the DIP Facility available to the Debtors. The DIP Financing Amendment was further amended by the parties on May 9, 2016, pursuant to that certain Amended and Restated Debtor in Possession Financing Amendment to Amended and Restated Credit Agreement (the "First DIP Financing Amendment").

On July 20 2016, the Agent for the Lenders filed the *Notice of Assignment and Transfer of Claims* [Docket No. 523], thereby serving notice that the outgoing lenders set forth on Exhibit 1 attached thereto had assigned their respective notes and claims in the Chapter 11 Cases to certain lenders set forth on Exhibit 2 attached

---

[3]    The Credit Agreement amended and restated that certain Credit Agreement, dated as of November 20, 2012, among Emerald, as borrower, the Agent and the Lenders.

thereto. On September 27, 2016, Emerald entered into that certain Second Debtor in Possession Financing Agreement to Amended and Restated Credit Agreement (the "Second DIP Financing Amendment"), pursuant to which, among other things, Cortland Capital Market Services LLC became administrative agent (successor in such capacity to the Agent, the "Credit Facility Agent") for the Lenders. Pursuant to the Second DIP Financing Amendment, the parties also agreed to extend the DIP Facility maturity date to the earliest of (a) October 31, 2016 at 5:00 p.m. Central Time, (b) the date the Debtors or Credit Facility Agent terminate the commitment of the Lenders to make loans under the DIP Facility, (c) the date following the occurrence of an uncured Event of Default, (d) the effective date of a confirmed plan of the Debtors, (e) the date on which any agreement for the sale of substantially all of the Debtors' assets closes, or (f) the date on which the Bankruptcy Court approves the extension of any other credit facilities to the Debtors over the objection of the Credit Facility Agent, each as more particularly set forth in the Second DIP Financing Amendment.

On November 1, 2016, the court entered the *Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Further Implementing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Modifying Certain Provisions of the Final DIP Order, (E) Approving the DMS Settlement, and (F) Granting Related Relief* [Docket No. 874] (the "Sale Order"), pursuant to which the Lenders' commitment under the Final DIP Order terminated.

4.    *The Convertible Notes*

Emerald issued those certain 2.0 percent Convertible Senior Notes due 2019 (the "Convertible Notes") pursuant to an Indenture dated March 24, 2014 between Emerald and U.S. Bank, National Association, as indenture trustee (the "Indenture Trustee"). The Convertible Notes, issued in the aggregate principal amount of $172,500,000 (netting approximately $167 million in proceeds), mature on April 1, 2019. Interest on the Convertible Notes is payable semi-annually on October 1 and April 1 of each year. The Convertible Notes are not guaranteed by the other Debtors. On October 22, 2015, the Debtors entered into an agreement with a holder of the Convertible Notes pursuant to which the Debtors and the noteholder agreed to exchange approximately $3 million principal value of Convertible Notes for a number of shares of common stock, thereby achieving a limited deleveraging.

5.    *Common and Preferred Stock*

As of December 31, 2015, Emerald had 9,582,970 shares of common stock outstanding and 255,732 shares of Series B Voting Preferred Stock issued and outstanding. On February 11, 2015, Emerald completed a public offering of 1,357,955 shares of common stock at a price of $22.40 per share for total net proceeds of approximately $29.4 million.

Then, on May 20, 2015, a majority of Emerald's stockholders approved a 1-for-20 reverse stock split pursuant to which all stockholders of record received one share of common stock for each twenty shares of common stock owned (subject to minor adjustments as a result of fractional shares). During April and May 2015, Emerald issued shares of common stock through its "at the market" or "ATM" program totaling 2,460,045 at an average price of $6.87 per share for total net proceeds of approximately $16.4 million, and during September 2015, issued another 848,961 shares at an average price of $2.79 per share for total net proceeds of approximately $2.3 million.

6.    *Asset Retirement Obligations*

As of December 31, 2015, the Debtors had asset retirement obligations associated with the future plugging and abandonment of its proved oil and natural gas properties and related facilities in the discounted amount of $4.7 million. Such obligations may be mandated by federal regulations that impose a comprehensive set of requirements for plugging wells with the goal of protecting workers and the environment.

## ARTICLE V.

## EVENTS LEADING TO THE CHAPTER 11 CASES

A.     *Industry Challenges*

The oil and natural gas industry is intensely competitive, particularly with respect to the acquisition of prospective oil and natural gas properties and oil and natural gas reserves.  The Debtors competed against a substantial number of major and independent oil and natural gas companies that have larger technical staffs and greater financial and operational resources than the Debtors.  Many of these companies not only engage in the acquisition, exploration, development, and production of oil and natural gas reserves, but also have refining operations, sell market refined products, and generate electricity.

In addition, winter weather conditions and lease stipulations could limit or temporarily halt the Debtors' drilling and producing activities and other oil and natural gas operations.  These constraints and the resulting shortages or high costs could delay or temporarily halt operations and materially increase operating and capital costs.  Such seasonal anomalies could also pose challenges for meeting well drilling objectives and may increase competition for equipment, supplies, and personnel during the spring and summer months, which could lead to shortages and increase costs or delay or temporarily halt operations.

The Debtors' business was also subject to extensive rules and regulations promulgated by federal, state, tribal, and local authorities and agencies.  For example, North Dakota requires permits for drilling operations, posting of drilling bonds, and reports concerning operations and imposes stringent limits on the amount of excess natural gas that the Debtors can "flare," *i.e.* burn up, thereby imposing significant additional costs to remain environmentally compliant.  The Debtors' operations were subject to other extensive and changing federal, state, and local laws and regulations relating to environmental protection, including the generation, storage, handling, emission, transportation, and discharge of materials into the environment, and similar laws and regulations relating to safety and health. The recent trend in environmental legislation and regulation generally is toward stricter standards, and the Debtors anticipate that this trend will likely continue.[4]

B.     *Adverse Market Conditions*

In the fall of 2014, oil prices plummeted due to a worldwide oversupply, and these prices have remained depressed.  Simultaneously, the natural gas market saw the impact of continued growth in natural gas production in the United States, which, coupled with generally mild weather, has caused a sustained drop in natural gas prices for the foreseeable future.  The graphics below illustrate the drop in commodity prices over the last two years:[5]

---

[4]    Existing laws pertaining to the Debtors may include, among others, the Comprehensive Environmental, Response, Compensation, and Liability Act, the Federal Safe Drinking Water Act, the Underground Injection Control program, the federal Clean Water Act and analogous state laws, the federal Clean Air Act and comparable state laws, and the Endangered Species Act.

[5]    *See Commodity Futures Price Quotes for Crude Oil*, NASDAQ, http://www.nasdaq.com/markets/crude-oil.aspx?timeframe=2y (last visited December 28, 2016); *Commodity Futures Price Quotes for Natural Gas*, NASDAQ, http://www.nasdaq.com/markets/natural-gas.aspx?timeframe=2y (last visited December 28, 2016).



The Debtors are not alone in their difficult position. A number of other independent exploration and production companies, including Magnum Hunter Resources Corporation, Swift Energy Company, American Eagle Energy Corporation, Quicksilver Resources Inc., Saratoga Resources Inc., Sabine Oil & Gas Corporation, Energy and Exploration Partners, LLC, Samson Resources Corporation, SandRidge Energy, Inc., Ultra Petroleum, Corp., Midstates Petroleum Company, Inc., and Linn Energy, LLC filed for bankruptcy protection in 2015 and 2016. A growing number of other similarly situated companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings. Most small- and mid-cap oil and gas companies are under financial distress due to the continued decline in commodity prices.

C.      *Proactive and Disciplined Approach to Addressing Liquidity Constraints*

      1.      *Operational Changes*

As oil and gas prices continued to decline starting in late 2014 and through 2015, and as the Debtors understood the potential for future prices to remain at such low levels for an extended period of time, the Debtors considered numerous proactive actions to stabilize their financial position, including:  (a) actively managing their debt capital structure; (b) selling assets; (c) minimizing capital expenditures; (d) obtaining waivers or amendments from the Lenders; (e) effectively managing working capital; (f) improving cash flows from operations; and (g) accessing the equity capital markets.

The Debtors also initiated numerous measures aimed at continuing to improve efficiency and cutting costs at both the operational and corporate level.  For example, in December 2014, the Debtors reduced the 2015 development program due to the fallen commodity price environment.  The Debtors therefore released two of their three contracted rigs at the beginning of 2015 and halted the majority of their previously planned drilling program for 2015.  With their remaining rig, the Debtors realized an approximate 30 percent reduction in drilling and completion costs, driven primarily by commodity price depression and the subsequent effect on the Debtors' field service providers combined with operational efficiencies achieved by the Debtors.  The Debtors released their remaining contracted rig in July 2015 due to the continued commodity price depression.

Unfortunately, the Debtors also have had to discharge approximately 55 percent of their employees since the beginning of 2015.  The Debtors were also not to pay all of their vendors on a current basis in the months leading up to the Petition Date.  Beginning in November, 2015, the Debtors extended certain trade terms with their vendors in order to carefully manage their precarious liquidity situation.  Since then, the Debtors have reached trade settlements with several of their critical day to day vendors who continued to perform services postpetition.

      2.      *Koch and Angelus Transactions*

On July 31, 2015, certain of the Debtors entered into a purchase and sale agreement with Koch Exploration Company, LLC ("Koch Exploration"), a wholly owned subsidiary of Koch Industries Inc., pursuant to which Koch Exploration acquired a 30 percent working interest in approximately 25,000 undeveloped net acres held by the

Debtors in McKenzie County, North Dakota and approximately 4,400 undeveloped net acres held by the Debtors in Richland County, Montana, for approximately $17.4 million. Koch Exploration also reimbursed the Debtors approximately $5.4 million for its proportionate share of drilled and uncompleted wells in southern McKenzie County. Total proceeds received by the Debtors upon closing the transaction on October 1, 2015 were approximately $20 million and were used to pay down outstanding borrowings under the Credit Facility. Approximately $2.7 million was held in escrow subject to customary closing diligence items, of which approximately $1.8 million has subsequently been paid over to the Debtors (with approximately $674,000 of this $1.8 million then applied to repayment of the Credit Facility).

On December 18, 2015, the Debtors entered into a purchase and sale agreement with Angelus Private Equity Group with respect to the sale of certain of the Debtors' oil and gas leases totaling approximately 9,750 net acres with associated daily production of approximately 375 barrels of oil equivalent for an aggregate $9.75 million. The sale closed on January 11, 2016, and all of the proceeds were used to pay down outstanding borrowings under the Credit Facility.

D.       *Other Attempts to Address Liquidity*

The Debtors entered into exclusive negotiations with an unrelated third party on June 11, 2015 regarding a $75 million senior secured second lien term loan facility. The proceeds from the proposed transaction were intended to pay down outstanding borrowings under the Credit Facility, which would have resulted in additional borrowing capacity for the Debtors. On October 12, 2015, the Debtors and the counterparty determined they were unable to consummate a transaction and terminated the exclusivity arrangement. The primary negating factor in the failure to close the proposed transaction was the inability of the counterparty to agree to terms under a required intercreditor agreement.

The Debtors also entered into exclusive negotiations with an unrelated third party on October 20, 2015 regarding a $175 million refinancing (consisting of a $50 million revolving credit facility and a $125 million term loan). The proceeds from the proposed transaction were intended to pay off the Lenders in full and allow some additional funds for working capital purposes. In December 2015, however, the Debtors and the counterparty determined that they were unable to consummate a transaction and terminated the exclusivity arrangement. The primary negating factor in the failure to close the proposed transaction was the continued effect on the Debtors' reserve base caused by the sustained commodity price downturn.

On November 18, 2015, the Debtors executed a term sheet with another unrelated party to provide the Debtors $30 million in a private offering of convertible notes. The offering was contingent on the Debtors successfully closing on either a senior secured loan or a second lien term loan and successfully reducing the outstanding loan on the Credit Facility to a level acceptable to the counterparty. Unfortunately, the Debtors were unable to successfully close such a loan or reduce their outstanding loan on the Credit Facility to an acceptable level, and therefore the potential offering failed.

In addition, on March 16, 2015, the Lenders executed a term sheet with an unrelated third party proposing to assign the Credit Facility from the Lenders to the third party. The assignment was contingent on certain conditions precedent being executed, including the satisfactory performance of due diligence, and would have resulted in an immediate liquidity injection from the third party. The transaction was never consummated.

E.       *Events of Default and Temporary Forbearance*

Given the myriad issues facing its industry, Emerald was unable to maintain the minimum ratios required by certain of its financial covenants under the Credit Agreement for the quarters ended June 30 and September 30, 2015. On October 6, 2015, the Agent delivered a "New Borrowing Base Notice" as permitted under the Credit Agreement, notifying Emerald that, as of that date, the borrowing base was decreased from $200 million to $120 million. At the time, the principal amount of approximately $140 million was outstanding under the Credit Facility, resulting in a deficiency of approximately $20 million. Under the terms of the Credit Agreement, Emerald was obligated to repay the deficiency in three monthly installments beginning on November 5, 2015.

Given the financial covenant defaults and Emerald's inability to make the first installment payment with respect to the deficiency, on November 5, 2015, the Debtors, certain Lenders, and the Agent entered into a forbearance agreement (the "Forbearance Agreement") pursuant to which such Lenders and the Agent agreed to forbear from exercising their rights and remedies under the Credit Agreement until December 18, 2015, with respect to certain events of default (including the financial covenant breaches). The parties to the Forbearance Agreement subsequently extended its term until January 29, 2016. During the forbearance period provided by the Forbearance Agreement, the Debtors and their advisors engaged in numerous discussions with their key constituents—namely, the Agent, the Lenders, and certain holders of the Convertible Notes—regarding possible restructuring alternatives. Although the parties tried to reach a global, consensual resolution, these attempts failed and the Forbearance Agreement expired according to its terms on January 29, 2016.

As result of the events of default under the Credit Agreement, BNS notified the Debtors that it had designated February 3, 2016 as the early termination date of the ISDA Master Agreement (together with all schedules and confirmations and amendments thereto, the "ISDA Agreement") dated as of June 20, 2014. Thereafter, on February 3, 2016, BNS terminated the ISDA Agreement and applied $17.5 million of proceeds from the termination to amounts owing by the Debtors to BNS under the Credit Agreement. As a result of this payment of the ISDA Agreement termination proceeds to the Credit Agreement, as well as the proceeds from other transactions consummated by the Debtors, the Debtors cured the borrowing base deficiency under the Credit Facility.

However, notwithstanding the cure of the borrowing base deficiency, the Debtors remained in default under the Credit Facility based on the continuing covenant defaults, and there was no further credit available under the Credit Facility. In addition, the possibility of an acceleration of the obligations under the Credit Facility posed the threat of a potential cross-default under the documents governing the Convertible Notes and the related possibility of holders of the Convertible Notes accelerating their maturity. On February 26, the Debtors provided written notice to the Indenture Trustee of certain defaults under the indenture governing the Convertible Notes, as well as the expiration of the Forbearance Agreement.

F.      *Sale Term Sheet*

The Debtors also negotiated with various parties in the months leading up to the Petition Date concerning a potential sale of a material portion or substantially all of the Debtors' assets. These sustained good-faith efforts on the part of the Debtors and their advisors ultimately led to the Debtors' entry into a non-binding sale term sheet with a potential purchaser. While the Debtors continued conversations with this interested party during their larger marketing process (as described in more detail below), the two parties ultimately did not consummate a transaction.

## ARTICLE VI.

## EVENTS OF THE CHAPTER 11 CASES

A.      *First Day Pleadings and Other Case Matters*

1.      *First and Second Day Relief*

The Debtors Filed on, or shortly after, the Petition Date certain motions and applications requesting various types of "first day" and "second day" relief. The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things: (a) an order authorizing the Debtors to obtain postpetition secured financing, use cash collateral during the Chapter 11 Cases, and granting certain adequate protection to certain secured parties [Docket No. 17]; (b) an order authorizing the Debtors to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions [Docket No. 11]; (c) an order directing joint administration of the Chapter 11 Cases [Docket No. 2]; (d) an order authorizing the Debtors to  pay certain prepetition taxes and fees [Docket No. 5]; (e) an order authorizing the Debtors to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of

20

business [Docket No. 7]; (f) an order authorizing the Debtors to make mineral payments and working interest disbursements [Docket No. 8]; (g) an order granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs [Docket No. 9]; (h) an order authorizing the Debtors to make payment on account of prepetition Claims of certain working interest expenses, joint interest billings, marketing expenses, and 503(b)(9) claimants [Docket No. 10]; (i) an order authorizing the Debtors to retain and compensate professionals utilized in the ordinary course of business [Docket No. 12]; (j) an order approving notification and hearing procedures for certain transfers of common stock and preferred stock [Docket No. 13]; and (k) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance [Docket No. 14].

### 2.   Retention of Chapter 11 Professionals

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders authorizing the Debtors to retain and employ the following professionals:  (a) Donlin Recano & Company, Inc., as the notice and claims agent and administrative advisor for the Debtors [Docket Nos. 42 and 309]; (b) Kirkland & Ellis LLP, as counsel [Docket No. 310]; (c) Pachulski Stang Ziehl & Jones LLP, as co-counsel [Docket No. 270]; (d) Intrepid Financial Partners LLC, as financial advisor [Docket No. 235]; and (e) Opportune LLP, to provide a Chief Restructuring Officer and certain additional personnel [Docket No. 302].  On May 11, 2016, the Bankruptcy Court entered an order approving procedures for the interim compensation and reimbursement of expenses of retained professionals [Docket No. 311].  On April 19, 2016, the Bankruptcy Court also granted the Debtors the authority to retain and compensate certain professionals utilized by the Debtors in the ordinary course of business [Docket No. 207].

### 3.   Appointment of Official Committee of Unsecured Creditors

On April 6, 2016, 2016, the Office of the U.S. Trustee appointed the Committee [Docket No. 125].  The members of the Committee are: (a) UBS O'Connor; (b) U.S. Bank National Association, as Indenture Trustee; (c) Stoneham Drilling Corp.; (d) FTS International Services, LLC; and (e) Wolverine Flagship Fund Trading Limited.[6]

On June 2, 2016, the Bankruptcy Court entered orders approving the Committee's retention of Akin Gump Strauss Hauer & Feld as co-counsel [Docket No. 357] and Whiteford, Taylor, & Preston as co-counsel [Docket No. 358].  On September 14, 2016, the Bankruptcy Court entered an order approving the Committee's retention of Houlihan Lokey Capital, Inc. as financial advisor [Docket No. 693].

### B.   Claims Bar Date

On May 6, 2016, the Debtors Filed the Schedules [Docket Nos. 289–298] pursuant to section 521 of the Bankruptcy Code and in accordance with the Bankruptcy Court's order [Docket No. 206].  On June 17, 2016, the Debtors file the amended Schedules [Docket Nos. 396–404] pursuant to section 521 of the Bankruptcy Code.

The Bankruptcy Code allows the Bankruptcy Court to fix the time within which Proofs of Claim must be filed in the Chapter 11 Cases.  Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must File a Proof of Claim.

On May 20, 2016, the Debtors Filed a motion requesting the Bankruptcy Court to enter an order approving, among other things:  (a) July 15, 2016, at 5:00 p.m. prevailing Eastern Time (the "Claims Bar Date") as the deadline

---

6    Koch Exploration Company, LLC, an initial member of the Committee, resigned from the Committee on July 5, 2016. *See Supplemental Declaration of David H. Botter in Support of the Application of the Official Committee of Unsecured Creditors of Emerald Oil, Inc., et al. to Retain and Employ Akin Gump Strauss Hauer & Feld LLP as Co-Counsel, Nunc Pro Tunc* to April 6, 2016 [Docket No. 502].  In addition, MSD Partners, L.P, an initial member of the Committee, resigned from the Committee on September 22, 2016.

for all non-Governmental Units to File Claims in the Chapter 11 Cases; (b) September 19, 2016, at 5:00 p.m. prevailing Eastern Time as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases; (c) July 15, 2016, as the deadline to request allowance of certain Administrative Claims; (d) procedures for filing Proofs of Claim; and (e) the form and manner of notice of the bar dates [Docket No. 326].  On June 6, 2016, the Bankruptcy Court granted such relief [Docket No. 364].

As of the General Claims Bar Date, approximately 980 Proofs of Claim were timely Filed in the Chapter 11 Cases asserting a total of approximately $1.0 billion, plus unliquidated amounts.  The Debtors are currently reviewing these Proofs of Claim to determine whether the asserted Claims should be Allowed, and if so, in what amount and priority.  The Debtors or the Plan Administrator may file objections to certain Claims by the Claims Objection  Bar Date that they believe should not be Allowed in the amount or priority asserted in the relevant Proofs of Claim.

C.      *The Sale Transaction*

A key event of these Chapter 11 Cases is the Sale Transaction pursuant to which the Debtors sold substantially all of the assets of their chapter 11 estates.  Postpetition, the Debtors engaged in arm's-length negotiations with interested parties regarding a potential sale of all or substantially all of the assets of their Estates. These negotiations culminated with the execution of that certain asset purchase agreement, dated as of May 25, 2016, by and among the Debtors and New Emerald Holdings, LLC (the "Stalking Horse Bidder").  On May 25, 2016, the Debtors Filed a motion [Docket No. 336] (the "Bidding Procedures Motion") seeking, in part, approval of bidding procedures for a sale of the substantially all of the Debtors' assets through an auction pursuant to section 363 of the Bankruptcy Code.  On July 28, 2016 (as revised pursuant to orders entered on August 18, 2016 and August 30, 2016), the Bankruptcy Court entered orders [Docket Nos. 572, 629, and 664] (collectively, the "Bidding Procedures Order") approving the Bidding Procedures Motion and related sale procedures.  The Bidding Procedures Order established, among other things, the Stalking Horse Bidder as a Qualified Bidder (as defined in the Bidding Procedures Order).  The Debtors proceeded to continue to use their best efforts to market the assets of the estates in order to obtain Qualified Bids (as defined in the Bidding Procedures Order) prior to the September 27, 2016, bid deadline.  As the auction approached, the pool of potential bidders narrowed to include the Stalking Horse Bidder and the Debtors' Credit Facility Agent, on behalf of the Lenders under their prepetition credit facility and postpetition DIP Facility.  As described in the *Notice of Successful Bidder and Cancellation of Auction* [Docket No. 752], the Credit Facility Agent, on behalf of the Lenders, exercised its credit bid right (the "Lender Bid") for the benefit of and on behalf of a newly formed entity controlled by the Lenders (the "Purchaser").  Thereafter, the Stalking Horse Bidder indicated it would not participate further in an auction and the Debtors, in consultation with their advisors, determined the Lender Bid to be the highest and best bid.  Pursuant to the Purchase Agreement entered into by the Lenders and the Debtors:

- the Purchaser agreed to purchase substantially all of the Debtors' assets for a Base Purchase Price of $110,500,000, including a Credit Bid Portion and Cash Portion (as each term is defined in the Purchase Agreement);

- the parties agreed that the assets to be sold pursuant to the Purchase Agreement were to be sold free and clear of all Encumbrances pursuant to section 363(f) of the Bankruptcy Code, but subject to Permitted Encumbrances (as each term is defined in the Purchase Agreement);

- the Purchaser agreed to assume certain Assumed Liabilities in connection with the Debtors' businesses, including certain Cure Costs (as each term is defined in the Purchase Agreement); and

- the parties agreed that the Debtors shall be permitted to retain certain Avoidance Actions, as set forth in detail pursuant to the Purchase Agreement.

After considering the issues at a hearing on October 28, 2016, the Bankruptcy Court entered the Sale Order. On November 1, 2016, the Debtors consummated the Sale Transaction with the Lenders.

D.    *DMS Litigation*

The Sale Transaction also effectuated the successful resolution of the Debtors' litigation with Dakota Midstream, LLC, Dakota Energy Connection, LLC, and Dakota Fluid Solutions f/k/a Mesa Oil Services, LLC (collectively, "<u>DMS</u>").  The Debtors and DMS were parties to four separate agreements, pursuant to which DMS had certain rights to gather crude oil, natural gas, or produced water from certain of the Debtors' wells.  Those agreements were:  (i) that certain Amended and Restated Gas Dedication and Gathering Agreement having an effective date of July 1, 2014 (the "<u>Gas Gathering Agreement</u>"); (ii) that certain Amended and Restated Crude Oil Dedication & Throughput Commitment Transportation Agreement having an effective date of July 1, 2014 (the "<u>Crude Oil Gathering Agreement</u>"); (iii) that certain Amended and Restated Water Dedication and Gathering Agreement having an effective date of July 1, 2014 (the "<u>Water Gathering Agreement</u>," and together with the Gas Gathering Agreement and Crude Oil Gathering Agreement, collectively, the "<u>Gathering Agreements</u>"); and (iv) that certain Amended and Restated Disposal Well Services Agreement dated July 1, 2014 (the "<u>Disposal Well Services Agreement</u>," and together with the Gathering Agreements, collectively, the "<u>DMS Agreements</u>").

The litigation comprised two separate, but related actions.  First, on June 3, 2016, the Debtors commenced Adversary Proceeding No. 16-50998 (the "<u>Adversary Proceeding</u>") by filing the *Complaint for Declaratory Judgment* [Docket No. 363] (the "<u>Complaint</u>") in front of the Bankruptcy Court.  The Complaint sought a judgment that the four DMS Agreements did not contain either covenants that run with the land or equitable servitudes, both pursuant to North Dakota law.  Second, also on June 3, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts with the Dakota Midstream Parties and (II) Granting Related Relief* [Docket No. 362] (the "<u>DMS Rejection Motion</u>").  Pursuant to the DMS Rejection Motion, the Debtors sought the authority to reject the DMS Agreements as required pursuant to the terms of the Stalking Horse Bidder's asset purchase agreement.

As set forth in the *Joint Notice of Filing Global Settlement Term Sheet* dated September 28, 2016 [Docket No. 754], the Debtors, the Credit Facility Agent, on behalf of the Lenders, and DMS entered into a letter of intent dated September 21, 2016 (the "<u>LOI</u>") seeking a settlement and final resolution of all issues arising out of and related to the Adversary Proceeding, DMS Rejection Motion, and certain other contested matters set forth therein. The successful resolution of the Adversary Proceeding and DMS Rejection Motion was effectuated pursuant to the order approving the Sale Transaction and will allow the Debtors to proceed towards confirmation of the Plan.

E.    *The Lender-Committee Settlement*

In July 2016, the Credit Facility Agent, on behalf of the Lenders, and the Committee entered into an agreement in principle resolving the Committee's formal and informal objections to the Sale Transaction and Plan. Pursuant to the terms of that agreement in principle, the Credit Facility Agent, on behalf of the Lenders, and the Committee agreed as follows:

- the Lenders agreed to pay $2 million in Cash (the "<u>Lender-Committee Settlement Payment</u>") to Holders of Class 4 General Unsecured Claims, regardless of whether the Sale Transaction's winning bid were a cash bid or, alternatively, a credit bid made by the Credit Facility Agent; *provided* that the purchase price would be in a total amount of at least the amount of the bid placed by the Stalking Horse Bidder; *provided, further*, that the Stalking Horse Bidder would not withdraw or decrease its bid in an effort to frustrate the settlement between the Credit Facility Agent and Committee—and that that any credit bid by the Credit Facility Agent or the Lenders would result in payment of the Lender-Committee Settlement Payment;

- pursuant to the Plan, after satisfying Allowed Administrative Claims, Priority Claims, and Other Secured Claims, and after paying the Lender-Committee Settlement Payment, any surplus Cash from the General Account (as set forth in Article VIII.H of the Plan), would be paid to the Credit Facility Agent for the benefit of the Lenders—in order to satisfy in full, in Cash, the Credit Facility Claims;

23

- for the avoidance of doubt and pursuant to the Plan, the Lender-Committee Settlement Payment would represent a floor for the General Unsecured Creditors' recovery, and therefore, to the extent the value of assets of the Estates were to exceed the total amount of Priority Claims and Other Secured Claims, and to the extent that funds would be available for distributions to Holders of General Unsecured Claims, the Lender-Committee Settlement Payment would be reduced dollar-for-dollar by such amounts and would be reduced to zero if the amounts available for distribution to Holders of General Unsecured Creditors exceeded $2 million;

- the Committee agreed to support entry of the Bidding Procedures Order and the relief requested by the Debtors at the sale hearing, as well as the Debtors' efforts to resolve the Debtors' litigation with DMS;

- the Lenders agreed to waive any deficiency claim related to the total amount of the Lender-Committee Settlement Payment; and

- the parties agreed to act in good faith to memorialize and document their agreements in a mutually satisfactory manner.

F.    *BLM Leases*

On May 10, 2016, the Montana State Office of the Bureau of Land Management (the "BLM") entered a decision (the "Decision") requiring the shutdown of the Debtors' Clark Griswold Federal 3-7-20H, Noonan Federal 3-18-19H, and Greg Marmalard 3-28-33H wells (the "Wells") and termination of the Debtors' BLM leases described more particularly as NDM 94704, 94705, 94706, and 94112 (the "Leases") on account of the Debtors' alleged failure to maintain wells capable of producing crude oil and natural gas in paying quantities. In compliance with the Decision, the Debtors shut-in the Wells on June 7, 2016. On June 10, 2016, the Debtors filed a Notice of Appeal and Petition for Stay of the Decision (the "Appeal") with the United States Department of Interior's Office of hearings and Appeals (the "DOI") seeking to set aside the Decision and reinstate the BLM Leases because the Wells are capable of producing crude oil and natural gas in paying quantities. The BLM filed its answer to the Appeal on September 12, 2016, and the parties have not yet received a ruling on the Appeal from the DOI.

In the event the Appeal is not successful, the Debtors also began the process of having the Leases reinstated. The Debtors have been in contact with the BLM and the United States Forest Service regarding the reinstatement requirements and believe they have taken steps to comply with all such requirements to date.

The Debtors reserve and preserve the right to continue prosecuting the Appeal, reinstatement of the BLM Leases and related Wells, and any and all related proceedings in front of the DOI, BLM, and applicable agencies, regulatory entities, courts, and governmental entities, notwithstanding the approval of the Plan or Disclosure Statement or the successful completion of these Chapter 11 Cases, through settlement or final judgment where the Appeal is or will be pending (including any further appeals therefrom) and reinstatement of the BLM Leases and related Wells. Subject to the other disclosures in this Disclosure Statement, the Debtors reserve all rights with respect to the Decision and Appeal on these matters.

**ARTICLE VII.**

**SUMMARY OF THE PLAN**

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as any exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and

reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan, and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors and the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Administrative and Priority Claims*

    1.    *Administrative Claims*

Subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Plan Administrator agree to less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Debtors or the Plan Administrator shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due) with a Cash distribution from the Priority Claims Reserve by the Plan Administrator; (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Plan Administrator, as applicable; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided* that any Administrative Claim that has been assumed by the Purchaser pursuant to the Purchase Agreement shall not be an obligation of the Debtors.

Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, and the Plan Administrator, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.   Objections to such requests must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Priority Claims Reserve in Cash as described in Article VIII.C of the Plan.  Any amounts remaining in the Priority Claims Reserve after payment of all Allowed Priority Claims shall be transferred to the Plan Administrator and shall be distributed in accordance with the Plan.

    2.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.  In the event that an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full. On the Effective Date, any liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

3.      *Professional Compensation*

(a)      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Accrued Professional Compensation Claims incurred during the period from the Petition Date through the Effective Date, shall be Filed no later than 60 days after the Effective Date. All such final requests will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders, including the Interim Compensation Order, and once approved by the Court, shall be promptly paid from the Professional Fee Escrow up to the full Allowed amount. To the extent that funds held in the Professional Fee Escrow are unable to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

(b)      Professional Fee Escrow

On the Effective Date, the Debtors or the Post-Effective Date Debtor shall establish and fund the Professional Fee Escrow. The Professional Fee Escrow shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates or of the Post-Effective Date Debtor. The amount of the Professional Fee claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow as soon as reasonably practicable after such Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the General Account and shall be distributed in accordance with the Plan without any further action or order of the Court.

4.      *U.S. Trustee Statutory Fees*

The Debtors or the Plan Administrator, as applicable, shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

B.      *Classification, Treatment, and Voting of Claims and Interests*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.      *Summary of Classifications*

All Claims and Interests, other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims, are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking Confirmation or approval of the Plan with respect to all other Debtors. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.D of the Plan.

2.      *Substantive Consolidation of the Estates*

Pursuant to Article IV.A of the Plan, the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and the classifications set forth in Classes 1 through 7 of the Plan shall be deemed to apply to each

Debtor, except for Class 8, which only applies to Parent.  If substantive consolidation is ordered pursuant to Article IV.A of the Plan, each Class with respect to the Debtors shall vote as set forth in Article III of the Plan.  If substantive consolidation is not ordered, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable, and each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each of the Debtors.

The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating each of the Estates of the Debtors into a single consolidated Estate solely for the limited purposes of voting, Confirmation, and distribution.  For the avoidance of doubt, the Plan shall not serve as a motion by the Debtors seeking entry of an order substantively consolidating the Debtors for any other purposes.  Notwithstanding anything in  Article IV.A of the Plan, all distributions under the Plan shall be made in accordance with Article VI of the Plan.

If the Debtors' estates are substantively consolidated in accordance with Article IV.A of the Plan, then, on and after the Effective Date, all assets and liabilities (including Allowed Claims) of the Debtors shall be treated as though they were merged into one Estate solely for purposes of voting, Confirmation, and distribution.  The limited substantive consolidation described in the Plan shall not affect the legal and organizational structure of the Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, with respect to Executory Contracts or Unexpired Leases that were assumed or entered into during the Chapter 11 Cases, if any.  **Moreover, any alleged defaults under any applicable agreement with the Debtors, the Post-Effective Date Debtor, or their respective Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.**

If the Debtors' Estates are not substantively consolidated in accordance with Article IV.A of the Plan, then (1) the Plan shall be deemed to constitute a separate sub-plan for each of the Debtors and each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable, (2) the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each sub-plan, (3) any Claim against any of the Debtors shall be treated as a Claim only against the applicable Debtor, as applicable, for purposes of voting and Confirmation, (4) such Claims shall be administered as provided in the Plan, (5) the portion of the GUC Reserve available for distributions to Holders of General Unsecured Claims against each Debtor shall be equal to the proportion that the Allowed General Unsecured Claims against each Debtor bears to the aggregate amount of Allowed General Unsecured Claims against all of the Debtors; and (6) the Debtors shall not, nor shall they be required to, re-solicit votes with respect to the Plan, nor will the failure of the Court to approve limited substantive consolidation of the Debtors alter the distributions set forth in the Plan.

Notwithstanding the substantive consolidation provided for in the Plan, nothing shall affect the obligation of each and every Debtor to pay the quarterly fees to the U.S. Trustee until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

3.      *Class Identification*

The classification of Claims against and Interests in each Debtor (as applicable) pursuant to the Plan is as set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Allowed Priority Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 2 | Credit Facility Claims | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Interests in Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

The treatment of the Classes of Claims and Interests under the Plan shall be as set forth in Article III.B of the Plan and Article II hereof.

4. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Plan Administrator, the Debtors, or the Debtors' Estates in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

5. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6. *Voting Class; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

7. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

C.    *Means for Implementation of the Plan*

    1.    *Sources of Consideration for Plan Distributions*

The Debtors' Cash on hand, the Sale Proceeds, the Priority Claims Reserve, the Other Secured Claims Reserve, the GUC Reserve, the Debtors' rights under the Purchase Agreement, all Causes of Action not previously settled, released, or exculpated under the Plan, and the remainder of the Post-Effective Date Debtor Assets, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in the Plan.

    2.    *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.[7]

A court may approve a proposed compromise or settlement, so long as the compromise or settlement is in the "best interest of the estate." *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986). In making this determination, a court typically examines four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted). Further, a court need only determine that the proposed settlement or compromise is above the "lowest point in the range of reasonableness." *In re Pa. Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993); *see also In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (noting that "the court does not have to be convinced that the settlement is the best possible compromise," rather the court need only "conclude that the settlement is 'within the reasonable range of litigation possibilities'" (citations omitted)).

    3.    *Credit Facility Claims*

Effective as of the Effective Date, the Debtors' obligations under the Credit Documents shall be deemed terminated, canceled, and released. In full and final satisfaction, settlement, and release of and in exchange for each Holder's Allowed Credit Facility Claim, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Plan Administrator, as the case may be, may take such actions, in their sole discretion, to execute and deliver such other and further documents as may be reasonably requested by the Credit Facility Agent.

    4.    *Post-Effective Date Debtor*

On or after to the Effective Date, the Post-Effective Date Debtor shall continue in existence for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, (2) resolving Disputed Claims, (2) paying Allowed Priority Tax Claims, Allowed Administrative Claims (including, but not limited to, Professional Fee Claims), Allowed Priority Claims, Allowed Credit Facility Claims, Allowed Other Secured Claims, Allowed General Unsecured Claims held by Participating GUC Holders, and cure Claims, (4) establishing and funding the Distribution Reserve Accounts, (5) enforcing and prosecuting claims, interests, rights, and privileges under the Post-Effective Date Debtor Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (6) filing appropriate tax returns, and (7) administering the Plan in an efficacious manner. The Post-Effective Date Debtor shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the

---

[7]    Generally, the standards for approval of a settlement or compromise under section 1123 of the Bankruptcy Code are the same as those under Bankruptcy Rule 9019. *In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004).

need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, the Post-Effective Date Debtor Assets shall vest in the Post-Effective Date Debtor for the purpose of liquidating the Estates and Consummating the Plan.  The Post-Effective Date Debtor Assets shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan.  Any distributions to be made under the Plan from the Post-Effective Date Debtor Assets shall be made by the Plan Administrator or its designee(s).  Notwithstanding anything in the Plan to the contrary, the Post-Effective Date Debtor and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

5.    *Plan Administrator*

The Plan Administrator shall act for the Post-Effective Date Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Post-Effective Date Debtor shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Post-Effective Date Debtor and shall succeed to the powers of the Post-Effective Date Debtor's managers and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtor as further described in Article VII of the Plan.

(a)    Powers of the Plan Administrator

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the businesses and affairs of the Debtors and the Post-Effective Date Debtor, including:  (1) liquidating, receiving, holding, and investing, supervising, and protecting the Post-Effective Date Debtor Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Distribution Reserve Accounts; (3) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtor; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtor; (7) administering and paying taxes of the Post-Effective Date Debtor, including filing tax returns; (8) representing the interests of the Post-Effective Date Debtor or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court, provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Post-Effective Date Debtor shall be terminated.

(b)    Appointment of the Plan Administrator

The Plan Administrator shall be appointed by the Debtors, in consultation with the Lenders and the Committee.  The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan and the Plan Supplement, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the Post-Effective Date Debtor Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

(c)     Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Post-Effective Date Debtor from the Plan Administrator Expense Reserve upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Post-Effective Date Debtor Assets, and shall not be subject to the approval of the Bankruptcy Court.

(d)     Plan Administrator Compensation and Expenses

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and shall be paid out of the Plan Administrator Expense Reserve.

All costs, expenses, and obligations incurred by the Plan Administrator in administering the Plan, the Post-Effective Date Debtor, or in any manner connected, incidental, or related thereto, in effecting distributions from the Post-Effective Date Debtor thereunder (including the reimbursement of reasonable expenses) shall be a charge against the Post-Effective Date Debtor Assets remaining from time to time in the hands of the Plan Administrator. Such expenses shall be paid as they are incurred without the need for Bankruptcy Court approval.  All costs, expenses, and obligations incurred by the GUC Oversight Representative shall be paid by the Plan Administrator from the Plan Administrator Expense Reserve, *provided* such costs, expenses, and obligations shall not exceed $50,000.

(e)     Plan Administrator Oversight

The Plan Administrator shall consult with (x) the Lenders with regard to the settlement of any Claims and (y) the GUC Oversight Representative with regard to settlement of any General Unsecured Claims.  The Plan Administrator shall provide the GUC Oversight Representative with an update each month regarding all settlements and payments on account of General Unsecured Claims.

(f)     Wind Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement; (2) file for each of the Debtors, except the Post-Effective Date Debtor, a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable), including, but not limited to, any actions contemplated in Sections 275–283 of the DGCL; and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  For purposes of clause (2) of the preceding sentence, the Plan shall constitute a plan of distribution as contemplated in the DGCL.  The certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or Board of Directors of any Debtor.  From and after the Effective Date, except with respect to the Post-Effective Date Debtor as set forth herein, the Debtors (4) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (5) shall be deemed to have cancelled pursuant to the Plan all Interests, and (6) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, except with respect to the Post-Effective Date Debtor as set forth herein, (7) notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

31

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

(g)     Exculpation; Indemnification; Insurance; Liability Limitation

The Plan Administrator, all professionals retained by the Plan Administrator, the GUC Oversight Representative, and representatives of each of the foregoing, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtor.  The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtor and with funds from the Plan Administrator Expense Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtor.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator and the GUC Oversight Representative, each in their capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

(h)     Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

(i)     Dissolution of the Post-Effective Date Debtor

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtor shall be deemed to be dissolved without any further action by the Post-Effective Date Debtor, including the filing of any documents with the secretary of state for the state in which the Post-Effective Date Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtor in and withdraw the Post-Effective Date Debtor from applicable state(s).

6.     *Reserves Administered by the Plan Administrator*

The Plan Administrator shall establish each of the Distribution Reserve Accounts (which, notwithstanding anything to the contrary contained in the Plan, may be affected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator).

(a)     Undeliverable Distribution Reserve

If a Distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such Distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such Distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIII.B.2 of the Plan.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an Undeliverable or Unclaimed Distribution within three months after the first Distribution is made to such Holder shall be deemed to have forfeited its claim for such Undeliverable or Unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for the Undeliverable or Unclaimed Distribution against any Debtor, any Estate, the Plan Administrator , the Post-Effective Date Debtor, or their respective properties or assets.  In such cases, any Cash or other property held by the Post-Effective Date Debtor in the Undeliverable Distribution Reserve for distribution on account of such claims for Undeliverable or Unclaimed Distributions, including the interest that has accrued on such Undeliverable or Unclaimed Distribution while in the Undeliverable Distribution Reserve, shall become the

property of the Post-Effective Date Debtor, notwithstanding any federal or state escheat laws to the contrary, and shall be available for immediate distribution by the Post-Effective Date Debtor; *provided* that any Undeliverable or Unclaimed Distribution on account of an Allowed General Unsecured Claim shall be transferred to the GUC Reserve.  Nothing contained in the Plan shall require the Debtors to attempt to locate any holder of an Allowed Claim; provided, however, that in his or her sole discretion, the Plan Administrator may periodically publish notice of Unclaimed Distributions.  Additionally, the Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Claim Holder, or (ii) obtain an executed Internal Revenue Service Form W-9 from any Claim Holder.

Within 15 Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an Undeliverable or Unclaimed Distribution (provided that satisfaction occurs within the time limits set forth in Article VIII.B.2 of the Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the Undeliverable or Unclaimed Distribution attributable to such Claim, including the interest that has accrued on such Undeliverable or Unclaimed Distribution while in the Undeliverable Distribution Reserve to the General Account.

      (b)      Priority Claims Reserve

On the Effective Date, the Plan Administrator shall establish the Priority Claims Reserve by depositing from the Post-Effective Date Debtor Assets Cash in the amount of the Priority Claims Reserve Amount.  The Priority Claims Reserve Amount shall be used to pay Allowed Priority Claims.  If all or any portion of a Priority Claim shall become a Disallowed Claim, then the amount on deposit in the and Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the and Priority Claims Reserve, shall remain in the and Priority Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the and Priority Claims Reserve is sufficient to ensure that all Allowed Priority Claims will be paid in accordance with the Plan.

      (c)      Plan Administrator Expense Reserve

On the Effective Date, the Plan Administrator shall deposit Cash from the Post-Effective Date Debtor Assets into the Plan Administrator Expense Reserve in the amount of the Plan Administrator Expense Reserve Amount.  The funds constituting the Plan Administrator Expense Reserve are to be used by the Plan Administrator solely to satisfy the expenses of the Post-Effective Date Debtor and the Plan Administrator as set forth in the Plan; *provided* that all costs and expenses associated with the winding up of the Post-Effective Date Debtor and the storage of records and documents shall constitute expenses of the Post-Effective Date Debtor and shall be paid from the funds held in the Plan Administrator Expense Reserve.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

      (d)      Other Secured Claim Reserve

On the Effective Date, the Plan Administrator shall establish the Other Secured Claims Reserve by depositing from the Post-Effective Date Debtor Assets Cash in the amount of the Other Secured Claims Reserve Amount.  The Other Secured Claims Reserve Amount shall be used to pay Allowed Other Secured Claims.  If all or any portion of an Other Secured Claim shall become a Disallowed Claim, then the amount on deposit in the Other Secured Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Other Secured Claims Reserve, shall remain in the Other Secured Claims Reserve or be transferred out of the Other Secured Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Other Secured Claims Reserve is sufficient to ensure that all Allowed Other Secured Claims will be paid in accordance with the Plan.

      (e)      GUC Reserve

On the Effective Date, the Plan Administrator shall establish and thereafter maintain the GUC Reserve in a separate, segregated account by depositing from the Post-Effective Date Debtor Assets Cash in the amount of the GUC Reserve Amount.  The GUC Reserve Amount shall be used to pay Allowed General Unsecured Claims held by Participating GUC Holders.  If all or any portion of a General Unsecured Claim shall become a Disallowed Claim, then the amount on deposit in the GUC Reserve attributable to such surplus or such Disallowed Claim,

including the interest that has accrued on said amount while on deposit in the GUC Reserve, shall remain in the GUC Reserve.

The Post-Effective Date Debtor shall not have any reversionary or other interest in or with respect to any of the GUC Reserve Amount. Notwithstanding anything to the contrary herein, neither the Plan Administrator, the Post-Effective Date Debtor, nor any other party in interest shall be obligated to fund the GUC Reserve in an aggregate amount in excess of the GUC Reserve Amount.

(f)     General Account and Distribution Reserve Account Adjustments

On the Effective Date, the Post-Effective Date Debtor Assets (except for the Distribution Reserve Accounts) shall be transferred to the General Account. Beginning on the first anniversary of the Effective Date and thereafter, on each anniversary of the Effective Date, the Plan Administrator shall determine the amount of Cash required to adequately maintain each of the Distribution Reserve Accounts. Other than with respect to amounts held in the GUC Reserve, if after making and giving effect to any determination referred to in the immediately preceding sentence, the Plan Administrator determines that any Distribution Reserve Account (i) contains Cash in an amount in excess of the amount then required to adequately maintain such Distribution Reserve Account, then at any such time the Plan Administrator shall transfer such surplus Cash to the General Account for distribution to the Lenders, or (ii) does not contain Cash in an amount sufficient to adequately maintain such Distribution Reserve Account, then at any such time the Plan Administrator shall transfer Cash from the General Account to the extent Cash is available in the General Account until the deficit in such Distribution Reserve Account is eliminated.

7.     *Corporate Action*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

Upon the Effective Date or as soon as reasonably practicable thereafter, the existing boards of directors and managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, shareholders, and members and all remaining officers or directors of each Debtor shall be dismissed without any further action required on the part of any such Debtor, the shareholders of such Debtor, or the officers and directors of such Debtor. The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized pursuant to Article IV.H of the Plan to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion to implement the provisions of Articles IV.H of the Plan.

The authorizations and approvals contemplated by Article IV of the Plan shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

8.     *Release of Liens*

On the Effective Date, all Liens on any property of any Debtors or any Reorganized Debtors shall automatically terminate, all Collateral subject to such Liens shall be automatically released, and all guarantees of any Debtors or any Reorganized Debtors shall be automatically discharged and released; provided that such Liens shall attach to Cash in the applicable Distribution Reserve Accounts, as provided in this Plan or the Confirmation Order.

9.     *Effectuating Documents; Further Transactions*

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Plan Administrator, and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts,

securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

10.      *Exemption from Certain Taxes and Fees*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

11.      *Causes of Action*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled under the Plan or any Final Order (including, for the avoidance of doubt, any claims or Causes of Action released pursuant to Article X.D of the Plan), the Debtors reserve and, as of the Effective Date, assign to the Post-Effective Date Debtor the Causes of Action, which shall include, for the avoidance of doubt, those Causes of Action identified as being retained in the Plan Supplement.  On and after the Effective Date, the Plan Administrator may pursue the Causes of Action on behalf of and for the benefit of the applicable beneficiaries.  On the Effective Date, all Avoidance Actions shall be deemed waived, relinquished, and extinguished, and no Avoidance Actions shall revert to creditors of the Debtors.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Actions against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors or the Post-Effective Date Debtor, as applicable, reserve such Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator, shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

12.      *Closing the Chapter 11 Cases*

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Parent, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Emerald Oil, Inc.

When all Disputed Claims have become Allowed or Disallowed, all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Emerald Oil, Inc. in accordance with the Bankruptcy Code and the Bankruptcy Rules.

D.        *Treatment of Executory Contracts and Unexpired Leases*

1.        *Assumption and Assignment of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including, without limitation, any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed or assumed and assigned to the Purchaser or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Purchase Agreement.   Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

2.        *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Obligation in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitation described below, by the Debtors as an Administrative Claim or by Purchaser in accordance with the Purchase Agreement, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.   In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Unless otherwise provided by an order of the Bankruptcy Court, at least 14 days before the Confirmation Hearing, the Debtors shall cause notice of proposed assumption and proposed Cure Obligations to be sent to applicable counterparties.   Any objection by such counterparty must be Filed, served, and actually received by the Debtors not later than seven days after service of notice of the Debtors' proposed assumption and associated Cure Obligations.   Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Obligation.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment.  **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity**.

3.        *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Plan Administrator, as applicable, no later than 30 days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease.   In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Plan Administrator, as

applicable, no later than 14 days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Post-Effective Date Debtor, or the property for any of the foregoing without the need for any objection by the Debtors or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims against the appropriate Debtor, or upon the Effective Date, the Post-Effective Date Debtor, except as otherwise provided by order of the Bankruptcy Court.

    4.    *Purchase Agreement; Assumed Contracts*

The Debtors' assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Purchaser's rights and obligations, including any Cure Obligations assumed by the Purchaser in accordance with the Purchase Agreement, with respect to any such Executory Contracts or Unexpired Leases that constitute Assumed Contracts (as defined in the Purchase Agreement) as set forth in the Purchase Agreement.

    5.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors or the Debtors on behalf of the Debtors' Estates during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Bankruptcy Court order to the contrary.

    6.    *D&O Policies*

The D&O Policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Post-Effective Date Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any of the D&O Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

    7.    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease on Schedule G of the Debtors' Schedules or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 90 days following

entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

E.     *Provisions Governing Distributions*

    1.     *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors or the Plan Administrator on behalf of the Debtors.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article IX of the Plan.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

    2.     *Rights and Powers of the Debtors and the Plan Administrator*

        (a)     Powers of the Debtors and the Plan Administrator

Except as otherwise set forth in the Plan, all distributions under the Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter by the Debtors or the Plan Administrator (or its designee(s)), the timing of which shall be subject to the reasonable discretion of the Debtors or the Plan Administrator, as applicable.

On and after the Effective Date, the Plan Administrator and its designees or representatives shall have the right to object to, Allow, or otherwise resolve any General Unsecured Claim, Priority Claim, or Other Secured Claim, subject to the terms of the Plan.

The Debtors and the Plan Administrator as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Plan Administrator Expense Reserve.

        (b)     Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to or action, order, or approval of the Bankruptcy Court in Cash from the Plan Administrator Expense Reserve if such amounts relate to any actions taken hereunder.

    3.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

        (a)     Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Plan Administrator, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  The Distribution Record Date shall not apply to the Indenture Trustee with respect to beneficial holders of the Convertible Notes.

      (b)      Distributions to Beneficial Holders of the Convertible Notes

Notwithstanding any provision of the Plan to the contrary, distributions to beneficial holders of the Convertible Notes shall be made to or at the direction of the Indenture Trustee, which shall act as disbursing agent for distributions to the beneficial holders of the Convertible Notes under the Convertible Notes Indenture.  The Indenture Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with beneficial holders of Convertible Notes to the extent consistent with the customary practices of DTC.  Such distributions shall be subject in all respects to the right of the Indenture Trustee to assert its charging lien under the Convertible Notes Indenture against such distributions.  All distributions to be made to beneficial holders of Convertible Notes shall be eligible to be distributed through the facilities of DTC and as provided for under the Convertible Notes Indenture.

      (c)      Delivery of Distributions in General

          a)      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Plan Administrator, be deemed to have been made by the Plan Administrator on the Effective Date unless the Plan Administrator and the Holder of such Claim agree otherwise.

          b)      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Debtors or the Plan Administrator, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

          c)      Distributions

On and after the Effective Date, the Debtors or the Plan Administrator, as applicable, shall make the distributions required to be made on account of Allowed Claims under the Plan.  Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be held by the Plan Administrator in the Priority Claims Reserve, the GUC Reserve, or any other reserve established by the Plan Administrator in accordance with the Plan, as applicable, and distributed on the next Subsequent Distribution Date that occurs after such Claim is Allowed.  In accordance with Article VI.G of the Plan, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to the Plan.

      (d)      Minimum; De Minimis Distributions

No Cash payment of less than $50.00, in the reasonable discretion of the Debtors or the Plan Administrator, as applicable, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

      (e)      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors or the Plan Administrator, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the initial distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Post-Effective Date Debtor automatically and without need for a further order

by the Bankruptcy Court for distribution in accordance with the Plan and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred; *provided* that such unclaimed property or interests in property on account of Priority Claims, Other Secured Claims, and General Unsecured Claims shall be allocated to the General Account.

      (f)      Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Debtors or the Plan Administrator, as applicable, by check or by wire transfer.

      4.      *Compliance with Tax Requirements/Allocations*

In connection with the Plan and all distributions hereunder, to the extent applicable, the Debtors or the Plan Administrator, as applicable, are authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of a distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Plan Administrator and the Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution.

      5.      *Allocation of Plan Distributions Between Principal and Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein.

      6.      *Setoffs and Recoupment*

Except as otherwise expressly provided in the Plan, the Debtors or the Post-Effective Date Debtor may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Post-Effective Date Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Post-Effective Date Debtor of any such Claim it may have against the Holder of such Claim.

      7.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

      8.      *Claims Paid or Payable by Third Parties*

      (a)      Claims Paid by Third Parties; Recourse to Collateral

The Debtors or the Plan Administrator, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on

account of such Claim from a party that is not a Debtor, including on account of recourse to collateral held by third parties that secure such Claim.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

(b)    Claims Payable by Insurance, Third Parties; Recourse to Collateral

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    Applicability of Insurance Policies

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Debtor's insurance policies with respect to such policies, including the D&O Policies.

F.    *Procedures for Resolving Contingent, Unliquidated, and Disputed Claims and Interests*

1.    *Resolution of Disputed Claims*

(a)    Allowance of Claims and Interests

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim.

(b)    Prosecution of Objections to Claims

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Plan Administrator by order of the Bankruptcy Court, shall have the sole authority, in consultation with the Lenders with regard to all Claims and the GUC Oversight Representative with regard to General Unsecured Claims:  (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

(c)    Claims Estimation

On and after the Effective Date, the Plan Administrator, may, at any time, request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to

41

section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

        (d)        Adjustment to Claims Register Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court

        (e)        Time to File Objections to Claims

Any objections to Claims or Interests shall be Filed no later than the Claims Objection Bar Date, as such may be extended pursuant to the terms of the Plan.

        2.        *Disallowance of Claims*

To the maximum extent provided by section 502(d) of the Bankruptcy Code, any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Plan Administrator.  All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.        *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Plan Administrator and any such new or amended Claim Filed without such prior authorization shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

        4.        *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article IX of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

5.        *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.

6.        *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

G.    *Settlement, Release, Injunction, and Related Provisions*

1.        *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.        *Terms of Injunctions or Stays*

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

3.        ***Release of Liens***

**Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  In addition, the Credit Facility Agent shall execute and deliver all documents reasonably requested by the Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

4.    *Debtor Release*

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED EXPRESSLY, UNCONDITIONALLY, GENERALLY, AND INDIVIDUALLY AND COLLECTIVELY, FOREVER ACQUITTED, RELEASED, AND DISCHARGED BY THE DEBTORS, AND THE ESTATES, EACH ON BEHALF OF ITSELF AND ITS PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, SHAREHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS, FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, ANY CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF ANY HOLDER OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS AND ANY CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF ANY OTHER ENTITY, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE OR OTHERWISE, THAT SUCH RELEASING PARTY (WHETHER INDIVIDUALLY OR COLLECTIVELY), EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING EFFORTS, THE DEBTORS' INTERCOMPANY TRANSACTIONS (INCLUDING DIVIDENDS PAID), ANY PREFERENCE OR AVOIDANCE CLAIM PURSUANT TO SECTIONS 544, 547, 548, AND 549 OF THE BANKRUPTCY CODE, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF, OR ANY OTHER TRANSACTION RELATING TO ANY SECURITY OR OTHER DEBT OBLIGATIONS OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS AFFECTED BY OR CLASSIFIED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND THE RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE SALE TRANSACTIONS IMPLEMENTED BY THE PLAN OR ANY OTHER TRANSACTION OR OTHER ARRANGEMENT WITH THE DEBTORS WHETHER BEFORE OR DURING THE SALE TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE SALE TRANSACTIONS, THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, OR ANY RELATED AGREEMENTS, ANY ASSET PURCHASE AGREEMENT, INSTRUMENTS OR OTHER DOCUMENTS (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THE PLAN, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES OR OTHER DEBT OBLIGATIONS PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR ARISING ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, EXCEPT FOR ANY ACT OR OMISSION THAT CONSTITUTES ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION; *PROVIDED* THAT NOTHING IN THE FOREGOING SHALL RESULT IN ANY OF THE DEBTORS' OFFICERS AND DIRECTORS WAIVING ANY INDEMNIFICATION CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR INSURANCE CARRIERS OR ANY RIGHTS AS BENEFICIARIES OF ANY INSURANCE POLICIES, WHICH INDEMNIFICATION OBLIGATIONS AND INSURANCE POLICIES SHALL BE ASSUMED BY THE POST-EFFECTIVE DATE DEBTOR. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET

FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY OF THE SALE TRANSACTIONS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

5.    *Third Party Release*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, AS OF THE EFFECTIVE DATE AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, EACH RELEASING PARTY EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY FOREVER RELEASES, ACQUITS, AND DISCHARGES THE DEBTORS, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, ANY CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF ANY HOLDER OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS AND ANY CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF ANY OTHER ENTITY, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE OR OTHERWISE, THAT SUCH RELEASING PARTY (WHETHER INDIVIDUALLY OR COLLECTIVELY), EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING EFFORTS, THE DEBTORS' INTERCOMPANY TRANSACTIONS (INCLUDING DIVIDENDS PAID), ANY PREFERENCE OR AVOIDANCE CLAIM PURSUANT TO SECTIONS 544, 547, 548, AND 549 OF THE BANKRUPTCY CODE, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OR OTHER DEBT OBLIGATION OF THE DEBTORS, OR ANY OTHER TRANSACTION RELATING TO ANY SECURITY OR OTHER DEBT OBLIGATION OF THE DEBTORS, OR ANY OTHER TRANSACTION OR OTHER ARRANGEMENT WITH THE DEBTORS WHETHER BEFORE OR DURING THE SALE TRANSACTIONS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS AFFECTED BY OR CLASSIFIED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND THE RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE SALE TRANSACTIONS IMPLEMENTED BY THE PLAN, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE SALE TRANSACTIONS, THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, OR ANY RELATED AGREEMENTS, ANY ASSET PURCHASE AGREEMENT, INSTRUMENTS OR OTHER DOCUMENTS (INCLUDING, FOR THE AVOIDANCE OF DOUBT, PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THE PLAN, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES OR OTHER DEBT OBLIGATION PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE OR ARISING ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING, EXCEPT FOR ANY ACT OR OMISSION THAT CONSTITUTES ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION; *PROVIDED* THAT NOTHING IN THE FOREGOING SHALL RESULT IN ANY OF THE DEBTORS' OFFICERS AND DIRECTORS WAIVING ANY INDEMNIFICATION CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR INSURANCE CARRIERS OR ANY RIGHTS AS BENEFICIARIES OF ANY INSURANCE POLICIES, WHICH INDEMNIFICATION OBLIGATIONS AND INSURANCE POLICIES SHALL BE ASSUMED BY THE POST-EFFECTIVE DATE DEBTOR. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET

**FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY OF THE SALE TRANSACTIONS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

The Debtors believe the third party release is entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See Indianapolis Downs, LLC*, 486 B.R. 286, 304–06 (Bankr. D. Del. 2013). The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions provided by the Plan as part of Confirmation of the Plan.

As more fully explained above and in the Plan, the effect of this consensual third party release will be a full and final release of any and all causes of action and all other claims against certain parties as of the Effective Date of the Plan, to the extent such causes of action or claims relate, generally, to the subject matter of the Holders' Claim or the prior or existing business or operations of the Debtors. Such consensual release will include both known and unknown causes of action and claims. As described more fully in the Plan, the parties receiving releases include (a) the Debtors, (b) the Debtors' current and former officers, directors, and managers, (c) the Lenders, (d) the Committee, and (e) each of the foregoing entities' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such.

      6.    *Exculpation*

**The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement. Without limiting the foregoing "Exculpation" provided under Article VIII.F of the Plan, the rights of any Holder of a Claim or Interest to enforce rights arising under the Plan shall be preserved, including the right to compel payment of distributions in accordance with the Plan.**

      7.    *Injunction*

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE X.D OF THE PLAN; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE X.E OF THE PLAN; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE X.F OF THE PLAN; OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD,**

**DECREE, OR ORDER AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF OR SUBROGATION RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE POST-EFFECTIVE DATE DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; *PROVIDED* THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; *PROVIDED, FURTHER*, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS, OBJECTIONS, OR COLLECTION ACTIONS WHETHER BE ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.**

        8.     *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

        9.     *Subordination Rights*

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

H.     *Confirmation and Substantial Consummation of the Plan*

        1.     *Condition Precedent to Confirmation of the Plan*

It shall be a condition to Consummation of the Plan that the following conditions have been satisfied or waived pursuant to the provisions of Article XI.B of the Plan:

(a) the Bankruptcy Court shall have entered the Confirmation Order, prepared in consultation with the Committee and the Lenders and in form and substance materially consistent with the Plan in all respects;

(b) the Plan Administrator shall have been appointed;

(c) all documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(d) the Priority Claims Reserve shall have been established and funded;

(e) the Professional Fee Escrow shall have been established and funded;

(f) the Other Secured Claims Reserve shall have been established and funded;

(g) the Plan Administrator Expense Reserve shall have been established and funded; and

(h) the GUC Reserve shall have been established and funded.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

2.     *Waiver of Conditions*

The conditions to Confirmation of the Plan set forth in Article IX.A of the Plan may be waived by the Debtors.

3.     *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

I.     *Modification, Revocation, or Withdrawal of the Plan*

1.     *Modification and Amendments*

Subject to the limitations contained in the Plan, upon consultation with the Committee and the Lenders, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, upon consultation with the Committee and the Lenders, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII of the Plan.

2.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then:  (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to the Plan with respect to such Debtor, shall be deemed null and void; and (3) nothing contained in the Plan with respect to such Debtor shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

J.      *Retention of Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)     resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Plan Administrator amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases set forth on the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)     adjudicate, decide, or resolve any and all matters related to Causes of Action;

(g)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(i)     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(j)     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(k)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

(l)     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article X of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(m)    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H of the Plan;

(n)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(o)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(p)     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

(q)     consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(r)     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

(s)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(t)     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit

program, regardless of whether such termination occurred prior to or after the Effective Date;

(u)        enforce all orders previously entered by the Bankruptcy Court;

(v)        hear any other matter not inconsistent with the Bankruptcy Code;

(w)       enter an order concluding or closing the Chapter 11 Cases;

(x)        enforce the Purchase Agreement; and

(y)        enforce the injunction, release, and exculpation provisions set forth in Article X of the Plan.

K.      *Miscellaneous Provisions*

1.      *Immediate Binding Effect*

Subject to the terms of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Debtors' Estates, the Plan Administrator, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.      *Dissolution of Committee*

On the Effective Date, the Committee shall dissolve and members thereof shall be compromised, settled, and released from all rights and duties from or related to the Chapter 11 Cases, except the Committee will remain intact solely with respect to the (x) preparation, filing, review, and resolution of applications for Professional Fee Claims and (y) any appeal of the Confirmation Order.  The Debtors and the Post-Effective Date Debtor shall have no obligation to pay any fees or expenses incurred after the Effective Date by the Committee or the Committee Members other than with respect to (x) the preparation, filing, review, and resolution of applications for Professional Fee Claims and (y) any appeal of the Confirmation Order.

4.      *Reservation of Rights*

Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors or any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

5.        *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

6.        *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the following entities and shall be served via first class mail, overnight delivery, or messenger on:

If to the Debtors or the Post-Effective Date Debtor, to:

> Emerald Oil, Inc.
> 200 Columbine Street, Suite 500
> Denver, Colorado 80206
> Attn:  James Muchmore

with copies to:

> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois  60654
> Attn.:  Ryan Blaine Bennett and Travis M. Bayer
>
> Pachulski Stang Ziehl & Jones LLP
> 919 North Market Street, 17th Floor
> P.O. Box 8705
> Wilmington Delaware 19899-8705 (Courier 19801)
> Attn:  Laura Davis Jones

If to the Plan Administrator, to:

> Opportune LLP
> 711 Louisiana Street, Suite 3100
> Houston, Texas 77002
> Attn.:  Wade Stubblefield

If to the Committee, to:

> Akin Gump Strauss Hauer & Feld LLP
> 1 Bryant Park
> New York, New York  10036
> Attn:  David Botter

with copies to:

> Whiteford, Taylor, & Preston LLC
> The Renaissance Centre
> 405 North King Street, Suite 500
> Wilmington, Delaware 19801
> Attn:  Christopher M. Samis

7.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the later of the maximum extent permitted by law or the closing of the Chapter 11 Cases.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

8.    *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

9.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, *provided* that at the request of the Debtors (in their sole discretion), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

10.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

11.    *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, this Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

## ARTICLE VIII.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

A.      *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  **The Bankruptcy Court has scheduled the Confirmation Hearing for March 22, 2017, at 10:00 a.m, prevailing Eastern Time.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the Filing of a notice of such adjournment served in accordance with the order approving this Disclosure Statement and Solicitation Procedures.  Any objection to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (3) state the name, address, phone number, and email address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be Filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is <u>**actually**</u> <u>**received**</u> by the following notice parties set forth below no later than the Plan Objection Deadline.  **Unless an objection to the Plan is timely served and Filed, it may not be considered by the Bankruptcy Court.**

| *Co-Counsel to the Debtors* | |
|---|---|
| James H.M. Sprayregen, P.C.<br>Ryan Blaine Bennett (admitted *pro hac vice*)<br>Travis M. Bayer (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>Email:    james.sprayregen@kirkland.com<br>      ryan.bennett@kirkland.com<br>      travis.bayer@kirkland.com | Laura Davis Jones (DE Bar No. 2436)<br>Colin R. Robinson (DE Bar No. 5524)<br>Joseph M. Mulvihill (DE Bar No. 6061)<br>**PACHULSKI STANG ZIEHL & JONES LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705 (Courier 19801)<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400<br>Email:    ljones@pszjlaw.com<br>      crobinson@pszjlaw.com<br>      jmulvihill@pszjlaw.com |
| *Counsel to the Committee* | |
| **WHITEFORD, TAYLOR, & PRESTON LLC**<br>Christopher M. Samis (No. 4909)<br>L. Katherine Good (No. 5101)<br>Chantelle D. McClamb (No. 5978)<br>The Renaissance Centre<br>405 North King Street, Suite 500<br>Wilmington, Delaware 19801<br>Telephone: (302) 353-4144<br>Facsimile:  (302) 661-7950<br><br>**AKIN GUMP STRAUSS HAUER & FELD LLP**<br>David H. Botter (admitted pro hac vice)<br>One Bryant Park, Bank of America Tower<br>New York, New York 10036<br>Telephone: (212) 872-1000<br>Facsimile: (212) 872-1002<br><br>- and -<br>Sarah Link Schultz (admitted pro hac vice)<br>Marty L. Brimmage, Jr. (admitted pro hac vice)<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201<br>Telephone: (214) 969-2800<br>Facsimile: (214) 969-4343 | |

| **Counsel to the Credit Facility Agent** |
|---|
| **WEIL, GOTSHAL & MANGES LLP**<br>Joseph H. Smolinsky (admitted pro hac vice)<br>David N. Griffiths (admitted pro hac vice)<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br><br>- and -<br><br>**RICHARDS, LAYTON & FINGER, P.A.**<br>Mark D. Collins (DE 3848)<br>Zachary I. Shapiro (DE 5103)<br>Andrew M. Dean (DE 6147)<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701 |

| **U.S. Trustee** |
|---|
| Office of the United States Trustee<br>The District of Delaware<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801<br>Attn: Hannah McCollum, Esq. |

B.      *Confirmation Standards*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

1.      *Feasibility*

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

2.      *Best Interests of Creditors*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such Holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7.

The Debtors believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the assets of the Debtors' business were liquidated through the Sale Transaction in accordance with the Purchase Agreement. Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed General Unsecured Claims than would a chapter 7 liquidation. Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed General Unsecured Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

Critically, the GUC Reserve Amount provided for certain Holders of General Unsecured Claims would not be available in a chapter 7 liquidation, as demonstrated in a liquidation analysis (the "Liquidation Analysis") attached hereto as **Exhibit B**. Without the GUC Reserve Amount, there would be no funds available to pay Holders of General Unsecured Claims.

Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

C.      *Alternative Plans*

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates. The Debtors believe that the Plan, as described herein, enables Holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

D.      *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to Confirmation that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that

class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of claims.  Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance, subject to Article III of the Plan.  Only Holders of Claims in the Voting Classes will be entitled to vote on the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan.  No Class including Holders of Interests is entitled to vote on the Plan.

Article III.E of the Plan provides in full:  "If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class."  Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code.  *See In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme?  I conclude that it may." (footnote omitted)); *see In re Adelphia Commc'ns Corp.*, 368 B.R. 14, 259–63 (Bankr. S.D.N.Y. 2007).

E.      *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if Impaired Classes entitled to vote on the plan have not accepted it or if an Impaired Class is deemed to reject the Plan; *provided* that the plan is accepted by at least one Impaired Class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

1.      *No Unfair Discrimination*

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of Classes of Claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for nonconsensual Confirmation.

2.      *Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to the non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because, for each applicable Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

(a)      Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to

57

another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

> (b)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims requires that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

> (c)    Equity Interests

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

## ARTICLE IX.

## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.    *Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan*

> 1.    *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recoveries of Some Holders of Allowed Claims*

The estimates of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan.  Some Holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Debtors' various assumptions, even those Holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

> 2.    *The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein.  For example, a number of Proofs of Claim allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement.  In addition, the Debtors are continuing to review the Proofs of Claim filed in their Chapter 11 Cases.  As such, the estimated amount of Claims may materially change due to the

58

Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

   3.   *Any Valuation of Any Assets to be Distributed under the Plan Is Speculative and Could Potentially Be Zero*

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, and the value of such assets could potentially be zero. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors, including Holders of Claims in the Voting Classes.

   4.   *The Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Other Priority Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

   5.   *Certain Tax Implications of the Debtors' Bankruptcy*

Holders of Allowed Claims should carefully review Article X of this Disclosure Statement, "Certain United States Federal Income Tax Consequences," for a description of certain tax implications of the Plan and the Chapter 11 Cases.

B.   *Certain Bankruptcy Law Considerations*

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

   1.   *Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

   2.   *Failure to Satisfy Vote Requirements*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates, such as an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution,

an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

3.      *The Debtors May Not Be Able to Secure Confirmation of the Plan*

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.  The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.      *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

5.      *Risk that BLM Appeal Is Not Favorable to the Debtors*

As set forth in Article VI herein, the Debtors and BLM are currently attempting to reinstate the BLM Leases and related Wells through a proceeding in front of the DOI.  Pursuant to the terms of the Purchase Agreement, at Closing (as that term is defined in the Purchase Agreement), to the extent the Leases have not been reinstated by the BLM and the Debtors are prohibited from assigning the Debtors' right, title, and interests in, to, or under the Leases and the applicable Wells, the Debtors shall retain their rights, title, and interests in, to, and under the Leases and related Wells and all other assets to the extent associated with the applicable Wells (collectively, the "BLM Holdback Assets").  The BLM Holdback Assets are not subject to any lien, attachment, trustee process, or any other judicial process of any creditor of the Debtors or Purchaser other than any validly perfected lien or

attachment that existed as of the Petition Date and not otherwise extinguished by Bankruptcy Court Order, but only to the extent of the Debtors' interest in the BLM Holdback Assets.  The Purchaser's interest in the BLM Holdback Assets are free and clear of any such lien, attachment, trustee process, or other judicial process of any creditor of the Debtors or the Purchaser.  If the Debtors are unable to assign the BLM Holdback Assets to the Purchaser, then the Lenders will be unable to take assignment of the BLM Leases and related Wells pursuant to the Purchase Agreement, thereby negatively impacting their recoveries pursuant to the Plan.

6.      *Risk of Nonoccurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

7.      *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be Allowed. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

8.      *Risk Affecting Potential Recoveries of Holders of Claims in the Voting Classes*

The Debtors cannot state with any degree of certainty what recovery will be available to Holders of Allowed Claims in the Voting Classes.  In particular, the Debtors cannot know, at this time, the number or size of Claims in the Voting Classes which will ultimately be Allowed or how many assets will remain after paying all Allowed Claims which are senior to the Claims of Holders in the Voting Classes.  The ultimate amount of Allowed Claims in the Voting Classes could materially reduce the recovery available to Holders of Allowed Claims in the Voting Classes.

C.      *Disclosure Statement Disclaimer*

1.      *The Financial Information Contained in this Disclosure Statement Has Not Been Audited*

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.      *Information Contained in this Disclosure Statement Is for Soliciting Votes*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      *This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4.      *This Disclosure Statement May Contain Forward Looking Statements*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5.      *No Legal or Tax Advice Is Provided to You by this Disclosure Statement*

***This Disclosure Statement is not legal advice to you.*** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.      *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7.      *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

8.      *No Waiver of Right to Object to Claim or Interest*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

9.      *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.     *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the

Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

       11.      *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

D.      *Liquidation under Chapter 7*

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. As discussed above, conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c). Moreover, the GUC Reserve may not be available in a chapter 7 liquidation.

## ARTICLE X.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain Holders of Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations thereunder ("Treasury Regulations"), and administrative and judicial interpretations, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the United States federal income tax consequences of the Plan described below.

This summary does not apply to Holders of Allowed Claims that are not United States persons, as such term is defined in the Internal Revenue Code ("Non-U.S. Holders"), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons holding Allowed Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction, and regulated investment companies). Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and Holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF ALLOWED CLAIMS

ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

A.      *Certain United States Federal Income Tax Consequences to Holders of Allowed Claims*

      1.      *Consequences to Holders of Allowed Class* 2 *and* 4 *Claims*

Pursuant to the Plan, Holders of Allowed  Class 2 Claims (Credit Facility Claims) will receive the right to receive surplus Cash from the General Account and Holders of Allowed Class 4 Claims (General Unsecured Claims) will receive their Pro Rata share of the Cash held in the GUC Reserve in exchange for such Holders' Claims.  The United States federal income tax treatment of such exchanges is uncertain.  However, the Debtors intend to take the position that such Holders receiving rights to receive Cash distributions from the General Account and the GUC Reserve will be treated for United States federal income tax purposes as receiving their pro rata share of the Post-Effective Date Debtor Assets from the Debtors in a taxable exchange and then contributing them to the Post-Effective Date Debtor in a transaction under Section 721(a) of the Internal Revenue Code. As a result, on the Effective Date, the Post-Effective Date Debtor will become a new partnership for United States federal income tax purposes.  Each Holder of an Allowed Class 2 or Class 4 Claim generally will recognize income, gain, or loss for United States federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received on the Effective Date and the fair market value of the Post-Effective Date Debtor Assets that such Holder is deemed to receive in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of "accrued interest" and "market discount" below. A Holder's ability to deduct any loss recognized on the exchange of its Claim will depend on such Holder's own circumstances and may be restricted under the Internal Revenue Code.

A Holder's tax basis in such Holder's Post-Effective Date Debtor interests should equal the fair market value of such Holder's share of the Post-Effective Date Debtor Assets as of the Effective Date.  A Holder's holding period for such Holder's Post-Effective Date Debtor interests should begin on the day following the Effective Date.

It is plausible that a Holder receiving interests in the Post-Effective Date Debtor could treat the transaction as an "open" transaction for United States federal income tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the proceeds ultimately received from the General Account or the GUC Reserve, as applicable.  The United States federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

      2.      *Ownership and Disposition of Interests in the Post-Effective Date Debtor*

As a partnership, the Post-Effective Date Debtor itself will not be subject to U.S. federal income tax. Instead, the Post-Effective Date Debtor will file an annual partnership information return with the Internal Revenue Service, which form will report any items of income, gain, loss or deduction of the Post-Effective Date Debtor. Each partner will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Post-Effective Date Debtor's income, gain, loss, deduction and credit for each taxable year of the Post-Effective Date Debtor ending with or within the member's taxable year. Each item generally will have the same character as if the partner had realized the item directly.  Partners will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from the Post-Effective Date Debtor for such taxable year, and thus may incur income tax liabilities in excess of any distributions from the Post-Effective Date Debtor.

The Plan Administrator will provide each partner with the necessary information to report its allocable share of the Post-Effective Date Debtor's tax items for U.S. federal income tax purposes.

64

A partner that holds Post-Effective Date Debtor interests generally will recognize gain on the receipt of a distribution of Cash from the General Reserve or the GUC Account, as applicable to the extent such Cash distribution exceeds such partner's adjusted tax basis in its Post-Effective Date Debtor interest. Any gain recognized by a partner on the receipt of a distribution from the General Reserve or the GUC Account held by the Post-Effective Date Debtor generally will be capital gain. A partner holding Post-Effective Date Debtor interests generally will recognize a capital loss to the extent the amount of Cash received by such partner is less than such partner's adjusted tax basis in its partnership interest.

A partner's adjusted tax basis in its Post-Effective Date Debtor interest generally will be equal to such partner's initial tax basis (discussed above), increased by such partner's allocable share of the income of the Post-Effective Date Debtor and reduced, but not below zero, by the sum of such partner's allocable share of the losses of the Post-Effective Date Debtor and the amount of Cash distributed to such partner.

A sale of all or part of a partner's interest in the Post-Effective Date Debtor will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds and such partner's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year. A partner's ability to deduct any loss recognized on the sale of its interest in the Post-Effective Date Debtor will depend on the partner's own circumstances and may be restricted under the Internal Revenue Code.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

3.      *Accrued Interest*

A portion of the consideration received by Holders of Allowed Claims may be attributable to accrued interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal. The Internal Revenue Service could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

4.      *Market Discount*

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount

(equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

5.      *Information Reporting and Backup Withholding*

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally on Form W-9).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided that* the required information is timely provided to the Internal Revenue Service.

The Debtors, or the applicable withholding agent, will withhold all amounts required by law to be withheld from payments of interest.  The Debtors will comply with all applicable reporting requirements of the Internal Revenue Service.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

B.      *Certain United States Federal Income Tax Consequences to the Debtors*

1.      *Cancellation of Debt Income*

Under the Internal Revenue Code, a taxpayer generally recognizes cancellation of debt income ("CODI") to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions.  The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income.  In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided. In this case, the Debtors expect that they may recognize significant CODI from the implementation of the Plan.  As a result, the Debtors expect that their tax attributes may be reduced on account of such CODI.  However, because the Debtors intend to liquidate, any remaining net operating losses will have no ongoing value to the Debtors or to the Holders of Claims.

## ARTICLE XI.

## RECOMMENDATION OF THE DEBTORS

The Debtors believe that the Plan is in the best interests of all Holders of Claims against and Interests in the Debtors, and urge all Holders of Claims against and Interests in the Debtors entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Solicitation Agent by the Voting Deadline.

Dated: February 8, 2017                    Emerald Oil, Inc.

By: _____
Name:     Wade Stubblefield
Title:      Chief Restructuring Officer

Prepared by:

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         james.sprayregen@kirkland.com
               ryan.bennett@kirkland.com
               travis.bayer@kirkland.com

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:         ljones@pszjlaw.com
               crobinson@pszjlaw.com
               jmulvihill@pszjlaw.com

*Counsel to the Debtors*